No. 80,920

STATE OF KANSAS, *Appellee*, v. GARY W. KLEYPAS, *Appellant*.

(40 P.3d 139)

900

Opinion filed December 28, 2001.

*Jessica R. Kunen*, chief appellate defender, and *Steven R. Zinn*, deputy appellate defender, argued the cause, and *Rebecca E. Woodman, Reid T. Nelson*, and *Kirk C. Redmond*, assistant appellate defenders, and *David Gottlieb*, of Kansas Defender Project, of Lawrence, were with them on the briefs for appellant.

*Carla J. Stovall*, attorney general, argued the cause, and *David B. Debenham* and *Julene L. Miller*, deputy attorneys general; *Alexander M. Walczak, Athena E. Andaya, John K. Bork*, and *Jared S. Maag*, assistant attorneys general; and *Stephen R. McAllister*, special assistant attorney general, were with them on the briefs for appellee.

*Stephen P. Garvey, John H. Blume III*, and *Sheri Lynn Johnson*, of Ithaca, New York, were on the brief for *amicus curiae* Cornell Death Penalty Project.

*Andrea D. Lyon*, of Ann Arbor, Michigan, was on the brief for *amicus curiae* National Association of Criminal Defense Lawyers.

*Paige A. Nichols*, of Lawrence, was on the brief for *amicus curiae* Kansas Association of Criminal Defense Lawyers.

*Kent S. Scheidegger*, of Sacramento, California, was on the brief for *amicus curiae* Criminal Justice Legal Foundation.

The opinion of the court was delivered by

*Per Curiam*: Gary W. Kleypas was sentenced to death for the murder of C.W. He appeals, claiming errors occurred in the jury's determination of his guilt and that death should be imposed. He also raises what he claims are constitutional deficiencies with Kansas statutes authorizing imposition of the death penalty. We conclude that no reversible error occurred during the guilt phase of the trial and affirm all of Kleypas' convictions. We conclude that imposition of the death penalty must be vacated because of an instructional error. We remand for another separate sentencing proceeding to determine whether Kleypas should be sentenced to death.

The Kansas Legislature enacted a death penalty in 1994. See K.S.A. 21-3439; K.S.A. 21-4624. This case represents the first court

challenge under the enactment. Kansas law requires an automatic review by this court for anyone who has been sentenced to death under Kansas law:

"(a) A judgment of conviction resulting in a sentence of death shall be subject to automatic review by and appeal to the supreme court of Kansas in the manner provided by the applicable statutes and rules of the supreme court governing appellate procedure. The review and appeal shall be expedited in every manner consistent with the proper presentation thereof and given priority pursuant to the statutes and rules of the supreme court governing appellate procedure.

"(b) The supreme court of Kansas shall consider the question of sentence as well as any errors asserted in the review and appeal and shall be authorized to notice unassigned errors appearing of record if the ends of justice would be served thereby.

"(c) With regard to the sentence, the court shall determine:
 (1) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and
 (2) whether the evidence supports the findings that an aggravating circumstance or circumstances existed and that any mitigating circumstances were insufficient to outweigh the aggravating circumstances.

"(d) The court shall be authorized to enter such orders as are necessary to effect a proper and complete disposition of the review and appeal." K.S.A. 21-4627.

We will consider in this opinion Kleypas' assigned errors, as well as our responsibilities under K.S.A. 21-4627, in three parts. Part one deals with issues arising in the guilt or innocence phase of the trial. This phase is, with few exceptions, analogous to the trial in a non-death penalty case. Part two, the penalty phase, concerns the constitutional challenges against the Kansas death penalty. Finally, part three, which is operative only if an accused is convicted of capital murder in the guilt phase, concerns whether the death penalty shall be imposed.

## FACTS

On March 30, 1996, the body of Pittsburg State University student C.W. was discovered in the bedroom of her apartment at 113 W. Lindburg in Pittsburg, Kansas. She had been stabbed seven times through the heart, and her liver had been badly damaged, possibly by stomping. Her body was heavily bruised and her jaw was fractured. She also had a wound over her eyebrow that was caused by a sharp object. Socks tied to a chair in the bedroom,

along with socks tied to C.W.'s right leg, indicated that C.W. had been tied to the chair at one point. There was also evidence that C.W. had been sodomized by some object, and there were body fluids on her shirt.

On several occasions prior to the murder, C.W. and her roommate, Robyn, had returned to the apartment to find the door open. In September 1995, money and Robyn's camera were stolen from the apartment. At the time it was stolen, the camera had contained film with photographs Robyn had taken on a trip to Padre Island, Texas. The camera also had sand in the viewfinder as the result of that trip. C.W. and Robyn requested that the lock to their apartment be changed as a result of the break-ins.

C.W. and Robyn had also been receiving obscene telephone calls from an unidentified male caller. The caller indicated that he knew their names and wished to engage in anal intercourse with C.W. After Robyn reported the calls to police, C.W.'s mother bought a caller identification unit for the apartment and the calls subsequently ceased.

On the night before the discovery of the body, C.W. and her best friend, Tiffany, had spent the evening watching a video in the apartment. C.W. dropped Tiffany off at her residence at approximately 1 a.m. The two made plans to go to garage sales at 8 a.m. that next morning. Mike, C.W.'s fiancee, returned an earlier call from C.W. shortly after 2 a.m. and spoke to her at that time.

When Tiffany arrived at the apartment at 8 a.m. to meet C.W., no one answered the door. Thinking C.W. had decided to sleep in, Tiffany went to a few garage sales alone. She then went to her house and attempted to call C.W. She left a message and continued to telephone because she knew C.W. was scheduled to work at J.C. Penney's sometime in the early afternoon. After calling Penney's and learning that C.W. was to report to work at 1 p.m. and then calling Mike, who told her that he had not heard from C.W., Tiffany decided to go to the apartment. When no one responded after she knocked on the doors and windows, she became alarmed and went next door to the apartment manager's residence. The manager and her son went with Tiffany, and they entered C.W.'s apartment. Tiffany began to call for C.W. Tiffany noticed that C.W.'s

bedroom door was closed, and she knew this was unusual. When she told the manager she was afraid, the manager offered to open the door but Tiffany continued. She called out to C.W., but no one answered, so she opened the door and saw the body on the floor.

Police found a footprint outside the kitchen window of the apartment. Another window and its frame had been broken and the screen removed. The screen was found in the trash behind the apartment and a piece of screen was also found in the bedroom clothes hamper. There was blood on the inside doorknob of the apartment and a bloody handprint on the wall. Blood on a pillow in the bedroom was consistent with someone holding a pillow over the mouth of a person who was bleeding.

Suspicion focused on Kleypas, a neighbor of C.W. Kleypas was also a student at Pittsburg State University and had helped his cousin, a maintenance man, provide service for the neighboring apartment buildings. The police discovered that Kleypas' telephone number had registered on the caller ID in C.W.'s apartment at 1:48 on the morning of the murder. One of the officers recognized the name and knew that Kleypas lived nearby and was on parole for a prior murder. A neighbor found a roll of film on the ground beside Kleypas' car on the morning of the murder. The developed roll contained photographs of Robyn and her friends and three photographs of the inside of Kleypas' apartment.

Officers went to Kleypas' apartment building where they discovered blood on the outer door. A search warrant was obtained and the scene sealed. After the warrant arrived at the scene, officers discovered that the portion of the warrant which contained the list of items to be seized was blank. The officers present conferred and determined that the affidavit could be read together with the warrant. The officers entering Kleypas' apartment were briefed on the items to be seized that were listed in the affidavit. Inside Kleypas' apartment, police collected serological evidence and seized a large quantity of physical evidence, including a shower curtain, a pair of shoes, papers identifying Kleypas as the resident, drug paraphernalia, answering machine tapes, photographs, an empty bottle of Canadian Mist, and a wooden box with a false

bottom containing syringes. More drug paraphernalia was found in a hidden space outside the apartment door to Kleypas' unit.

Between 7 and 9 on the morning of the murder, Kleypas went to two stores, writing checks at both for cash. He also withdrew $100 from his bank account and left town.

By that evening, Crawford County Attorney Barry Disney became aware that Kleypas was a suspect. Over the next 2 days, Disney discovered that a report had been filed in 1994 against Kleypas alleging rape and that he had decided not to file charges because he did not think he could win the case. Upon reconsideration, Disney decided to file charges for the 1994 rape. An arrest warrant was issued and Kleypas' name was entered into a national law enforcement database.

On April 1, 1996, Agent Tom Williams of the Kansas Bureau of Investigation (KBI) was contacted by the Springfield, Missouri, Police Department and advised that Kleypas was in custody. Springfield police officers had been called to the Silver Saddle Motel on April 1 regarding an individual who was attempting suicide. Officers entered the motel room to find blood everywhere and John Kleypas, the brother of Gary Kleypas, standing above Gary Kleypas, and holding him down. The officers ordered John Kleypas from the room. As he left, Gary Kleypas dashed into the bathroom, he had so much blood on his body that officers could not identify his wounds.

Gary Kleypas was ordered from the bathroom. He reached into the waistband of his sweat pants and officers pulled their sidearms. Kleypas continued to reach inside his pants as if looking for something. After he was ordered to remove his hands, he held up his hands and one of the officers could see that he was holding a razor blade. Kleypas said over his shoulder that the officers should just go ahead and shoot him. An officer attempted to mace Kleypas but Kleypas stepped into the bathtub, pulled the shower curtain around his head, and began cutting himself on the legs and ankles. Kleypas then leaned back, and the officer sprayed mace directly into his face. Kleypas crawled out of the bathtub as ordered and collapsed in the doorway as he was crawling out of the bathroom. Medical personnel took him to the hospital.

A search of the motel room uncovered several items, including a bloody check with a note on it that stated "Check brain. Full autopsy please." They also found narcotics and needles with the plungers pushed in, a bag containing acne medication, a Wal-Mart receipt, and a camera with sand in the viewfinder. Several officers, including KBI Agent Tom Williams and Detective Stuart Hite of the Crawford County Sheriff's Department, traveled to Springfield. Agent Williams and Detective Hite visited Kleypas at the hospital where he had been admitted for treatment of his wounds. When they inquired of Kleypas how he was doing, Kleypas told them that it would have been better if "this" had worked and held up his bandaged arms. He told them he did not wish to talk to them at that time.

Upon release from the hospital, Kleypas was taken to the Green County, Missouri, Sheriff's Office for booking and was read his rights. He waived extradition to Kansas. Kleypas told Agent Williams and Detective Hite that they should wait to question him until during the ride back to Kansas. Kleypas, Detective Hite, and Agent Williams returned to Girard, Kansas, by car.

In the car, Kleypas admitted that he had killed C.W. Kleypas told the officers that he had entered the front door after ringing the door bell. C.W. answered the door, and Kleypas forced his way in with a filet knife. He forced C.W. into her bedroom and tied her to a chair. When he attempted to tie her hands, she panicked. She told him that if he would leave she would give him a head start before calling police. After being told he had been identified on the caller ID, Kleypas admitted making the telephone calls to the apartment. He said that he had called the night prior to the murder but did not recall saying anything.

Once in Girard at the Crawford County Sheriff's Office, Kleypas agreed to give the officers further details. Kleypas said he first attempted to enter the apartment through the front window. He had taken the screen off and the window broke. He took the screen to a trash can in the alley and then went to the front door. When Kleypas rang the bell the first time, C.W. peered out and called out for Mike, her fiancee. She said she knew it was Mike and said he should stop horsing around. She went back inside and Kleypas

rang the bell again. When she answered, he forced himself inside. He said he might have slapped C.W. and that they ran into the couch in the living room. He forced her into the bedroom and made her undress. Kleypas used socks to bind C.W. He attempted intercourse but was unable to obtain an erection. He said he penetrated her vaginally with his fingers. He also admitted that he had been watching C.W. and her roommate and had been making obscene telephone calls to them.

After he put his fingers into her vagina, Kleypas allowed C.W. to dress. She asked him to leave and said she would give him a head start. At some point, C.W. said she recognized him as the man who lived in the green house down the street. After he unplugged the telephone from the wall, there was a struggle because C.W. did not want her hands bound.

When C.W. became free of the chair, Kleypas tried to strangle her with his hands but that did not work. He took a piece of clothing and stuffed it into her mouth. When that was not successful, Kleypas found the knife and stabbed her repeatedly in the chest. He then took the engagement ring from her finger and some of the contents from her purse and left the apartment. Kleypas said he later disposed of some of the clothing he wore that night and other items by dropping them into a dumpster at a Springfield car wash, but he was uncertain what happened to the ring and it was never found.

Kleypas told the officers that after the murder he returned to his apartment, took a shower, and waited for stores to open before writing checks and leaving town. Kleypas also admitted taking the camera. He said that he wanted to plead guilty and spend the rest of his life in prison.

Kleypas was asked to make a written statement, but when he learned that it would take time to get a stenographer, he agreed to a videotaped statement if it was kept short, if he was not interrogated on tape, and if he could review the questions before taping. During the videotaped statement, Kleypas added that after he had tied up C.W., he sat on the bed for a time thinking about what to do.

Kleypas was originally charged with first-degree murder, rape, aggravated criminal sodomy, aggravated robbery, aggravated burglary, burglary of a dwelling, and theft. He was notified in accordance with K.S.A. 21-4624(a) that the State would pursue the death penalty for capital murder.

The jury found Kleypas guilty of capital murder, attempted rape, and one count of aggravated burglary. Upon conclusion of the separate sentencing proceeding the jury, by unanimous vote, found beyond a reasonable doubt the following three aggravating circumstances: (1) Kleypas was previously convicted of a felony in which he inflicted great bodily harm, disfigurement, dismemberment, or death on another, (2) Kleypas committed the crime in order to avoid or prevent a lawful arrest or prosecution, and (3) Kleypas committed the crime in an especially heinous, atrocious, or cruel manner. The jury further found beyond a reasonable doubt that the existence of such aggravating circumstances were not outweighed by any mitigating circumstances which were found to exist. The jury determined that Kleypas should be sentenced to death. Kleypas filed a motion to recall the jurors and a motion for new trial which were denied by the trial court. Additional facts will be presented as necessary to address the issues raised.

## PART I—GUILT PHASE

Kleypas raises the following issues challenging his convictions:
Ability to Present a Complete Defense Regarding Confabulation
Admissibility of Kleypas' Confession
Validity of Search Warrant
Validity of Arrest Warrant
The Trial Court's Failure to Suppress DNA Evidence
The Felony-Murder Jury Instruction
The Instruction on Attempted Rape
Failure to Instruct on Simple Battery
Instruction on Voluntary Intoxication
Instruction Regarding State's Failure to Timely Notify Kleypas
of Change in Testimony
Whether K.S.A. 21-3439(a)(4) Makes a Killing Occurring During an Attempted Rape Subject to the Death Penalty

Prosecutorial Misconduct in the Guilt Phase

Jury Misconduct

Sufficiency of Notice to Seek the Death Penalty and Failure to Provide a Pretrial Ruling on Whether Sufficient Evidence Existed to Support Aggravating Circumstances

Competency to Stand Trial

Removal of Prospective Juror Molden for Cause—United States Constitution.

Removal of Five Jurors for Cause—Kansas Constitution

Denial of a Separate Sentencing Jury

Alleged Judicial Misconduct During Jury Orientation

Alleged *Batson* Violation for Peremptory Strike Juror Wheeler

Cumulative Error in the Guilt Phase

## Issue 1. Ability to Present a Complete Defense Regarding Confabulation

Before trial, a full evidentiary hearing was held on Kleypas' motion to suppress his confession. The videotaped confession detailed Kleypas' actions on the evening of March 29 and the early morning hours of March 30 when C.W. was murdered. The trial court determined that this videotaped confession was freely and voluntarily given. The confession was admitted at trial and shown to the jury.

At trial, Kleypas challenged the reliability and weight to be given to his confession. His expert witnesses sought to establish that he experienced a blackout during the evening and morning of the murder, that his memory of the events related by his confession was impaired, and that the events he related were at least in part supplied by the officers who interrogated him on the return trip to Kansas. More specifically, Kleypas claimed that his confession was, at least in part, the product of confabulation. Confabulation was explained in depth by Kleypas' expert witnesses as the process where one who has little or no memory of events occurring because of a blackout will gather information from outside sources to fill in the gaps in memory.

Defense expert witness Dr. John Wisner, an associate professor of psychiatry at the University of Kansas School of Medicine, testified regarding the concept of confabulation:

"Confabulation is what happens when the brain tries to make up for missing information, tries to fill in missing pieces of data. It is part of a natural reflex that we use just, for example, in vision. There is a hole if you cover up one eye and use only one eye to look at the world, there is actually a hole in your visual field where the nerve comes into the eye. There [are] no sensors there for light. But if you close your eye and look, you are not aware that there is a big hole there. The brain fills in missing information. It slides stuff in from the edges so that we are not aware of the gap. That is what also happens when there is a memory lacuna [hole], when there is a gap in memory, the brain literally will try to bring in extraneous information, little bits and pieces from elsewhere so as to ignore or fill in this big chuckhole in memory."

Dr. Wisner thoroughly explained the process involved in confabulation to the jury. According to Dr. Wisner, there is a danger in questioning someone who has experienced a blackout by using leading questions or hypothetical questions because the question will contain a part of the answer. He described for the jury the difference between lying and confabulation:

"Well, they are completely different. In lying a person knows information and either contradicts it or makes something else up. It is a conscious, knowing act. Confabulation is literally a reflex. It is going to happen whether you want it to or not and if the circumstances are right, it is almost sure to happen."

Blackouts and confabulation were thoroughly explored in Kleypas' direct examination of Dr. Wisner. No limitation was imposed by the court on his testimony.

Following Dr. Wisner, Kleypas called another clinical professor of psychiatry from the University of Kansas School of Medicine, Dr. Ekkehard Othmer. During direct examination, Dr. Othmer was asked if in his medical opinion Kleypas had suffered a blackout during the period of time surrounding the 29th and 30th of March 1996. An objection was made by the State on the basis that the answer to this question related to the criminal responsibility of Kleypas for the acts he committed on those dates. More specifically, the State argued that while Kleypas had initially notified the State under the provisions of K.S.A. 22-3219 that he would rely on evidence of a mental disease or defect excluding criminal responsibility, Kleypas later withdrew this notice.

An extended hearing was conducted outside the presence of the jury on the admissibility of the answer of Dr. Othmer. Notwith-

standing the argument of Kleypas that he was seeking admission of Dr. Othmer's answer to attack the credibility of his confession on the basis that it was a product of confabulation, the trial court viewed admission of such evidence as an attempt by Kleypas to rely on the defense of lack of mental state to establish his lack of criminal responsibility for his acts on the 29th and 30th of March 1996. Had Kleypas not withdrawn his notice to rely on the mental disease or defect provisions of K.S.A. 22-3219, the State would have been entitled to have Kleypas examined by a psychiatrist of its own choosing to rebut such evidence. The court viewed Kleypas' attempt as an indirect attempt to circumvent the provisions of K.S.A. 22-3219, by raising a very technical defense which the trial court characterized as "fundamentally unfair" and as an ambush. After much discussion and argument, the trial court concluded:

"The Court would deny that and the Court will order as follows. The defendant will be allowed to provide information to the jury through Dr. Othmer's testimony regarding whether or not the defendant was suffering from some sort of black out during that period of time that he gave his confession or his statement so as to induce him or so as to make him prone to confabulate. The defendant seeks to go further than that and explore through this testimony the defendant's state of mind at the time of the matter in question that violates 22-3219. The defendant previously had filed a notice of intent to rely upon the defense of lack of mental state. The defendant later withdrew that request and the court ordered that pursuant to that statute the State would have the opportunity to subject the defendant to its own expert examination.

"Upon being advised of that, the defendant withdrew its notice of the intent to rely upon that statute. The defendant seeks to essentially through the back door get into evidence that sort of information. This is fundamentally unfair to the State. The State has not had the opportunity to examine the defendant as to his state of mind. This is complex information, complex testimony. The State has a right to examine the defendant and, frankly, Mr. Moots [defense counsel], the Court continues to believe that no matter how you phrase it, you are trying to introduce testimony regarding the defendant's state of mind the day in question and, in fact, you have told me you were wanting to introduce the defendant's state of mind on the 29th and 30th.

"If you can limit it to the—to April 2 when the defendant gave his alleged statement and whether or not he was suffering from some sort of mental state that would make him prone to confabulate on April 2, I will allow that but anything beyond that you've gone too far and the Court would not specifically allow that."

Thus, Kleypas was prevented by the ruling of the court from inquiring about his state of mind on the 29th and 30th of March, but was allowed to inquire into his state of mind subsequent to the time of the offenses. The crux of Kleypas' claim is that he was denied his constitutional right to present a complete defense because the court precluded meaningful questioning of Dr. Othmer regarding whether Kleypas' statement to the police was confabulated.

After the trial court's ruling, direct examination of Dr. Othmer continued and Kleypas was able to fully develop his theory that his confession was in part the result of confabulation. Dr. Othmer testified at length concerning confabulation, indicating to the jury that the method of asking questions used in Kleypas' case, including urging him that the two families needed answers and that confession was good for the soul, increased the likelihood of confabulation. Dr. Othmer testified that Kleypas was much more susceptible to confabulation than an ordinary person. Finally, defense counsel asked Dr. Othmer:

"Q. Did the recorded interview that you watched, the twelve minute videotape, allow you to make any medical or psychiatric conclusions about what you believed occurred during the unrecorded statements?

"A. It is clearly a rehearsal. It is clearly picking out certain things from what went on—what went on before because these questions connect poorly. In a live interview, in a naturalistic interview, you pick up the clues from the—from the respondent and this is here missing as I showed with this one question like out of the blue these questions seemed to comment, you wonder where is the connection, where is it coming come from, what does a suspect tell you to prompt such a question.

"Q. Without knowing the exact form of the questions that were asked of Mr. Kleypas in the car, can you tell whether or not Agent Williams and Detective Hite provided him information that allowed him to confabulate parts of his statement to them?

"A. Yes, several of these questions contain information that Mr. Williams and Mr. Hite knew as a fact and they introduced that. Whether that is Mr. Kleypas' true recollection or not is completely unclear.

"Q. Okay. So the form of the question is very important when you are dealing with somebody who may be confabulating at least parts of their statements?

"A. Absolutely. You want to be as open ended as possible and not suggest any facts.

"Q. Okay. And since there is no recording of the earlier statements, can you tell what information was implanted for Mr. Kleypas and what was his own autonomous recollection?

"A. Well, that is difficult to do. Each of the questions that he was asked may have been his recollection, may not have been his recollection, so it is so confounded with the interview technique, that the results are very questionable to me."

With these facts in mind, we turn to our analysis of this issue. Our standard of review concerning this claimed error involves the interpretation of K.S.A. 22-3219, as well as a determination whether, based on the evidence of record, Kleypas was denied his constitutional right to present a complete defense.

K.S.A. 22-3219 provides:

"Evidence of mental disease or defect excluding criminal responsibility is not admissible upon a trial unless the defendant serves upon the prosecuting attorney and files with the court a written notice of such defendant's intention to assert the defense that the defendant, as a result of mental disease or defect lacked the mental state required as an element of the offense charged."

Kleypas initially invoked the above provision but then withdrew his notice prior to trial. The trial court concluded Dr. Othmer's testimony as to a blackout at the time of the offenses charged amounted to evidence of mental disease or defect and was therefore inadmissible. At the same time, both Dr. Wisner and Dr. Othmer were given wide latitude in their testimony concerning confabulation. Dr. Othmer was allowed to give his opinion that Kleypas' confession was in part the product of confabulation.

Our prior cases draw a clear distinction between a defense of insanity and voluntary intoxication. See *In re Habeas Corpus Petition of Mason*, 245 Kan. 111, 113, 775 P.2d 179 (1989). In *Mason*, we stated:

"We have recognized that insanity and voluntary intoxication are two separate defenses. In *State v. Seely*, 212 Kan. 195, 200, 510 P.2d 115 (1973), we held the defendant was not entitled to an insanity instruction because the evidence showed 'alcohol was the key factor in [the defendant's] loss of control and the *sina qua non* of all of his difficulties.' We held ' "mental incapacity produced by voluntary intoxication, existing only temporarily at the time of the criminal offense" ' does not reach the level of insanity. 212 Kan. at 197.

. . . .

"To hold that evidence of a temporary mental condition caused by voluntary intoxication requires the defense to plead insanity would be to abolish the distinctions between the two defenses clearly laid out by statute and our cases. No notice of an insanity defense is required where the evidence points only to a temporary mental state negating specific intent caused by the voluntary consumption of alcohol. The trial court thus erred in declaring a mistrial." 245 Kan. at 113-14.

The trial court in *Mason* had ordered a mistrial because defense counsel had in its opening statement told the jury that the evidence would show that Mason was incapable of forming intent because of his alcohol consumption. Similar to the trial court's ruling in the case we now review, the court in *Mason* found that evidence supporting the defense theory of a blackout, including Mason's previous history with alcohol, was evidence of mental illness amounting to insanity rather than simply evidence of voluntary intoxication. On appeal, this court reversed and drew a distinction between the defenses of insanity and voluntary intoxication, holding that evidence that a defendant suffered a blackout as a result of alcohol abuse, when introduced to show lack of intent, was not subject to the notice requirements of K.S.A. 22-3219. 245 Kan. at 114.

There is a difference between the claim of Kleypas and that in *Mason*. Kleypas' claim of a blackout involved not only alcohol but chronic cocaine use and organic brain damage. These additional claims obviously influenced the trial court's decision. Nevertheless, based on *Mason* and the cases cited therein, together with our consideration of K.S.A. 22-3219, we conclude that the trial court erred by not allowing Dr. Othmer to express his opinion as to whether Kleypas experienced a blackout at the time of the offenses.

The question we must answer is whether this error prevented Kleypas from presenting a complete defense and denied him a fair trial. See *Crane v. Kentucky*, 476 U.S. 683, 690-91, 90 L. Ed. 2d 636, 106 S. Ct. 2142 (1986) (holding that the exclusion of evidence which denied the defendant an opportunity to present a defense is subject to harmless error analysis).

In *Crane*, the prosecutor stressed in his opening statement that the Commonwealth's case rested almost entirely on the defend-

ant's confession. In response, defense counsel outlined what would prove to be the principal avenue of defense—that for a number of reasons, the defendant's confession should not be believed because it was rife with inconsistencies. In response to the prosecutor's motion in limine to exclude such testimony, "the court expressly held that the defense could inquire into the inconsistencies contained in the confession, but would not be permitted to 'develop in front of the jury' any evidence about the duration of the interrogation or the individuals who were in attendance." 476 U.S. at 686. The United States Supreme Court reversed on the basis that the defendant was denied due process of law. The Court noted that the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense and stated:

"That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.' [Citations omitted]." 476 U.S. at 690-91.

Similarly, in *U. S. v. Hall*, 93 F.3d 1337 (7th Cir. 1996), the 7th Circuit Court of Appeals reversed the defendant's conviction where the trial court did not allow expert testimony that the defendant's personality disorder could cause the defendant to give a false confession. The trial court entirely excluded expert testimony from a psychologist on false confessions, the indicia experts have identified to demonstrate when a false confession is likely to occur, and the factors experts rely on to distinguish between reliable and unreliable confessions. The court further limited the testimony of a psychiatrist, allowing him to testify about the defendant's mental condition but not about the defendant's susceptibility to various interrogation techniques and his capability of confessing to a crime he did not commit.

Unlike *Crane* and *Hall*, in this case Dr. Wisner testified extensively on the psychiatric medical aspects of blackouts and the possibility of later confabulation. Dr. Othmer testified that it was his opinion that Kleypas' confession was at least in part confabulated

and gave the basis of his opinion. While Kleypas claims that the exclusion of testimony concerning his blackout on the night of the murder denied him the right to present his defense, he was able to show that he had been drinking before the crimes, that there was evidence of extensive cocaine use prior to the night of the murder, and that he suffered from organic brain damage, all of which increased his chances of a blackout and the likelihood that the confession was the product of confabulation. When this evidence is considered with the testimony of Dr. Wisner and Dr. Othmer, it becomes clear that Kleypas was given the opportunity to convince the jury that his confession was in part confabulated. The limitations imposed by the court did not, in our opinion, prevent Kleypas from presenting his theory of defense to the jury, and we are able to conclude beyond a reasonable doubt that the error had little if any effect on the outcome.

## Issue 2. Admissibility of Kleypas' Confession

Kleypas filed a motion to suppress statements made to officers during the automobile trip from Missouri to Kansas, and the videotaped statement made to officers after he arrived in Girard. He claims that these statements were involuntary. Hearings were held during 3 days in September 1996 on Kleypas' motion. The trial court denied Kleypas' motion in a written opinion setting forth its findings of fact and conclusions of law. Thereafter, Kleypas raised additional contentions concerning his statements which were denied by the trial court after a further hearing on May 16, 1997.

Kleypas raises three points in this appeal: (1) His statements made shortly after his release from the hospital were involuntary because of his mental condition and an alleged threat by the interrogating officer, (2) the officers ignored his attempt to end the interrogation, and (3) his statements should be stricken because of alleged misconduct on the part of the State.

The standard of review to be applied in assessing Kleypas' claims is well established:

"Factors to be considered in determining whether a confession is voluntary include: (1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused on request to communicate with the

outside world; (4) the accused's age, intellect, and background; and (5) the fairness of the officers in conducting the investigation. See *State v. Esquivel-Hernandez,* 266 Kan. 821, 975 P.2d 254 (1999); *State v. Speed,* 265 Kan. 26, 34-35, 961 P.2d 13 (1998). Voluntariness of a confession is determined from the totality of the circumstances, and where a trial court conducts a full prehearing on the admissibility of extrajudicial statements by the accused, determines the statements were freely and voluntarily given, and admits the statements into evidence at trial, appellate courts accept that determination if supported by substantial competent evidence and do not attempt to reweigh the evidence. [Citation omitted.]" *State v. McCorkendale,* 267 Kan. 263, 270-71, 979 P.2d 1239 (1999).

The trial court's determination that Kleypas' statements were made freely and voluntarily is supported by substantial competent evidence. In making its decision, the trial court considered all factors relating to voluntariness as set forth by this court in *Esquivel-Hernandez* and *Speed.*

The trial court's decision did not expressly address Kleypas' second allegation that the officers ignored his attempt to end the interrogation. However, we find no merit in this contention. Kleypas makes reference to his statement made during the ride from Missouri to Kansas, which was recorded. In his statement, Kleypas said: "I think that might be all for you." He claims that this statement constituted an unambiguous assertion of his desire to end the interview. We disagree and conclude that the above statement, either standing alone or in context, was not an unambiguous assertion of a desire to end the interview.

"When a suspect makes a statement which may be ambiguous as to whether the suspect is asserting a right to remain silent, the interrogator may, but is not required to, ask questions to clarify and instead may continue questioning. [Citations omitted.]" *McCorkendale,* 267 Kan. at 273. Kleypas did not unambiguously assert his right to remain silent, *Michigan v. Mosley,* 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975), and *State v. Matson,* 260 Kan. 366, 375, 921 P.2d 790 (1996), which would have required the officers to 'scrupulously honor' that right and cease the interrogation, were not implicated. Instead, his statement was at best ambiguous, thus, permitting the officers to continue their questioning or make an attempt to clarify Kleypas' meaning.

Finally, Kleypas claims that his statements made during the ride back to Kansas from Missouri should be struck because of misconduct on the part of the State. After the court's original ruling on the motion to suppress, the audiotape of the trip back was enhanced by the Federal Bureau of Investigation (FBI). The enhanced version included one of the officers in the car saying: "Are we going to have to get out and walk?" Kleypas filed a supplemental motion to suppress, arguing that this phrase constituted a threat that he would be forced to get out and walk if he did not confess. At the hearing, KBI Agent Williams could not recall making such a statement. Ultimately, Detective Hite recalled that he had made the statement in reference to the small amount of gas left in the car. The court held that the statement was not a threat.

However, after the hearing, Agent Williams listened to the tape and at trial testified that he was the one who had made the statement. The State made no attempt to communicate this to defense counsel. Kleypas asserts that this misconduct on the part of the State should have been sanctioned by suppressing the confession.

The trial court concluded with ample evidentiary support in the record that there was no coercive interrogation of the defendant and no purposefully false testimony by the State that would invalidate the defendant's statement. The record is devoid of evidence to suggest that there was bad faith or a deliberate withholding of the change in Agent Williams' testimony by the prosecution. The court ultimately instructed the jury that it could consider the State's failure to notify defense counsel of the change in testimony when determining the credibility of the witnesses. The findings of the trial court are supported in the record and there is no evidence to support exclusion of Kleypas' confession. We conclude that the court did not err in admitting Kleypas' confession.

Issue 3. Validity of Search Warrant

The trial court found that the search warrant was invalid and not cured by the affidavit in support of the warrant, but that the good faith exception applied and suppression of all the evidence uncovered was not warranted. Kleypas contends that the trial court erred in failing to suppress all of the items taken in the search of his

residence. He argues that the search warrant was invalid because it failed to list the items to be seized, that this failure was not cured by the affidavit, and that the officers far exceeded the scope of the search, thus, rendering the good faith exception unavailable.

The factual findings of the trial court are not in dispute. "When the facts material to a decision of the court on a motion to suppress evidence are not in dispute, the question of whether to suppress becomes a question of law. [Citation omitted.] An appellate court's scope of review on questions of law is unlimited." *State v. Anderson*, 259 Kan. 16, 18, 910 P.2d 180 (1996).

A search warrant was issued for Kleypas' residence at 117 W. Lindburg in Pittsburg. The affidavit in support of the search warrant specifically listed the items to be seized with particularity: "[T]race evidence from the murder victim . . . including but not limited to hair fiber of the [victim], fabric fiber from the clothing of the [victim], . . . any trace evidence from the body, blood from the victim, [and] weapons used in the murder." However, the portion of the actual warrant which references the items to be seized was left blank. When officers at the scene noticed the blank portion of the warrant, Officer Rosebrough, the attesting officer, brought the supporting affidavit to 117 W. Lindburg. After the officers discussed the omission and reviewed the affidavit, they decided the warrant was valid because the supporting affidavit listed the items to be seized with particularity. The specific items were discussed so the officers would know exactly what to seize. Officer Rosebrough did not enter 117 W. Lindburg because of the adopted policy that anyone entering the crime scene at 113 W. Lindburg would not enter the one at 117 W. Lindburg to prevent cross-contamination.

The officers found a crack pipe in a ceiling duct located in a public hallway outside the door to Kleypas' apartment.

Upon entering the apartment, officers photographed the interior, then exited and sealed the apartment awaiting KBI lab analysts. KBI lab technicians entered the apartment later the same day, March 31, 1996, and recovered various items of potential evidence including alleged blood residue.

Officers then reentered the apartment on April 3 to complete the search and specifically to seize the items listed on the affidavit. By this time, the officers were aware that Kleypas had given a statement claiming that he discarded the weapon.

During the search, officers seized items specifically listed and items with apparent blood residue on them. Some items such as shoes and clothing were seized to determine if any blood residue or other trace evidence might be found. Other items such as the telephone answering machine with cassette and videotapes were seized to determine if they revealed any connection between Kleypas and C.W. The officers were aware at this time that C.W.'s caller ID showed a call from Kleypas' apartment on the night of the homicide.

Officers also seized several boxes containing Kleypas' personal effects such as memorabilia, pictures of Kleypas and others, private papers, jewelry, and other mementos as revealed in the inventory. The trial court found these items were seized because they contained documentation verifying Kleypas as the occupant of the apartment. Though not all this paraphernalia proved identity, the officers did not individually examine every item prior to seizure; rather, if a box or packet contained items showing the identity of the occupant of the apartment, the officers seized the entire box or packet. The supervisor of the search team, KBI Agent Adams, believed all items seized had potential evidentiary value.

Officers also found drugs and drug paraphernalia during the search.

The trial court concluded that while an affidavit could be used to cure an insufficient description of the items to be seized in the search warrant, the affidavit must be referenced in the warrant to do so. The court also found that while the officers exceeded the scope of the items described in the affidavit, this conduct did not require the suppression of all the evidence seized. Rather, the trial court ordered that any items not contained in the affidavit be suppressed.

Both the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights protect the rights of the people against unreasonable searches, and both provide that

"no [w]arrant[s] shall issue, but upon probable cause, supported by [o]ath or affirmation, [and] particularly describing the place to be searched and the persons or [property] to be seized." U.S. Const. amend. IV; Kan. Const. Bill of Rights, § 15. K.S.A. 22-2502(a) also requires a search warrant to particularly describe a person, place, or means of conveyance to be searched and things to be seized.

"The purpose of the constitutional requirement that search warrants particularly describe the place to be searched and the person or property to be seized is to prevent general searches and the seizure of items at the discretion of the officer executing the warrant." *State v. LeFort*, 248 Kan. 332, Syl. ¶ 1, 806 P.2d 986 (1991). " '[I]t is constitutionally required that a search warrant shall "particularly" describe the place to be searched. Thus general or blanket warrants which give the executing officers *a roving commission* to search where they choose are forbidden.' (Emphasis added.)" 248 Kan. at 335 (quoting *State v. Gordon*, 221 Kan. 253, 258, 559 P.2d 312 [1977]). This particularity requirement is equally applicable to the specificity in the items to be seized. See *State v. Dye*, 250 Kan. 287, 293, 826 P.2d 500 (1992).

The question of whether an affidavit which does list the place to be searched or the items to be seized with particularity may be sufficient to cure an inadequate description in a search warrant has been answered in different ways by different jurisdictions and there is no real universal agreement. See *U. S. v. Morris*, 977 F.2d 677, 681 n.3 (1st Cir. 1992); *U. S. v. George*, 975 F.2d 72, 76 (2d Cir. 1992); *United States v. Johnson*, 690 F.2d 60, 64 (3d Cir. 1982); *U. S. v. Gahagan*, 865 F.2d 1490, 1496-98 (6th Cir. 1989); *U. S. v. Tagbering*, 985 F.2d 946, 950 (8th Cir. 1993); *U. S. v. Towne*, 997 F.2d 537, 548 (9th Cir. 1993); *United States v. Wuagneux*, 683 F.2d 1343, 1351 n.6 (11th Cir. 1982); *U. S. v. Maxwell*, 920 F.2d 1025, 1031-32 (D.C. Cir 1990); *People v. Staton*, 924 P.2d 127, 132 (Colo. 1996); *State v. Balduc*, 514 N.W.2d 607, 610 (Minn. App. 1994); *State v. Stenson*, 132 Wash. 2d 668, 696, 940 P.2d 1239 (1997).

In some cases, in order for an affidavit to cure a warrant which is defective for lack of specificity, the affidavit must be incorporated by reference in the warrant and present at the search. See *Towne*,

997 F.2d at 548; *Morris*, 977 F.2d at 681 n.3; *Maxwell*, 920 F.2d at 1031-32; *Johnson*, 690 F.2d at 64; *Staton*, 924 P.2d at 132; *Balduc*, 514 N.W.2d at 610. The court in *Towne* noted that this two-step rule serves two purposes. It assures that the affidavit actually limits the discretion of the officers executing the warrant and provides the person being searched of notice of the specific items the officer is entitled to seize. 997 F.2d at 548. In others, express incorporation is not necessary if the affidavit is available at the scene. See *Gahagan*, 865 F.2d at 1496-98; *Tagbering*, 985 F.2d at 950. See also *Wuagneux*, 683 F.2d at 1351 n.6 (affidavit sufficient if either incorporated by reference, attached, or present at the scene). In still others, the affidavit must be actually attached to the warrant and incorporated in it. See *George*, 975 F.2d at 76; *Stenson*, 132 Wash. 2d at 696.

In Kansas, we have held that an affidavit may cure an omission in the search warrant even though the affidavit is not attached to the warrant or present at the scene, when the affiant was one of the executing officers. See *Dye*, 250 Kan. at 294-95; *LeFort*, 248 Kan. at 341 (both cases involving a search warrant that did not sufficiently describe the property to be searched.) In *LeFort*, we stated:

"In determining whether the description given the executing officer in the warrant was sufficient, the initial examination is directed to the description stated in the warrant. However, if the description in the warrant is inadequate due to a technical irregularity, the focus then shifts to the description contained in the application or affidavit for the warrant if the officers were able to use that description to execute the search warrant. When the officer executing the search warrant is the affiant who described the property to be searched, and the judge finds there was probable cause to search the property described by the affiant and the search is confined to the area which the affiant described in the affidavit, the search does not affect the substantial rights of the accused and is in compliance with the Fourth Amendment of the Constitution of the United States and Section Fifteen of the Kansas Bill of Rights." 248 Kan. at 341.

In the case at hand, although the affiant, Officer Rosebrough, did not actually execute the search warrant, he was present at the scene with the affidavit and the officers who executed the search warrant were briefed on the affidavit so they would know what to seize. There is no appreciable difference between the situation in

this case and those in *LeFort* and *Dye*. Indeed, the officers had more information in the case at hand because even though the affiant was not actually taking part in the search, he was at the scene along with the affidavit, which was not actually present in either *LeFort* or *Dye*. See *Dye*, 250 Kan. at 294. We, therefore, hold that where the affidavit contains a particularized description of the items to be seized; the affiant and the affidavit are both present at the scene of the execution of the search warrant, even if the affiant is not the person executing the search warrant; and the officers executing the search warrant are briefed as to the items listed in the affidavit, the description in the affidavit cures a deficiency in the description of the search warrant. The warrant was, therefore, valid, and the trial court erred in finding otherwise.

The question remaining is whether the seizure of items outside the scope of the warrant requires suppression of all the evidence seized. "When law enforcement officers grossly exceed the scope of a search warrant in seizing property, the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under that warrant." *U.S. v. Medlin (Medlin II)*, 842 F.2d 1194, 1199 (10th Cir. 1988). See *U.S. v. Foster*, 100 F.3d 846, 849-50 (10th Cir. 1996). However, "[a]n '[u]nlawful seizure of items outside a warrant does not alone render the whole search invalid and require suppression of all evidence seized, including that lawfully taken pursuant to the warrant.' [Citations omitted.]" *Gahagan*, 865 F.2d at 1496. Unless there is a flagrant disregard for the terms of the warrant, only the improperly seized evidence, rather than all the evidence, need be suppressed. See *Waller v. Georgia*, 467 U.S. 39, 43 n.3, 81 L. Ed. 2d 31, 104 S. Ct. 2210 (1984); *United States v. Medlin (Medlin I)*, 798 F.2d 407, 411 (10th Cir. 1986); *Wuagneux*, 683 F.2d at 1354.

After consideration of the evidence in this case, we agree with the trial court's suppression of only those items not mentioned in the affidavit. Although there were items seized outside the scope of the warrant, the officers' conduct did not evidence a "flagrant disregard" for its terms. Many of the items taken were taken because they identified Kleypas as the owner of the property or be-

cause they were in boxes with other items. However, there is no indication that the search rose to the level which the courts in *Medlin II* and *Foster* found to justify blanket suppression. See *Medlin II*, 842 F.2d at 1195-96 (667 items of property not identified in the warrant versus approximately 130 firearms seized in accordance with the warrant); *Foster*, 100 F.3d at 850 (officers admitted taking "anything of value" whether or not contained in the warrant). Under the facts of this case, blanket suppression was not warranted, and the trial court correctly suppressed only those items seized which were not identified in the search warrant.

Issue 4. Validity of Arrest Warrant

Crawford County Attorney Barry Disney based the warrant for Kleypas' arrest on the allegation of a rape that occurred in January 1994, rather than on the murder of C.W. Before the trial court and now on appeal, Kleypas claims that the affidavit in support of his arrest warrant omitted material matters and that the trial court erroneously relied on hearsay evidence at the suppression hearing. Thus, Kleypas claims that the arrest was illegal and that the trial court erred by denying his motion to suppress his statement and all other evidence derived from the arrest.

In order to analyze this issue, it is necessary to set forth facts regarding the alleged 1994 rape. The victim, D.J., was Kleypas' live-in girlfriend. The police were dispatched to the apartment that D.J. shared with Kleypas where she claimed Kleypas held her hostage for an hour and a half, threatened her with a knife, and raped her by digital penetration. The officers taking the report noted that D.J. appeared to have been drinking and may have been intoxicated. The officers noted also that D.J. appeared somewhat confused about what had happened and might not be telling the true story. There was also some inconsistency in D.J.'s story regarding whether Kleypas had a knife. At the time, Disney declined to prosecute the rape.

The affidavit filed by Disney in support of an arrest warrant based upon the 1994 incident provided:

"That on 1-23-94 Pittsburg Police received a call from a [D.J.]. Officer Joseph Head responded to [D.J.'s] location which was a residence just north of 1706 S.

Pine. [D.J.] advised Head that her and her boyfriend, Gary W. Kleypas, had been to J.B.'s Bar & Grill in Pittsburg, Kansas. After leaving J.B.'s they went to the home they mutually shared located at 1706 S. Pine, Pittsburg, Kansas. [D.J.] advised that once at the home she and Kleypas began to argue. [D.J.] advised Head that Kleypas had 'lost control' and held her hostage in the house for 1.5 hours. That during this 1.5 hours he had threatened her and had put his hands around her throat. [D.J.] further advised that Kleypas penetrated her rectum and vagina with his fingers. [D.J.] advised Head that she did not give Kleypas permission to put his finger in her rectum or vagina."

After a full and complete hearing, the trial court issued its memorandum decision finding that Disney declined to prosecute the rape in 1994 because he believed the case would be difficult to win and not because there was insufficient probable cause to support charges. The trial court further found that the following factors involving a reevaluation of the case with additional information prompted the reversal of Disney's position: (1) Disney was advised by the Pittsburg Chief of Police that he should have filed the rape charge in 1994, (2) KBI Special Agent Delaney interviewed D.J. after Kleypas became a suspect in C.W.'s death and indicated that D.J. still maintained that Kleypas had raped her in 1994, and Delaney stated that she would not be a "bad witness," (3) Delaney was able to clear up any confusion over whether Kleypas had a knife during the 1994 incident, (4) Kleypas was a suspect in both the 1994 rape and C.W.'s murder, which had apparent sexual overtones, and (5) Kleypas had been convicted and incarcerated in Missouri for a murder with sexual overtones.

Where a defendant attacks the affidavit supporting an arrest warrant based on the omission of material information, he or she must show: (1) The omission was deliberate, and (2) the omission was material. An omission is material if the original affidavit together with the previously omitted information would not support a finding of probable cause. *State v. Breazeale*, 238 Kan. 714, 725, 714 P.2d 1356, *cert. denied* 479 U.S. 846 (1986). Probable cause exists if, under the totality of circumstances as set forth in the affidavit, a fair probability exists that a crime has been committed and that the defendant has committed it. 238 Kan. at 726.

At trial, Kleypas submitted 15 alleged omissions. On appeal, he now relies upon the following three omissions from the affidavit

which he contends cast doubt on the veracity of the victim's allegation of rape: (1) The victim had provided inconsistent statements as to whether a knife had been used, (2) the victim had been drinking and could have been intoxicated, and (3) the investigating officer had concluded that the victim appeared confused and might not be telling the truth.

Our scope of review in regard to the alleged error is limited to determining whether substantial competent evidence supports the trial court's findings. *Breazeale*, 238 Kan. at 724. The trial court, in a well-reasoned opinion, specifically examined each alleged omission in the affidavit, outlined all the evidence relating to probable cause, and found that there was substantial competent evidence to support the issuance of the warrant even considering the omissions. The findings and conclusions of the trial court are amply supported by the record.

Kleypas also contends that the trial court incorrectly relied on inadmissible hearsay at the hearing on the motion to suppress, specifically, Disney's testimony regarding Delaney's conversation with D.J. However, it is clear that the trial court relied on the evidence not to prove the truth of the matter asserted therein but to show its effect on Disney's decision to file the charges in 1996 that he had not filed in 1994. As such, the testimony was not hearsay. See K.S.A. 60-460.

Under these circumstances, applying our standard of review, we affirm the trial court's denial of Kleypas' motion to suppress for lack of probable cause for the arrest warrant.

## Issue 5. The Trial Court's Failure to Suppress DNA Evidence

Kleypas argues that the trial court erred in failing to suppress the State's evidence regarding DNA testing by the FBI where the prosecutor failed to inform the FBI of the court's order to exercise good faith in using only that portion of any item necessary for testing. Kleypas contends that because the FBI consumed all the material in its testing, suppression is warranted.

The State sent numerous items to the FBI laboratory for DNA testing. Kleypas requested that the trial court allow him to also

examine the evidence. The trial court, in response, made the following order:

"[T]he State can conduct testing of evidentiary objects that consumes those objects, however, there is no need to simply destroy items of evidence. . . . You are free to conduct whatever testing you deem appropriate. Now, I will ask, indeed; I will order the State to exercise good faith. Don't unduly consume an evidentiary item. Use that portion of the item that is necessary for testing but don't just arbitrarily consume something completely unless such is necessary for the testing. So don't go overboard I guess is what I'm saying."

Of the items sent, one was a sock that had been tied around the victim's leg and another was a blue blanket recovered from beneath her body. The FBI totally consumed bloodstains from both items. At trial, the FBI serologist testified that there was a high statistical probability that Kleypas was the donor of the bloodstains found on the sock and blanket.

Prior to trial, Kleypas filed a motion to bar the DNA evidence. During hearings on this motion, experts presented conflicting evidence regarding the necessity of consuming all the available material for DNA testing. The experts estimated the sample from the sock and blanket yielded 200 and 400 nanograms of material for testing respectively. Kleypas' witnesses, Dr. Dean Stetler, a professor of microbiology, Chair of Genetics, and Director of Undergraduate Biological Sciences, at the University of Kansas, and Dr. Susan Egan, assistant professor in the University of Kansas Department of Microbiology and Program of Genetics, testified that a minimum of 50 nanograms was required to perform a Restriction Fragment Length Polymorphism (RFLP) test and only 250 picograms for the less specific Polymerase Chain Reaction (PCR) test. In Dr. Stetler's opinion, the FBI did not exercise good faith in attempting to preserve at least the minimum amount of material for independent testing by the defense. However, Dr. Stetler stated that 200 nanograms is often a target amount to assure more reliable results.

In rebuttal, Dr. Thomas Callahan, the forensic examiner for the FBI, testified that as a matter of unwritten protocol in DNA testing, his laboratory uses 200 nanograms of matter. If the items come from a crime scene, however, the lab prefers to use 400 nanograms.

Dr. Callahan testified that the State did not inform the FBI of the trial court's order to use good faith in any correspondence; however, the FBI consumed all the material from the items as a matter of routine procedure.

When questioned, Dr. Callahan recalled a telephone conversation with prosecutor John Bork, asking that the FBI preserve some material if possible. However, Bork authorized the FBI to use all of the bloodstained material if necessary for its DNA testing. After objection, the trial court agreed to strike the telephone conversation and not consider it in the court's decision.

In its memorandum decision, the trial court commented that the State should have clearly communicated the trial court's order to the FBI lab. The court stated, however, that the real issue before the court was whether the FBI itself exercised good faith in testing the material. The trial court noted that all the experts were in agreement that a minimum of 50 nanograms was required for DNA testing but that the accuracy of the results increase as greater quantities are used.

The trial court found that the sample from the sock comprised approximately 200 nanograms and the sample from the blanket amounted to approximately 400 nanograms. The trial court further found that although the FBI consumed both items in the testing process, the FBI conducted its testing within its standard operating procedures. It was the FBI laboratory's procedure to load a minimum of 200 nanograms, and optimally, 400 nanograms. The fact that this practice is not written manual procedure did not concern the trial court as long as the testimony supported a finding that the FBI did not process this case any differently than any other case handled by the lab.

Therefore, the trial court concluded that in light of the United States Supreme Court decision in *Arizona v. Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988), and the trial court's own finding that the FBI followed routine procedure in its handling of the test items, Kleypas' motion to suppress should be denied. Nevertheless, the trial court was mindful of the State's failure to inform the FBI of the court's order to preserve a portion of the material if possible for independent testing. As this failure did not

impact the propriety of the testing itself, the trial court found suppression was not appropriate. Instead, the trial court believed the jury should be instructed that it could consider the State's failure to affirmatively request the FBI to make a good faith attempt to preserve a portion of the sample in determining the weight to be given the DNA results.

The trial court correctly applied *Youngblood* in resolving this issue. In *Youngblood*, the Arizona Court of Appeals reversed the defendant's conviction on child molestation, sexual assault, and kidnapping based on the State's failure to preserve semen samples from the victim's body and clothing. The United States Supreme Court reversed, finding the State's failure to preserve evidentiary material, absent a showing of bad faith, was not a violation of the Due Process Clause of the Fourteenth Amendment. The Court stated:

> "The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady* [*v. Maryland*, 373 U.S. 83 (1963)], makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. . . . We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 57-58.

In *Youngblood*, the Court found the failure of the police to refrigerate the victim's clothing and to perform tests on semen samples was, at worst, negligence. The Court noted that none of this information was concealed from the defense and that the evidence, such as it was, was made available to the defense. As a result, the Court concluded there was no showing of bad faith. 488 U.S. at 58.

When reviewing a trial court's decision as to the suppression of evidence, an appellate court normally gives great deference to the factual findings of the trial court. The ultimate determination of the suppression of the evidence is a legal question requiring independent appellate determination. *State v. Vandiver*, 257 Kan. 53, 58, 891 P.2d 350 (1995). The question of whether the State acted in bad faith is a question of fact. *State v. Lamae*, 268 Kan. 544, 551, 998 P.2d 106 (2000).

Kleypas does not contest the trial court's finding that the FBI acted in good faith. Rather, he directs fault at the State for the FBI's failure to preserve material for independent DNA analysis. Despite Kleypas' attempt to focus solely on the State's conduct, the FBI's good faith was relevant to the trial court's decision. The trial court clearly considered the State's failure to inform the FBI as part of the circumstances surrounding the DNA testing but found it insufficient to require suppression. This decision is supported by substantial competent evidence.

Based on the United States Supreme Court's decision in *Youngblood* and the facts of this case, we hold that the trial court did not err in failing to suppress the DNA evidence.

## Issue 6. The Felony-Murder Jury Instruction

The trial court gave an instruction on felony murder as a lesser included offense of capital murder. Kleypas contends that the trial court erred, however, in refusing to instruct the jury that a felony murder could occur in the "flight from" an inherently dangerous felony.

K.S.A. 21-3401(b) defines felony murder as the killing of a human being committed "in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto." The instruction given by the trial court omitted the term "flight from" because the trial court found that there was no evidence to support it. Kleypas contends that the jury could have determined that he killed C.W. during his "flight from" an inherently dangerous felony and that the trial court's refusal to include the term "flight from" violated his Sixth Amendment right to a fair trial.

A criminal defendant has a right to an instruction on all lesser included offenses supported by the evidence as long as: (1) the evidence, when viewed in the light most favorable to the defendant's theory, would justify a jury verdict in accord with that theory and (2) the evidence at trial does not exclude a theory of guilt on the lesser offense. *State v. Williams*, 268 Kan. 1, 15, 988 P.2d 722 (1999). An instruction on a lesser included offense is not proper if from the evidence the jury could not reasonably convict of the lesser offense. *State v. Robinson*, 261 Kan. 865, 883, 934 P.2d 38 (1997).

Kleypas argues that he was entitled to the "flight from" part of the instruction because there was evidence that he committed the murder to facilitate flight and that the State sought the death penalty based on an aggravating factor which involved flight. He contends that the State's reliance on the aggravating factor that "[t]he defendant committed the crime in order to avoid or prevent a lawful arrest or prosecution" mandates the "flight from" instruction. See K.S.A. 21-4625(5). In *State v. Purnell*, 126 N.J. 518, 533-34, 601 A.2d 175 (1992), the New Jersey Supreme Court held that where a separate offense encompassed by the aggravating factor is, in itself, a basis for an alternative form of murder that is non-capital, a defendant is constitutionally entitled to have that alternative offered for jury deliberation in the guilt phase.

However, neither of these arguments requires the requested instruction. The terms "in the commission of," "attempt to commit," and "flight from," as used in the felony-murder statute, are temporal requirements delineating when a killing may occur and still be part of the underlying felony. See *State v. Hearron*, 228 Kan. 693, 694-96, 619 P.2d 1157 (1980). That a murder was committed to facilitate escape or to avoid or prevent arrest or prosecution are matters of intent and, as such, are fundamentally different from the "flight from" requirement for felony murder. A murder may be committed in order to facilitate escape or to avoid or prevent an arrest or prosecution and still not occur during the flight from the crime. Similarly, a murder may occur during the flight from the crime but not have as its purpose the facilitation of escape or the avoidance or prevention of arrest or prosecution. The need for

an instruction is instead based on the evidence in each particular case.

In the case at hand, there was no evidence from which a jury could reasonably have convicted Kleypas of felony murder based on the theory that the killing occurred during the "flight from" an inherently dangerous felony. In order to require such an instruction, there must be evidence that the killing occurred during flight from the scene of the felony. There was no such evidence in this case, and the trial court's instruction was correct.

Kleypas also contends that trial court erred by not defining the phrase "in the commission of" in the felony-murder instruction. He argues that the court should have defined the term "commission" to make it clear to the jury that a killing which occurred subsequent to the underlying felony could still be considered felony murder. He argues that such an instruction was necessary in light of the jury instruction on capital murder that used the terminology "in the commission of or subsequent to" the underlying offense.

Kleypas admits that he failed to request such an instruction. We have held:

"No party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds of his or her objection, unless the instruction or the failure to give the instruction is clearly erroneous. Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." *State v. Cravatt*, 267 Kan. 314, Syl. ¶ 1, 979 P.2d 679 (1999).

Despite Kleypas' contention, we conclude that the instruction as given properly stated the law and that the jury could not have been misled by the failure to define the term "commission."

"When reviewing challenges to jury instructions, the instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous." *State v. Aikins*, 261 Kan. 346, Syl. ¶ 25, 932 P.2d 408 (1997).

Therefore, we conclude that the instruction given was not clearly erroneous.

## Issues 7 and 8. The Instruction on Attempted Rape

Kleypas argues that the trial court failed to include an essential element in its instruction on attempted rape. He admits that he failed to object to this instruction or to request a different instruction and, therefore, our review is limited to determining whether the instruction as given was clearly erroneous. *Cravatt*, 267 Kan. 314, Syl. ¶ 1.

K.S.A. 21-3301(a), defining attempt, states: "An attempt is *any overt act toward the perpetration of a crime* done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." (Emphasis added.) The trial court, however, instructed the jury on the crime of attempted rape as follows:

"If you find the defendant is not guilty of rape, you shall consider if he is guilty of an attempt to commit the crime of rape. To establish this charge, each of the following claims must be proved:
"1. That the defendant *performed an act toward the commission of the crime* of rape;
"2. That the defendant did so with the intent to commit the crime of rape;
"3. That the defendant failed to complete commission of the crime of rape;
"4. That this act occurred on or about the 30th day of March, 1996, in Crawford County, Kansas." (Emphasis added.)

Kleypas contends that because the instruction given to the jury did not make it clear that an "overt" act was required, the jury might have incorrectly relied on mere acts of preparation to satisfy the overt act requirement.

We have held that an overt act is an essential element of an attempted crime. *State v. Collins*, 257 Kan. 408, 418, 893 P.2d 217 (1995); *State v. Robinson*, 256 Kan. 133, 136, 883 P.2d 764 (1994); *State v. Gobin*, 216 Kan. 278, 280-82, 531 P.2d 16 (1975). Mere preparation is not sufficient to constitute an overt act. *Gobin*, 216 Kan. at 281-82.

The instruction given by the trial court was taken verbatim from PIK Crim. 3d 55.01. We are puzzled as to why the PIK instruction

does not use the word "overt" in keeping with the language of the statute. However, even had the instruction used the word "overt," it would not have alleviated the problem of which Kleypas complains. The word "overt" as used in conjunction with an attempt means: "An outward act, however innocent in itself, done in furtherance of a conspiracy, treason, or criminal attempt." Blacks Law Dictionary 1130 (7th ed. 1999). The word "overt" used in combination with "act" would be no more definitive or descriptive of what acts a jury would be required to find in any particular case in order to support a conviction than the phrase "act towards the commission of a crime."

We hold that the language of the instruction which required the jury to find that "the defendant performed an act toward the commission of the crime" sufficiently instructed the jury with regard to the crime, and the instruction was not clearly erroneous. Nevertheless, in order to further clarify the instruction in the future, we recommend that PIK Crim. 3d 55.01 be amended to insert the word "overt" immediately before the word "act" and to include a sentence which states: "Mere preparation is insufficient to constitute an overt act."

Kleypas also contends, with regard to the instruction on attempted rape, that the instruction was clearly erroneous because it failed to specify the overt act which supported the conviction. Kleypas argues that the jury was required to be unanimous on the overt act which supported the attempted rape and the court either should have required the State to elect an overt act or given a unanimity instruction. Again, because Kleypas did not object to the instruction at trial, our review is limited to the determination as to whether the instruction given was clearly erroneous. *Cravatt*, 267 Kan. 314, Syl. ¶ 1.

We have held that in a multiple acts case where several acts are alleged and any one of them could constitute the crime charged, the jury must be unanimous as to which act or incident constitutes the crime. *State v. Timley*, 255 Kan. 286, 289-90, 875 P.2d 242 (1994). In such a case, either the State must be required to elect the particular criminal act upon which it will rely for conviction or the trial court must instruct the jury that all must agree on the

underlying criminal act. 255 Kan. at 289-90. In contrast, in an alternative means case where a single criminal offense may be committed in various ways, there must be unanimity as to guilt on the crime charged, but unanimity is not required as to the means by which the crime was committed. In reviewing an alternative means case, the court must simply determine whether a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt. 255 Kan. at 289-90.

However, the attempted rape charge at hand presents neither a multiple acts nor an alternative means situation. The possible overt acts need not themselves be illegal or chargeable as criminal offenses and, thus, this is not a multiple acts case. Nor are the overt acts alternative means of committing the offense. Rather, they are acts, however innocent in themselves, which signify and trigger liability for the offense of attempt. As such, there was no requirement that the jury be instructed as to a specific overt act. See *State v. Thompson*, 3 Kan. App. 2d 426, 430, 596 P.2d 174, *rev. denied* 226 Kan. 793 (1979). Therefore, the instruction given was not clearly erroneous.

## Issue 9. Failure to Instruct on Simple Battery

Kleypas argues that the trial court erred in failing to instruct on simple battery as a lesser included offense of attempted rape. He contends that the evidence adduced at trial to prove attempted rape necessarily proved the offense of simple battery.

A trial court has the affirmative duty to instruct the jury on all lesser included offenses established by the evidence. Instructions on a lesser included offense must be given even though the evidence is weak and inconclusive and consists solely of the testimony of the defendant. *State v. Ordway*, 261 Kan. 776, 784, 934 P.2d 94 (1997). An instruction on an included offense is not proper if from the evidence the jury could not reasonably convict of the lesser offense. *State v. Robinson*, 261 Kan. 865, 883, 934 P.2d 38 (1997).

Based on the law in effect at the time the crime was committed, our analysis of whether simple battery was a lesser included offense

of attempted rape is conducted under the rules laid out in *State v. Fike*, 243 Kan. 365, 757 P.2d 724 (1988).

"[*Fike*] provides a two-pronged test for determining if there is a lesser included crime under K.S.A. 21-3107(2)(d). Under the first prong, the statutory elements of the crime charged and the alleged lesser included crime are examined. If all of the statutory elements of the alleged lesser crime will automatically be proved if the State establishes the elements of the charged crime, the alleged lesser crime is an included crime of the greater. 243 Kan. at 368. If no included crime is found under the first prong, there may still be an included crime under the second prong of the test. Under the second prong, the charging document is examined to determine whether the evidence that must be adduced at trial to prove the crime charged would also necessarily prove another crime. If another crime is necessarily proved by proving the charged crime, the former is an included crime. 243 Kan. at 368." *Williams*, 268 Kan. at 17.

Simple battery was not a lesser included offense of attempted rape under the first prong of *Fike*. See *State v. Arnold*, 223 Kan. 715, 716-17, 576 P.2d 651 (1978) (holding simple battery not a lesser included offense of attempted rape under the elements test). Further, the State was not required to prove that Kleypas touched C.W. in a rude, insolent, or angry manner in order to prove attempted rape. All that was required was that the State prove some overt act toward the commission of rape. Under these circumstances, simple battery was not a lesser included offense of attempted rape, and the trial court did not err in failing to give such an instruction.

## Issue 10. Instruction on Voluntary Intoxication

Kleypas raises two contentions with regard to the court's instruction on voluntary intoxication. First, he argues that the instruction changed voluntary intoxication into an affirmative defense thereby improperly placing the burden upon Kleypas. Second, he contends that the instruction prohibited the jury from aggregating intoxication with other evidence of his mental disorder, which also affected his capacity to form the necessary intent.

As we have previously stated, our standard of review for these claims based upon Kleypas' objection to the instruction given is well established:

"When reviewing challenges to jury instructions, the instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous." *Aikins*, 261 Kan. 346, Syl. ¶ 25.

Kleypas requested the following instruction, which tracked with the provisions of K.S.A. 21-3208(2):

"An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."

The trial court rejected Kleypas' request and instructed the jury as follows in accordance with PIK Crim. 3d 54.12-A:

"Voluntary intoxication may be a defense to the charge of Capital Murder, Premeditated First-Degree Murder, Second-Degree Murder, Attempted Rape, and the Aggravated Burglary allegedly occurring on March 30, 1996, where the evidence indicates that such intoxication impaired a defendant's mental faculties to the extent that he was incapable of forming the necessary intent to kill as required in the Capital Murder, Premeditated First-Degree Murder, and Second-Degree Murder charges; and the necessary intent to commit a theft as required in the Aggravated Burglary charge, and the intent to commit rape as required in the Attempted Rape charge."

In support of his first argument that the PIK instruction given changed voluntary intoxication to an affirmative defense, Kleypas relies upon our decision in *State v. Ludlow*, 256 Kan. 139, 883 P.2d 1144 (1994). According to Kleypas, we recognized in *Ludlow* that PIK Crim. 3d 54.12-A was a significant departure from the statutory language regarding voluntary intoxication in K.S.A. 21-3208(2), thus casting voluntary intoxication as an affirmative defense. This argument misinterprets our holding in *Ludlow*.

The issue in *Ludlow* involved the PIK instruction's omission of "or other state of mind" where K.S.A. 21-3208(2) states that voluntary intoxication may be considered "when a particular intent or other state of mind is a necessary element to constitute a particular crime." Ludlow complained that premeditation was an "other state of mind." We agreed with Ludlow and held that the district court's use of PIK Crim. 3d 54.12-A which departed from the statutory

language by omitting the phrase "or other state of mind" was error where the defendant is charged with premeditated murder. 256 Kan. at 147.

In tracking the change in the PIK instruction to determine when the removal of "or other state of mind" occurred, *Ludlow* referenced the pattern instruction approved in *State v. Beebe*, 244 Kan. 48, 60-61, 766 P.2d 158 (1988), noting that "the most obvious change [in the voluntary intoxication instruction] is in the lead-in declaration—voluntary intoxication changes from not being a defense to possibly being a defense." 256 Kan. at 145. *Ludlow* did not state that this was error or that the language suggested by the defendant changed voluntary intoxication to an affirmative defense.

In addition to Instruction No. 12 on voluntary intoxication, the trial court instructed the jury in Instruction No. 13 that voluntary intoxication may be a defense to the extent Kleypas was incapable of forming the necessary state of mind of premeditation, following *Ludlow*. As part of Instruction No. 2, the trial court instructed: "The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty until you are convinced from the evidence that he is guilty." Instruction No. 8 again placed the burden of proof on the State:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty until you are convinced from the evidence that he is guilty.

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims made by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of any of the claims made by the State, you should find the defendant guilty."

In *Ludlow*, this court read the voluntary intoxication instruction together with another instruction which stated that the State bore the burden of proving " 'the required criminal intent of the defendant' and that '[t]his burden never shifts to the defendant,' " and found that the instructions properly advised the jury that "voluntary intoxication may be a defense if the evidence indicates that it rendered Ludlow incapable of forming the necessary intent, that

the State had the burden of proving intent, and that Ludlow does not have a burden for showing lack of intent." 256 Kan. at 150. In the case at hand, the instructions, read together, properly advised the jury that the State bore the burden to prove intent, and the instructions did not relieve the State of this burden or make voluntary intoxication an affirmative defense. We also note that the trial court avoided the major problem in *Ludlow* by giving a separate instruction on voluntary intoxication specifically referencing "other state of mind" and premeditation. Kleypas' first contention fails.

Kleypas' second contention regarding the voluntary intoxication instruction is that the instruction prevented the jury from using the voluntary intoxication evidence unless it found that it alone negated premeditation or intent. He claims that the United States Supreme Court in *Martin v. Ohio*, 480 U.S. 228, 233-34, 94 L. Ed. 2d 267, 107 S. Ct. 1098 (1987), recognizes that defendants must be permitted to combine different kinds of evidence to negate specific intent for charged crimes. He argues that the instruction given prohibited the jury from considering intoxication for any purpose unless Kleypas established the affirmative defense by a preponderance of evidence. According to Kleypas, because the jury in his case was precluded from considering evidence of voluntary intoxication unless that evidence alone negated specific intent, the instruction ran afoul of both K.S.A. 21-3208 and the Due Process Clause of the United States Constitution.

*Martin* does not support this contention of Kleypas. The defendant in *Martin* was charged with aggravated murder. Ohio law placed the burden of proving the elements of a criminal offense upon the prosecution but placed on the accused the burden of proving an affirmative defense by a preponderance of the evidence. Self-defense was an affirmative defense under Ohio law and therefore had to be proved by the defendant. The defendant was convicted and in his appeal to the Supreme Court he claimed that his conviction violated the Due Process Clause because of the burden placed upon him to prove self-defense. The Court disagreed and held that the State did not exceed its authority in defining the crime of murder as purposely causing the death of another with prior

calculation or design. It did not seek to shift to Martin the burden of proving any of those elements. The Court noted that it would be quite different if the jury had been instructed that self-defense evidence could not be considered in determining whether there was a reasonable doubt about the State's case, *i.e.*, that self-defense evidence must be put aside for all purposes unless it satisfied the preponderance standard. The Court held that such an instruction would relieve the State of its burden and plainly run afoul of the mandate in *In re Winship*, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970), requiring the State to prove all of the elements of the crime beyond a reasonable doubt. 480 U.S. at 233-34.

In our case, contrary to Kleypas' assertion, the instruction on voluntary intoxication did not limit the jury's consideration of Kleypas' state of intoxication nor did it limit consideration of any other evidence offered as to mental illness, prior drug use, or brain damage in determining whether the State proved the elements of the crime. The instruction only provided the jury with the standard it must consider in evaluating evidence regarding Kleypas' voluntary intoxication.

We have concluded above that the instructions read as a whole placed the burden of proving all elements of the crimes charged upon the State. As in *Martin*, the instructions, "read as a whole, . . . are adequate to convey to the jury that all of the evidence, including the evidence going to self-defense, must be considered in deciding whether there was a reasonable doubt about the sufficiency of the State's proof of the elements of the crime." 480 U.S. at 234. The instruction given on voluntary intoxication in this case properly and fairly stated the law as applied to the facts. Kleypas was not prevented from presenting evidence regarding other factors bearing upon his ability to form specific intent. The burden of proving all essential elements of the crimes charged never shifted to Kleypas. We conclude that Kleypas' contention is without merit and the jury could not reasonably have been misled by the court's instruction on intoxication.

## Issue 11. Instruction Regarding State's Failure to Timely Notify Kleypas of Change in Testimony

This issue involves a statement made by one of the officers while driving Kleypas back to Kansas after Kleypas had waived extradition. As noted in our analysis concerning the admissibility of Kleypas' confession, during a pretrial suppression hearing, before the taperecording of the conversation was enhanced, both officers believed that the statement "Are we going to have to get out and walk?" was made by Detective Hite. Prior to trial, KBI Agent Williams listened to an enhancement of the audiotape and realized that it was he who had made the statement. The State, however, did not notify the court of this change or notify Kleypas as required by law.

Based upon the State's failure to do so, the court instructed the jury that it could consider this failure in the following instruction:

"The State's failure to timely notify the defendant when Agent Tom Williams concluded he was the person who stated on the tape 'are we going to have to get out and walk?' may be considered by you in determining what weight to give to his testimony."

Kleypas requested that the above instruction also refer to the weight the jury could give to Detective Hite's testimony because Hite had also modified his testimony. The trial court rejected the request, stating that it was Agent Williams who had realized he had made the statement but was not forthcoming with the information, not Hite.

We agree with the trial court. The record demonstrates that while both Agent Williams and Detective Hite after listening to the enhanced taperecording agreed that the recorded statement was that of Agent Williams; Hite did not change his statement at trial. He explained that he believed he had made a similar statement on the trip back to Kansas.

Our standard of review is whether the instruction given without the additional language requested by the defendant properly and fairly stated the law as applied to the facts of the case and whether it reasonably could have misled the jury. See *State v. Carr*, 265 Kan. 608, 617, 963 P.2d 421 (1998). We have no hesitancy in con-

cluding that the instruction given met the above standard. We emphasize that the court properly placed the duty on the State to notify both the court and Kleypas of a change in testimony. The credibility of both officers was thoroughly explored by Kleypas at trial, and the trial court's instruction was consistent with the evidence that Agent Williams, not Detective Hite, changed his testimony.

Issue 12. Whether K.S.A. 21-3439(a)(4) Makes a Killing Occurring During an Attempted Rape Subject to the Death Penalty

Kleypas was convicted of capital murder based on the intentional and premeditated killing of the victim in the commission of the crime of attempted rape. He argues, however, that a correct interpretation of K.S.A. 21-3439(a)(4) precludes attempted rape as a predicate for capital murder. We find no merit in his claim.

K.S.A. 21-3439(a)(4) defines the offense of capital murder as:

"Intentional and premeditated killing of the victim of one of the following crimes in the commission of, or subsequent to, such crime: Rape, as defined in K.S.A. 21-3502 and amendments thereto, criminal sodomy, as defined in subsections (a)(2) or (a)(3) of K.S.A. 21-3505 and amendments thereto or aggravated criminal sodomy, as defined in K.S.A. 21-3506 and amendments thereto, *or any attempt thereof*, as defined in K.S.A. 21-3301 and amendments thereto." (Emphasis added.)

Kleypas' argument is that the statutory language "or any attempt thereof" refers to aggravated criminal sodomy and not an attempted rape or criminal sodomy.

The interpretation of a statute is a question of law, and this court's review is unlimited. *State v. Lewis*, 263 Kan. 843, 847, 953 P.2d 1016 (1998). The fundamental rule of statutory construction guiding this court's determination is that the intent of the legislature governs when that intent can be ascertained from the statute. When a statute is plain and unambiguous, we must give it the effect intended by the legislature rather than determine what the law should or should not be. *State v. Taylor*, 262 Kan. 471, 478, 939 P.2d 904 (1997). The plain and unambiguous language of the statute demonstrates that "or any attempt thereof" relates to all crimes specified in the same sentence.

Nevertheless, Kleypas moves beyond the plain language of the statute, suggesting that ambiguity arises by reason of testimony given by the attorney general during the adoption of the death penalty in Kansas. Kleypas points out that the Virginia death penalty statute which provided a general pattern for Kansas uses the following language: "The willful, deliberate, and premeditated killing of any person in the commission of, or subsequent to, rape or attempted rape, forcible sodomy or attempted forcible sodomy or object sexual penetration." Va. Code Ann. § 18.2-31(5) (Michie 1996).

Kleypas argues that when the Kansas Legislature passed the death penalty statute, it modified an earlier proposed version of the statute that would have explicitly made it clear that a killing during attempted rape was a capital offense, as in the Virginia model. In doing so, Kleypas contends, the legislature created an ambiguity in the final version. According to Kleypas, by application of the "last antecedent rule," the legislature intended that "or any attempt thereof" modify only the immediately preceding phrase "aggravated criminal sodomy" and not any other crimes mentioned before. See *Taylor v. Perdition Minerals Group, Ltd.*, 244 Kan. 126, 133-34, 766 P.2d 805 (1988) (explaining last antecedent rule). He also invokes the "rule of lenity," which provides that any reasonable doubt about the meaning of criminal statutes is to be decided in favor of the accused. See *State v. Vega-Fuentes*, 264 Kan. 10, 14, 955 P.2d 1235 (1998).

We need not dwell on the above arguments. The last antecedent rule is merely an aid to construction. It may not be employed to reach a certain result where the language of the statute is plain and unambiguous. See *Link, Inc. v. City of Hays*, 266 Kan. 648, 654, 972 P.2d 753 (1999). Similarly, while the rule of lenity is the general rule in construing criminal statutes, it too is subordinate to the rule that judicial interpretation must effect legislative design and intent. *Vega-Fuentes*, 264 Kan. 10, Syl. ¶ 3.

The capital-murder statute in Kansas narrowly defines the class eligible for the death penalty in plain and unambiguous language. To adopt the interpretation advanced by Kleypas would distort the statute, resulting in absurdity. In 1994, when the capital-murder

statute became law, rape and aggravated sodomy were considered equally severe as shown by their classification as severity level 2 crimes. In 1996, the offense of rape as described in K.S.A. 21-3502(a)(1) and (a)(2) became a severity level 1 crime. There is no logical reason the legislature would intend the intentional and premeditated killing of the victim during the commission of an attempted aggravated sodomy to be a capital offense but the equally severe and now more severe crime of attempted rape would not be a capital offense. Finally, the failure of our legislature to adopt an earlier version of a proposed law or the wording of the Virginia statute becomes significant only in case of an ambiguous final version. We, therefore, hold that the phrase "or any attempt thereof" modifies all the offenses contained in K.S.A. 21-3439(a)(4) and, thus, makes the intentional and premeditated killing of the victim during the commission of, or subsequent to, an attempted rape a capital murder.

## Issue 13. Prosecutorial Misconduct in the Guilt Phase

Kleypas contends that prosecutorial misconduct during opening and closing statements and the prosecutor's conduct during trial and in discovery denied him a fair trial. He argues that the conduct was so egregious as to warrant the reversal of his convictions and a new trial.

Prior to a discussion of the specific errors alleged by Kleypas, some general discussion with regard to this court's handling of prosecutorial misconduct is appropriate. The first preliminary matter to be addressed concerns the necessity of a contemporaneous objection. While many of the allegedly improper remarks made by the State during closing argument were objected to by Kleypas, others were not. Reversible error normally cannot be predicated upon a complaint of misconduct by the prosecutor during closing argument where no contemporaneous objection is lodged. However, if the prosecutor's statements rise to the level of violating a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection. *State v. McCorkendale*, 267 Kan. 263, 278, 979 P.2d 1239 (1999).

In addition, K.S.A. 21-4627(b) directs that this court "shall consider the question of sentence as well as any errors asserted in the review and appeal and shall be authorized to notice unassigned errors appearing of record if the ends of justice would be served thereby." In *State v. Collier*, 259 Kan. 346, 353, 913 P.2d 597 (1996), we held that the same language in the pre-1994 hard 40 sentencing statute authorized this court to consider a defendant's claim of prosecutorial misconduct even though he had failed to object to the remarks at trial. See *State v. White*, 263 Kan. 283, 305-306, 950 P.2d 1316 (1997). Thus, pursuant to K.S.A. 21-4627(b), this court will consider Kleypas' claims of prosecutorial misconduct whether or not objected to at trial.

An appellate court's analysis of the effect of a prosecutor's allegedly improper remarks in closing argument is a two-step process: First, the appellate court must determine whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. Second, the appellate court must determine whether the remarks constituted plain error, that is, whether they were so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial. In order to find that the remarks were not so gross or flagrant, this court must be able to find that when viewed in light of the record as a whole, the error had little, if any, likelihood of changing the result of the trial. *McCorkendale*, 267 Kan. at 278-79. Factors relevant in determining whether a new trial should be granted for prosecutorial misconduct include: (1) Whether the misconduct is so gross and flagrant as to deny the accused a fair trial, (2) whether the remarks show ill will on the part of the prosecutor, and (3) whether the evidence against the accused is of such a direct and overwhelming nature that it can be said that the prejudicial remarks of the prosecutor were likely to have little weight in the minds of the jurors. *State v. Foster*, 259 Kan. 198, 204, 910 P.2d 848 (1996).

In determining whether a prosecutor's remark was improper, it should be noted:

"It is the duty of a prosecutor in a criminal matter to see that the State's case is properly presented with earnestness and vigor and to use every legitimate means to bring about a just conviction, but he should always bear in mind that he is an

officer of the court and, as such, occupies a quasi-judicial position whose sanctions and traditions he should preserve. [Citation omitted.]" *State v. Ruff*, 252 Kan. 625, 634, 847 P.2d 1258 (1993).

A prosecutor has a duty to refrain from making improper, misleading, inflammatory, or irrelevant statements to the jury. See *Berger v. United States*, 295 U.S. 78, 84-88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935). This duty is heightened in capital cases. See *Lesko v. Lehman*, 925 F.2d 1527, 1541 (3d Cir. 1991). See also *California v. Ramos*, 463 U.S. 992, 998-99, 77 L. Ed. 2d 1171, 103 S. Ct. 3446 (1983) (stating that "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination").

With these standards securely in mind, we turn to the specific arguments raised by Kleypas. Kleypas alleges that the State improperly attempted to hinder discovery and identifies comments of the prosecutor during opening statement, closing argument, and at trial which he claims were improper and prejudicial.

## A. Hindering Defense Discovery

Kleypas argues the State's actions in persistently hindering defense discovery must be considered in addressing the pattern of misconduct and bad faith on the part of the State. He incorporates his arguments on the State's failure to correct KBI Agent Williams' testimony regarding the "Are we going to have to get out and walk?" statement and the failure to inform the FBI of the trial court's order to not consume all DNA material needlessly. He adds to this another alleged failure on the part of the State to timely disclose evidence relating to the "officer at the elbow" question.

During the car ride from Springfield to Girard, Kleypas was asked if he would have committed the crime if a police officer had been present. Kleypas replied he thought it would not have mattered "when he gets like that." Kleypas appears to suggest there was some sort of purposeful omission of this statement in Agent Williams' and Detective Hite's reports.

The events surrounding this question, Agent Williams' and Detective Hite's failures to report the comment, and how the information came to light occurred as follows: On April 5, 1996, 3 days

after the car ride in which the comment was made, defense counsel filed a motion to preserve police communications and request for discovery. The trial court granted the motion to preserve communications. Approximately 1 year later, on March 5, 1997, defense counsel filed a motion to call prosecutor Barry Disney as a witness to ask him about a comment that he made in a taped telephone conversation to a member of the attorney general's office. During the conversation, Disney had relayed Kleypas' answer to the "officer at the elbow" question and stated that neither Agent Williams nor Detective Hite had provided this information in his report or acknowledged such a statement in his testimony. In its response to this motion, the State noted that the tape of the telephone conversation had been listened to by a defense investigator on April 29, 1996, but defense counsel had never questioned Hite as to the statement. At a hearing on the motion, the defense counsel examined Hite and asked if Hite recalled asking Kleypas if he would have committed the crime had an officer been standing next to him. Hite stated that Kleypas "didn't really give me a yes or no answer." Hite also indicated that Disney requested that he ask the question. In response to a question, Hite agreed that he had not included this question and answer in his report. Agent Williams also agreed, in response to a defense question, that he had not written down this particular question and answer.

Kleypas admits this evidence became available to the defense well before trial but claims the State's failure to disclose this exculpatory statement under both K.S.A. 22-3212(a)(4) and *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), demonstrates a bad-faith attempt to obstruct the defense. According to Kleypas, as the State does not contest that the statement was exculpatory in nature, the State's duty to disclose was triggered. Furthermore, Kleypas claims Hite's failure to include Kleypas' response to this question could not have been inadvertent given the fact that the matter was deemed so important that he was specifically directed by Disney to ask Kleypas the question.

Kleypas' contention that nondisclosure of the statement was purposeful is wholly without support. The fact that Disney may have asked Detective Hite to ask Kleypas this question does not suggest

that Hite gave it any significance nor should he have. There is no evidence the State purposefully hindered discovery by failing to notify the defense that Agent Williams realized he had made the, "Are we going to have to get out and walk?" statement, by failing to inform the FBI to conserve DNA material if at all possible, or by failing to report Kleypas' response to the question of whether he would have committed the crime had an officer been present at the scene. While it is clear that the State should have notified the defense counsel of these statements and should have informed the FBI of the court's ruling regarding DNA testing, the misconduct here was not so gross and flagrant as to deny Kleypas a fair trial.

### B. Opening Statements

The State initiated opening statements by saying:

"If it please the Court, opposing counsel and ladies and gentlemen of the jury. [C.W.] was a bright, lively young woman just twenty-one years old. In March of 1996 she was a junior at Pittsburg State University in Pittsburg, Kansas. She was engaged to be married to [M.F.]. She was interested in tennis, in fashion merchandising, her major, and helping other people and in planning her wedding."

The defense counsel approached the bench to object, stating:

"Your Honor, all of this is irrelevant. [C.W.'s] activities . . . are irrelevant to the jury. It has nothing to do with the evidence. He's making an argument at this time which is not the purpose of opening statement and none of that is relevant, none of it is going to be put on as evidence, there is no purpose for it at all so I'm objecting to that whole line of argument because that is what it is. He's not going to be allowed to put on evidence that says she was a wonderful person, she was a buoyant person, she played tennis, she played this or that. All of that is irrelevant."

The State responded:

"Your Honor, we are not going to dwell on that but we have a right to at least show who she was. I've got just a couple of questions about what she was interested in, what sort of things did she do and we aren't dwelling on that, it is not the central part of the case but it is something we will produce evidence on and it is perfectly proper."

The trial court overruled the objection but ordered the State to "move along."

Prior to trial, Kleypas had filed a motion to bar victim impact statements during the penalty phase of the trial. The motion sought to exclude, among other things, "any evidence regarding the deceased's life plans at the time of her death." The trial court granted the motion.

Kleypas contends that since the jury was instructed during the penalty phase that it could consider all evidence presented during the guilt phase, the State was prohibited from presenting any victim impact evidence at any point in the bifurcated proceedings. Kleypas contends the State's opening comments demonstrate bad faith. Further, even if this court concludes this is not error in and of itself, Kleypas argues, this court should consider it as part of the overall pattern of prosecutorial misconduct which he claims "permeated this case."

Kleypas contends the State was bound by its acquiescence in the motion to bar victim impact evidence during the penalty phase to not argue such evidence during the guilt phase. The basis of this argument apparently is the prejudicial impact since the jury was the same for both phases, *i.e.*, what is improper in one phase must necessarily be improper in the other. This same concept, except in reverse, was discussed in Justice Souter's concurring opinion in *Payne v. Tennessee*, 501 U.S. 808, 841, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991). *Payne* reversed the decisions in *Booth v. Maryland*, 482 U.S. 496, 96 L. Ed. 2d 440, 107 St. Ct. 2529 (1987), and *South Carolina v. Gathers*, 490 U.S. 805, 104 L. Ed. 2d 876, 109 S. Ct. 2207 (1989), which had held the Eighth Amendment to the United States Constitution bars the admission of victim impact evidence during the penalty phase of a capital trial. *Payne* held that such evidence was not per se precluded by the Eighth Amendment. 501 U.S. at 825, 827. "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." 501 U.S. at 825. In its analysis, the United States Supreme Court noted that in many cases evidence relating to the victim is already before the jury because of its relevance at the guilt phase of the trial. 501 U.S. at 823. Justice Souter commented:

"*Booth* thus raises a dilemma with very practical consequences. If we were to require the rules of guilt-phase evidence to be changed to guarantee the full effect of *Booth's* promise to exclude consideration of specific facts unknown to the defendant and thus supposedly without significance in morally evaluating his decision to kill, we would seriously reduce the comprehensibility of most trials by depriving jurors of those details of context that allow them to understand what is being described. If, on the other hand, we are to leave the rules of trial evidence alone, *Booth's* objective will not be attained without requiring a separate sentencing jury to be empaneled. This would be a major imposition on the States, however, and I suppose that no one would seriously consider adding such a further requirement." 501 U.S. at 841 (Souter, J., concurring).

Imposing constraints on the State in the guilt phase because it agreed to a motion concerning the penalty phase would present an unexpected trap for the State. Though the State may have acquiesced in Kleypas' motion to bar victim impact evidence during the penalty phase, it did not do so for the guilt phase of the trial. It should be noted that Kleypas does not argue that his motion in limine to prohibit improper arguments during first and second stage trial prohibited the prosecutor's opening statement here. The trial court did not sustain this motion; instead, the court stated it would consider improper arguments on a case-by-case basis.

"Opening statements by counsel in criminal prosecutions are not evidence. They are given for the purposes of assisting the jury in understanding what each side expects its evidence at trial will establish and to advise the jury what questions will be presented for its decision. The tendency is to permit a prosecuting and defense attorney reasonable latitude in stating to the jury the facts they propose to prove." *McCorkendale*, 267 Kan. 263, Syl. ¶ 4.

The prosecutor's opening statements were within the reasonable latitude in stating facts or reasonable inferences from facts which the State would prove during the trial. It would be unreasonable to expect the State to refer to the victim in any case without some qualifiers concerning who this individual was in life. The absence of any characteristics of the victim would be artificial. There necessarily must be some reference to who the victim was and his or her relevance in the context of the time and place of the homicide. The prosecutor's comments here were not error.

## C. Conduct During Trial

During defense counsel Wood's cross-examination of KBI Agent Williams concerning a memorandum on interrogation techniques, the following exchange occurred:

"Q. And you've already testified that Stu Hite read *Miranda* rights to Mr. Kleypas?
"A. Yes, sir.
"Q. Okay. Then it goes on —
"Mr. BORK [Prosecutor]: Your Honor, I'm going to object to this line of questioning because this gets into dealing with whether it is a free and voluntary confession *which the Court has already ruled upon.*
"Mr. WOOD: Judge, I object to that statement. That is improper under *Crane v. Kentucky.*" (Emphasis added.)

Following the objections, a heated argument occurred at the bench. Wood requested a mistrial, which the court took under advisement. The trial court agreed with prosecutor Bork that the defense counsel could not discuss the legal requirements concerning admissibility of a confession but agreed with Wood that he could raise questions concerning the circumstances surrounding the confession. The trial court instructed the jury: "Ladies and gentlemen of the jury, you are to disregard Mr. Bork's comments in his last objection. You as the jury have the right to consider all the surrounding circumstances of the defendant's statement and you may give what weight you desire to those surrounding circumstances."

Kleypas correctly argues that his counsel had a right to litigate issues surrounding the voluntariness and reliability of Kleypas' confession under *Crane v. Kentucky*, 476 U.S. 683, 90 L. Ed. 2d 636, 106 S. Ct. 2142 (1986), and K.S.A. 22-3215(5). He further argues that it is inconceivable that the prosecution was unaware of the law and that this incident must be considered as evidence of the prosecutor's ill will in addressing the overall pattern of misconduct.

The trial court in addressing the motion for mistrial, stated:

"So we start with the premise the defendant is completely entitled to present the surrounding circumstances of the confession to the jury. That is an undeniable. I told you that when you came up to the bench for the side bar, . . . that is what the Court allowed, I didn't restrict the defendant in giving this information to the jury, the defendant was entitled to fully explore the surrounding circumstances that attend the statement in issue. Indeed the Court instructed the jury to that very effect. Now, I don't think the jury has been prevented from considering the surrounding circumstances. They have been advised that they can give the appropriate weight to the surrounding circumstances that they deem appropriate. I believe they will and I believe they can do this. I believe that Mr. Bork's

comments did not convey to the jury that they are precluded from doing this. So the request for mistrial will be denied."

Our review of the heated exchange between counsel and the record involving this claim does not support a finding of ill will on the part of the prosecutor. While the objection by the prosecutor may have been improper, defense counsel was able to fully litigate the issue of the weight and credibility the jury should give Kleypas' confession and the jurors were clearly informed that it was within their province as fact finders to make that determination. Finally, the jury was instructed by the court to disregard the comments of the prosecutor. Under these circumstances, no prejudicial error occurred.

### D. Closing Argument

Kleypas contends that during closing arguments, prosecutor Bork launched a personal attack on defense counsel Wood, referred to matters not in evidence, and claimed defense counsel thought Kleypas was guilty of some offense. Kleypas argues that at least seven incidents of misconduct occurred during closing arguments and that this constituted a denial of his right to a fair trial.

1. Upon completion of the State's direct examination of Robin, the roommate of the victim, defense counsel asked for the police report containing her statement. Twice the prosecution denied having the report. At the beginning of the cross-examination, however, the witness stated that she had discussed the report with prosecutors. At this time, the prosecutor found the report and gave it to defense counsel, who then completed his cross-examination.

Outside the presence of the jury, defense counsel asked the court that it be made known that the prosecution had misrepresented the State when it denied having the report. The trial court refused, noting it saw no purposeful concealment considering the amount of documents in the case.

In closing argument, defense counsel commented upon the witness' revelation that she had discussed the report with the prosecutors and stated "only at this point do you see the hand going down to the briefcase." The State objected, stating: "That is not in evidence. That is Mr. Wood's fantasy." The trial court sustained

the objection. Thereafter, Wood continued his argument without objection by stating: "You decide what you saw. I guess I've fantasized a materialization of that report into the hands of my co-counsel for the very first time here in the courtroom. I guess you all fantasized that too."

Kleypas argues that the prosecutor's use of the word "fantasy" implied that Wood was lying and attempting to fabricate a claim of misconduct. According to Kleypas, the trial court gave credence to this attack and impaired Wood's credibility in front of the jury by sustaining the objection. In support of this contention, Kleypas cites *State v. Lockhart*, 24 Kan. App. 2d 488, 947 P.2d 461, *rev. denied* 263 Kan. 889 (1997). In *Lockhart*, the Court of Appeals found that prosecutorial misconduct which included calling defense counsel a liar necessitated a new trial. 24 Kan. App. 2d at 491-92.

In the case at hand, the prosecutor's use of the word "fantasy" was in response to the argument advanced by Kleypas that the State purposefully concealed the police report until that concealment was discovered. Defense counsel also used the same term arguing effectively to the jury: "I guess you all fantasized that too." Moreover, the entire transaction between the parties was played out before the jury. The circumstances in *Lockhart* bear no similarity to this case. Under the circumstances of this case, we conclude that prosecutorial misconduct did not occur.

2. The second alleged attack occurred during the State's rebuttal when prosecutor Bork argued during closing that he was used to a defense attorney's accusations that he was hiding the facts or doing something unethical because "that is an old tactic." Wood objected, stating, "I object, Your Honor, I have never accused Mr. Bork of that. It is not an old tactic with me. I object to that." The trial judge stated, "I don't believe he was referencing you." Bork continued:

"Doesn't want to talk about the facts of this case, would rather talk about counsel and I don't blame him for that. It doesn't particularly endear him to me, it doesn't make me like him a lot but I don't blame him for that. Because there is not a lot of case for them to talk about here."

Woods objected: "Judge, again how Mr. Bork feels about me personally is improper. I ask that the jury be admonished that doesn't matter." The trial court sustained the objection and told the jury to disregard Bork's comment.

Kleypas complains that by overruling Wood's objection to the "old tactic" comment, the trial court implied wrongful conduct and gave credence to Bork's implication that defense counsel was attempting to mislead the jury. Kleypas admits the proceedings were "highly acrimonious"; however, there was no justification for expressions of personal feelings.

While we acknowledge that it was error for the prosecutor to express his personal feelings regarding defense counsel or what defense counsel may have thought of him, we note that the trial court sustained the objection and admonished the jury to disregard the statements. Even without this, we conclude that the entire exchange does not amount to misconduct so gross and flagrant as to deny Kleypas a fair trial.

3. In the third instance of alleged prosecutorial misconduct during closing arguments, prosecutor Bork stated:

"He made sure she was alone and he shaved his pubic hairs. Remember Dr. Mitchell and Dave Schroeder talking about trace evidence on the body and how you might be able to determine who had left the hairs there. The defendant couldn't have left any pubic hairs, his pubic hairs were shaved in preparation for this."

Defense counsel Moots objected that this was a misstatement when there was no evidence as to when Kleypas shaved his pubic hair. The trial court overruled the objection. Bork then stated: "What other purpose could the defendant have had in mind."

Kleypas contends there was no evidence of any subjective reason for removal of his pubic hair, and no evidence whether he did so on a regular basis. He suggests that when the trial court overruled the defense counsel's objection it gave the jury the impression that Bork's statement was accurate and added support to the State's theory of premeditation.

The comments of the prosecutor were not error. In closing argument, the prosecutor may draw reasonable inferences from the evidence but may not comment upon facts outside the evidence.

*State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000); *State v. McCray*, 267 Kan. 339, 351, 979 P.2d 134 (1999). Based on the evidence in the record, it was reasonable to infer that Kleypas shaved his pubic hair in preparation for a sexual assault on C.W.

4. Kleypas next objects to what he called the State's mischaracterization of the defense counsel's letter to Dr. J.D. Dix, a pathologist and medical examiner from Missouri. Bork stated: "When you discuss Dr. Dix's testimony, remember the reason why he was here. The defense wrote him and said we need someone to challenge Dr. Mitchell's testimony about penetration." Kleypas objected on the grounds that this was a mischaracterization of the letter, but the objection was overruled. Kleypas contends what was actually stated in the letter was: "What we are interested in is any way to challenge Dr. Mitchell's conclusion regarding the anal sodomy." Kleypas was acquitted of aggravated criminal sodomy. Nonetheless, Kleypas suggests the "attack" was pertinent in addressing the pattern of bad faith demonstrated by the State.

Dr. Dix admitted on the stand that the defense "wanted a way to challenge Dr. Mitchell's testimony." The comment complained of was fair interpretation of the letter and unquestionably did not influence or prejudice the jury because Kleypas was acquitted of aggravated criminal sodomy.

5. Kleypas argues that further instances of ill will were shown when the State, in closing argument, violated the trial court's order in limine to avoid reference to C.W.'s personal characteristics. Prosecutor Bork stated: "[C.W.] was a young woman twenty years old. She had a wonderful life." While acknowledging that the trial court sustained Kleypas' objection and told the jury to disregard the comment, Kleypas suggests this was a continuing disregard for his right to a fair trial.

We doubt whether the statement "She had a wonderful life" violated the trial court's order in limine. While the trial court's order related to the victim's personal characteristics, the phrase complained of is so general and ambiguous that it can hardly be said to be a reference to C.W.'s personal characteristics or a violation of the motion in limine. The fact that she was young and 20 years old was in the evidence and did not provide the jury with any

information it did not already have. Even if it can be considered a violation, the statement was so brief and limited as to be of no prejudicial effect and hardly stands as an example of ill will on the part of the State.

6. Another example of ill will occurred, according to Kleypas, when prosecutor Bork was discussing KBI Agent Williams' realization that it was his voice on the audiotape making the statement: "Are we going to have to get out and walk?" Bork said: "If there is any fault in the fact that this information didn't get to the Judge, then it is my fault." The trial court sustained an objection but refused to give a curative instruction. Kleypas argues Bork's attempt to place the blame solely on himself was improper because it implicitly informed the jury it could disregard Instruction No. 10, which notified the jury it could consider the failure to notify in determining what weight to give Agent Williams' testimony, and also by implicitly vouching for Agent Williams' credibility.

The alleged reference to Instruction No. 10 occurred when Bork stated: "As the Judge told you, the state should have brought that to the attention of Court and opposing counsel, I didn't do that." We conclude that the statement was not prosecutorial misconduct. While the statement could be viewed as an attempt to deflect fault from Agent Williams, Instruction No. 10 as worded did not place the responsibility on either Bork or Agent Williams but rather on the State.

7. Finally, Kleypas complains of the State's comments toward the end of closing argument when Bork said: "Opposing counsel has talked about the life or death of his client. Now is not the time to determine that. Now your duty is to determine whether or not his client is guilty. And he says that his client is guilty of something. It is just not capital murder." The trial court sustained defense counsel's objection. The trial court was not asked to admonish the jury, nor did it do so *sua sponte*.

After searching the record, we could find only two instances where defense counsel Wood made reference to lesser offenses. During his explanation of the lesser included murder instructions to the jury, Wood stated:

"And I'm going to tell you right now, I'm asking you—I'm asking you to—I'm telling you it is the right thing to do under the law, under the facts, under the situation to not give Mr. Kleypas capital murder, to not convict him of capital murder. Beyond that, it is up to your wisdom. It is up to your wisdom based upon what you have heard and seen what to do.

"I'm going to trust in you. We are going to trust in you to look at that beyond that and do what is appropriate."

In his same argument at a later point, Wood stated: "[B]ut you know enough at this point, you know enough that you can't convict Mr. Kleypas of capital murder. The rest is in your hands. That it is all in your hands."

It is apparent that the defense counsel's tactic in closing argument was to urge the jury not to convict Kleypas of capital murder. Although Wood's statements could be perceived as reflecting an opinion that Kleypas was guilty of some lesser crime of murder, Bork's reference to Wood's opinion, whether express or inferred, was improper.

In *McCray*, 267 Kan. at 347, we held that error is committed when the prosecutor injects his or her personal opinion. Moreover, "[c]ourts generally, although not uniformly, have found that it is improper for a prosecutor in a criminal jury trial to speculate in oral argument about the supposed beliefs of the defendant's attorney with respect to defendant's guilt or innocence." See *State v. Carpenter*, 5 Kan. App. 2d 214, 219, 613 P.2d 966 (1980). In this case, we conclude that the comments of the prosecutor were error.

The remaining question is whether the comments denied Kleypas a fair trial. As noted in the beginning of our discussion concerning prosecutorial misconduct, our standard of review is well established:

"In determining that a prosecutor's improper remarks made in closing argument are not so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial, the reviewing court must be able to find that when viewed in light of the record as a whole, the error had little, if any, likelihood of changing the result of the trial. This is a harmless error analysis. The court must be able to declare beyond a reasonable doubt that the error was harmless." *State v. McCorkendale*, 267 Kan. 263, Syl. ¶ 8, 979 P.2d 1239 (1999).

We conclude that the remarks complained of were not so gross and flagrant as to deny a fair trial. The evidence of guilt was of

such an overwhelming nature that there is little possibility the prosecutor's comments were given any weight in the jurors' minds. Thus, we are able to conclude beyond a reasonable doubt that error was harmless.

## Issue 14. Jury Misconduct

Following the penalty phase of trial, Kleypas filed a motion for recall of the jury, requesting a hearing on allegations of jury misconduct and a new trial. The motion was accompanied by affidavits from five jurors and the affidavit of Gaye Nease, an investigator with the Death Penalty Defense Unit, regarding her interviews with the jurors. The State responded with affidavits from eight jurors.

Kleypas alleges six instances of jury misconduct occurring during the guilt and penalty phases:

(1) Juror Garrison, a police officer, improperly consulted a Kansas Criminal Code and Procedure Handbook during deliberations and read from it to the other jurors.

(2) Juror Mawhiney quoted the Bible during the penalty phase.

(3) Jurors disregarded the court's instruction and considered Kleypas' failure to testify during the penalty phase.

(4) Jurors speculated about the length of time Kleypas would serve in prison if he were not sentenced to death.

(5) Juror Seawood refused to consider mitigating evidence after evidence of Kleypas' prior homicide conviction was introduced.

(6) Juror Garrison advised the other jurors that a vote for death did not mean Kleypas would be put to death.

### A. Consulting the Kansas Criminal Code

In a memorandum opinion, the trial court ruled that except for the claim concerning juror Garrison's consultation of a statute handbook, the allegations referenced the personal reasons the individual jurors relied on as to the verdict and, as such, improperly delved into their mental processes. The trial court found, however, the "handbook" did not involve mental processes and the trial court

ruled this was a proper area of inquiry. Accordingly, the trial court allowed the recall of juror Garrison and held a hearing on the matter on February 20, 1998.

Juror Swygert's affidavit stated:

"During deliberation a question came up regarding the definition of intent. The police officer advised that the court's definition was wrong and different from the definition that the police department had given her. She took a book out of her purse and read the definition out loud. She stated that the court was making up its own rules and that she did not wish to be a part of it."

Juror Garrison, the police officer, stated in her affidavit:

"I thought that an element had been left out of the first degree murder instruction. I had the Kansas Criminal Code and Procedure Handbook put out by the Kansas Peace Officers Association with me. I looked at the definition of first degree murder and may have read it to the jury. Because of my concerns we asked the question about the elements. When the Judge told us that the instructions were correct I based my decision on the written instructions that were given to us."

At the recall hearing, juror Garrison testified that she consulted a Kansas State Statute Code book concerning the various degrees of murder during the guilt-phase deliberations. Garrison kept the handbook in her purse. She could not remember whether she consulted any other portions but specifically denied reading anything regarding intent or advising any other jurors on a definition of intent. Garrison also did not remember if she read the definitions of first- and second-degree murder to the other jury members. As a result of reading her handbook, Garrison asked the trial court a question. The trial court's response clarified any questions she had.

Garrison's question to the court read:

"As a police officer, I know one element of premeditated 1st degree murder was left out of the jury instructions. This element I believe is that the murder happened during the commission of another violent felony. I realize I must only rely on the instructions and not my personal knowledge. On the other hand, I can't erase this knowledge & make a decision. I think I should be excused & an alternate take my place."

The trial court responded: "You are instructed that the jury instructions correctly state the elements of the crime charged and that you are to follow said instructions. You are instructed to review

jury instructions #17 and #18 as they correctly state the elements of Premeditated First Degree Murder and Felony Murder."

After Garrison testified, the trial court noted that the handbook, with a minor irrelevant exception, correctly stated the law regarding first- and second-degree murder and voluntary manslaughter. The trial court concluded that the introduction of this extrinsic material was juror misconduct. However, relying mainly on this court's decision in *State v. Goseland*, 256 Kan. 729, 887 P.2d 1109 (1994), and the Court of Appeals' decision in *State v. Duncan*, 3 Kan. App. 2d 271, 593 P.2d 427 (1979), the court concluded the handbook did not introduce material issues of fact or personal knowledge of extraneous facts and, therefore, there was no showing that Kleypas' rights were substantially prejudiced. The trial court denied Kleypas' motion for new trial based on juror misconduct.

Kleypas advances two arguments. First, he argues that the trial court should have conducted further inquiry where the affidavits submitted contradicted a juror's testimony during the hearing. Kleypas objected to the limited "scope" of the recall hearing, pointing out the apparent conflict between Garrison's testimony denying that she read the definition of intent from her handbook and the affidavits of juror Healy and juror Swygert. He cites the language found in *Saucedo v. Winger*, 252 Kan. 718, 850 P.2d 908 (1993): "We have found it advisable to permit inquiry into a juror's misconduct which comes to the attention of other members of the panel and may be verified or denied," and a subsequent statement: "Where a juror's misconduct relates to a material issue, the only way for a trial court to determine if the misconduct improperly influenced the jury's verdict is to recall the jury and inquire." 252 Kan. at 729, 732.

The two statutes bearing on the issue are K.S.A. 60-441 and K.S.A. 60-444, which provide:

"Upon an inquiry as to the validity of a verdict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined." K.S.A. 60-441.

"This article shall not be construed to a exempt a juror from testifying as a witness to conditions or occurrences either within or outside of the jury room having a material bearing on the validity of the verdict or the indictment, except as expressly limited by K.S.A. 60-441." K.S.A. 60-444(a).

The inquiry which was proper under K.S.A. 60-444(a) was whether Garrison committed misconduct by reading the definition of intent from her handbook and whether she read the definition to the other jurors, but not what effect the misconduct might have had on the thought processes of the jurors. In *Saucedo*, where this court did find the trial court abused its discretion by failing to recall the jury, none of the jurors was recalled or questioned further. Here, the trial court did recall juror Garrison. Garrison was examined and cross-examined by the parties.

The granting of a new trial or recalling the jury to answer for misconduct is within the sound discretion of the trial court. K.S.A. 60-259. See *Saucedo*, 252 Kan. at 729; *State v. Macomber*, 244 Kan. 396, 407, 769 P.2d 621, *cert. denied* 493 U.S. 842 (1989). The test of the trial court's abuse of discretion is whether no reasonable person would agree with the trial court. If any reasonable person would agree, an appellate court will not disturb the trial court's decision. *Goseland*, 256 Kan. at 735.

Intent was a material issue at trial. The issue here is whether the trial court abused its discretion by limiting the recall of jurors to Garrison. It is difficult to conceive what purpose further testimony from the other jurors would provide. Even if the affidavits of Swygert and Nease are accepted as true, there is no allegation that the definition of intent contained in the handbook was incorrect. Further, after Garrison's misconduct, the jury asked for clarification from the court. The court directed the jury to the proper instructions which correctly stated the law. Under the circumstances, the trial judge's decision that a recall of jurors other than Garrison was unnecessary was not a decision with which no reasonable person could agree. Kleypas has failed to show that the trial court abused its discretion in limiting the scope of the recall or denying the motion for a new trial on the basis of Garrison's actions.

### B. Juror Mawhiney's Biblical Quotation

Kleypas argues Garrison's affidavit admits that another juror "quoted the Bible to her." Kleypas states that though it is not clear

what specific passage was discussed, it is clear that the Bible was improperly considered in the penalty phase. Accordingly, he argues the death penalty must be set aside or, at the minimum, a recall of the jury ordered for further inquiry.

Garrison's affidavit stated in relevant part: "I do remember one lady quoting a Bible passage to me, but this did not play a big part in my decision." No other juror affidavit mentioned this occurrence. Gaye Nease's affidavit stated, in relevant part:

"When I interviewed Juror Garrison, she advised that she was having difficulty deciding to vote for death because of her religious beliefs. In response to her making statements about this, Juror Mawhiney quoted a passage from the Bible to her. The quote had the effect of removing her religious concerns about imposing the death penalty and allowed her to proceed to vote for the death penalty."

The trial court did not refer to this specific incident in its memorandum opinion. Instead, the court concluded that except for Garrison's consulting her handbook, all other allegations of misconduct delved into the mental processes of the jury. The State's response to this allegation of juror misconduct and the remaining allegations is that the trial court correctly found the affidavits delved into mental processes and, thus, were inadmissible. This court may consider the fact that Mawhiney quoted a biblical passage. See K.S.A. 60-441 and 60-444.

In the cases Kleypas cites, a Bible was present in the jury room. The court in *Jones v. Kemp*, 706 F. Supp. 1534, 1560 (N.D. Ga. 1989), held it was constitutional error for the trial court to have given permission for the jury to take a Bible into the jury room at the jurors' request. Key in its decision was the implied court approval of the jury's reference to extra judicial authority though the record was silent on whether the Bible was read or merely present in the room. In dicta, the court stated it "in no way means to suggest that jurors cannot rely on their personal faith and deeply-held beliefs when facing the awesome decision of whether to impose the sentence of death on a fellow citizen." 706 F. Supp. at 1560.

In *State v. Harrington*, 627 S.W.2d 345, 350 (Tenn. 1981), the Tennessee Supreme Court vacated the defendant's death sentence

where a juror was excluded because of the juror's opposition to the death penalty. The court also noted:

"[D]uring deliberations in the sentencing phase of the trial, the jury foreman buttressed his argument for imposition of the death penalty by *reading* to the jury selected biblical passages. His action, of course, was error which would have required a new sentencing hearing absent the error in excluding jurors for cause in violation of the *Witherspoon* standard." (Emphasis added.) 627 S.W.2d at 350.

Though not determining whether grounds for reversal standing alone, the Kentucky Supreme Court noted it was error for jurors to take Bibles into the jury room with them in *Grooms v. Com.*, 756 S.W.2d 131, 142 (Ky. 1988). The Chief Justice, in a concurring and dissenting opinion, would have found the use of the Bible an additional ground for reversal. Furthermore, the Chief Justice found it "alarming" that the uncontested affidavit not only confirmed the existence and use of the Bible during deliberations but that a particular passage played a "major role" in the jury's decision to vote for the death sentence. The Chief Justice stated:

"What the Bible says about the appropriateness of a death penalty in a particular case is not a legitimate concern of a penalty phase jury. 'The law specifies when the death penalty is appropriate, and neither the prosecutor nor the defense counsel should be permitted to adduce evidence as to how [a capital] case should be decided on religious grounds.' *Ice v. Commonwealth, Ky.*, 667 S.W.2d 671, 676 (1984). If evidence of biblical references to capital punishment is not competent during the penalty phase of a capital trial, it is axiomatic that a jury may not independently consult the biblical scriptures for guidance in reaching its life and death decision." 756 S.W.2d at 145. (Chief Justice Stephens, concurring and dissenting).

All we know from the affidavit here is that juror Mawhiney quoted, not read, a biblical passage to juror Garrison, but it did not play a major role in her decision. The trial court did not abuse its discretion by not ordering a recall or inquiry into this matter.

## C. Jurors Considering Kleypas' Failure to Testify

Kleypas argues the trial court erred in failing to recall the jury to inquire into affidavits stating that the jurors considered Kleypas' failure to testify despite jury instructions in both phases directing the jury to not consider this fact; to inquire into juror speculation regarding alternate sentencing dispositions in the event a death

sentence was not imposed; and one juror's affidavit stating that she did not consider mitigating evidence after she was informed of Kleypas' prior homicide conviction. The trial court declined to recall jurors on any of these allegations, finding the claims improperly delved into the mental processes of the jury.

Kleypas acknowledges that in *State v. Myers*, 215 Kan. 600, 602-03, 527 P.2d 1053 (1974), we ruled a jury verdict may not be impeached by evidence the jury considered the defendant's failure to testify. Kleypas complains this holding leaves a defendant no recourse despite flagrant disregard of a court's instruction and furthermore is inconsistent with later decisions, citing: *City of Ottawa v. Heathman*, 236 Kan. 417, 424, 690 P.2d 1375 (1984); *Verren v. City of Pittsburg*, 227 Kan. 259, 607 P.2d 36 (1980); *State v. Wainwright*, 18 Kan. App. 2d 449, 856 P.2d 163 (1993); and *Johnson v. Haupt*, 5 Kan. App. 2d 682, 623 P.2d 537 (1981). Kleypas suggests that to the extent even one juror voted for the death penalty because of his failure to testify, he was denied a right to a fair and impartial trial.

When addressing this specific allegation of juror misconduct, the trial court relied on *State v. Mitchell*, 234 Kan. 185, 672 P.2d 1 (1983), which followed the ruling in *Myers*. *Mitchell* found allegations that a juror considered a defendant's failure to testify were prohibited by K.S.A. 60-441. 234 Kan. at 191. The trial court further found the affidavits failed to demonstrate a conscious conspiracy on the part of the jury to disregard the instructions following *Wainwright*, 18 Kan. App. 2d at 453.

In *Myers*, this court cited the long-held rule: " 'A juror cannot be heard to impeach his verdict by saying that in the deliberation he or any other member of the jury took into consideration the matter of the defendant having failed to testify in his own behalf when the jury was instructed not to do so.' [Citation omitted.]" 215 Kan. at 602. This is in essence what is codified in K.S.A. 60-441. Under similar facts, *Mitchell* relied on *Myers* in finding no error when the trial court ruled a juror affidavit was not admissible as delving into the mind of the juror. 234 Kan. at 190-91.

In *City of Ottawa*, this court discussed when it was proper to grant a motion for new trial based on evidence the jury has not

followed the court's instructions. *City of Ottawa* acknowledged the limitations of K.S.A. 60-441 and 60-444 and held:

"Where under all the facts and circumstances it is disclosed that the jury was confused in making findings and in awarding damages, or where a jury verdict manifests a disregard for the plain instructions of the court on the issue of damages, or arbitrarily ignores proven elements of damage, or indicates passion, prejudice or a compromise on the issues of liability and damages, the verdict should be set aside on motion for a new trial." 236 Kan. at 423.

Again, in *Verren*, the matter of jury misconduct concerned specifically conspiring to circumvent the instructions given to include attorney fees in the amount of damages awarded and did not rest solely on the mental processes of the jury.

"[T]he truth and veracity of those testifying to such misconduct can be tested. The matters recited in the affidavits filed in the present case do not solely relate to the mental processes, nor do they rest alone in the mind of a juror or jurors. The matters set forth in the affidavits, if proven, would establish a conscious conspiracy by the members of the jury to disregard and circumvent the instructions on the law given by the court." 227 Kan. at 262.

A similar situation existed in *Johnson*, 5 Kan. App. 2d at 686-87. The same concept was repeated in *Wainwright*, where juror affidavits were offered to show the jury disregarded the trial court's instruction on consideration of bloodhound evidence. The Court of Appeals found no error in the court refusing to delve into the mental processes of the jury where "[t]he verdict is not so contrary to the evidence that it suggests a conspiracy to disregard the instruction." 18 Kan. App. 2d at 453.

Where claims of jury misconduct directly implicate the jury's mental processes and cannot be readily verified as is the case here, the trial court does not abuse its discretion by refusing to recall the jury. Where the affidavits set forth allegations, the truth of which can be verified, as in damage awards, the trial court can allow inquiry and order a new trial. There is no conflict in this area of law. The trial court did not abuse its discretion by refusing to recall the jury based on allegations the jury disregarded the court's instruction to not consider the fact that Kleypas did not testify in either the guilt or penalty phases.

## D. Jury's Speculation on Potential Non-death Sentence

Kleypas argues the affidavits show the jurors speculated during the penalty phase on the amount of time he would be required to serve if the death penalty were not imposed. He contends this was a proper area for recall and inquiry as it involved consideration of extrinsic matters. Kleypas contends he was prejudiced because the affidavits demonstrate that this speculation played a key part in the jury's sentencing verdict. Furthermore, according to Kleypas, juror Swygert's affidavit shows the jury's understanding of alternative dispositions was wrong. Kleypas contends that because of the jurors' attempts to misadvise each other regarding the law, there was jury misconduct requiring reversal of the death sentence.

In *Cott v. Peppermint Twist Mgt. Co.*, 253 Kan. 452, 476, 856 P.2d 906 (1993), this court considered the extent a trial court can delve into the mental processes of the jury and stated:

" 'Under these statutes [K.S.A. 60-441 and 60-444] we have held that a juror may not impeach his or her verdict on any ground inherent in the verdict itself; a juror may not divulge what considerations personally influenced him or her in arriving at the verdict or what reasoning personally led him or her to the final decision. *State v. Taylor*, 212 Kan. 780, 512 P.2d 449 (1973). More recently in *Crowley v. Ottken*, 224 Kan. 27, 31, 578 P.2d 689 (1978), it was pointed out that evidence is not admissible under K.S.A. 60-441 if it only pertains to the reasons a juror joined in the verdict. To be admissible the evidence must relate to extrinsic misconduct or to physical facts or occurrences within or without the jury room.' *Verren v. City of Pittsburg*, 227 Kan. 259, 260, 607 P.2d 36 (1980).

" 'The mental process of a juror in reaching a verdict or the factors which influence the mental process cannot be inquired into for the purpose of impeaching a verdict. Public policy forbids the questioning of a juror on these matters for a very obvious reason, *i.e.*, there is no possible way to test the truth or veracity of the answers.' *Saucedo v. Winger*, 252 Kan. 718, 729, 850 P.2d 908 (1993).

See *Crowley v. Ottken*, 224 Kan. 27, 31, 578 P.2d 689 (1978) (juror's affidavit to impeach verdict inadmissible; affidavit 'did not relate to extrinsic misconduct or to physical facts or occurrences within or without the jury room but only to the reasons she joined in the verdict'); *Smith v. Union Pacific Railroad Co.*, 214 Kan. 128, 134-35, 519 P.2d 1101 (1974) (trial court properly excluded juror's affidavit that stated jury 'instructions were not clear and were confusing to some of the jurors')."

The jurors' speculation of what sentence Kleypas would receive or how long Kleypas would be incarcerated if he did not receive the death penalty was part of the reasoning or thought processes of the jury. In accordance with our well-reasoned precedent in this area, these were not proper subjects for recall and inquiry in order to impeach the verdict.

### E. Juror's Refusal to Consider Mitigating Evidence

In an affidavit for the defense, juror Seawood stated:

"I felt cheated and angry when we were told about the old lady being killed for the first time at the penalty phase trial. Once I heard about the murder of the old lady, I did not want to hear any more. I did not even consider mitigation after I heard about the old lady's murder. I felt like it was my grandmother that had been killed. At second phase my thought went to the old lady even more than to [C.W.]. I did not hear what other jurors were saying because my thoughts about this were so strong."

In her affidavit prepared for the State, she stated: "Hearing about the murder of Bessie Lawrence did have a great effect on me. I still listened to all the evidence but the mitigators could not outweigh the aggravator of his killing the old lady."

Kleypas suggests juror Seawood's initial affidavit shows that after she heard evidence of the prior homicide she had in essence decided the case prior to hearing all the evidence. He contends that therefore Seawood was not an impartial juror and a death sentence imposed by a jury where a member is not impartial denies him due process of law, citing *State v. Cady*, 248 Kan. 743, 811 P.2d 1130 (1991).

In *Cady*, a juror was overheard during a recess saying, " '[t]hat son-of-a-bitch [Cady] is guilty as hell.' " 248 Kan. at 749-50. The remark was overheard by a detective who reported it to the prosecution; however, the prosecution never reported it to the defense counsel. While noting the right to a jury trial guarantees to the defendant a fair trial by an impartial, indifferent jury, the court also stated:

"[T]he Fourteenth Amendment's guaranty of due process does not require that a prospective juror be totally ignorant of the facts and issues involved in the case, and the mere existence on his or her part of a preconceived notion as to the guilt

or innocence of the accused is, without more, insufficient to rebut the presumption of impartiality if he or she can lay aside an impression or opinion and render a verdict based on the evidence presented in court." 248 Kan. at 755.

The court did not consider whether this juror's preconceived opinion violated due process because prosecutorial misconduct required a new trial. 248 Kan. at 757.

Juror Seawood's statement is not of the type that occurred in *Cady*, and her second affidavit stated that she "listened to all the evidence but the mitigators could not outweigh the aggravator of his killing the old lady." Instead of indicating a preconceived opinion, the affidavits, read together, demonstrate a proper weighing of aggravating and mitigating circumstances. She was required to and did evaluate all the evidence. Her ultimate decision was adverse to Kleypas but provides no basis for his claims of a denial of due process.

## F. Juror Garrison Advising Other Jurors That a Vote For Death Would Not Mean Kleypas Would Get Death

Juror Garrett stated in her affidavit for the defense, "[a]nother juror, the police officer, repeatedly told the jury that just because a vote was for death, that did not mean that Mr. Kleypas would get death." She clarified in her affidavit for the State by stating:

"When I said in paragraph 4 in my first affidavit, 'Another juror, a police officer, repeatedly told the jury that just because a vote was for death, that did not mean that Mr. Kleypas would get death,' what I meant, and what I think I had originally said, was that the police officer told the jury that just because a vote was for capital murder in the first phase, that did not mean that Mr. Kleypas would automatically get death in the second phase."

Kleypas argues the trial court erred by not recalling juror Garrett to resolve the discrepancy between her affidavits. He contends it is critical to determine whether her comments were made during the guilt or penalty phase, as the effect was to minimize the gravity of the decision the jury was making, citing *Caldwell v. Mississippi*, 472 U.S. 320, 328-29, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985), in which the United States Supreme Court held that it was impermissible for the State to argue in closing that the responsibility for

determining appropriateness of the defendant's death sentence lies elsewhere than with the jury.

The trial court did not specifically address this claim, again labeling all of the issues except juror Garrison's consultation of her handbook as being the mental processes of the jury. The question is whether the trial court abused its discretion by refusing to recall juror Garrett. Even if we were to consider the affidavit, we note that Garrett's second affidavit clarified her original affidavit and hold that the trial court did not abuse its discretion.

Having considered all of Kleypas' allegations of juror misconduct, we find that the trial court did not abuse its discretion in failing to recall jurors other than Garrison and in ultimately concluding that Kleypas' motion for new trial based on juror misconduct should be denied.

Issue 15. Sufficiency of Notice to Seek the Death Penalty and Failure to Provide a Pretrial Ruling on Whether Sufficient Evidence Existed to Support Aggravating Circumstances

Kleypas argues the State's notice of intent to seek the death penalty was insufficient where it did not provide notice of any aggravating circumstances or evidence the State would rely upon. He argues, furthermore, that when the State did file its notice of aggravating circumstances, the notice omitted some evidence the State ultimately presented. Finally, Kleypas contends that when he objected to the sufficiency of the aggravating circumstances, the trial court refused to rule on the motion until after the guilt phase of trial. According to Kleypas, this violated his due process rights.

A. Sufficiency of Notice

The notice statute, K.S.A. 21-4624, states in relevant part:

"(a) If a defendant is charged with capital murder, the county or district attorney *shall file written notice if such attorney intends, upon conviction of the defendant, to request a separate sentencing proceeding to determine whether the defendant should be sentenced to death. Such notice shall be filed with the court and served on the defendant or the defendant's attorney not later than five days after the time of arraignment.* If such notice is not filed and served as required by this subsection, the county or district attorney may not request such a sentencing proceeding and

the defendant, if convicted of capital murder, shall be sentenced as otherwise provided by law, and no sentence of death shall be imposed hereunder.

. . . .

"(c) In the sentencing proceeding, evidence may be presented concerning any matter that the court deems relevant to the question of sentence and shall include matters relating to any of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto and any mitigating circumstances. Any such evidence which the court deems to have probative value may be received regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. *Only such evidence of aggravating circumstances as the state has made known to the defendant prior to the sentencing proceeding shall be admissible,* and no evidence secured in violation of the constitution of the United States or of the state of Kansas shall be admissible." (Emphasis added.)

On October 17, 1996, the day of arraignment, the State filed the following notice:

"The State of Kansas by and through Carla J. Stovall, Attorney General, John K. Bork, Assistant Attorney General, and Barry K. Disney, Crawford County Attorney, give notice to the Court and to the defendant of the State's intention, upon *conviction of the defendant, to request a separate sentencing proceeding to de*termine whether the defendant should be sentenced to death."

Kleypas filed a motion to bar the State from seeking the death penalty for inadequate and defective notice based on the omission of aggravating circumstances the State intended to rely upon in seeking the death penalty. The trial court denied the motion after a hearing. The trial court reasoned the statute was clear and gave no indication that the aggravating circumstances must be listed or included with the notice of intent to seek the death penalty. The trial court ruled the State must file its statutory aggravating circumstances within a reasonable time of trial so that the defendant has sufficient time to prepare accordingly.

The State filed notice of the aggravating circumstances on January 3, 1997. The guilt-phase trial began on July 8, 1997.

The issue involves interpretation of K.S.A. 21-4624. Therefore, our standard of review is as follows:

"Interpretation of a statute is a question of law, and our review is unlimited. *State v. Robinson*, 261 Kan. 865, 874, 934 P.2d 38 (1997). A fundamental rule of statutory construction is that the intent of the legislature governs when that intent can be ascertained from the statute. When a statute is plain and unambiguous, an

appellate court must give effect to the intention of the legislature rather than determine what the law should or should not be. *State v. Proffitt*, 261 Kan. 526, 532, 930 P.2d 1059 (1997). The general rule is that a criminal statute must be strictly construed in favor of the accused and any reasonable doubt about the meaning is decided in favor of anyone subjected to the criminal statute. However, this rule is subordinate to the rule that judicial interpretation must be reasonable and sensible to effect legislative design and intent. *State v. Roderick*, 259 Kan. 107, 110, 911 P.2d 159 (1996)." *State v. Lewis*, 263 Kan. 843, 847, 953 P.2d 1016 (1998).

Kleypas argues the term "notice" in K.S.A. 21-4624(a) requires more than the cursory notice that the State intended to seek the death penalty and that instead notice must be sufficient to allow a defendant to face the death penalty proceedings. He contends that K.S.A. 21-4624 provides for only one notice and that nothing in the statute provides for a later second notice which would contain the aggravating circumstances. In support of his contention, he cites *State v. Gideon*, 257 Kan. 591, 894 P.2d 850 (1995).

In *Gideon*, the State presented notice at arraignment of the aggravating circumstances on which it would rely. Gideon, however, argued that the State was required to give notice of the evidence it would present at the sentencing proceeding, not just the aggravating circumstances. We found that the State's presentation of the aggravating circumstances was sufficient, noting that K.S.A. 1993 Supp. 21-4624(1), which at that time addressed the notice requirement for imposition of the hard 40 sentence, "does not detail what information must be contained in the notice." 257 Kan. at 601. We also concluded that the presentation of aggravating circumstances before trial was sufficient under the facts to advise Gideon as to what evidence would be presented. 257 Kan. at 601.

Contrary to Kleypas' argument, our opinion in *Gideon* does not stand for the proposition that K.S.A. 21-4624 requires the State to present notice of the aggravating circumstances at the time of arraignment. Rather, in *Gideon*, we held that it was sufficient for the State to do so at that time and that no further notice regarding the evidence was required. 257 Kan. at 600-01.

Kleypas also cites *State v. Timmons*, 192 N.J. Super. 141, 469 A.2d 46 (1983), for the proposition that notice of aggravating factors at arraignment is required. In *Timmons*, the State failed to

present aggravating factors at arraignment as required by court rule. The court found this to be error and precluded the State from alleging aggravating factors not disclosed. 192 N.J. Super. at 149. In so holding, the court stated:

"R. 3:13-4(a) requires the prosecutor to give defendant, at arraignment, an itemization of aggravating factors which he or she intends to prove at the sentencing hearing. Discovery pertaining to such aggravating factors must also be disclosed at arraignment, unless the time to do so is enlarged for good cause by the court. The purpose for this requirement is revealed in the commentary to the rule, which states, 'This practice would serve to avoid needless delays often occasioned by the failure to provide discovery in a timely fashion. Such a practice has the added advantage fo allowing increased time to fully investigate and analyze the aggravating and mitigating circumstances said to be present in a given case.' [Citation omitted.]

"The additional time for investigation provided via the rule is vitally important for the defendant. This is so because, '. . .the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100 year prison term differs from one of only a year to two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.' *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 2991, 49 L. Ed.2d 944 (1976). This distinction cannot be overstated." 192 N.J. Super. at 144.

The *Timmons* court went on to recite several considerations for which a defendant might need this extra time, including: (1) the retention or appointment of counsel,( 2) tactical decision about the handling of the case and pretrial motion, (3) preparation for the penalty phase, (4) eligibility for bail, and (5) plea bargaining. 192 N.J. Super. at 145-46.

While the policy considerations that lead the New Jersey courts to adopt a court rule requiring notice of aggravating factors at the time of arraignment are certainly valid, we have adopted no such rule in Kansas. Such a bright line rule might be helpful but it cannot be said that it is required by the language of K.S.A. 21-4624. Rather, the statute requires only that the State file notice of its intent to seek the death penalty at that time. K.S.A. 21-4624(a). This notice is sufficient to allow a defendant to begin his or her preparation for trial as it serves notice that the case will indeed be a death case, thus allowing the defendant to make choices regard-

ing the retention of counsel, plea bargaining, and preparation of mitigating circumstances. See *Timmons*, 192 N.J. Super. at 145-46.

We, therefore, hold that under K.S.A. 21-4624, the State is only required to provide notice that it intends to seek the death penalty upon conviction for capital murder. The State may at that time provide notice of the aggravating circumstances on which it will rely but the State is not required to do so as long as it provides such notice within a reasonable time prior to trial to allow the defendant an opportunity to prepare to defend against the aggravating circumstances.

Here, the State filed notice of aggravating circumstances 6 months before trial. Kleypas was aware of one likely aggravating circumstance—his prior murder conviction. Under the circumstances, Kleypas' due process rights were not violated.

As part of his argument regarding the notice requirement in K.S.A. 21-4624, Kleypas also contends that the prosecution's list of the evidence which it would offer lacked notice of some of the evidence ultimately presented, specifically, that footprints behind Bessie Lawrence's house led to Kleypas' home. However, K.S.A. 21-4624 does not require the State to list the evidence it will present with regard to the aggravating circumstances as long as the State has made this evidence known to the defense prior to the sentencing proceeding. See K.S.A. 21-4624(c); *Gideon*, 257 Kan. at 600-01.

## B. Pretrial Ruling on Sufficiency of Aggravating Circumstances

Kleypas contends he had a right to a judicial determination of whether there was some basis for the existence of the aggravating circumstances or, in other words, probable cause before the guilt phase even began. Kleypas filed a motion challenging the sufficiency of some of the aggravating circumstances; however, the trial court refused to rule on the motion until the conclusion of the guilt phase.

The State filed notice of five aggravating circumstances on January 3, 1997. Prior to commencement of the penalty phase trial,

the State dismissed one aggravator and the trial court dismissed another, leaving three aggravating circumstances.

Kleypas argues the trial court's failure to rule on his motions deprived him of due process of law. He contends the Due Process Clause of the Fourteenth Amendment to the Unites States Constitution requires that a defendant subject to the death penalty must first be given notice that the penalty may be imposed and then be given a fair opportunity to contest the imposition before it is pronounced. He urges this court to follow California and New Jersey and find some judicial review of the prosecutor's decision to seek the death penalty prior to trial would be in order, citing *State v. McCrary*, 97 N.J. 132, 478 A.2d 339 (1984), and *Ghent v. Superior Court of Santa Clara County*, 153 Cal. Rptr. 720, 90 Cal. App. 3d 944 (1979). Otherwise, according to Kleypas, any time there is a homicide the prosecutor can impanel a death qualified jury for the guilt phase of the trial by merely filing a list of aggravating circumstances, even if none exist. He argues that a defendant has a significant interest in having a normal non-death qualified jury, an interest which is lost if the trial court denies the defendant a hearing and ruling on challenges to aggravating circumstances.

In *McCrary*, the State of New Jersey brought an indictment charging McCrary with purposeful or knowing murder, aggravated assault, unlawful possession of a handgun, and possession of a firearm with a purpose to use the weapon unlawfully. Under New Jersey law, McCrary faced the death penalty for a purposeful or knowing murder if one or more statutorily specified aggravating factors were shown and not outweighed by one or more mitigating factors. The New Jersey Code required the State to give a defendant notice of any aggravating factors it intended to prove " '[p]rior to the commencement of the sentencing proceeding, or at such time as he has knowledge of the existence of an aggravating factor . . . .' " 97 N.J. at 135. At the time of notification, the State was also required to provide " 'all discovery bearing on' " the aggravating factors. 97 N.J. at 138.

Before trial, McCrary moved to strike the aggravating factors, alleging the factors were totally unsupported by the evidence. Over the State's objection, the trial court ordered a hearing on the suf-

ficiency of proof of aggravating factors. The State filed a motion for leave to appeal from the order. The New Jersey court granted review on the limited issue of whether the New Jersey Code permitted judicial review of aggravating factors prior to trial on the factual basis of the factors and, if so, the type of hearing that could be conducted. The New Jersey court made clear that it was not addressing any constitutional or statutory issues not squarely before the court. 97 N.J. at 138.

First, on the issue of jurisdiction, the New Jersey court stated:

"When a criminal proceeding takes on the character of a capital case, the exercise of such authority [jurisdictional] is not only tenable, it is absolutely imperative to ensure fundamental fairness to a defendant. There is a qualitative distinction between death and imprisonment. 'Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.' *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). A healthy sensitivity to this distinction militates against prejudicing a defendant by the unwarranted injection of the possibility of a death sentence in a homicide proceeding." 97 N.J. at 139-40.

Next, the court stated that the fact that the legislature did not provide for such a remedy did not mean the judicial branch was limited in fashioning or denying remedies within the boundary of legislative expression. The court particularly noted the appropriateness of judicial oversight in view of the significance of the prosecutor's notice, which alone transforms a homicide case into a capital proceeding. The New Jersey Code requires no probable cause determination of whether a homicide case should proceed as a capital case. The prosecutor's notice acts as the trigger for both the death qualification of the jury and the separate sentencing phase. Therefore, "[s]ome judicial oversight is required to ensure at the very least that the proceeding contemplated by the prosecutor's notice not be set in motion without justifiable cause." 97 N.J. at 140.

Addressing prosecutorial discretion, the New Jersey court acknowledged the broad discretionary powers and presumption of validity in the conduct of the prosecutor and sought only minimal intrusion into this area. Accordingly, in striking a balance between prosecutorial discretion and fairness to the defendant, the court

adopted the following standard for dismissal of indictments: a presumption in favor of the charges requiring a challenging defendant to demonstrate that evidence is clearly lacking to support the charges. 97 N.J. at 142.

The New Jersey court stressed that trial court discretion in granting a hearing should be limited to motions alleging the aggravating factors are plainly without support. The court noted striking of an aggravating factor would be without prejudice. If later supporting evidence came to light before commencement of the sentencing phase and upon notice to the defendant, a sentencing phase could proceed. 97 N.J. at 144-45. Although it found California case law distinguishable because California law required that evidence of "special circumstances" justifying imposition of a death penalty be alleged in accusatory pleadings presented by the grand jury, the New Jersey court noted with approval the limited review provided for in *Ghent*. 97 N.J. at 145. See also *State v. Matulewicz*, 115 N.J. 191, 557 A.2d 1001 (1989) (following *McCrary*). In *Ghent*, the court allowed pretrial review of the evidence supporting the special circumstances required to impose the death penalty. 153 Cal. Rptr. at 726-27.

Both *McCrary* and *Ghent* stand for the proposition that it is not error to allow a pretrial challenge to aggravating factors. However, Kleypas provides no authority holding that a pretrial determination of whether there is sufficient evidence of aggravating circumstances to justify a separate penalty phase trial is constitutionally required. We do not find the reasoning in *McCrary* in favor of conducting such a determination to be persuasive. Kansas has a specific charge of capital murder and, therefore, an initial determination of whether a case should proceed as a capital offense. In New Jersey, a defendant may be subject to the death penalty for any purposeful murder after the State provides notice of an aggravating factor and there is no prosecutorial check before the case proceeds as a capital-murder case. Due to the nature of this system, the New Jersey court held that some judicial oversight was required. Based on the marked difference between Kansas and New Jersey law, we are not required to fashion such a judicial remedy in order to protect the rights of defendants. We hold that the trial

court did not err in failing to allow Kleypas to challenge the sufficiency of the aggravating circumstances prior to the guilt phase of the trial.

## Issue 16. Competency to Stand Trial

Kleypas filed two motions alleging that he was incompetent to stand trial. Both were denied by the court after hearing. He contends that the trial court abused its discretion in denying both motions.

Our standard of review on both motions is one of abuse of discretion.

"A criminal defendant is incompetent to stand trial when, because of a mental illness or defect, the defendant is unable to understand the nature and purpose of the proceedings against him or her or where he or she is unable to make or assist in making a defense. K.S.A. 22-3301. On appeal, a reviewing court's inquiry regarding the decision of a district court that a defendant is competent to stand trial is whether the trial court abused its discretion. *State v. Peckham*, 255 Kan. 310, 325, 875 P.2d 257 (1994). Judicial discretion is abused where no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *State v. O'Neal*, 256 Kan. 909, 911, 889 P.2d 128 (1995)." *State v. Barnes*, 263 Kan. 249, 263, 948 P.2d 627 (1997).

Kleypas urges this court to apply the above standard to the evidence but argues that the burden of proof at the first hearing was upon the State because the trial court ordered his competency evaluation on its own motion. He cites *State v. Cellier*, 263 Kan. 54, 70, 948 P.2d 616 (1997):

"The obvious rule is that a party who raises the issue of competence to stand trial has the burden of going forward with the evidence, which will be measured by the preponderance of the evidence standard. When the court itself raises the competency issue, the court is not a party and cannot be responsible for coming forward with the evidence, but it can assign that burden to the State because both the court and the State have a duty to provide due process and to provide a fair trial to an accused."

However, it is clear that while the trial court appointed Larned State Security Hospital (Larned Hospital) to evaluate Kleypas, it did so only after the defense counsel filed a motion raising the issue of incompetency. The party who raises the issue of compe-

tency, not the one who orders the evaluation, is assigned the burden of proof. When opening the first hearing, the trial court explicitly stated: "Approximately a month ago the Court ordered that the defendant's competency be determined *pursuant to motion filed by the defendant*. Accordingly, he was sent to the Larned State Security Hospital for that competency evaluation." (Emphasis added.) Contrary to his contention, application of our standard of review properly places the burden of proof on Kleypas.

A. First Motion

On March 7, 1997, Kleypas filed a notice of incompetency to stand trial. Attached to the notice was an affidavit signed by the defense counsel attesting to Kleypas' behavior. Also attached was an affidavit of Dr. Jonathan Lipman, a neuropharmacologist, attesting to his findings after an evaluation of Kleypas in June 1996, and Dr. Gerald Gentry, attesting to his observations of Kleypas in August and September 1996. The final attachment was a 1977 report from Dr. Emasue Snow, apparently conducted and written for Kleypas' defense in the murder trial of Bessie Lawrence.

The trial court held a hearing on April 11, 1997. Dr. Ekkehard Othmer testified for the defense, and Dr. J.L. Fernando, of Larned Hospital, testified for the State. Dr. Fernando testified that Kleypas was clearly competent to stand trial and that it was "not even a close call." Dr. Fernando testified that Larned Hospital did not perform comprehensive testing on Kleypas because such extensive evaluation is usually reserved for marginal competency cases or where it is necessary to determine the existence of mental disease or defect as required for a potential insanity defense, which was not the case here. Dr. Fernando noted that Kleypas was aware of the serious nature of the charges against him and the potential consequences of the charges. It was Dr. Fernando's opinion that Kleypas would be able to work with his attorneys as demonstrated when Kleypas refused to sign a release of information consent form without first consulting his lawyers. Dr. Fernando testified that Kleypas' thought processes were organized and there was no evidence of auditory or visual hallucinations during Kleypas' stay at Larned Hospital. Larned Hospital staff did not observe evidence

of bizarre behavior or response to unseen stimuli and, in general, observed that Kleypas acted appropriately throughout his stay.

Dr. Othmer did not evaluate Kleypas; rather, he evaluated the adequacy of Larned Hospital's evaluation. It was Dr. Othmer's opinion that Larned Hospital's evaluation process was inadequate to provide a reliable conclusion on Kleypas' competency to stand trial. He criticized the lack of thorough psychological testing of Kleypas, although admitting that in cases where the individual is obviously competent, such an evaluation process could be shortened. Dr. Othmer also took issue with Larned Hospital's assignment of a Global Assessment Function (GAF) score of 40. The GAF is computed on a scale of 1 to 100 with anyone rated at 50 or below requiring hospitalization. The GAF measures an individual's ability to relate or interact with others in an appropriate way. Dr. Othmer found Kleypas' score of 40 inconsistent with Dr. Fernando's opinion that Kleypas was competent to stand trial. Dr. Fernando, however, based the low GAF score on Kleypas' prior murder and his present capital-murder charge, rather than a lack of contact with reality.

After consideration of the testimony of both psychiatrists regarding Kleypas' GAF score and concluding that a score of 40 under the facts of this case was not inconsistent with a finding of competency, the trial court ruled:

"Competency to stand trial is defined as the ability of a defendant to understand the nature and purpose of the proceedings against him and to make or assist in making a defense. *State v. Peckham*, 255 Kan. 310. There is simply nothing of significance in the testimony or the exhibits of significance that militates against a finding of competency. SSH [Larned Hospital] believes the defendant is obviously competent and that this is not even a close call. Rather than presenting evidence that the defendant is incompetent, counsel have only attacked the thoroughness of the SSH evaluation. Even Dr. Othmer did not state that the defendant is incompetent, rather, he believes that additional testing is necessary before that determination can be made. This position goes to the weight of the evidence. Ultimately the only evidence on the issue of competency that was presented, and can therefore be weighed, is evidence supporting a finding of competency.

"The above-cited *Peckham* case is instructive as it involved a determination of competency base upon three factors: first, the lack of evidence of incompetency; second, as expert's direct opinion of competency; and third, the court's own observations. *Peckham*, at 325. In the present matter, there is no evidence of incom-

petency. Secondly, the only direct opinion on the issue of competency was Dr. Fernando's opinion that the defendant is indeed competent for trial. Dr. Othmer was unable to render an opinion of the issue of competency. Indeed, Dr. Othmer has never interviewed the defendant. Third, the Court's observations of the defendant in court support a finding of competency. The defendant has always responded appropriately to questions posed by the Court, the defendant answered questions appropriately the sole time he has testified in this matter, and the Court has never observed any inappropriate conduct or mannerism exhibited by the defendant during the many hearings held to date in this matter. Moreover, the Court notes the defendant's responses to the so-called Sentence Completion Test, the form entitled "C.S.T.," in the Psychiatric section of Defense Exhibit #1. Said form clearly demonstrates that the defendant has the correct perception of this matter.

"Based upon the above-referenced findings and comments, all exhibits submitted, the testimony of the competency hearing, and arguments of counsel, the Court finds that the defendant understands the nature and the purpose of the proceedings against him and is able to make or assist in the making of his defense. The defendant is accordingly found competent to stand trial. In the absence of any evidence to the contrary, the Court finds that the defendant has been unable to sustain his burden of proving incompetency by a preponderance of the evidence. Moreover, the Court believes that the evidence of competency is sufficiently substantial enough that the Court would nevertheless find the defendant competent to stand trial even were the burden to be placed upon the State."

On appeal, Kleypas raises many of the same issues addressed by the trial court. Rather than attacking the trial court's finding of competency, Kleypas complains of the inadequacy of the Larned Hospital evaluation. The additional arguments and authority advanced by Kleypas fail to demonstrate an abuse of discretion. Accordingly, under our standard we affirm the trial court's determination as to Kleypas' first motion.

B. Second Motion

On June 30, 1997, within 2-1/2 months of the trial court's initial determination that Kleypas was competent to stand trial, Kleypas filed a second notice of incompetency. In addition to attacking the prior competency hearing, this notice alleged that Kleypas was experiencing ongoing memory lapses or amnesia. The notice included an affidavit from Gaye Nease, an attorney employed as a mitigation specialist by the Kansas Death Penalty Defense Unit. In the affidavit, Nease brought up several instances regarding Kley-

pas' mental processes interfering with his ability to communicate with counsel. However, Nease did not testify at the second competency hearing.

Despite the trial court's opinion that the notice provided no new information and was in the nature of a delaying tactic, the court ordered another competency evaluation to be performed by Wyandot Mental Health Center (WMHC).

Kleypas refused to be interviewed by WMHC before consulting with his attorneys. He was allowed to consult with his attorneys, and the interview was rescheduled. Kleypas again refused to cooperate with WMHC. The trial court held a hearing on July 7, 1997. The only evidence presented was that of Mark Roberts, a psychologist at WMHC, who testified that Kleypas had refused testing and that he recommended further testing as merely standard operating procedure when someone refused to be interviewed. The trial court offered Kleypas another chance to be evaluated, but he again declined.

The trial court concluded that the allegations in Kleypas' second notice of incompetency were essentially the same as contained in the first notice; that Kleypas, in essence, was attempting to attack the first finding of competency. The court noted the affidavit of Nease and that she was not present for testimony or cross-examination. The trial court found Kleypas' refusal to be interviewed by WMHC before he consulted with his attorneys again suggests he understands the seriousness of the charges and does not suggest any incompetency. As Kleypas' actions precluded any further attempt to determine his competency and in view of the lack of evidence presented at this hearing, the trial court concluded that it could only find Kleypas competent to stand trial.

After the trial court ruled against Kleypas on the competency issue, defense counsel Wood stated he was prepared to take the witness stand and provide evidence on Kleypas' alleged amnesia, referring to an earlier motion filed by defense counsel titled "Notice of Necessity of Defense Counsel Becoming a Witness for the Accused and Proffer of Material Evidence to Which Counsel is the only Witness." This earlier motion claimed that Kleypas could not recall the initial interrogation by Agent Williams and Detective

Hite or that he told defense counsel that Agent Williams and Hite threatened him on the car ride back to Kansas; that he could not recall advising his attorneys that Agent Williams rehearsed what would be covered on the videotaped confession; and that he did not respond " '[t]he long and the short of it, yes,' " to the question of whether he killed C.W. but instead said, " 'I guess I did, I'm not sure.' "

The trial court did not allow Wood to testify, indicating that it was not doubting Wood's word but instead was finding that even if the testimony were allowed, amnesia alone would not be sufficient to make a finding of incompetency, citing *State v. Owens*, 248 Kan. 273, 807 P.2d 101 (1991).

Kleypas argues the trial court's refusal to hear testimony from the defense counsel on the competency issue is reversible error. He claims the refusal was a due process violation as the defense counsel's testimony was the best evidence of Kleypas' behavior since counsel had spent countless hours conversing with Kleypas. Kleypas contends the overwhelming weight of federal and state law supports his argument that defense counsel "must" be permitted to testify at a competency hearing.

The authorities cited by Kleypas support the view that an attorney *may* testify at a competency hearing. However, the general principle in those cases is that the attorney's testimony may not violate the attorney-client privilege and, thus, is permitted where it does not reveal the substance of any confidential communication but instead focuses on the attorney's observations of matters that are not confidential, such as the defendant's behavior or demeanor. See *Howell v. United States*, 282 F. Supp. 246, 249 (E.D. Ill. 1968); *Bishop v. Superior Court In & For Puma Cty.*, 150 Ariz. 404, 408, 724 P.2d 23 (1986); *Manning v. State*, 766 S.W.2d 551, 556-57 (Tex. App. 1989).

Regarding amnesia as a basis for a claim of incompetency, we have held:

"Amnesia alone should not supply the basis for declaring a defendant incompetent to stand trial. Amnesia is a factor to be considered in determining whether the defendant is able to meet the test of competency to stand trial and to obtain a fair trial. *State v. Gilder*, 223 Kan. 220, Syl. ¶ 3, 574 P.2d 196 (1977). See

Annot., 46 A.L.R.3d 544. The danger of false claims is great. *Fajeriak v. State*, 520 P.2d 795, 802 (Alaska 1974). Amnesia can easily be feigned. *State v. Mc-Clendan*, 103 Ariz. 105, 108, 437 P.2d 421 (1968)." *Owens*, 248 Kan. at 280.

Kleypas acknowledges that amnesia alone does not require a finding of incompetence; however, he contends there was evidence of significant amnesia which "hamstrung" his ability to effectively communicate with his defense team.

There was no evidence of Kleypas' memory deficit from Larned Hospital's evaluation of him. Kleypas gave no indication he had any amnesia for the significant events constituting the offense. Kleypas' suggestion that he refused the second competency evaluation "contrary to the advice of counsel" is self serving and not supported by the record.

It is true that the "failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent . . . deprives him of his due process right to a fair trial." *Drope v. Missouri*, 420 U.S. 162, 172, 43 L. Ed. 2d 103, 95 S. Ct. 896 (1975). However, the court's failure to allow the defense counsel to testify regarding Kleypas' alleged amnesia did not deprive Kleypas of his due process rights. The procedure used here was adequate to protect Kleypas' due process rights, and the evidence supported the trial court's finding of competency.

We conclude that under the circumstances of this case, neither the refusal of the trial court to allow Wood to testify nor the finding that Kleypas was competent to stand trial was an abuse of discretion on the part of the trial court. *State v. Peckham*, 255 Kan. 310, 325, 875 P.2d 257 (1994). Even considering Wood's proffered testimony, the trial court did not abuse its discretion in determining that Kleypas was competent to stand trial. Although Wood proffered that Kleypas suffered from amnesia which affected his ability to communicate effectively with counsel, Kleypas' evaluation from Larned Hospital showed no such memory deficit. Under the circumstances, any error in the failure to consider Wood's testimony was harmless.

Issue 17. Removal of Prospective Juror Molden for Cause—United States Constitution

Kleypas contends that the trial court erred in removing prospective juror Molden for cause due to her moral and religious

beliefs about the death penalty. During voir dire, Molden stated that her moral and religious beliefs would prevent her from returning a verdict which would result in the execution of another human being. However, upon questions posed by the defense counsel, she indicated that it would be possible for her to return a death penalty if the case fell within her list of very few exceptions. These exceptions were not identified, although Molden said she would know at once if the case met her exceptions. The defense counsel did not object to the removal of Molden for cause.

We have held that challenges for cause are matters left to the sound discretion of the trial court, which is in a better position to view the demeanor of prospective jurors during voir dire. A trial court's ruling on a challenge for cause will not be disturbed on appeal unless it is clearly erroneous or amounts to an abuse of discretion. *State v. Dixon*, 248 Kan. 776, 788, 811 P.2d 1153 (1991).

Kleypas argues that the court abused its discretion because the juror's response that she could return a death penalty for one of her very few exceptions rehabilitated her as a qualified juror under *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), and *Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841, 105 S. Ct. 844 (1985). In *Witherspoon*, the United States Supreme Court held "that a sentence of death could not be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522. *Witt* clarified the standard for determining when a prospective juror may be excluded for cause because of his or her views on the death penalty. The Court stated that a prospective juror may be excluded for cause because of his or her views on capital punishment where "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " 469 U.S. at 424. The Court said that "this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' " 469 U.S. at 424.

The *Witt* decision was grounded in the Sixth and Fourteenth Amendments and the right to an impartial jury. 469 U.S. at 422-23.

K.S.A. 22-3410(2)(i) allows a party to challenge any prospective juror for cause when a juror's "state of mind with reference to the case or any of the parties is such that the court determines there is doubt that he can act impartially and without prejudice to the substantial rights of any party."

Kleypas argues that the facts in this case are strikingly similar to those in *Gray v. Mississippi*, 481 U.S. 648, 95 L. Ed. 2d 622, 107 S. Ct. 2045 (1987); *Farina v. State*, 680 So. 2d 392 (Fla. 1996); and *Clark v. State*, 929 S.W.2d 5 (Tex. Crim. App. 1996). However, in each of the cases relied upon by Kleypas, the juror, although opposed to the death, unequivocally stated that she would follow the instructions even if it resulted in the imposition of the death penalty. In the case at hand, the State asked whether Molden's beliefs would substantially impair her ability to follow the instructions. She stated: "Yeah, I guess I would put it like that, yeah." Her comments following this statement regarding special cases where she might impose the death penalty did not rehabilitate her in this regard. Clearly, from her testimony, Molden's ability to follow the instructions would have been dependent on whether the case was one of her "very few exceptions," a standard she was unable to articulate. Thus, the court's decision that Molden's views would " 'prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath' " was not clearly erroneous or an abuse of discretion. See *Witt*, 469 U.S. at 424.

## Issue 18. Removal of Five Jurors for Cause—Kansas Constitution

Kleypas next argues about the removal of five prospective jurors, including Molden, for cause. We have already discussed the removal of Molden above, concluding that it was not error under *Witt*. Kleypas recognizes that the removal of the other four prospective jury members, Ash, Watson, Neal, and Tinder may also have been permissible under the standard in *Witt*. Kleypas contends, however, that the removal of the five prospective jurors violated § 7 of the Kansas Constitution Bill of Rights, which he claims provides broader protection than the First Amendment to the United States Constitution and should be read to provide a further

limitation on the State's power to exclude prospective jurors based on their religious opposition to the death penalty.

Section 7 of the Kansas Constitution Bill of Rights provides:

"The right to worship God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend or support any form of worship; nor shall any control of or interference with the rights of conscience be permitted, nor any preference be given by law to any religious establishment or mode of worship. No religious test or property qualification shall be required for any office of public trust, nor for any vote at any election, nor shall any person be incompetent to testify on account of religious belief."

Kleypas contends an "office of public trust" is equivalent to "public office" which would include a juror, citing K.S.A. 21-3110(19)(c) ("public officer" includes a "judicial officer" which in turn includes a juror) and *State v. Monahan*, 72 Kan. 492, 501, 84 Pac. 130 (1905) ("office of public trust" is equivalent to "public office"). Consequently, Kleypas maintains the trial court cannot require a religious test of an individual holding the office of juror. Thus, according to Kleypas' theory, excluding a juror for cause on the basis of his or her religious belief concerning the death penalty is an impermissible "religious test," violating § 7 of the Kansas Constitution Bill of Rights.

K.S.A. 43-156 provides that "[n]o person shall be excluded from service as a grand or petit juror in the district courts of Kansas on account of race, color, religion, sex, national origin, or economic status." Section 7 of the Kansas Constitution Bill of Rights does not provide any greater limitation than already provided under K.S.A. 43-156. The trial court excused Ash, Watson, Neal, Tinder, and Molden due to their inability to be impartial and follow their oath as jurors regarding consideration of the death penalty, not on religious grounds. Further, where one of the jurors cited religious beliefs as a basis for objecting to the death penalty, religion did not appear to be the sole basis for the formation of their beliefs as exemplified by juror Ash's comment that his views on the death penalty "developed as a result of life experiences."

We conclude that the trial court did not abuse its discretion by excusing Ash, Watson, Neal, Tinder, and Molden for cause.

Issue 19. Denial of a Separate Sentencing Jury

Kleypas contends that the trial court erred in denying his request for a separate sentencing jury. He argues that he was prejudiced because the same jury that heard his guilt phase also heard the penalty phase argument.

K.S.A. 21-4624(b) governs juries in capital cases and provides:

"Except as provided in K.S.A. 21-4622 and 21-4623, and amendments thereto, upon conviction of a defendant of capital murder, the court, upon motion of the county or district attorney, shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death. *The proceeding shall be conducted by the trial judge before the trial jury as soon as practical. If any person who served on the trial jury is unable to serve on the jury for the sentencing proceeding, the court shall substitute an alternate juror who has been impaneled for the trial jury. If there are insufficient alternate jurors to replace trial jurors who are unable to serve at the sentencing proceeding, the trial judge may summon a special jury of 12 persons which shall determine the question of whether a sentence of death shall be imposed.* Jury selection procedures, qualifications of jurors and grounds for exemption or challenge of prospective jurors in criminal trials shall be applicable to the selection of such special jury. The jury at the sentencing proceeding may be waived in the manner provided by K.S.A. 22-3403 and amendments thereto for waiver of a trial jury. If the jury at the sentencing proceeding has been waived or the trial jury has been waived, the sentencing proceeding shall be conducted by the court." (Emphasis added.)

The express provisions of the statute undermine Kleypas' argument. We are not at liberty to interpret other provisions of the statute to require a separate jury where, as here, express provisions of the statute provide otherwise.

The provisions of K.S.A. 21-4624(b) are constitutionally sound. The United States Supreme Court has repeatedly upheld legislatures' enactments of unitary or same jury procedures in capital cases. *Lockhart v. McCree*, 476 U.S. 162, 180, 90 L. Ed. 2d 137, 106 S. Ct. 1758 (1986); *Spaziano v. Florida*, 468 U.S. 447, 464, 82 L. Ed. 2d 340, 104 S. Ct. 3154 (1984); *Gregg v. Georgia*, 428 U.S. 153, 168, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976). *Lockhart* identified several interests in support of a unified jury: (1) The same jurors responsible for deciding guilt should also have the responsibility for deciding punishment, the two questions being intertwined; (2) in some cases the defendant may benefit from the same

jury system if the jury has any "residual doubts" concerning the strength of the evidence; and (3) evidence presented during the guilt phase, having a bearing on the penalty phase, would not have to be presented twice. 476 U.S. at 181. The trial judge in this case specifically identified some of the above advantages in denying the defendant's motions.

Kleypas argues that the failure to provide for a separate sentencing jury puts him in the untenable position of being unable to voir dire the jury as to its bias regarding certain aggravating circumstances, such as his prior record, for fear of prejudicing the jury in the guilt phase. He cites authority from Oregon and New Jersey involving a similar issue to the one he now raises. See *State v. Biegenwald*, 126 N.J. 1, 594 A.2d 172 (1991); *State v. Pinnell*, 311 Or. 98, 806 P.2d 110 (1991). However, it must be observed that each state interprets its own law and none of the authority cited is controlling in the interpretation of Kansas law.

K.S.A. 21-4624(b) provides a method for the defendant in every capital-murder case to remove biased jurors during the penalty phase. The defendant is entitled to ask questions during voir dire before the sentencing phase of the trial begins. Here, Kleypas chose not to voir dire the jurors concerning the binding effect of his prior murder conviction or any of the aggravating circumstances. However, that procedure existed as a method of removing potentially biased jurors for cause. See *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222 (1992). The provisions of K.S.A. 21-4624(b) anticipate that persons who served as jurors during trial may not be available for the sentencing phase of the trial:

"If any person who served on the trial jury is unable to serve on the jury for the sentencing proceeding, the court shall substitute an alternate juror who has been impaneled for the trial jury. If there are insufficient alternate jurors to replace trial jurors who are unable to serve at the sentencing proceeding, the trial judge may summon a special jury of 12 persons which shall determine the question of whether a sentence of death shall be imposed."

We conclude, based upon the express provision of K.S.A. 21-4624(b), that the trial court correctly denied Kleypas' motion for a separate sentencing jury.

## Issue 20. Alleged Judicial Misconduct During Jury Orientation

Kleypas contends that a comment made by the trial court during jury orientation was error and prejudiced his right to a fair trial. During jury orientation, the prospective jurors were separated into two groups. As part of its opening comments before both groups, the trial court provided a brief general overview of the justice system and, in particular, juries and their function. In giving this overview, the trial court stated: "Under certain circumstances, parties are entitled to a jury trial when they are not otherwise able to settle their controversies."

The next morning, Kleypas filed a motion for mistrial and discharge of panel and/or corrective instruction. Kleypas argued the comment would lead the jury to believe that it was within Kleypas' power to "settle the controversy" but that he had not done so. Further, the comment suggested to the jury that there had been failed plea negotiations indicating his guilt on charges filed. The proffered curative instruction stated: "Mr. Kleypas has an absolute right to a jury trial under the constitution. The State of Kansas is responsible for the necessity of this case going to trial as the State has refused any attempt to resolve the matter short of a death sentence for Mr. Kleypas." In chambers before the start of voir dire, the trial court denied the motion, stating that it was the court's opinion that nothing untoward was conveyed to the jury by the court's opening comments. The fact that Kleypas offered to plead and the offer refused by the State was not known to the jury and until this point not known to the trial court. The court stated that in fact the curative instruction would convey to the jury that Kleypas had offered to plea and make a suggestion of guilt.

This court analyzes jury orientation comments under the judicial misconduct standard of review. *State v. Gadelkarim*, 256 Kan. 671, 676, 887 P.2d 88 (1994). Under that standard:

"Allegations of judicial misconduct during trial must be decided on the particular facts and circumstances surrounding such alleged misconduct. In order to warrant or require the granting of a new trial, it must affirmatively appear that the conduct was of such a nature that it prejudiced the substantial rights of the complaining party. A mere possibility of prejudice from a remark of the judge is not sufficient to overturn a verdict or judgment. If a proper and reasonable con-

struction will render the remark unobjectionable, the remark is not prejudicial. *State v. Nguyen*, 251 Kan. 69, Syl. ¶¶ 4, 5, 833 P.2d 937 (1992)." 256 Kan. at 677.

Kleypas contends the trial court's comments were prejudicial and required a mistrial or a curative instruction. As this did not occur, he believes a new trial is warranted. Kleypas argues the comment was prejudicial as it "denigrated" his constitutional right to a jury trial. He further argues that there was a reasonable likelihood that the jury construed the statement as an indication that Kleypas was responsible for the parties' inability to settle their controversies and implied there had been unsuccessful plea negotiations and, thus, an acknowledgment of guilt on the defendant's part, citing *State v. Miller*, 259 Kan. 478, 485-86, 912 P.2d 722 (1996).

In *Miller*, before the trial court dismissed those venire members who were not seated on the jury, the court stated:

" 'And I just want to tell you that we appreciate the fact you came in, because if we didn't have persons such as yourselves who were willing to take a day out of their lives to come down here to make up a jury panel for us, we'd never get juries. And the reality is that for every case we try, we end up handling nearly twenty of them without the necessity of a trial because people involved in the process know that citizens such as yourselves are willing to come down here and make up juries for us and that we have a system that will, in fact, work.' " 259 Kan. at 485.

Miller claimed that this comment denied him a fair and impartial trial. We held that Miller showed no prejudice from the remark and that the remark, read in context, did not suggest that Miller should have pled guilty, and found no error. 259 Kan. at 486.

The trial court's brief statement was lifted from prepared general jury orientation comments. We conclude that the remarks of the trial judge in no way referred to, nor could even be inferred as referring to, anything specific in Kleypas' case. The remark was unobjectionable and not prejudicial. The trial court did not err in refusing to give the corrective instruction suggested by Kleypas.

## Issue 21. Alleged *Batson* Violation for Peremptory Strike of Juror Wheeler

Kleypas argues that the State's peremptory strike of prospective juror Wheeler violated the United States Supreme Court decision

in *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). He contends that the State struck Wheeler on the basis of gender and that the gender-neutral reasons given for the strike—that Wheeler's roommate was an alcoholic and that Wheeler had indicated that she was unsure whether the death penalty was a necessary punishment—were unlawful reasons.

Kleypas further argues that striking Wheeler because of her association with an Americans with Disabilities Act (ADA) disability-qualified individual is in itself a *Batson* violation and cannot be a gender-neutral reason. Alcoholism meets the definition of a disability for ADA purposes. See *Miners v. Cargill Communications, Inc.*, 113 F.3d 820, 823 n.5 (8th Cir. 1997); *Senate Sergeant at Arms v. Senate Fair Emp. Pract.*, 95 F.3d 1102, 1105 (Fed. Cir. 1996).

It is questionable whether *Batson* applies to ADA disabilities. See *U. S. v. Santiago-Martinez*, 58 F.3d 422, 423 (9th Cir. 1995). In *Santiago-Martinez*, the Ninth Circuit Court of Appeals held that a peremptory strike based on obesity did not violate *Batson* even though obesity was a recognized disability for purposes of the ADA. The Ninth Circuit limited any *Batson* protection beyond gender and race to those classes to which heightened scrutiny under the Equal Protection Clause would apply. 58 F.3d at 423. In so holding, the Ninth Circuit noted that the United States Supreme Court in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 L. Ed. 2d 89, 114 S. Ct. 1419 (1994), had stated that "[p]arties may . . . exercise their peremptory challenges to remove from the venire any group . . . subject to 'rational basis' review." 58 F.3d at 423. See *J.E.B.*, 511 U.S. at 143. It has been held that alcoholics are not a suspect or quasi-suspect class for equal protection analysis and are thus subject only to rational basis review. See *Mitchell v. Commissioner of the Social Sec. Admin.*, 182 F.3d 272, 274 (4th Cir. 1999); *Gazette v. City of Pontiac*, 41 F.3d 1061, 1067 (6th Cir. 1994).

Because alcoholism is subject only to a rational basis review under the Equal Protection Clause, *Batson* does not prohibit strikes based on alcoholism and Kleypas' argument in this respect fails.

In *State v. Edwards*, 264 Kan. 177, 192-94, 955 P.2d 1276 (1998), we summarized the requirements of *Batson* and its progeny as follows:

"In *Batson*, the United States Supreme Court set out a framework designed to prevent the discriminatory exclusion of jurors on the basis of race. Under the *Batson* framework, the defendant must first make a prima facie case showing that the prosecutor has exercised peremptory challenges on the basis of race. Once such a showing has been made, the burden shifts to the prosecutor to articulate a race-neutral reason for striking the juror. The trial court must then determine whether the defendant has carried the burden of proving purposeful discrimination. See *Hernandez v. New York*, 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (1991).

"The Court in *Batson* found that in order to establish a prima facie case, the defendant must first show that he or she is a member of a cognizable racial group and that the prosecution has exercised peremptory challenges to remove from the venire members of the defendant's race. *Batson*, 476 U.S. at 96. The defendant is entitled to rely on the fact that peremptory challenges constitute a jury selection practice that permits those who are of a mind to discriminate to do so. The defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude jurors from the jury on account of their race. 476 U.S. at 96.

"This framework has been extended beyond the initial set of circumstances in *Batson*. In *Powers v. Ohio*, 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (1991), the United States Supreme Court determined that the *Batson* framework extended to a challenge by a white defendant to the prosecutor's use of peremptory strikes to exclude prospective black jurors on the basis of race. In reaching this conclusion, the Court determined that the Equal Protection Clause prohibits the use of peremptory challenges to exclude otherwise qualified and unbiased persons from the jury panel solely by reason of their race and that a defendant has standing to raise the juror's equal protection claims. 499 U.S. at 409-15. Further, in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 L. Ed. 2d 89, 114 S. Ct. 1419 (1994), the Court extended the *Batson* framework to prohibit discrimination based on gender. In so doing, the Court stated:

'[T]he Equal Protection Clause prohibits discrimination in jury selection on the basis of gender, or on the assumption that an individual will be biased in a particular case for no reason other than the fact that the person happens to be a woman or happens to be a man. As with race, the "core guarantee of equal protection, ensuring citizens that their State will not discriminate . . ., would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the jurors' [gender]." [Citation omitted.].' 511 U.S. at 146.

"These rulings have changed the requirements for the establishment of a prima facie case. The defendant need no longer establish that he or she is a member of

a cognizable minority group since the focus is now on the individual rights of jury members not to be excluded on the basis of race or sex. See *Powers v. Ohio*, 499 U.S. at 415; *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. at 140-41. Thus, in order to establish a prima facie case, the defendant need only show that the prosecution has exercised peremptory challenges to remove from the venire members of a certain race or gender and that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the jurors from the jury on account of their race or gender. *Batson*, 476 U.S. at 96."

Kleypas contends that the alternate reason for striking Wheeler, that she was unsure whether the death penalty was an appropriate punishment in society, was insufficient. When asked on the juror questionnaire if the death penalty was a necessary punishment in our society, Wheeler had marked "unsure." Later, on voir dire, Wheeler indicated that she could impose a sentence of death in an appropriate case. Kleypas contends that other jurors whom the State did not strike demonstrated a greater aversion to the death penalty.

The ultimate question with regard to whether a *Batson* violation existed is whether the State has purposefully discriminated. *State v. Walston*, 256 Kan. 372, 381, 886 P.2d 349 (1994). Kleypas objected to the strike against Wheeler on the basis of gender. Certainly, the fact that the State struck Wheeler, a woman, due to her aversion to the death penalty, while leaving prospective male jurors who also indicated such an aversion is circumstantial evidence of discrimination. See *Walston* 256 Kan. at 381. However, the defendant failed to show at the *Batson* hearing that similar prospective male jurors were not struck. Therefore, the trial court did not err in finding that there was no discrimination.

Kleypas' final argument with regard to the strike of Wheeler is that it was improper for the State to use its peremptory strike to remove Wheeler from the jury on the basis of her aversion to imposing the death penalty. However, appellate courts addressing this issue have found such a practice not to be improper. See *Pitsonbarger v. Gramley*, 141 F.3d 728 (7th Cir.), *cert. denied* 525 U.S. 984 (1998); *Brown v. Dixon*, 891 F.2d 490 (4th Cir. 1989), *cert. denied* 495 U.S. 953 (1990); *Zuern v. Tate*, 101 F. Supp. 2d 948 (S.D. Ohio 2000); *State v. Bolton*, 182 Ariz. 290, 302, 896 P.2d 830

(1995); *State v. King*, 249 Conn. 645, 661-62, 735 A.2d 267 (1999); *Manning v. State*, 735 So. 2d 323, 339 (Miss. 1999); *State v. Bjork-lund*, 258 Neb. 432, 456, 604 N.W.2d 169 (2000); *State v. Clark*, 128 N.M. 119, 131, 990 P.2d 793 (1999).

We hold that the trial court did not err in allowing the peremptory strike of prospective juror Wheeler.

Issue 22. Cumulative Error in the Guilt Phase

Kleypas argues that each of the above errors are independent grounds for reversal; however, if this court concludes that no single error requires reversal then the cumulative effect of all the errors requires reversal. "We have recognized that cumulative trial errors may be so great as to require reversal of a defendant's conviction. See *State v. Castoreno*, 255 Kan. 401, 411, 874 P.2d 1173 (1994). The test is whether the totality of circumstances substantially prejudiced the defendant and denied him or her a fair trial. 255 Kan. at 411." *State v. Carr*, 265 Kan. 608, 625-26, 963 P.2d 421 (1998).

Based upon the above analysis of the issues raised by Kleypas regarding the guilt phase, we conclude that under the totality of the circumstances, Kleypas was not denied a fair trial and there was no cumulative error sufficient to require reversal.

Guilt Phase—Conclusion

Based upon our findings above, the defendant's convictions of capital murder, attempted rape, and aggravated burglary are affirmed.

## PART II—CONSTITUTIONAL ISSUES

We turn now to the issues Kleypas raises concerning the constitutionality of the death penalty in Kansas. These issues include:

Constitutionality of the Weighing Equation
Constitutional and Evidentiary Challenge to the Avoid Arrest Aggravating Circumstance
Constitutional Challenge to the Definition of the Heinous, Atrocious, or Cruel Manner Aggravating Circumstance
Proportionality of Sentence

Constitutionality of Upward Departure for Conviction of Aggravated Burglary
Instruction on Mercy
Standard for Admission of Evidence During the Penalty Phase
Effect of a Guilty Plea Under K.S.A. 21-4624
The Right to Life Under the Kansas Constitution
Failure to Make Written Findings as to Mitigators
Lethal Injection as Cruel and Unusual Punishment
Death Penalty Under International Law

## Issue 23. Constitutionality of Weighing Equation

Kleypas argues that the weighing equation set forth in K.S.A. 21-4624(e) violates the state and federal constitutional prohibitions against cruel and unusual punishment and the guarantees of due process because it mandates a sentence of death when aggravating and mitigating circumstances are found to be in equal balance. Under the facts of this case, we agree that the weighing equation violates the Eighth and Fourteenth Amendments to the United States Constitution.

K.S.A. 21-4624(e) provides:

"If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced to death; otherwise, the defendant shall be sentenced as provided by law."

Kleypas argues that mandating death when aggravating and mitigating circumstances are found to be in equal balance produces unrealistic results, creates a presumption of death, shifts the burden of proof to the defendant to prevent imposition of a death sentence, and precludes the jury from giving effect to the mitigating evidence.

The constitutionality of a statute is a question of law over which this court has de novo review. *State v. Ponce*, 258 Kan. 708, 709, 907 P.2d 876 (1995). We must decide if the weighing equation in the statute violates the Eighth Amendment to the United States Constitution because it mandates a sentence of death if the jury

finds that the mitigating and aggravating circumstances are in equipoise. Equipoise is a result of mandating the death sentence if the mitigating circumstances do not outweigh the aggravating circumstances.

Kleypas contends that the Kansas weighing formula is unique among the 38 death penalty states by mandating a death sentence when there is equipoise. Although no other state statute has identical language to our statute, five states have similar language resulting in the same weighing equation.

Kleypas first raised the equipoise issue by motion filed in the district court. The district court denied the motion, finding that the United States Supreme Court approved such a statutory scheme in *Proffitt v. Florida*, 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960 (1976). The district court's reliance on *Proffitt* is misplaced. In *Proffitt*, the Supreme Court noted:

"The jury found the defendant guilty as charged. Subsequently, as provided by Florida law, a separate hearing was held to determine whether the petitioner should be sentenced to death or to life imprisonment. Under the state law that decision turned on whether certain statutory aggravating circumstances surrounding the crime outweighed any statutory mitigating circumstances found to exist." 242 U.S. at 245-46.

Justice White in concurring also noted: "Under Florida law, the sentencing judge is *required* to impose the death penalty on all first-degree murderers as to whom the statutory aggravating factors outweigh the mitigating factors." 242 U.S. at 260 (White, J., concurring). The Florida weighing equation is not the same as ours. Under the Florida weighing equation, a death sentence cannot be imposed if there is a finding that equipoise exists. *Proffitt* does not support the district court's decision in the present case. In addition, the Florida jury returns an advisory verdict, and the judge has the ultimate responsibility for sentencing the defendant.

Kleypas cites three cases in support of his constitutional challenge to K.S.A. 21-4624(e). The first is *State v. Biegenwald*, 106 N.J. 13, 524 A.2d 130 (1987). The New Jersey statute in effect at the time of the crime stated in part: " 'If the jury or the court finds that any aggravating factor exists and is not outweighed by one or more mitigating factors, the court shall sentence the defendant to

death.' " 106 N.J. at 58. The court considered the weighing equation *sua sponte*, finding it constituted plain error. The court stated:

"The error concerns the jury's function in balancing aggravating factors against mitigating factors, a function that leads directly to its ultimate life or death decision. Its effect was to allow a death sentence without a finding that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. We hold that such a finding was required by the Act at the time of defendant's trial as a matter of fundamental fairness and that its absence mandates reversal and retrial of the penalty decision. Legislative policy also mandates this result, as indicated by the 1985 amendments to the Act; those amendments, furthermore, provide an independent basis for this result." 106 N.J. at 53.

The court made it clear that the former rather than the latter was ultimately the basis for its decision: "If anywhere in the criminal law a defendant is entitled to the benefit of the doubt, it is here. We therefore hold that as a matter of fundamental fairness the jury must find that aggravating factors *outweigh* mitigating factors, and this balance must be found beyond a reasonable doubt." 106 N.J. at 62.

In *People v. Young*, 814 P.2d 834 (Colo. 1991), the Colorado Supreme Court considered the constitutionality of their statutory weighing equation which required the jury return a sentence of death if the jury found insufficient mitigating factors to outweigh the statutory aggravating factors. The court noted that under this formula a death sentence was mandated if the "mitigators and aggravators are equally balanced." 814 P.2d at 839. The court concluded that the statute violated the state constitution provision against cruel and unusual punishment, stating:

"The result of a decision that the relevant considerations for and against imposition of the death penalty in a particular case are in equipoise is that the jury *cannot* determine with reliability and certainty that the death sentence is appropriate under the standards established by the legislature. A statute that requires a death penalty to be imposed in such circumstances without the necessity for further deliberations, as does section 16-11-103(2)(b)(III), is fundamentally at odds with the requirement that the procedure produce a certain and reliable conclusion that the death sentence should be imposed. That such a result is mandated by statute rather than arrived at by a jury adds nothing to the reliability of the death sentence. The legislature has committed the function of weighing aggravators and mitigators to the jury. A jury determination that such factors are in equipoise means nothing more or less than that the moral evaluation of the de-

fendant's character and crime expressed as a process of weighing has yielded inconclusive results. A death sentence imposed in such circumstances violates requirements of certainty and reliability and is arbitrary and capricious in contravention of basic constitutional principles. Accordingly, we conclude that the statute contravenes the prohibition of cruel and unusual punishments under article II, section 20, of the Colorado Constitution, and deprives the defendant of due process of law under article II, section 25, of that constitution." 814 P.2d at 845.

Although the decision in *Young* rests upon state constitutional grounds, the court found that the United States Supreme Court had not addressed the equipoise issue, stating:

"Key to the United States Supreme Court rulings is the conclusion that a limitation on the class of persons eligible for the death penalty is constitutionally required and may be accomplished by a finding of at least one aggravating factor, and that a weighing of all relevant mitigating factors is constitutionally required before a sentence of death can be imposed on a particular individual. *Walton*, 110 S. Ct. at 3056 (plurality opinion); *Boyde*, 110 S. Ct. at 1196; *Blystone*, 110 S. Ct. at 1083. The basis for these requirements 'is the principle that punishment should be directly related to the personal culpability of the criminal defendant.' *Penry*, 492 U.S. at 319, 109 S. Ct. at 2947. Thus, the Court in *Penry* stated

" ' "that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence. Only then can we be sure that the sentencer has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence." ' " *Penry*, 492 U.S. at 319, 109 S. Ct. at 2947 (quoting *Woodson*, 428 U.S. at 304, 96 S. Ct. at 2991) (citation omitted).

Constitutional sufficiency is not assured simply because the jury is not limited in the mitigating factors it may hear and consider. The sentencer must also determine whether those mitigating factors are outweighed by the aggravating factors, *Boyde*, 110 S. Ct. at 1196; *Blystone*, 110 S. Ct. at 1083, or, stated alternatively, are sufficient to call for leniency, *Walton*, 110 S. Ct. at 3056. We find nothing in the reasoning in the United States Supreme Court cases cited that casts doubt on our conclusion that the Colorado death penalty statute fails to satisfy our own constitutional standards. We do not believe that the United States Supreme Court cases can be fairly read to contain any suggestion that the death penalty can be imposed when the sentencer finds aggravating and mitigating considerations to be equally balanced. Even if we are wrong in our understanding of federal precedent, however, we hold that to authorize imposition of the death penalty when aggravators and mitigators weigh equally, as does the current version of section 16-11-103, violates fundamental requirements of certainty and reliability under the cruel and unusual punishments and due process clauses of the Colorado Constitution." 814 P.2d at 846.

The third case relied on by Kleypas is *Hulsey v. Sargent*, 868 F. Supp. 1090 (E. D. Ark. 1993). At issue in *Hulsey* was the Arkansas statute mandating a death sentence if the mitigating circumstances did not outweigh the aggravating circumstances. 868 F. Supp. at 1092. The court noted the problem such an equation created:

"If a jury found the mitigating and aggravating circumstances in equipoise, neither one more probative than the other, or, could not fairly come to a conclusion about what balance existed between them, they would be *obliged* to impose the death sentence since the mitigating circumstances would not be found to outweigh the aggravating. The requirement that the aggravating circumstances justify the sentence of death, which could easily be (and was probably intended to be) construed as an independent inquiry (satisfied by a single finding of an aggravating circumstance) would not cure the presumption created by the equation." 868 F. Supp. at 1101.

The court concluded: "Here, it is explicit in the statute that mitigating must outweigh aggravating circumstances and no saving instruction is found. Here too, the strictures of the Eighth and Fourteenth Amendments with their requirements of individualized sentencing and full consideration of evidence in mitigation appear to require relief." 868 F. Supp. at 1103.

The State does not bother to respond or attempt to distinguish the cases cited by Kleypas. Instead, the State relies completely on *Walton v. Arizona*, 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990). In *Walton,* the United States Supreme Court considered the constitutionality of the Arizona statute which provided that the court " 'shall impose a sentence of death if the court finds one or more of the aggravating circumstances enumerated . . . and that there are no mitigating circumstances sufficiently substantial to call for leniency.' " 497 U.S. at 644.

The State argues that the U.S. Supreme Court specifically addressed this in *Walton* and rejected Kleypas' argument. The State's argument is premised on its view that the Arizona statute "is functionally indistinguishable from the Kansas statute in this respect." We disagree and find the two statutes distinguishable. The obvious distinction is the language used in each statute. The Arizona statute does not call for a weighing formula in which the mitigating circumstances must outweigh the aggravating circum-

stances, the very essence of the issue before this court. Such a weighing equation results in mandating a death sentence where the jury finds equipoise as to the mitigating and aggravating circumstances.

As previously noted, the Colorado Supreme Court in *Young* distinguished the language in the Arizona statute from the Colorado statute and found that the issue of equipoise was not raised or decided in *Walton*. 814 P.2d at 846. We agree.

The failure of the plurality in *Walton* to address equipoise was noted by Justice Blackmun in his dissent:

> "The plurality does not attempt to explain why Arizona may require a capital sentence in a case where aggravating and mitigating circumstances are evenly balanced. Indeed, the plurality does not even acknowledge that this is the dispositive question. Instead, it offers only a conclusory assertion: 'So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.' [Citation omitted.]" 497 U.S. at 688 (Blackmun, J., dissenting).

Justice Blackmun, however, addressed the issue:

> "If the mitigating and aggravating circumstances are in equipoise, the statute requires that the trial judge impose capital punishment. The assertion that a sentence of death may be imposed in such a case runs directly counter to the Eighth Amendment requirement that a capital sentence must rest upon a 'determination that death is the appropriate punishment in a specific case.' *Woodson v. North Carolina*, 428 U.S., at 305 (plurality opinion).
>
> "The plurality takes a hard-line approach and makes little effort to ground its holding on our Eighth Amendment jurisprudence. In support of its position, the plurality cites only two very recent capital cases, *Blystone v. Pennsylvania*, 494 U.S., at 305 (1990) and *Boyde v. California*, 494 U.S. 370 (1990). Reliance even on these precedents is misplaced. The statutes upheld in those cases provided that the death penalty would be imposed 'only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances.' *Blystone*, 494 U.S., at 305. In neither *Boyde* nor *Blystone* did the challenged statute require a capital sentence when aggravating and mitigating factors are evenly balanced. Those decisions simply do not speak to the issue posed by the Arizona statute: whether the State permissibly may place upon

the capital defendant the burden of demonstrating that a sentence of death is not appropriate." 497 U.S. at 687-88 (Blackmun, J., dissenting).

In *Montana v. Smith*, 261 Mont. 419, 863 P.2d 1000 (1993), the Montana Supreme Court considered the Montana statute which read:

"In determining whether to impose a sentence of death or imprisonment, the court shall take into account aggravating and mitigating circumstances . . . and shall impose a sentence of death if it finds one or more of the aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency." Mont. Code Ann. § 46-18-305 (1977).

The Montana Supreme Court rejected the *Young* rationale on the basis that the Montana weighing equation was much different from that of Colorado. The court held Montana's statute "requires imposition of the death penalty if the court finds one or more aggravating circumstances and no mitigating circumstances sufficiently substantial to call for leniency. Unlike the Colorado provision, it does not require the death sentence to be imposed if the aggravating and mitigating factors are of equal weight." 261 Mont. at 438.

The difference between the language in K.S.A. 21-4624(e) and the Arizona statute is expressed in the *amicus curiae* Cornell Death Penalty Project brief as follows:

"On its face, the Arizona provision operates on a different logic than does section 21-4624(e). Unlike section 21-4624(e), the Arizona statute does *not* tell the sentencer to impose death if aggravating circumstances are not outweighed by mitigating circumstances. Instead, it requires death only if 'there are not mitigating circumstances sufficiently substantial to call for leniency.' The key to the Arizona sentencing formula is the idea of 'sufficiently substantial.'

"That language, unlike section 21-4624(e), does not direct the sentencer to impose death if it finds aggravating and mitigating circumstances are in equipoise. If a sentencer in Arizona thought aggravating and mitigating circumstances were equally balanced, he or she could reasonably conclude that there were mitigating circumstances 'sufficiently substantial to call for leniency,' *or* he or she could reach the opposite conclusion. The law leaves the sentencer free to decide either way. In contrast, a Kansas juror who reached the same conclusion about the relative balance between aggravation and mitigation would have only one option: to impose death. In fact, under the Arizona scheme a sentencer who thought that aggravating circumstances actually *outweighed* mitigating circumstances could *still* conclude that the available mitigating circumstances were 'sufficiently substantial'

— i.e., that they crossed some critical threshold of substantiality — to 'call for leniency.' A Kansas juror clearly does not have that option."

This court has addressed this issue in the context of K.S.A. 1999 Supp. 21-4635(c), the hard 40 sentence. *In State v. Spain*, 269 Kan. 54, 60, 4 P.3d 621 (2000), we held that statute was not unconstitutional. We made it clear that the death penalty cases are not controlling in hard 40 cases. Likewise, hard 40 cases are not controlling when the sentence is death. That distinction is reflected by the State not citing or relying on our decision in *Spain*. *Spain* is not controlling here because the death penalty is different from all other punishments:

"[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976).

Justice Stevens wrote:

"In the 12 years since *Furman v. Georgia*, 408 U.S. 238 (1972), every Member of this Court has written or joined at least one opinion endorsing the proposition that because of its severity and irrevocability, the death penalty is qualitatively different from any other punishment, and hence must be accompanied by unique safeguards to ensure that it is a justified response to a given offense." *Spaziano v. Florida*, 468 U.S. 447, 468, 82 L. Ed. 2d 340, 104 S. Ct. 3154 (1984) (Stevens, J., concurring in part and dissenting in part).

In *Spain*, we said:

"In addition, we reaffirm that death penalty cases are not controlling in hard 40 cases. The distinction between the two is obvious. The death penalty as it existed prior to the decision in *Furman v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972), was held to be unconstitutional. The unconstrained discretion in imposing the death penalty constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. The states were required to provide ' "specific and detailed guidance" ' and ' "make rationally reviewable the process for imposing a sentence of death." ' *Godfrey v. Georgia*, 446 U.S. 420,428, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980) (quoting *Proffitt v. Florida*, 428 U.S. 242, 253, 49 L. Ed. 2d 913, 96 S. Ct. 2960 [1976], and *Woodson v. North Carolina*, 428 U.S. 280, 303, 49 L. Ed. 2d 944, 96 S. Ct. 2978 [1976], respectively). Not so with a hard 40 sentence. In *State v. Bailey*, 251 Kan. 156,

171, 834 P.2d 342 (1992), we said: '[T]he finality and severity of the imposition of the death penalty, the hurdles the prosecution must clear if the death penalty is to be imposed are higher than in any other area of criminal law.' The United States Supreme Court, in *Rummel v. Estelle*, 445 U.S. 263, 272, 63 L. Ed. 2d 382, 100 S. Ct. 1133 (1980), stated: 'Because a sentence of death differs in kind from any sentence of imprisonment, no matter how long, our decisions applying the prohibition of cruel and unusual punishments to capital cases are of limited assistance in deciding the constitutionality of the punishment meted out to Rummel.' " 269 Kan. at 59-60.

No issue is more difficult or divisive than determining to what extent a capital punishment is permitted under the Eighth and Fourteenth Amendments to the United States Constitution. We determined earlier in this opinion that the death penalty in and of itself does not constitute cruel and unusual punishment under the Eighth Amendment. The issue we grapple with here is whether the imposition of the death penalty under our statutory weighing formula constitutes cruel and unusual punishment under the Eighth Amendment. More specifically, is K.S.A. 21-4624(e) applied in an unconstitutional manner by mandating death if the aggravating and mitigating circumstances are in equipoise?

In *Furman v. Georgia*, 408 U.S. 238, 309-10, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972), the Supreme Court held the death penalty as imposed in Georgia to be cruel and unusual punishment in violation of the Eighth and 14th Amendments. The Supreme Court did so in a one paragraph, *per curiam* opinion. The rationale of the decision is to be found in the five separate opinions which follow the *per curiam* opinion. That poses some difficulty since none of the five separate opinions concurred in any of the other opinions. Four justices filed separate dissents.

The opinions of Justices White and Stewart are relied on in subsequent opinions of the Supreme Court. Both made it clear that the death penalty is not in itself cruel and unusual under the Eighth Amendment. Justice Stewart's view was that the "the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." 408 U.S. at 310 (Stewart, J., concurring). Justice White wrote: "[T]here is no meaningful basis for distinguishing the few cases in which it is imposed

from the many cases in which it is not." 408 U.S. at 313 (White, J., concurring).

Four years later, the Supreme Court approved the Georgia death penalty statute as amended in response to the Court's decision in *Furman*. In *Gregg v. Georgia*, 428 U.S. 153, 207, 49 L. Ed. 2d 859, 96 S. Ct. 2909, *reh. denied* 429 U.S. 875 (1976), the Court found the amended death penalty statutes to be constitutional. That decision was announced by three justices: Stewart, Powell, and Stevens. The three justices focused on the procedure by which the defendant was given the death penalty and not the actual punishment. Justices White and Rehnquist and Chief Justice Burger concurred in the judgment by separate opinion, as did Justice Blackmun. The Georgia statute required that the jury must find beyond a reasonable doubt 1 of 10 statutory aggravating circumstances before it can impose a sentence of death.

"In addition, the jury is authorized to consider any other appropriate aggravating or mitigating circumstances. [Citation omitted.] The jury is not required to find any mitigating circumstance in order to make a recommendation of mercy that is binding on the trial court, [citation omitted], but it must find a statutory aggravating circumstance before recommending a sentence of death." 428 U.S. at 197.

Stewart went on to write:

"No longer can a Georgia jury do as Furman's jury did: reach a finding of the defendant's guilt and then, without guidance or direction, decide whether he should live or die. Instead, the jury's attention is directed to the specific circumstances of the crime: Was it committed in the course of another capital felony? Was it committed for money? Was it committed upon a peace officer or judicial officer? Was it committed in a particularly heinous way or in a manner that endangered the lives of many persons? In addition, the jury's attention is focused on the characteristics of the person who committed the crime: Does he have a record of prior convictions for capital offenses? Are there any special facts about this defendant that mitigate against imposing capital punishment (e.g., his youth, the extent of his cooperation with the police, his emotional state at the time of the crime). As a result, while some jury discretion still exists, 'the discretion to be exercised is controlled by clear and objective standards so as to produce nondiscriminatory application.' *Coley v. State*, 231 Ga. 829, 834, 204 S.E.2d 612, 615 (1974.)" 428 U.S. at 197-98.

Following the Georgia decision, the Supreme Court invalidated the mandatory death penalty statutes passed in some states in re-

sponse to *Furman*. *Woodson v. North Carolina*, 428 U.S. at 303. The Supreme Court concluded that the death sentence process must include consideration of the "character and record of the individual offender." 428 U.S. at 304. In *Penry v. Lynaugh*, 492 U.S. 302, 316, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (1989), the Court noted:

"Indeed, as *Woodson v. North Carolina*, 428 U.S. 280 (1976), made clear, 'in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.' Id., at 304 (plurality opinion)."

The Court further stated:

"Our decisions subsequent to *Jurek* have reaffirmed that the Eighth Amendment mandates an individualized assessment of the appropriateness of the death penalty. In *Lockett v. Ohio*, 438 U.S. 586 (1978), a plurality of this Court held that the Eighth and Fourteenth Amendments require that the sentencer 'not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " 492 U.S. at 317.

"Underlying *Lockett* and *Eddings* is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, 'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.' *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring). Moreover, *Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence." 492 U.S. at 319.

Justice O'Connor, concurring in *Franklin v. Lynaugh*, 487 U.S. 164, 184-85, 101 L. Ed. 2d 155, 108 S. Ct. 2320 (1988), wrote:

"[I]t is clear that a State may not constitutionally prevent the sentencing body from giving effect to evidence relevant to the defendant's background or character or the circumstances of the offense that mitigates against the death penalty. Indeed, the right to have the sentencer consider and weigh relevant mitigating evidence would be meaningless unless the sentencer was also permitted to give effect to its consideration."

In *Penry*, Justice O'Connor speaking for a majority of the Court wrote:

"But as we made clear in *Gregg*, so long as the class of murderers subject to capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant. [428 U.S.] at 197-199, 203.

. . . .

" 'In contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence.' *McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) (emphasis in orginal). Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense. Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a ' " 'reasoned moral response to the defendant's background, character, and crime.' " ' *Franklin*, 487 U.S., at 184 (O'Connor, J., concurring in judgment) (quoting *California v. Brown*, 479 U.S., at 545 [O'Connor, J., concurring]). In order to ensure 'reliability in the determination that death is the appropriate punishment in a specific case,' *Woodson*, 428 U.S., at 305, the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." 492 U.S. at 327.

Penry argued that the jury was unable to express its "reasoned moral response" to his mitigation evidence of his mental retardation and childhood abuse in determining if death was an appropriate sentence. The Court agreed, stating:

"In this case, in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty, we conclude that the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision. Our reasoning in *Lockett* and *Eddings* thus compels a remand for resentencing so that we do not 'risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.' *Lockett*, 438 U.S., at 605; *Eddings*, 455 U.S., at 119 (O'Connor, J., concurring). When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.' *Lockett*, 438 U.S., at 605." 492 U.S. at 328.

In *Woodson*, Justice Stewart speaking for the majority wrote:

"While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, see *Trop v. Dulles*, 356 U.S., at 100 (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

"[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." 428 U. S. at 304-05 (Brennan, J., concurring).

If we are to give more than lip service to the principles espoused by the Supreme Court, then the weighing equation in K.S.A. 21-4624 cannot be approved. The Eighth Amendment forbids unguided discretion in imposing a sentence of death. Under our statutes, the jury discretion is guided by requiring that it find the existence of one statutory aggravated circumstance. That narrows the class of those eligible for the death penalty. The Supreme Court has made it clear that the process cannot stop there. Of equal importance is the sentencer's consideration of the mitigating circumstances. Here, the jury as the fact finder must be given discretion in considering and giving effect to the mitigating circumstances. As previously noted, the Georgia capital sentencing statutes, approved in *Gregg*, did not limit the jury's consideration of the mitigating circumstances. Here, the weighing equation not only limits the jury's consideration, it mandates death if the aggravating and mitigating circumstances are equal. As such, it denies what the Eighth Amendment requires: that the jury is to give effect to the mitigating circumstance that it finds exist.

It is important to note that on March 14, 1995, the attorney general analyzed the statute and recommended in the House Judiciary Committee of the Kansas Legislature that the statute be amended to require that aggravating circumstances outweigh mitigating circumstances, stating: "Now if they are equal, 'tie' goes to state. We're proposing 'tie' goes to defense . . . ." Unfortunately,

the legislature did not follow the attorney general's recommendation.

As the New Jersey Supreme Court pointed out in *Biegenwald,* there is a similarity of the jury's function in weighing the aggravating and mitigating circumstances to that of determining guilt or innocence of the defendant. The burden is the same. The process is much the same and the outcome as serious, if not more so. The penalty of death is not only unique in its severity, but it is irrevocable. The United States Supreme Court noted the similarity in *Spaziano v. Florida,* 468 U.S. at 458-59:

> "This Court, of course, has recognized that a capital proceeding in many respects resembles a trial on the issue of guilt or innocence. See *Bullington v. Missouri,* 451 U.S. 430, 444 (1981). Because the ' "embarrassment, expense and ordeal" . . . faced by a defendant at the penalty phase of a . . . capital murder trial . . . are at least equivalent to that faced by any defendant at the guilt phase of a criminal trial,' the Court has concluded that the Double Jeopardy Clause bars the State from making repeated efforts to persuade a sentencer to impose the death penalty. Id., at 445, quoting *Green v. United States,* 355 U.S. 184, 187 (1957); *Arizona v. Rumsey,* 467 U.S. 203 (1984)."

The legislature cannot mandate a death sentence for any category of murder. The legislature is limited to defining who is eligible, within constitutional limits, to receive the death penalty. It is for the jury, within permissible guidelines, to determine who will live and who will die. The issue is not whether the penalty of death is per se cruel and unusual punishment. *Furman* did not hold that the death penalty was cruel and unusual punishment per se under the Eighth Amendment. Here the issue, as that before the *Furman* court, is whether the process used to select which defendant will receive the irrevocable penalty of death "comports with the basic concept of human dignity at the core of the [Eighth] Amendment." *Gregg,* 428 U.S. at 183.

Is the weighing equation in K.S.A. 21-4624(e) a unique standard to ensure that the penalty of death is justified? Does it provide a higher hurdle for the prosecution to clear than any other area of criminal law? Does it allow the jury to express its "reasoned moral response" to the mitigating circumstances? We conclude it does not. Nor does it comport with the fundamental respect for hu-

manity underlying the Eighth Amendment. Last, fundamental fairness requires that a "tie goes to the defendant" when life or death is at issue. We see no way that the weighing equation in K.S.A. 21-4624(e), which provides that in doubtful cases the jury must return a sentence of death, is permissible under the Eighth and Fourteenth Amendments. We conclude K.S.A. 21-4624(e) as applied in this case is unconstitutional.

Our decision does not require that we invalidate K.S.A. 21-4624 or the death penalty itself. We do not find K.S.A. 21-4624(e) to be unconstitutional on its face, but rather, we find that the weighing equation impermissibly mandates the death penalty when the jury finds that the mitigating and aggravating circumstances are in equipoise.

In *State v. Motion Picture Entitled "The Bet,"* 219 Kan. 64, 547 P.2d 760 (1976), the defendant challenged the constitutionality of the definition of obscene material contained in K.S.A. 21-4301(2) (a) and (3) (Weeks). In 1973, the United States Supreme Court in *Miller v. California,* 413 U.S. 15, 24, 37 L. Ed. 2d 419, 93 S. Ct. 2607 (1973), revised the test for obscenity. The definition of obscene material in K.S.A. 21-4301 (Weeks) did not conform to the constitutional requirements of *Miller.* The district court, however, found the films to be obscene by construing the broader definition in our statute to conform to the requirement of the *Miller* decision. Simply stated, the district court read the *Miller* standards into K.S.A. 21-4301. This court affirmed the district court on appeal, stating:

"This court has on previous occasions seen fit to construe and limit criminal statutes in such a way as to uphold their constitutionality by reading judicial requirements into statutes which otherwise were overbroad.

. . . .

"Construction of this sort, moreover, was invited by the United States Supreme Court in *Miller* in which the Chief Justice speaking for a majority said:

'We do not hold . . . that all States . . . must now enact new obscenity statutes. Other existing state statutes as construed heretofore or hereafter, may well be adequate. [Citation omitted]' (413 U.S. 24, note 6, 37 L. Ed. 2d 430, 93 S. Ct. 2615.)

"The high court has itself adopted this course of judicial construction of statutes as noted in *United States v. 12 200-Ft. Reels of Film,* 413 U.S. 123, 37 L. Ed. 2d

500, 93 S. Ct. 2665, and in *United States v. Thirty-seven Photographs*, 402 U.S. 363, 28 L. Ed. 2d 822, 91 S. Ct. 1400, reh. den. 403 U.S. 924, 29 L. Ed. 2d 702, 91 S. Ct. 2221, with respect to federal statutes.

"In at least nine other states the courts have held that their obscenity statutes, though not couched in the language of *Miller*, should be judicially construed in a manner consistent with *Miller* and thereby evade constitutional challenge in the future. [Citations omitted.]

"We realize that to construe the statute to meet constitutional standards we may be subject to the accusation that we are invading the province of the legislature. However, after considering the manifest intention of the legislature when it passed K.S.A. 21-4310, *et seq.*, and our past difficulties in this area of regulating obscenity we feel fully justified in construing and limiting the present statute to meet constitutional standards. Such was the original intent of the Kansas legislature." 219 at 70-71.

This court then "authoritatively" construed K.S.A. 21-4301 (Weeks) to include the *Miller* test and held a conviction may be had under the statute.

In *In re Adoption of Baby Boy L.*, 231 Kan. 199, 223, 643 P.2d 168 (1982), Justice Holmes, speaking for the court, said:

"In examining the constitutionality of any statute there are certain basic principles which must be adhered to:

" 'We start with the proposition that the constitutionality of a statute is presumed; that all doubts must be resolved in favor of its validity, and before the statute may be stricken, it must clearly appear the statute violates the Constitution. It is the court's duty to uphold the statute under attack, if possible, rather than defeat it. If there is any reasonable way a statute may be construed constitutionally permissible, that should be done.' *Board of Greenwood County Comm'rs v. Nadel*, 228 Kan. 469, Syl. ¶ 1, 618 P.2d 778 (1980).

" 'A statute, apparently valid upon its face, may be unconstitutional in its application to a particular set of facts, circumstances or classifications.' *Flax v. Kansas Turnpike Authority*, 226 Kan. 1, Syl. ¶ 6, 596 P.2d 446 (1979).

"The corollary of *Flax*, of course, is that a statute apparently void on its face may be constitutional when limited and construed in such a way as to uphold its constitutionality by reading the necessary judicial requirements into the statute. This has often been done when it is clear that such an interpretation will carry out the intent of the legislature. *State v. Motion Picture Entitled 'The Bet'*, 219 Kan. 64, 70, 547 P.2d 760 (1976); *State v Gunzelman*, 210 Kan. 481, 502 P.2d 705 (1972); *State v. Hart*, 200 Kan. 153, 434 P.2d 999 (1967)."

In *State v. Durrant*, 244 Kan. 522, 769 P.2d 1174 (1989), the district court ruled K.S.A. 79-5201 *et seq.* (Ensley) unconstitutional in violation of the Fifth Amendment to the United States Consti-

tution. The district court held K.S.A. 79-5206 (Ensley) did not grant absolute immunity and thus did not prohibit the use of the information in prosecuting for other crimes. In other words, as written, K.S.A. 79-5206 granted use immunity but not derivative-use immunity. This court, relying on *In re Adoption of Baby Boy L.* and *State v. Motion Picture Entitled "The Bet,"* reversed the district court:

"This court not only has the authority, but also the duty, to construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute. To accomplish this purpose the court may read the necessary judicial requirements into the statute. *In re Adoption of Baby Boy L.*, 231 Kan. 199, Syl. ¶ 13, 643 P.2d 168 (1982); *State v. Motion Picture Entitled "The Bet,"* 219 Kan. 64, 547 P.2d 760 (1976); *State v. Gunzelman,* 210 Kan. 481, 502 P.2d 705 (1972); *State v. Hart,* 200 Kan. 153, 434 P.2d 999 (1967). We think it is obvious, and we so hold, that the legislature, by its enactment of 79-5206 as a part of the act, intended to extend not only use immunity but also derivative-use immunity to any person complying with the act. As construed, the immunity granted by the act is at least coextensive with the privilege against self-incrimination provided by the Fifth Amendment of the United States Constitution, and the act as so construed is constitutional." 244 Kan. at 534-35.

The legislative intent in passing the death penalty act is obvious. K.S.A. 21-4624 provides for a death sentencing scheme by which a sentence of death is imposed for certain offenses. By simply invalidating the weighing equation and construing K.S.A. 21-4624(e) to provide that if the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 21-4625 exists and, further, that such aggravating circumstance or circumstances outweigh any mitigating circumstance found to exist, the defendant shall be sentenced to death, the intent of the legislature is carried out in a constitutional manner. So construed, we hold that K.S.A. 21-4624 does not violate the Eighth Amendment prohibition against cruel and unusual punishment. Our holding requires that this case be remanded for the jury to reconsider imposition of the death penalty.

We set aside the death sentence for the reasons set out above and remand for resentencing in accordance with K.S.A. 21-4624 as construed herein.

Because we hold that the provisions of K.S.A. 21-4624 are constitutional as interpreted by this court, it becomes necessary to address Kleypas' additional constitutional challenges regarding capital murder provisions of Kansas statutory law.

## Issue 24. Constitutional and Evidentiary Challenge to the Avoid Arrest Aggravating Circumstance

Kleypas advances two arguments with regard to the Kansas statutory "avoid arrest" aggravating circumstance: (1) The evidence does not support the jury's finding that he murdered C.W. in order to avoid or prevent a lawful arrest or prosecution after his attempt to rape her, and (2) the "avoid arrest" aggravating circumstance violates the United States Constitution as well as the Kansas Constitution because it fails to narrow the class of persons eligible for the death penalty.

K.S.A. 21-4624(e) requires that aggravating circumstances outlined in K.S.A. 21-4625 be proven beyond a reasonable doubt. K.S.A. 21-4625(5) identifies the following aggravating circumstance: "The defendant committed the crime in order to avoid or prevent a lawful arrest or prosecution." The standard of review on appeal as to the sufficiency of evidence regarding an aggravating circumstance is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the existence of the aggravating circumstance beyond a reasonable doubt. See *State v. Evans*, 251 Kan. 132, 135-36, 834 P.2d 335 (1992).

### A. The State's Evidence and Argument

In its opening statement during the penalty phase, the State informed the jury that it would prove Kleypas murdered C.W. in order to avoid arrest and prosecution.

"I will ask you to consider the confession of the defendant and remember he says he was sitting on the bed, [C.W.] is tied to the chair, the defendant stated that [C.W.] knew him, knew him as the guy who lived in the big green house and the defendant knew that if he let [C.W.] live that she could tell the police. So the defendant made a choice and he made a choice to avoid arrest and prosecution."

In its closing statement, the State argued:

"The State in this case has proven three aggravating circumstances beyond a reasonable doubt. One of these is that the defendant committed the crime in order to avoid lawful arrest or prosecution. And you remember the evidence on this. The defendant going to the house of [C.W.] undisguised, going to the home of the neighbor who was sure to and, in fact, did recognize him.

"Remember the defendant's own words about being recognized. She knew me. I knew she knew me. She didn't recognize me personally but she recognized who I was. She made a comment to me about living in the house I live in. She only lived two houses down from me. These were the defendant's words about being recognized and he knew when he went there he would be recognized. He also knew that after he attempted to rape her that he got up and walked away he would be arrested and prosecuted.

"So he made a choice and he killed [C.W.] to avoid that. He sat there for several minutes as he told you when he made his choice. And his choice was to kill [C.W.] so that he would have a better chance of getting away. He started tying her up and then he told us he sat on the bed and thought about it. And he made that choice so that just a little bit longer he could prevent a lawful arrest and prosecution. And the evidence of this is clear not only by the defendant's own actions and words and not only by what he did to [C.W.] that night but what he did afterwards. He loaded up his truck, taking evidence of the murder with him and he fled town. He took off, he ran and he killed [C.W.] so that he could avoid arrest. There is no other conclusion that can be reached from this evidence."

Kleypas did not object to these comments or address the aggravators in his opening or closing arguments during the penalty phase.

Kleypas contends there are only two pieces of evidence offered by the State to support the avoid arrest aggravating factor: (1) The victim knew Kleypas and could identify him to police, and (2) Kleypas left the state after committing the crime. Kleypas, however, mischaracterizes the State's evidence.

The State relied heavily on testimony of KBI Agent Williams which recalled Kleypas' confession during the ride in the patrol car back to Kansas. In it, Kleypas related the following events which occurred on the night of the murder. Kleypas, once inside the house, forced C.W. to her bedroom at knife point. He forced her to undress and attempted to have intercourse with her. When he failed to get an erection, he penetrated her with his fingers. He allowed her to dress. C.W. asked him to leave. She said if he would leave she would give him a head start before she called the police.

He said she recognized him as the man who lived in the green house down the street.

According to Agent Williams, Kleypas confessed that he tied C.W. to a chair and that she started to panic. Kleypas unplugged the phone. After he tied her, he sat on the bed for a period of time thinking about his next action. She got loose from her binding to the chair, and he tried to strangle her. He tried to suffocate her with the sock but was unsuccessful. Kleypas stated that he then stabbed her repeatedly in the chest.

## B. Evidence that the Victim Could Identify Kleypas

Kleypas argues that the "simple statement that the victim knew him" provided in his confession "hardly constitutes such overwhelming proof of his motive for murder." He also asserts that "the State's evidence was no stronger than in the 'average' murder case—the victim could have given the police a description of her attacker."

Kleypas cites Florida law for the proposition that the mere fact the victim knew and could identify the defendant, without more, is insufficient to prove the avoid arrest aggravator beyond a reasonable doubt. In *Geralds v. Florida*, 601 So. 2d 1157 (Fla. 1992), the defendant was a carpenter remodeling the victim's house. He was convicted of capital murder after the victim was found beaten and stabbed and the house robbed. The Florida Supreme Court upheld the conviction but vacated and remanded the sentence based on the prosecutor's improper introduction of Geralds' extensive criminal history during the penalty phase. 601 So. 2d at 1161-62. For the benefit of the district court at resentencing, the Florida Supreme Court stated:

"Likewise, we agree with Geralds that the State has failed to prove the existence of the aggravating circumstance of witness elimination beyond a reasonable doubt. The trial court found as follows:

'The evidence establishes that the defendant had worked around the victim's home and was known by the victim, the victim's spouse and her children. The evidence established that the defendant had spoken with the victim and her two children the week prior to the murder and at that time sought out information concerning the family's time schedule and the fact that the victim's husband would be out of town on the date the crime was committed. The

evidence is clear to establish that the victim could have identified the defendant if she had survived the beating she was subjected to and the stabbing that occurred during the course of the robbery and burglary.'

"We have repeatedly held that the avoiding arrest aggravating factor is not applicable unless the evidence proves that the only or dominant motive for the killing was to eliminate a witness. [Citations omitted.] The mere fact that the victim knew and could identify the defendant, without more, is insufficient to prove this aggravating factor beyond a reasonable doubt." 601 So. 2d at 1164.

Other Florida cases have also recognized that the mere fact that the witness knew and could identify the victim, without more, is not sufficient to prove the "avoid arrest" aggravating factor. See *Jackson v. Florida*, 599 So. 2d 103, 109 (Fla. 1992); *Bruno v. Florida*, 574 So. 2d 76, 81-82 (Fla. 1991); *Hansbrough v. Florida*, 509 So. 2d 1081, 1086 (Fla. 1987).

In *State v. Spain*, 269 Kan. 54, 60, 4 P.3d 621 (2000), we considered the avoid arrest aggravator in the hard 40 context, specifically rejecting the notion espoused by the Florida cases cited by Kleypas that the avoid arrest aggravator applies only in those cases where witness elimination is the dominant or only motive for the murder. Instead, we held that the State must show that a motive—not the dominant or only motive—for the murder was to avoid prosecution. 263 Kan. at 719.

Here, the evidence at trial showed that C.W. did not see Kleypas for the first time on the night she was murdered. KBI Agent Williams testified that Kleypas said C.W. recognized Kleypas as the man who lived in the green house. She did not, as Kleypas suggests, merely observe him as he attacked her. C.W. had seen Kleypas before and recognized him as a man who lived in a specific house in her neighborhood. C.W. knew her attacker and would have been able to provide a solid identification of Kleypas in a subsequent prosecution. This constitutes substantial evidence that Kleypas murdered C.W. to avoid arrest or prosecution.

## C. Evidence that Kleypas Fled the State

Kleypas argues that the State told the jury that it could rely on evidence of his flight from Crawford County as evidence that he killed C.W. in order to avoid arrest or prosecution. He argues that evidence he sought to avoid arrest *after* the murder may not be

considered as an indicator of his motives at the time of the murder because to do so would unconstitutionally broaden the definition of the avoid arrest aggravator. Kleypas argues that if the avoid arrest aggravator is applied to situations where a defendant flees the scene of a crime, the aggravator would apply in virtually every death penalty case because "[v]ery few capital defendants wait at the crime scene for the authorities to apprehend them."

To pass constitutional scrutiny, an aggravating circumstance must channel the discretion of the sentencer with clear and objective standards which provide specific guidance and make possible a rational review of the process of sentencing a defendant to death. *Lewis v. Jeffers*, 497 U.S. 764, 774, 777-78, 111 L. Ed. 2d 606, 110 S. Ct. 3092 (1990). An aggravating circumstance must not apply to every defendant convicted of murder but only to a subclass of that larger group. *Tuilaepa v. California*, 512 U.S. 967, 972, 129 L. Ed. 2d 750, 114 S. Ct. 2630 (1994). If the sentencer could fairly conclude that an aggravating circumstance applies to every defendant convicted of murder, the circumstance is unconstitutionally broad and thus invalid. *Arave v. Creech*, 507 U.S. 463, 474, 123 L. Ed. 2d 188, 113 S. Ct. 1534 (1993).

Other courts have determined that the avoid arrest aggravator on its face is not unconstitutionally vague or overbroad. See, *e.g.*, *Toles v. Oklahoma*, 947 P.2d 180, 192 (Okla. Crim. 1997), *cert. denied* 524 U.S. 958 (1998); *Wike v. Florida*, 698 So. 2d 817, 822 (Fla. 1997), *cert. denied* 522 U.S. 1058 (1998); *Whitmore v. Lockhart*, 834 F. Supp. 1105, 1118 (E.D. Ark. 1992).

Kleypas advances two cases in support of his assertion that the avoid arrest aggravator is unconstitutionally broad as applied in this case. First, in *North Carolina v. Williams*, 304 N.C. 394, 424-25, 284 S.E.2d 437, *cert. denied* 456 U.S. 932 (1981), the North Carolina court held that there was not sufficient evidence to support the avoid arrest aggravator based on the mere fact that defendant told his accomplice that he wanted to leave the scene of the murder at a slow rate of speed in order to avoid arousing suspicion. 304 N.C. at 425. The court concluded:

"This single statement by the defendant occurred after the killing and at that point it was extremely likely that the statement reflected defendant's wish to avoid

detection for the killing. However, such a statement cannot raise a reasonable inference as to his motivation before or at the time of the killing. It is a post-killing expression evidencing an after-the-fact desire not to be detected or apprehended. In our opinion, it does not raise a reasonable inference that at the time of the killing defendant killed for the purpose of avoiding lawful arrest." 304 N.C. at 425.

In the second case, *Kormondy v. Florida*, 703 So. 2d 454 (Fla. 1997), the trial court admitted evidence that Kormondy, while in jail, said he would kill two other people, one of whom witnessed the murder committed by Kormondy. Kormondy argued on appeal that the evidence was prejudicial and not relevant to proving an aggravating circumstance. The State argued that the evidence was relevant to show that Kormondy committed the murder to avoid arrest. The Florida court disagreed, stating:

"In the circumstances attending this case, we cannot find that a statement allegedly made in jail (after the relevant criminal episode) as to a future intent to kill sheds any light on Kormondy's intent at the time of the crime. . . . His sentiment about future killings seems to have arisen after capture. It is simply too prejudicial to allow such speculative evidence to prove Kormondy's intent at the time of the shooting." 703 So. 2d at 462-63.

Unlike *Williams*, 304 N.C. 394, and *Kormondy*, 703 So. 2d 454, the State in this case anchored its argument on the evidence that C.W. knew Kleypas and that Kleypas spent time after the attempted rape, in the presence of C.W., considering his options. While the State referenced Kleypas' flight after the murder, it did so only in the last two sentences of its argument. The State's argument was based on the evidence that C.W. knew Kleypas and that he spent time after the attempted rape deliberating this fact, considered his options, and stabbed C.W. to death.

Kleypas' attack on the constitutionality of the statute as applied is nothing more than a rehash of his argument that the State misinformed the jury about the nature of the evidence available to prove the existence of the aggravating circumstance. This question will be addressed in our discussion of prosecutorial misconduct, and we will not further discuss it here.

After a review of all the evidence, viewed in the light most favorable to the prosecution, we determine that a rational factfinder

could have found the existence of the aggravating circumstance beyond a reasonable doubt. Kleypas knew that C.W. recognized him as a neighbor who lived on her street. After he attempted to rape her and tied her to a chair, he paused to consider his next action. He unplugged the telephone. When she attempted to escape he killed her. Based on this evidence, a rational factfinder could have found beyond a reasonable doubt that Kleypas murdered C.W. in order to avoid arrest or prosecution.

## Issue 25. Constitutional Challenge to the Definition of the Heinous, Atrocious, or Cruel Manner Aggravating Circumstance

Kleypas contends that the instruction defining the heinous, atrocious, or cruel manner aggravating circumstance as used in Kansas violates the Eighth and Fourteenth Amendments to the United States Constitution and § 9 of the Kansas Constitution Bill of Rights because it is unconstitutionally vague and fails to narrow the class of persons eligible to receive the death penalty.

The Eighth and Fourteenth Amendments of the United States Constitution require that a capital sentencing scheme direct and limit the discretion of the sentence " 'so as to minimize the risk of wholly arbitrary and capricious action.' " *Lewis v. Jeffers*, 497 U.S. at 774. The scheme must "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.' " *Godfrey v. Georgia*, 446 U.S. 420, 428, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980).

Where a jury is the final sentencer, as it is in this case, it is essential that the jurors be properly instructed regarding all facets of the sentencing process; it is insufficient to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face. *Walton v. Arizona*, 497 U.S. 639, 653, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990). When the statutory language defining an aggravating circumstance is challenged as unconstitutionally vague, this court must first determine whether the statutory language defining the circumstance is too vague to provide any guidance to the sentence. If so, the court must consider

whether the state court has applied a narrowing construction to define the vague terms in a constitutional manner. 497 U.S. at 654.

K.S.A. 21-4625(6) states as an aggravating circumstance that "the defendant committed the crime in an especially heinous, atrocious and cruel manner." The jury instruction regarding this aggravating circumstance stated that the jury must find

"[t]hat the defendant committed the crime in an especially heinous, atrocious or cruel manner. The term 'heinous' means extremely wicked or shockingly evil; 'atrocious' means outrageously wicked and vile; and 'cruel' means pitiless or designed to inflict a high degree of pain, utter indifference to, or enjoyment of the sufferings of others.

"A crime is committed in an especially heinous, atrocious, or cruel manner where the perpetrator inflicts serious mental anguish or serious physical abuse before the victim's death. Mental anguish includes a victim's uncertainty as to his or her ultimate fate."

This instruction was taken from PIK Crim. 3d 56.00-C.

The United States Supreme Court has found language similar to that used in the first paragraph in the instruction to be unconstitutionally vague. See *Maynard v. Cartwright*, 486 U.S. 356, 364, 100 L. Ed. 2d 372, 108 S. Ct. 1853 (1988); *Shell v. Mississippi*, 498 U.S. 1, 112 L. Ed. 2d 1, 111 S. Ct. 313 (1990). In *Maynard*, the Court found that the phrase "especially heinous, atrocious, or cruel" does not give sufficient guidance because an ordinary person could honestly believe that every unjustified, intentional taking of life is especially heinous. 486 U.S. at 364. In *Shell*, the Court found that the addition of the phrase " '[T]he word heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others' " failed to cure the constitutional defect. 498 U.S. at 1; 498 U.S. at 2 (Marshall, J., concurring).

This court recognized the problem with vagueness in connection with the first paragraph of our jury instruction in *State v. Willis*, 254 Kan. 119, 130-31, 864 P.2d 1198 (1993). In order to address this problem, we added the second paragraph to the instruction, adopting the language from that approved by the United States Supreme Court in *Walton v. Arizona*. *Willis*, 254 Kan. at 131.

In *Walton*, the Arizona Supreme Court had defined the phrase "especially cruel" in its "especially heinous, cruel or depraved" aggravating factor as follows: " 'A crime is committed in an especially cruel manner when the perpetrator inflicts mental anguish or physical abuse before the victim's death' and that '[m]ental anguish includes a victim's uncertainty as to his ultimate fate.' " 497 U.S. at 654. The United States Supreme Court stated:

"Recognizing that the proper degree of definition of an aggravating factor of this nature is not susceptible of mathematical precision, we conclude that the definition given to the 'especially cruel' provision by the Arizona Supreme Court is constitutionally sufficient because it give meaningful guidance to the sentencer." 497 U.S. at 655.

Kleypas argues that this court's adoption of the *Walton* language does not solve the vagueness problem because the court failed to adopt the five-factor test allegedly employed by Arizona courts to further define the aggravating factor. Kleypas contends that in Arizona once a crime satisfies the mental anguish or physical abuse requirement, the sentencing judge must then find the existence of one or more of the following factors: (1) the killer's apparent relishing of the murder; (2) the infliction of gratuitous violence on the victim; (3) the needless mutilation of the victim; (4) the senselessness of the crime; and (5) the helplessness of the victim (citing *Arizona v. Gretzler*, 135 Ariz. 42, 51-53, 659 P.2d 1 [1983]).

Kleypas' interpretation of *Gretzler* and of the Arizona sentencing scheme is incorrect. In Arizona, the three terms "cruel," "heinous," and "depraved" are phrased in the disjunctive, so either all or one could constitute an aggravating circumstance. *Gretzler*, 135 Ariz. at 51. In order to be committed in a cruel manner, the murder must have involved the infliction of physical or mental pain on the victim. 135 Ariz. at 50-51. This was the aggravating circumstance at issue in *Walton*. See 497 U.S. at 654. In order to be committed in a heinous or depraved manner, the murder must satisfy one or more of the five factors outlined above. *Gretzler*, 135 Ariz. at 51-53. Thus, the factors cited by Kleypas are not factors which further narrow a finding that the crime involved the infliction of physical or mental abuse but rather alternatives that allow the jury to find the aggravating factor.

Kansas, unlike Arizona, applies the language of the Arizona definition of cruel to the entirety of the phrase "especially heinous, atrocious or cruel." Thus, in order to find that a murder is committed in an especially heinous, atrocious, or cruel manner, the jury must find that the perpetrator inflicted mental anguish or physical abuse before the victim's death. In that respect, the Kansas scheme is nearly identical to that used by Oklahoma post-*Maynard*, 486 U.S. 356. In *Nuckols v. Oklahoma*, 805 P.2d 672, 674-75 (Okla. Crim. 1991), the Oklahoma Court of Criminal Appeals addressed OUJI-CR No. 436, which is virtually identical to PIK Crim. 3d 56.00-C except that the second paragraph states: "The phrase 'especially heinous, atrocious, or cruel' is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse." In *Nuckols* the court found that this instruction contemplates a two-step analysis. First, the jury must find that the death was preceded by torture or serious physical abuse, and once that category had been constitutionally narrowed, the jury would then apply the definitions of "heinous," "atrocious," or "cruel" to determine if the defendant would receive the death penalty. 805 P.2d at 674. The court concluded that the instruction passed constitutional muster.

Kleypas argues that the second paragraph of the Kansas instruction does not narrow the class of death eligible defendants as does the second paragraph of the Oklahoma statute. Kleypas contends that instead, the second paragraph of the PIK Crim. 3d 56.00-C(6) which states that "[a] crime is committed in an especially heinous, atrocious, or cruel manner where the perpetrator inflicts serious mental anguish or serious physical abuse before the victim's death" merely gives an example of the type of conduct that would qualify as heinous, atrocious, or cruel rather than restricting the aggravator to this conduct. Kleypas contrasts this with the Oklahoma instruction which states that the phrase is "directed" to such crimes. See OUJI-CR No. 436. However, a review of the language of the jury instruction in this case leads to the conclusion that the second paragraph is clearly intended to be a narrowing definition rather than an example, and we conclude that the narrow definition is neither confusing nor misleading.

Kleypas also argues that the second paragraph is vague because it does not instruct the jury that Kleypas must have intended to cause the physical or mental harm, is not limited to those acts over and above those necessary to cause death, and does not inform the jury that the physical abuse cannot include acts performed after the victim loses consciousness. However, none of these elements are mandated by the Constitution. Instead, the crucial question is whether the definition adequately narrows the class of persons who are death eligible by providing a principled basis for doing so. *Arave v. Creech*, 507 U.S. at 474.

The Kansas definition of "heinous, atrocious or cruel" is similar to the Arizona definition of "cruel" which was explicitly held to be sufficient under the Eighth and Fourteenth Amendments. *Walton*, 497 U.S. at 655. We conclude that the Kansas definition of "heinous, atrocious or cruel" narrows the class of persons who are death eligible defendants in a manner which complies with the requirements of the Eighth and Fourteenth Amendments to the United States Constitution.

## Issue 26. Proportionality of Sentence

Kleypas argues that our state constitution, our death penalty statute, and Kansas case law require this court to conduct a proportionality analysis of his sentence. This analysis will, according to Kleypas, require this court to set his sentence aside when it is compared with other sentences in Kansas for similar crimes. We do not address the merits of his claim based upon our conclusion that neither the state nor federal Constitution require this court to engage in a proportionality analysis of his sentence. Further, nothing in our state law requires such a review.

Traditionally, "proportionality" has been used to compare the gravity of the offense against the severity of the penalty, to compare a sentence imposed to other sentences for similar crimes, and to evaluate sentencing practices in other jurisdictions. *Pulley v. Harris*, 465 U.S. 37, 43, 79 L. Ed. 2d 29, 104 S. Ct. 871 (1984). The federal Constitution does not require that this court or any other Kansas court compare a defendant's sentence with other sentences

imposed in this or any other state for similar crimes. 465 U.S. at 43-44.

Kleypas, however, argues that the following language in the Kansas Constitution compels such a review:

"All persons shall be bailable by sufficient sureties except for capital offenses, where proof is evident or the presumption great. Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted." Kan. Const. Bill of Rights, § 9.

Kleypas emphasizes the difference in language between the Kansas and federal Constitutions. He places great weight upon the disjunctive "or" between "cruel" and "unusual." He argues that an "unusual" sentence implies a disproportionate sentence. Thus, according to Kleypas, § 9 of the Kansas Constitution Bill of Rights requires this court to conduct a proportionality review in order to determine whether his sentence is "unusual" as compared to those imposed in other cases.

In a similar vein, Kleypas turns to the language of K.S.A. 21-4627(c)(1): "With regard to the sentence, the court shall determine . . . [w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor." Kleypas focuses on the phrase "or any other arbitrary factor," claiming that the language alludes to a proportionality review. In support of his contention, Kleypas cites *District Attorney for the Suffolk District v. Watson*, 381 Mass. 648, 411 N.E.2d 1274 (1980). In *Watson*, the Massachusetts capital sentencing scheme at issue required in part that the appellate court review a sentence of death to determine whether " 'the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor' " and also required the appellate court to perform a proportionality review—to include in its decision " 'a reference to similar cases which it took into consideration' " extracted from records of other death penalty cases accumulated by the executive secretary to the justices of the state's high court. 381 Mass. at 654.

*Watson* held the Massachusetts death penalty scheme to be cruel or unusual punishment as defined by the state bill of rights because it offended contemporary standards of decency and was, as a his-

torical matter, arbitrarily inflicted. 381 Mass. at 660-61, 665. Based on its decision, the court in *Watson* did not consider the question of whether the statutory scheme required proportionality review. The Massachusetts statute specifically required the court to compare and reference sentences in similar cases and included a mechanism for collection of sentencing information for use by the court. The Kansas statutory scheme has no such provisions. Thus, *Watson* is of little value to Kleypas' argument.

Finally, Kleypas argues that Kansas case law suggests this court has been willing to conduct a proportionality review in criminal cases, absent statutory mandate, when the issue is raised on appeal from a sentence. In *State v. Freeman*, 223 Kan. 362, 574 P.2d 950 (1978), Freeman was convicted of second-degree murder in the death of her abusive husband. She received the minimum sentence but was denied probation pursuant to statute. Freeman attacked the operation of the statute as cruel and unusual punishment. 223 Kan. at 363.

This court set forth three criteria for evaluating whether the length of a sentence offends the constitutional prohibition against "cruel punishment."

"(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

"(2) *A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses,* and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense." (Emphasis added.) 223 Kan. at 367.

While relevant, *Freeman* fails for several reasons to support Kleypas' argument for proportionality review. First, the *Freeman* factors are designed to test whether a sentence constitutes cruel or unusual punishment in violation of § 9 of the Kansas Constitution Bill of Rights. They are clearly not designed as a mechanism for proportionality review. Second, *Freeman* tested the length— not the nature—of the sentence imposed. Third, the second *Free-*

*man* factor requires comparison of the punishment with punishments imposed in this state for more serious crimes, not the same or similar crimes, and not the actual punishments imposed on a case-by-case basis but the punishments set forth by statute. Indeed, *Freeman's* application of this second factor consisted of considering whether in Kansas a crime of greater severity level than Freeman's carried a less severe punishment. 223 Kan. at 368.

Kleypas points out that this court recently applied *Freeman* in *State v. Tyler*, 251 Kan. 616, 840 P.2d 413 (1992). However, in *Tyler* we pointed out that the Eighth Amendment to the federal Constitution does not carry a proportionality guarantee. We considered the *Freeman* factors in evaluating Tyler's claim under § 9 of the Kansas Constitution Bill of Rights, and stated:

> "After a review of the record and considering the nature of Tyler's offenses we find his sentence is not grossly disproportionate to his crimes in violation of § 9 of the Kansas Constitution Bill of Rights. The sentence imposed is within the limits proscribed by law and we find it is not a product of partiality or prejudice." 251 Kan. at 647.

Thus, *Tyler* limits the application of *Freeman* and provides little if any support for Kleypas. *Tyler* involved the issue of proportionality only in the context of whether Tyler's *sentence* was proportionate to his *crimes*. There was no comparison of Tyler's sentence to those of others convicted of the same or a similar crime. Further, Tyler complained of the length, not the nature, of his sentence.

Finally, this court severely limited the application of the *Freeman* factors in *State v. Scott*, 265 Kan. 1, 961 P.2d 667 (1998). Scott claimed the public access provisions of the Kansas Sex Offender Registration Act constituted cruel and unusual punishment. 265 Kan. at 2. The Court of Appeals applied the *Freeman* factors and held the Act violated the state constitution. On petition for review, this court considered the claim in the context of the federal and state Constitutions, noting that it had the right to interpret the Kansas Constitution differently from the federal Constitution but that it has not traditionally done so. 265 Kan. at 5. We observed in *Scott* that the proportionality test incorporated in the second *Freeman* factor had since been discredited by the United States Supreme Court, limiting application of the *Freeman* test to instances

where the *length* of a sentence was challenged. 265 Kan. at 8. We stated:

"While there may still be instances where the *Freeman* test should be applied, we will not apply it precisely here where the method of punishment, rather than the length of a sentence, is challenged as cruel or unusual. Neither this court nor the [United States] Supreme Court has applied such test outside of the length of sentence context. [Citation omitted.] We may look to some of the *Freeman* factors in our analysis, but our basic question is whether the public access provisions of the KSORA render punishment so barbarous and contrary to human dignity that it shocks our conscience." 265 Kan. at 9.

Kleypas also points out that the *Freeman* test has been used by this court in *State v. McCloud,* 257 Kan. 1, 5-6, 891 P.2d 324, *cert. denied* 516 U.S. 837 (1995) (length of sentence which was within statutory limits, not cruel or unusual); and *State v. McDaniel & Owens,* 228 Kan. 172, 185, 612 P.2d 1231 (1980) (*Freeman* test upheld for state constitutional analysis; sentences held not excessive or disproportionate); and a form of it used in *State v. Strauch,* 239 Kan. 203, 220, 718 P.2d 613 (1986) (criteria to consider when determining whether punishment is disproportionate to crime are "excessiveness, disproportionality, lack of necessity, unacceptability to society and arbitrariness of infliction"). He also contends that this court engaged in a proportionality review of the sentences of codefendants in *State v. Bailey,* 251 Kan. 527, 834 P.2d 1353 (1992).

All of the above cases dealt with complaints regarding the length, not the nature, of the sentences. *Scott* holds that the *Freeman* factors are to be applied only in evaluating the length of a sentence. Even so, the *Freeman* factors do not suggest a comparison of Kleypas' sentence with those imposed on other defendants in this state convicted of the same or similar crimes. Kansas case law simply does not mandate proportionality review as requested by Kleypas.

We hold that neither the Kansas Constitution, the Kansas death penalty statutes, nor Kansas case law requires that a defendant's sentence be subjected to a proportionality review which compares the defendant's sentence with those imposed on other Kansas defendants for the same or similar crimes.

## Issue 27. Constitutionality of Upward Departure for Conviction of Aggravated Burglary

Kleypas next argues that the trial court erred in imposing an upward durational departure sentence for his conviction of aggravated burglary. The trial court imposed an upward durational departure sentence of 68 months rather than the presumptive sentence for aggravated burglary of 31 to 34 months indicated by Kleypas' criminal history. This departure was based on (1) the excessive brutality of the crime and (2) the obsessive pursuit and/or stalking of the victim.

Based on the United States Supreme Court opinion in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and our opinion in *State v. Gould*, 271 Kan. 394, 23 P.3d 801 (2001), it is clear that Kleypas' departure sentence for aggravated burglary must be vacated and the matter remanded for resentencing.

## Issue 28. Instruction on Mercy

Kleypas argues that his constitutional rights were violated by the trial court's failure to properly instruct the jury on the exercise of mercy. The trial court submitted Instruction No. 13 to the jury during the sentencing phase as follows:

"Mitigating circumstances are those which in fairness may be considered as extenuating or reducing the degree of moral culpability or blame or which justified a sentence of less than death, although it does not justify or excuse the offense. The determination of what are mitigating circumstances is for you as jurors to resolve under the facts and circumstances of this case.

*"The appropriateness of the exercise of mercy can itself be a mitigating factor you may consider in determining whether the State has proved beyond a reasonable doubt that the death penalty is warranted."* (Emphasis added.)

The instruction also lists 31 mitigating factors put forth by Kleypas for the jury's consideration as well as the general statement that any other mitigators may be considered. The language precisely tracks that contained in PIK Crim. 3d 56.00-D.

During closing, Kleypas' attorney explained to the jury at length the function and availability of mercy during the sentencing phase:

"Mitigating circumstances are those facts for you which in fairness and mercy and that is the law, the law of this land in fairness and mercy make you believe that this man should not be killed, that he should be in prison. Look at instruction number 13. Mitigating circumstances are those which in fairness may be considered as extenuating or reducing the degree of moral culpability, that is part of it, or blame or which justify a sentence of less than death, which justified a sentence of less than death although it does not justify or excuse the offense.

. . . .

". . . It is something for you to consider in your heart in deciding whether to exercise fairness and mercy in this case and, in fact, you get a specific statement of the law on down in that instruction 13. The appropriateness of the exercise of mercy, mercy can itself be a mitigating factor you may consider in deciding whether this man seated over here should be killed or in prison. That is what the law says, fairness and mercy. . . . I looked up the word mercy in the dictionary and there is other places where the word mercy appears. But in the dictionary one of the definitions is compassion or forbearance shown to an offender.

"You know what another actual definition B in Webster's dictionary is imprisonment rather than death imposed as a penalty for murder. Compassion or forbearance for an offender. That is what the law says. The law says that is a valid mitigator. *If you decide that your heart tells you to exercise mercy, compassion or forbearance, fairness, then that is right. If you believe that that is a reason for you not to kill Gary Kleypas, not to vote for the execution of Gary Kleypas, then you have found that a mitigator outweighs the aggravators."* (Emphasis added.)

If the challenged instruction properly and fairly states the law as applied to the facts in the case, and if the jury could not reasonably have been misled by it, the instruction does not constitute reversible error. *State v. Alexander*, 268 Kan. 610, 613, 1 P.3d 875 (2000).

"The use of PIK instructions is not mandatory but is strongly recommended. The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction, or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed. [Citation omitted.]." *State v. Franklin*, 264 Kan. 496, 505, 958 P.2d 611 (1998).

Kleypas argues that while the instruction introduces the concept of exercising mercy to the jury, it does so in a legally insufficient manner. Kleypas argues that mercy, if it is to be exercised, must be exercised only *after* the jury has weighed aggravating and mit-

igating circumstances and determined that a sentence of death is warranted. According to Kleypas, only after the jury has decided that Kleypas should be put to death can it truly exercise mercy and instead impose a nondeath sentence, thus mercy itself should not be characterized as a mitigator.

Kleypas' arguments are unfocused. He supports them by citing cases upholding the right to trial by jury under the state constitution, treatises expounding upon the common-law tradition of the exercise of mercy by juries, and out-of-state cases purporting to recognize "the fallibility of legal rules designed to guide the jury's discretion in deciding a capital defendant's punishment." The cases cited stand for no such thing and are not helpful to Kleypas' argument.

As noted above, the United States Supreme Court has held that the Eighth Amendment requires two things of a death sentence: (1) The sentencer must not have unbridled discretion in determining the fate of the defendant, and (2) the defendant must be allowed to introduce any relevant mitigating evidence of his character or record or circumstances of the offense. *California v. Brown*, 479 U.S. 538, 541, 93 L. Ed. 2d 934, 107 S. Ct. 837 (1987). A mercy instruction per se is simply not required as part of this equation by federal or state law, nor is a specific type of mercy instruction.

The trial court provided the PIK instruction which incorporated the concept of mercy into the jury's consideration of mitigating factors. Kleypas fails to show how the instruction was not adequate to inform the jury of its option to exercise mercy or how the trial court otherwise failed to permit the jury to exercise mercy. We conclude that Instruction No. 13 properly and fairly stated the law as applied to the facts and that the jury could not have been misled by the instruction given.

## Issue 29. Standard for Admission of Evidence During the Penalty Phase

Kleypas argues that the standard for admission of evidence during the sentencing phase set forth in K.S.A. 21-4624(c) violates the heightened reliability requirements for capital sentencing as guar-

anteed by various provisions of the state and federal Constitutions. We reject this argument and find that the standard for admission satisfies the Eighth Amendment.

K.S.A. 21-4624(c) states:

"In the sentencing proceeding, evidence may be presented concerning any matter that the court deems relevant to the question of sentence and shall include matters relating to any of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto and any mitigating circumstances. Any such evidence which the court deems to have probative value may be received regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. Only such evidence of aggravating circumstances as the state made known to the defendant prior to the sentencing proceeding shall be admissible, and no evidence secured in violation of the constitution of the United States or of the state of Kansas shall be admissible. No testimony by the defendant at the sentencing proceeding shall be admissible against the defendant at any subsequent criminal proceeding. At the conclusion of the evidentiary presentation, the court shall allow the parties a reasonable period of time in which to present oral argument."

With regard to this standard, Kleypas raises two arguments: (1) Relaxation of the rules of evidence at the penalty phase of a capital trial may apply only to evidence offered in support of mitigating, not aggravating, circumstances; and (2) the absence of a requirement that the court weigh the probative value of the evidence sought to be admitted against its prejudicial effect is a fatal flaw which renders the statute unconstitutional. Kleypas relies heavily on a pair of related cases to support his arguments: *Washington v. Bartholomew (Bartholomew I)*, 98 Wash. 2d 173, 654 P.2d 1170 (1982); *Washington v. Bartholomew (Bartholomew II)*, 101 Wash. 2d 631, 683 P.2d 1079 (1984).

In *Bartholomew I*, the Washington Supreme Court considered the constitutionality of portions of that state's death penalty scheme which allowed the jury to consider among other things, the evidence of prior criminal conduct regardless of whether the conduct resulted in a charge or conviction and any relevant factors in determining whether there was sufficient mitigating circumstances to merit sparing the life of the capital defendant. In addition, the Washington statute included a provision which required the court at sentencing to admit any relevant probative evidence regardless

of its admissibility under the rules of evidence. 98 Wash. 2d at 198-99.

The Washington court set forth a lengthy analysis of Eighth Amendment capital punishment jurisprudence. It noted that the federal Constitution requires two things of a death penalty scheme: (1) It must guide the discretion of the jury, rendering the death sentence rationally reviewable, and (2) it must allow particularized consideration of the defendant's character and record. Of these two, the court further narrowed its focus to the first requirement of channeling the discretion of the jury. 98 Wash. 2d at 192-93.

On the issue of channeling, the Washington Supreme Court looked to United States Supreme Court precedent and distilled from it the conclusion that the Constitution requires the jury to consider any evidence supporting mitigation. The Washington Supreme Court admitted the Supreme Court had not passed on the question of whether the same was true of evidence supporting aggravation. 98 Wash. 2d at 194-95.

The court quoted *Gregg v. Georgia*, 428 U.S. 153, 203-04, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976), on the matter of the breadth of evidence admissible during the penalty phase of a capital trial:

" 'We think the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument. So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions.' " 98 Wash. 2d at 193.

The court also considered *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978), which forbade limitation of the jury's consideration of any aspect of the defendant's character or record or any aspect of the offense as a mitigating circumstance; *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982), which forbade any refusal to consider relevant mitigating circumstances; and *Green v. Georgia*, 442 U.S. 95, 60 L. Ed. 2d 738, 99 S. Ct. 2150 (1979), which forbade exclusion of mitigating evidence on the basis of state hearsay rules. 98 Wash. 2d at 194. The court summarized:

"While such liberal reception of mitigating information is mandated by *Lockett v. Ohio, et al.*, the Court has not yet considered specifically whether the same prin-

ciples apply to aggravating factors. The statements in *Gregg v. Georgia* quoted above are apparently broad enough to apply equally to aggravating and mitigating information. Nevertheless, the reasoning in *Lockett* is applicable only to mitigating information. Furthermore, *Gregg* contains one significant limitation on its sweeping language; the information before the sentence must not 'prejudice' the defendant. [Citation omitted.]" 98 Wash. 2d at 194-95.

The Washington Supreme Court seized on the notion of "prejudice," stating:

"At the very least, the Court's recognition that defendant may be prejudiced by the reception of information at his sentencing suggests that different criteria apply to aggravating factors than apply to mitigating factors." 98 Wash. 2d at 195.

In *Bartholomew I*, based on the above analysis, the Washington Supreme Court reversed the sentence of death, concluding that: (1) the provision authorizing admission of evidence of a defendant's previous criminal activity other than convictions should be stricken, (2) the liberal statutory authority to receive "any relevant evidence" must be limited to any relevant *mitigating* evidence, (3) consideration of "any relevant factors" should be limited to any relevant *mitigating* factors, and (4) the State may not introduce evidence of nonstatutory aggravators (other than criminal convictions) except for matters in rebuttal of mitigating evidence. 98 Wash. 2d at 198.

The United States Supreme Court granted *certiorari*, vacated the judgment in *Bartholomew I*, and remanded for reconsideration in light of *Zant v. Stephens*, 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983). *Washington v. Bartholomew*, 463 U.S. 1203, 77 L. Ed. 2d 1383, 103 S. Ct. 3530 (1983).

The Washington Supreme Court on remand in *Bartholomew II* did not change its decision. It characterized *Zant* as follows:

"The question before the United States Supreme Court was whether the invalidation of one of the multiple statutory aggravating circumstances found by a jury in imposing the death penalty requires that the sentence must be invalidated under the Eighth Amendment.

. . . .

"The Court in *Zant v. Stephens* went on to indicate that a jury's consideration of nonstatutory aggravating factors will not render a death sentence unconstitutional:

'[S]tatutory aggravating circumstances play a constitutionally necessary function . . . . But the Constitution does not require the jury to ignore other

possible [nonstatutory] aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death.'

. . . .

"In a limited way, *Zant v. Stephens* answers the question as to limits the constitution places on the prosecution's presentation of nonstatutory aggravating factors at the sentencing phase of a capital case. According to the Supreme Court, the sentencing jury may consider nonstatutory aggravating factors. However, the court in *Zant v. Stephens* does not say that nonstatutory aggravating factors should have the same liberal reception as mitigating information proffered by the defendant." 101 Wash. 2d at 635-36.

The Washington Supreme Court pointed out that *Zant* quoted *Gregg* for the proposition that " '[s]o long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions' " on admissibility of evidence. 101 Wash. 2d at 637. This prompted the Washington Supreme Court to declare that the United States Supreme Court once again "acknowledged this 'prejudice' standard." 101 Wash. 2d at 637. Lamenting, the Washington Supreme Court stated:

"Likewise, *Zant v. Stephens* and other recent Supreme Court decisions, have failed to clarify this concept. Nevertheless, faced with a death penalty statute, provisions of which we find offensive under the Eighth Amendment, Fourteenth Amendment, and our state constitution, we cannot wait for the Supreme Court to clarify this concept. It is our opinion that this 'prejudice' concept subjects the prosecution to a more stringent standard than that of the defendant at the sentencing phase of a capital case." 101 Wash. 2d at 637.

The court hastened to add that if its federal constitutional analysis was in error, the same conclusion was required under the Washington State Constitution. 101 Wash. 2d at 639. The court affirmed its prior decision in its entirety. 101 Wash. 2d at 648.

Kleypas draws from these cases two arguments: (1) K.S.A. 21-4624(c) is constitutionally infirm because it allows admission of probative evidence of aggravating circumstances without consideration for the rules of evidence, and (2) Kansas statute is invalid because it does not incorporate the *Gregg* prejudice standard. However, we do not find *Bartholomew I* and *Bartholomew II* persuasive.

In *Romano v. Oklahoma*, 512 U.S. 1, 129 L. Ed. 2d 1, 114 S. Ct. 2004 (1994), Romano was tried separately for two murders. His first trial resulted in conviction and a death sentence. During sentencing at his second trial, the prosecution introduced evidence of his first murder conviction and death sentence. Romano was sentenced to death in the second trial. On appeal, he argued that admission of evidence of his first sentence of death undermined the jury's understanding of its responsibility for determining the appropriateness of the death penalty in the second trial. He also pointed out that his first conviction was later overturned on appeal.

The United States Supreme Court framed the issue before it as follows:

" 'Does admission of evidence that a capital defendant already has been sentenced to death in another case impermissibly undermine the sentencing jury's sense of responsibility for determining the appropriateness of the defendant's death, in violation of the Eighth and Fourteenth Amendments?' " 512 U.S. at 6.

The Court reviewed its traditional Eighth Amendment framework in capital cases: (1) States must establish a threshold below which the death penalty cannot be imposed, that is, states must provide a mechanism which genuinely narrows the class of persons eligible for the death penalty while minimizing arbitrary and capricious sentencing decisions; and (2) states must ensure that sentences are based on the individual character and record of defendant, as well as the circumstances of the crime, without limiting consideration of any mitigating information. 512 U.S. at 7. The Court stated:

"Within these constitutional limits, 'the States enjoy their traditional latitude to prescribe the method by which those who commit murder shall be punished.' [Citation omitted.] This latitude extends to evidentiary rules at sentencing proceedings.

. . . .

"Petitioner's argument, pared down, seems to be a request that we fashion general evidentiary rules, under the guise of interpreting the Eighth Amendment, which would govern the admissibility of evidence at capital sentencing proceedings. We have not done so in the past, however, and we will not do so today. *The Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings.* [Citation omitted.]" (Emphasis added.) 512 U.S. at 7, 11-12.

Kleypas focuses much attention, as do the cases he cites, on the notion of "prejudice" as briefly mentioned in *Gregg*. Putting the quotation in context is helpful. In *Gregg*, the United States Supreme Court considered the constitutionality of the Georgia death penalty scheme. One of Gregg's minor arguments touched on an evidentiary issue.

"The petitioner objects, finally, to the wide scope of evidence and argument allowed at presentence hearings. We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument. [Citation omitted.] So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions. *We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision.* [Citation omitted.]" (Emphasis added.) 428 U.S. at 203-04.

Kleypas conveniently omits the last sentence of the quotation which is important to the message conveyed by the Supreme Court. Another twist that neither party mentions, however, is that the Georgia statute in effect at the time provided for a sentencing hearing "subject to the laws of evidence." Ga. Code Annot. § 27-2534 (1971) (repealed and superseded by the Act of 1974, now appearing at Ga. Code Annot. § 27-2503). See *Brown v. Georgia*, 235 Ga. 644, 648, 220 S.E.2d 922 (1975). Thus, the Supreme Court's comment that the jury should have as much information as possible was made in the context of a statute which subjected the sentencing hearing to the Georgia laws of evidence.

*Romano* is more helpful to the analysis and makes two important statements about evidentiary concerns against the backdrop of the Eighth Amendment. First, the State has great latitude in fashioning evidentiary rules for capital sentencing proceedings. Second, the Eighth Amendment does not provide a basis for inventing, at the federal level, evidentiary rules to restrict admissibility of evidence at a state capital sentencing proceeding.

K.S.A. 21-4624(c) requires evidence presented at sentencing to be relevant to the question of sentence and have probative value. Evidence secured in violation of the Constitution is not admissible. Further, the State may only introduce evidence of aggravating cir-

cumstances which were disclosed to the defendant prior to sentencing, and the defendant is guaranteed a fair opportunity to rebut hearsay statements. The statute ensures that the sentencer have as much information as possible while affording the defendant basic protections. Contrary to Kleypas' contention, we conclude that further restriction on the reception of evidence by applying the rules of evidence to aggravating but not mitigating evidence in the interest of preventing "prejudice" to the defendant is neither advisable nor required by the Eighth Amendment.

Kleypas also complains of the statute's failure to shield the jury from hearsay evidence in the form of a correctional adjustment checklist from the Missouri Department of Corrections. Kleypas argues that introduction of this evidence suggested to the jury that he was a racist and sexually preyed on weaker inmates in prison. He contends that admission of the checklist was improper because the information it contained was unreliable and it violated his right to confrontation.

These arguments are explored in greater detail in our discussion involving prosecutorial misconduct and will not be addressed here. Suffice it to say that the evidence Kleypas complains of was introduced as rebuttal to evidence he himself offered in mitigation of punishment. Even the court in *Bartholomew I* and *II* acknowledged that the prosecution is entitled to produce nonstatutory aggravating evidence when it is used to rebut matters raised by the defendant in mitigation. 98 Wash. 2d at 197-98; 101 Wash. 2d at 642-43. Kleypas' arguments concerning the admissibility of evidence during the penalty phase of a capital murder trial fail.

## Issue 30. Effect of A Guilty Plea Under K.S.A. 21-4624

Kleypas argues that K.S.A. 21-4624 does not allow a sentence of death to be imposed upon a plea of guilty to a capital crime, while allowing a sentence of death to be imposed upon conviction after a trial, thus encouraging a guilty plea and chilling his exercise of state and federal constitutional rights not to incriminate himself by pleading guilty.

Kleypas did not plead guilty to the crimes for which he was convicted. Clearly, the statute did not operate to chill his consti-

tutional rights. Kleypas' argument becomes instead that he has been punished for exercising these rights by exposure to a death sentence which he ultimately received.

Kleypas admits that he failed to raise this issue in the trial court. However, K.S.A. 21-4627(b) authorizes this court, when considering a death penalty appeal, to "notice unassigned errors appearing of record if the ends of justice would be served thereby." Because this issue is likely to arise in future cases, we will consider it here.

Kleypas bases his argument that K.S.A. 21-4624 is unconstitutional on the seminal case of *United States v. Jackson*, 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968). There, the United States Supreme Court invalidated the death penalty provisions of the Federal Kidnaping Act because only a jury could impose a death sentence. The Act allowed those who pled guilty or waived a jury trial to escape with their lives.

The Federal Kidnaping Act provided in pertinent part:

" 'Whoever knowingly transports in interstate . . . commerce, any person who has been unlawfully . . . kidnaped . . . and held for ransom . . . or otherwise . . . shall be punished (1) by death if the kidnaped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or life, if the death penalty is not imposed.' " 18 U.S.C. § 1201(a), as quoted at 390 U.S. at 570-71.

*Jackson* interpreted the statute as follows: "This statute thus creates an offense punishable by death 'if the verdict of the jury shall so recommend.' The statute sets forth no procedure for imposing the death penalty upon a defendant who waives the right to jury trial or upon one who pleads guilty." 390 U.S. at 571.

The Court concluded:

"Under the Federal Kidnaping Act, therefore, the defendant who abandons the right to contest his guilt before a jury is assured that he cannot be executed; the defendant ingenuous enough to seek a jury acquittal stands forewarned that, if the jury finds him guilty and does not wish to spare his life, he will die. Our problem is to decide whether the Constitution permits the establishment of such a death penalty, applicable only to those defendants who assert the right to contest their guilt before a jury. The inevitable effect of any such provision is, of course, to discourage assertion of the Fifth Amendment right not to plead guilty and to

deter exercise of the Sixth Amendment right to demand a jury trial." 390 U.S. at 581.

The Court determined that the death penalty provision "needlessly penalizes the assertion of a constitutional right" and was thus invalid. 390 U.S. at 583. A few months later, the Court analyzed similar language contained in the Federal Bank Robbery Act and reached the same conclusion. See *Pope v. United States*, 392 U.S. 651, 20 L. Ed. 2d 1317, 88 S. Ct. 2145 (1968).

K.S.A. 21-4624 does not present the Hobson's Choice which existed in *Jackson*. It is clear from the language of K.S.A. 21-4624(b) that a capital defendant may waive trial by jury which also waives sentencing by jury. However, where a defendant pleads guilty, thus waiving trial and sentencing by jury, he or she is still subject to imposition of the death penalty by the court. Thus, in Kansas, a defendant who pleads guilty to capital murder will be sentenced by the court according to the same standards imposed upon those sentenced by a jury and faces the same range of penalties. See K.S.A. 21-4624. Kleypas' arguments to the contrary are without merit. Thus, there is no needless encouragement of guilty pleas in capital cases, and there is no chilling effect on the state and federal constitutional rights to jury trial and against self-incrimination.

## Issue 31. The Right to Life Under the Kansas Constitution

Kleypas argues that Kansas' adoption of the death penalty violates §§ 1 and 9 of the Kansas Constitution Bill of Rights.

The constitutionality of a statutory scheme is a question of law over which this court has unlimited review. *State v. Myers*, 260 Kan. 669, 676, 923 P.2d 1024 (1996), *cert. denied* 521 U.S. 1118 (1997). A statutory scheme is presumed constitutional, and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe a statute as constitutionally valid, the court must do so. A statute must clearly violate the constitution before it may be struck down. *State v. Scherzer*, 254 Kan. 926, 938, 869 P.2d 729 (1994).

## A. Section 9

Kleypas relies most heavily on § 9 of the Kansas Constitution Bill of Rights. This section states:

"All persons shall be bailable by sufficient sureties except for capital offenses, where proof is evident or the presumption great. Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted."

Kleypas first draws a distinction between this language and that of the Eighth Amendment to the United States Constitution which states:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

According to Kleypas, although capital punishment per se does not violate the Eighth Amendment, it does violate § 9 of the Kansas Constitution Bill of Rights.

Section 9 of the Kansas Constitution Bill of Rights prohibits infliction of cruel or unusual punishment by the State. The prohibition is directed primarily at the kind of punishment imposed rather than its duration. *State v. McCloud*, 257 Kan. 1, 3, 891 P.2d 324, *cert. denied* 516 U.S. 837 (1995). Nonetheless, Kansas courts have held that the length of a sentence may be so excessive as to constitute cruel or unusual punishment. *State v. McDaniel & Owens*, 228 Kan. 172, 185, 612 P.2d 1231 (1980). "Cruel and unusual punishment involves punishment that shocks the conscience or 'which seems inhumane or barbarous.' " *Scherzer*, 254 Kan. at 939.

This court has on numerous occasions faced the issue of whether the length of a particular sentence constitutes cruel or unusual punishment in a variety of contexts. See, *e.g.*, *State v. Tyler*, 251 Kan. 616, 644-46, 840 P.2d 413 (1992) (consecutive sentences totaling 111 to 330 years not cruel and unusual punishment); *State v. Weigel*, 228 Kan. 194, 202, 612 P.2d 636 (1980) (sentence not cruel and unusual because it was longer than those given to the defendant's accomplices); *State v. Freeman*, 223 Kan. 362, 368, 574 P.2d 950 (1978) (statute fixing mandatory minimum prison term without parole not cruel and unusual); *Cippola v. State*, 207 Kan. 822, 824, 486 P.2d 1391 (1971) (Habitual Criminal Act sentence

enhancement does not constitute infliction of cruel or unusual punishment).

Less frequently this court has considered the question of whether the nature of the punishment is cruel or unusual. See, *e.g.*, *State v. Scherzer*, 254 Kan. at 939 (legislature's decision to allow house arrest for one type of crime and not for another was not cruel and unusual punishment); *State v. Kilpatrick*, 201 Kan. 6, 18-19, 439 P.2d 99 (1968) (hanging by the neck is not cruel and unusual punishment); *State v. White*, 44 Kan. 514, 515-17, 25 Pac. 33 (1890) (imprisonment at hard labor not per se cruel or unusual under § 9).

In both contexts, this court has generally not drawn a distinction between the analysis of whether a sentence is cruel *or* unusual under the state constitution and whether a sentence is cruel *and* unusual under the federal Constitution. See, *e.g.*, *Tyler*, 251 Kan. at 644-46 (lengthy consecutive sentences did not violate "cruel and unusual punishment prohibition found in § 9 of the Kansas Constitution Bill of Rights"); *Kilpatrick*, 201 Kan. at 18-19 (death by hanging did not violate § 9 or the Eighth Amendment because hanging is not cruel and unusual; no separate analysis of state and federal provisions). In *State v. Scott*, 265 Kan. 1, 5, 961 P.2d 667 (1998), we stated:

"Although we have the right to interpret our Kansas Constitution in a manner different than the United States Constitution has been construed, [citation omitted], we have not traditionally done so. [Citation omitted.] The wording of both clauses at issue is nearly identical, and we will look to constructions of both provisions in reaching our conclusions herein."

Kleypas argues that despite this court's historical treatment of the two provisions as interchangeable, the framers of the Kansas Constitution deliberately chose the phrase "cruel or unusual" instead of "cruel and unusual" for some reason not specified by Kleypas but which is nonetheless "significant, and cannot be ignored."

It is clear from records available that Kansas founders present at the Wyandotte Convention of 1859 decided to model the Kansas Constitution after that of Ohio, including its Preamble and Bill of Rights. Larimer, Wyandotte Constitutional Convention, pp. 39-40, 678 (1920). At that time, the Ohio Constitution prohibited the

infliction of cruel "and" unusual punishment. See Ohio Const. of 1851, art. 1, § 9. There was little or no discussion of § 9 of the Kansas Constitution Bill of Rights, save the suggestion that the "or" between cruel and unusual be replaced with "nor." The suggestion was apparently adopted but never appeared in the final version of the constitution. Larimer, p. 288. In fact, the only section of the Bill of Rights extensively debated was § 1, referring to equal rights including life, liberty, and pursuit of happiness, which was the basis for a contentious slavery debate. Larimer, p. 697.

There is nothing in the available history of the constitutional convention which suggests a significant reason for the choice of an "or" instead of an "and" between cruel and unusual in § 9. Further, § 9 itself references "capital offenses" in the context of declaring them nonbailable where the proof is evident or the presumption great. Kleypas argues that this reference does not confer constitutional stature upon the death penalty but merely recognizes its existence at the time of the section's adoption. However, even the mere recognition of its existence by the framers suggests that the punishment itself was not at the time considered "unusual."

Kleypas also cites two cases in other states in which state constitutions prohibiting infliction of "cruel or unusual" punishment were construed to invalidate legislatively imposed death penalty schemes. In *People v. Anderson,* 6 Cal. 3d 628, 100 Cal. Rptr. 152, 493 P.2d 880, *cert. denied* 406 U.S. 958 (1972), the California Supreme Court held that Anderson's death sentence violated the California Constitution's prohibition against cruel or unusual punishment. 6 Cal. 3d at 633-34. In reaching its decision, the court reviewed its constitutional history on the cruel or unusual punishment provision in its state constitution, noted the absence of discussion or debate on the language regarding "cruel or unusual punishment" at the constitutional convention, noted that the delegates relied on constitutional models which featured "cruel and unusual" provisions, and concluded that the court could not assume the framers chose the disjunctive option "or" haphazardly. 6 Cal. 3d at 634-48.

The court also analyzed what it called "incidental references" to the death penalty in the body of the California Constitution. The

court reasoned the references did no more than acknowledge the existence of capital punishment in nineteenth century society. 6 Cal. 3d at 638. Recognizing its duty to confront and resolve difficult constitutional issues, the court acknowledged its historical practice of superimposing an Eighth Amendment analysis on the state constitution's Cruel or Unusual Punishment Clause. 6 Cal. 3d at 639-41. Within this context, the court held the death penalty to be: (1) cruel in its physical and psychological effects, as well as dehumanizing; and (2) unusual in its infrequent application and waning popularity in other states and around the world. 6 Cal. 3d at 649-57.

The Massachusetts Supreme Court invalidated its death penalty on a similar basis in *District Attorney for the Suffolk District v. Watson*, 381 Mass. 648, 411 N.E.2d 1274 (1980). In a declaratory action, the Suffolk District Attorney sought a determination of whether the state constitution's Cruel or Unusual Punishment Clause prohibited capital punishment. 381 Mass. at 649-50. The court held that the death penalty was unconstitutionally cruel because it offended contemporary standards of decency and would necessarily be arbitrarily inflicted. 381 Mass. at 661-62, 665.

Interestingly, the voters of California and Massachusetts subsequently amended their state constitutions to clarify that the death penalty does not constitute cruel or unusual punishment within the meaning of the state constitution. *California v. Frierson*, 25 Cal. 3d 142, 184, 158 Cal. Rptr. 281, 599 P.2d 587 (1979); *Massachusetts v. Colon-Cruz*, 393 Mass. 150, 152, 470 N.E.2d 116 (1984). Commentators have dubbed *Anderson* "aggressive state constitutional lawmaking" which "exemplifies the activist state bench using the state constitution to promote a liberal agenda." In short, the opinion was a fine example of "state constitutional chutzpah." Latzer, *Essays: The Most Noteworthy State Constitutional Decisions: State Constitutional Chutzpah*, 59 Alb. L. Rev. 1733 (1996).

Individual jurists on other states' high courts have attempted to follow the lead of *Anderson* and *Watson* by attacking the death penalty on state constitutional grounds regardless of whether their state constitutions prohibited cruel and unusual punishment, cruel or unusual punishment, or contained different language altogether. These efforts have been entirely unsuccessful. See *Tennessee v.*

*Dicks*, 615 S.W.2d 126, 132-42 (Tenn.) (Brock, C.J., dissenting), *cert. denied* 454 U.S. 933 (1981); *Washington v. Rupe*, 101 Wash. 2d 664, 711-13, 683 P.2d 571 (1984) (Dolliver, J., concurring); *Hopkinson v. Wyoming*, 632 P.2d 79, 199-216 (Wyo. 1981) (Rose, C.J., concurring and dissenting), *cert. denied* 455 U.S. 922 (1982). Other courts have rejected *Anderson* challenges outright. *Peterson v. Mississippi*, 268 So. 2d 335, 336 (Miss. 1972) ("The *Anderson* opinion, which is essentially an excellent symposium on the subject of capital punishment, merits serious consideration, but a careful study of it and some of the source material upon which it is based does not persuade us that its conclusions are valid."); *Anderson v. State*, 932 S.W.2d 502, 509-10 (Tex. Crim.), *cert. denied* 521 U.S. 1122 (1996).

We note that most courts facing a state constitutional challenge to the death penalty have not engaged in an analysis different from that required under the Eighth Amendment, regardless of the phraseology of their state constitution's cruel and/or unusual punishment clause. Indeed, many engage in little analysis at all. See, *e.g.*, *Harris v. Alabama*, 352 So. 2d 460, 475-77 (Ala. Crim. App. 1976); *Graham v. Arkansas*, 253 Ark. 462, 463, 486 S.W.2d 678 (1972); *Delaware v. Dickerson*, 298 A.2d 761, 767-78 (Del. 1972); *Raulerson v. Florida*, 358 So. 2d 826, 828-29 (Fla.), *cert. denied* 439 U.S. 959 (1978); *Gilreath v. Georgia*, 247 Ga. 814, 840, 279 S.E.2d 650 (1981), *cert. denied* 456 U.S. 984 (1982); *Lowery v. Indiana*, 478 N.E.2d 1214, 1219-20 (Ind. 1985), *cert. denied* 475 U.S. 1098 (1986); *Louisiana v. Edwards*, 419 So. 2d 881, 889 (La. 1982); *Missouri v. Mallett*, 732 S.W.2d 527, 539 (Mo.), *cert. denied* 484 U.S. 933 (1987); *Nebraska v. Anderson and Hochstein*, 207 Neb. 51, 71-72, 296 N.W.2d 440 (1980), *cert. denied* 450 U.S. 1025 (1981); *New Jersey v. Ramseur*, 106 N.J. 123, 168-82, 524 A.2d 188 (1987); *New Mexico v. Garcia*, 99 N.M. 771, 777, 664 P.2d 969, *cert. denied* 462 U.S. 1112 (1983); *Glidwell v. Oklahoma*, 663 P.2d 738, 743 (Okla. Crim. 1983); *Pennsylvania v. Zettlemoyer*, 500 Pa. 16, 76-77, 454 A.2d 937 (1982), *cert. denied* 461 U.S. 970 (1983); *South Carolina v. McDowell*, 266 S.C. 508, 516, 224 S.E.2d 889 (1976); *Tennessee v. Austin*, 618 S.W.2d 738, 741 (Tenn.), *cert. denied* 454 U.S. 1128 (1981); *Smith v. Texas*, 683 S.W.2d 393, 409

(Tex. Crim. 1984); *Gray v. Virginia*, 233 Va. 313, 320, 356 S.E.2d 157 (1987), *cert. denied* 484 U.S. 872 (1987); *Washington v. Campbell*, 103 Wash. 2d 1, 31-35, 691 P.2d 929 (1984), *cert. denied* 471 U.S. 1094 (1985); *Hopkinson v. Wyoming*, 664 P.2d 43, 63-64 (Wyo.), *cert. denied* 464 U.S. 908 (1983).

We decline to interpret the Cruel and Unusual Punishment Clause found in § 9 of the Kansas Constitution Bill of Rights in a manner different from that found in the Eighth Amendment to the United States Constitution. As a result, we conclude that the death penalty does not constitute cruel and unusual punishment per se under the Kansas Constitution.

### B. Section 1

Finally, Kleypas argues that the death penalty violates § 1 of the Kansas Constitution Bill of Rights. The provision states:

"All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness."

Kleypas distinguishes this language from that of the Fourteenth Amendment to the federal Constitution, which states in part in Section 1:

"[N]or shall any State deprive any person of life, liberty, or property, without due process of law."

Kleypas argues that, unlike the federal version which does not allow the taking of life without due process of law, the above language in our state constitution simply does not contemplate the taking of a life by the State under any circumstances. He contends that the Kansas Constitution confers upon him an absolute right to life.

The framers of the Kansas Constitution spent a considerable amount of time debating the proposed § 1 of the Bill of Rights. The debate, however, was clearly grounded in the issue of slavery. Larimer, pp. 271-85. One participant raised the concern that the proposed language exhibited the "poison of higher-lawism," and would have the effect of insulating individuals from the reach of criminal law because it provided an inalienable right of liberty. Larimer, p. 276. This point of the debate evolved into one over

the enforceability of fugitive slave laws in Kansas. Larimer, pp. 276-79. Another participant limited the debate by stating that the language did not "propose that the authority of the State shall not hold the persons of men if they have committed crime, but simply that this right exists prior to law, and is inalienable by the person holding it—that is, he cannot sell it or dispossess himself of it." Larimer, p. 280. Samuel Kingman, who proposed the language ultimately adopted, stressed that he chose the words because of their similarity to those in the Declaration of Independence and that he did not wish to "change the clothing of these ideas." Larimer, p. 283.

We note that Kleypas' argument, though somewhat novel, has been soundly rejected by other state courts. See, *e.g.*, *Ruiz v. Arkansas*, 299 Ark. 144, 152-53, 777 S.W.2d 297 (1989); *Missouri v. Newlon*, 627 S.W.2d 606, 612-13 (Mo. 1982); *Slaughter v. Oklahoma*, 950 P.2d 839, 861-62 (Okla. Crim. 1997).

Kleypas would have this court stretch the meaning of the venerable words in § 1 of the state Bill of Rights far beyond their intended purpose. This we decline to do. We conclude that Kansas' death penalty scheme does not violate the spirit or the letter of § 1.

## Issue 32. Failure to Make Written Findings as to Mitigators

Kleypas argues that the Kansas death penalty scheme violates the federal and state Constitutions because it does not require the jury to specify in writing which if any mitigating factors it found to exist during the sentencing phase of the trial. Kleypas argues that such failure renders meaningful trial and appellate review of the sentence impossible, violating his right to due process and his right to be free from cruel and unusual punishment.

K.S.A. 21-4624(e) requires the jury, if its verdict is a unanimous recommendation of death, to designate in writing the statutory aggravating circumstances it found beyond a reasonable doubt. K.S.A. 21-4624(f) directs the trial court to review the jury verdict of death to determine whether the verdict is supported by the evidence. Further, K.S.A. 21-4627(c)(2) provides that this court shall determine whether the evidence supports the jury's findings

with regard to the weighing of the aggravating and mitigating circumstances.

Kleypas first suggests that the Kansas statutory scheme requires written findings of mitigating circumstances. In support, he cites K.S.A. 21-4624(e), which requires the court to weigh mitigating factors "which are found to exist." However, this does not equate to a requirement of written findings regarding mitigating circumstances. Clearly, K.S.A. 21-4624(e) does not require written findings.

Kleypas argues in the alternative that the lack of a requirement that the jury provide a written list of mitigators found to exist is a constitutional infirmity fatal to the validity of Kansas' death penalty scheme. Two cases relied on by Kleypas, *Woodson v. North Carolina*, 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976); and *Gardner v. Florida*, 430 U.S. 349, 51 L. Ed. 2d 393, 97 S. Ct. 1197 (1977), do not support his argument that mitigating factors found to exist must be written.

In *Woodson*, the United States Supreme Court considered the question of whether a death sentence imposed under a statute requiring a death sentence for a broad category of homicides constituted cruel and unusual punishment as defined by the Eighth and Fourteenth Amendments. 428 U.S. at 287. The Court found the mandatory death penalty scheme violated contemporary standards of decency and thus fit the definition of cruel and unusual punishment. 428 U.S. at 301. Further, the scheme failed to guide the jury in its determination of whom to sentence to death and whom to spare and failed to allow particularized consideration of the character and record of each individual defendant. 428 U.S. at 303-04.

In *Gardner*, the jury returned an advisory verdict of life imprisonment. The trial court imposed the death penalty based in part on information contained in a presentence report which was not disclosed to the parties. The United States Supreme Court reversed, holding that Gardner was denied due process of law because his death sentence was based in part on information that he had no opportunity to deny or explain. 430 U.S. at 351.

Contrary to Kleypas' assertion, neither case stands for the proposition that a jury must state its findings with respect to mitigating circumstances. Nor are the other cases cited by Kleypas persuasive. In *Arizona v. Leslie*, 147 Ariz. 38, 708 P.2d 719 (1985), the Arizona Supreme Court did hold that "the better practice is for the trial court to place, on the record, a list of all factors offered by a defendant in mitigation and then explain his reasons for accepting or rejecting them." 147 Ariz. at 50. However, the Arizona statute at issue in *Leslie* expressly required the verdict to set forth findings as to the existence or nonexistence of aggravating and mitigating factors, a requirement that is not present in the Kansas statute. Further, the Ninth Circuit limited *Leslie* in *Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994), finding that Arizona law does not require the sentence to itemize and discuss every item of evidence in mitigation; listing is helpful but not necessary where it is clear the trial court considered all mitigation evidence.

Kleypas' reliance on *Smith v. McCormick*, 914 F.2d 1153 (9th Cir. 1990), is similarly misplaced for the same reasons. Montana law required the trial court to present written findings of fact regarding determinations of aggravating and mitigating circumstances. The trial court's failure to discuss certain mitigation evidence in its findings, according to the Ninth Circuit, violated the statute and rendered the findings supporting a death sentence incomplete. 914 F.2d at 1166. Again, Kansas has no such requirement.

Kleypas points to no cases which have held that the failure to require a written list of mitigating factors found worked a constitutional violation. To the contrary, those courts which have considered the issue have found no such constitutional requirement. See *Rook v. Rice*, 783 F.2d 401, 407 (4th Cir. 1986); *McQueen v. Scroggy*, 99 F.3d 1302, 1332 (6th Cir. 1996); *Jeffries v. Blodgett*, 5 F.3d 1180, 1196-97 (9th Cir. 1993); *Skaggs v. Parker*, 27 F. Supp. 2d 952, 997 (W.D. Ky. 1998). Written findings with regard to mitigating circumstances are not mandated either by Kansas statute or the United States Constitution, and Kleypas' arguments to the contrary are without merit.

## Issue 33. Lethal Injection as Cruel and Unusual Punishment

Kleypas argues that Kansas' method of execution by lethal injection violates the Eighth Amendment because Kansas has failed to adopt a specific protocol for execution by lethal injection, rendering it impossible to determine whether lethal injection would constitute cruel and unusual punishment. In the absence of such an examination, according to Kleypas, the method must be assumed to be cruel and unusual and thus unconstitutional.

With regard to protocol, K.S.A. 22-4001, in effect prior to 1999, provided:

"(a) Subject to the provisions of this act, the mode of carrying out a sentence of death in this state shall be by intravenous injection of a substance or substances in a quantity sufficient to cause death in a swift and humane manner.

"(b) The secretary of corrections shall supervise the carrying out of each sentence of death and shall determine the procedures therefor, which shall be consistent with this act and the other laws of the state. The secretary of corrections shall designate one or more executioners and other persons necessary to assist in carrying out the sentence of death as provided in this section.

"(c) In order to provide the secretary of corrections with assistance in selecting the type of substance or substances to be administered in carrying out a sentence of death by intravenous injection in a swift and humane manner, the secretary shall appoint a panel of three persons to advise the secretary, one of whom shall be a pharmacologist, one of whom shall be a toxicologist and one of whom shall be an anesthesiologist. The panel shall also advise the secretary of corrections concerning matters related to K.S.A. 22-4015. The panel shall meet upon the call of the secretary and, for the performance of their official duties, panel members shall be paid compensation, subsistence allowances, mileage and other expenses as provided in K.S.A. 75-3223 and amendments thereto.

"(d) The secretary of corrections may designate in writing a warden of one of the correctional institutions under the secretary's supervision to perform the duties imposed upon the secretary by this section . . . ."

The statute was amended in 1999 by adding in subsection (b) the requirement that the identity of executioners be kept confidential and by completely rewriting subsection (c) as follows:

"The secretary of corrections shall select the type of substance or substances to be administered in carrying out a sentence of death by intravenous injection in a swift and humane manner. The secretary of health and environment shall certify to the secretary of corrections that the substance or substances selected by the secretary of corrections will result in death in a swift and humane manner. If the secretary of corrections desires to change the substance or substances to be ad-

ministered from those previously certified by the secretary of health and environment, the proposed substance or substances also shall be certified as provided in this section." K.S.A. 1999 Supp. 22-4001(c).

The Secretary of Corrections earlier this year adopted an execution protocol. Since Kleypas' argument is directed to the Secretary's failure to establish a protocol, we do not need to address the constitutionality of Kansas' method of execution at this time.

## Issue 34. Death Penalty under International Law

Kleypas' final argument regarding the constitutionality of the death penalty is that Kansas' death penalty statutes violate international law on two grounds: (1) Customary international law and specific international treaties prohibit capital punishment; and (2) customary international law and specific international treaties prohibit reinstatement of the death penalty by a governmental unit once it has been abolished. We find this argument to be without merit. The clear weight of federal and state authority dictates that no customary international law or international treaty prohibits the State of Kansas from invoking the death penalty as a punishment for certain crimes. See *Stanford v. Kentucky*, 492 U.S. 361, 106 L. Ed. 2d 306, 109 S. Ct. 2969 (1989); *White v. Johnson*, 79 F.3d 432, 439 (5th Cir. 1996); *United Mexican States v. Woods*, 126 F.3d 1220, 1223 (9th Cir. 1997); *California v. Ghent*, 43 Cal. 3d 739, 778-79, 239 Cal. Rptr. 82, 739 P.2d 1250 (1987); *Domingues v. Nevada*, 114 Nev. 783, 785, 961 P.2d 1279 (1998); *New Jersey v. Nelson*, 155 N.J. 487, 512, 715 A.2d 281 (1998); *Hinojosa v. Texas*, 4 S.W.3d 240, 252 (Tex. Crim. 1999).

## Constitutional Issues—Conclusion

The Kansas Legislature intended to create a constitutional death penalty. In order to carry out that intent, we have construed K.S.A. 21-4624(e) to require that the aggravating circumstances must outweigh the mitigating circumstances in order for a death sentence to be imposed. This construction makes it necessary to vacate Kleypas' sentence and remand for a new sentencing hearing. However, we conclude that, given our construction of K.S.A. 21-4624(e), the

death penalty as set out in the Kansas statutes passes constitutional muster.

## PART III—SENTENCING ISSUES

The final group of Kleypas' assigned errors arise during the penalty phase or separate sentencing proceeding under K.S.A. 21-4624(b). The jury determined that Kleypas should be sentenced to death. Given our interpretation of the weighing equation contained in K.S.A. 21-4624(e), Kleypas' sentence must be vacated and a new sentencing hearing conducted. However, we choose to address the sentencing issues raised by Kleypas that have the potential to reoccur in order to give guidance to the trial court for the new sentencing hearing. Therefore, we will analyze the following issues:

State's Failure to Move for a Separate Sentencing Hearing
Verdict Forms and Instructions Regarding the Verdict
Admission of Circumstances Regarding Prior Conviction
Failure to Allow Evidence of Prison Conditions
Instruction on the Definition of Mitigation
Whether the Penalty Phase Instructions Prevented the Jury from Considering Mitigating Circumstances
Failure to Inform Jury of Sentences that Might be Imposed for Other Convictions
Failure to Give Limiting Instruction Regarding Inconsistency Between Heinous, Atrocious, or Cruel Aggravating Manner Circumstance and Avoiding Arrest Aggravating Circumstance
Prosecutorial Misconduct in the Penalty Phase

Issue 35. State's Failure to Move for a Separate Sentencing Hearing

Kleypas contends that the entire penalty phase of his trial is unlawful because the State failed to move for a separate sentencing proceeding upon his conviction as required by K.S.A. 21-4624(b). He argues that the State's failure to do so precludes the imposition of a death sentence.

On July 25, 1997, the jury returned a verdict finding Kleypas guilty of capital murder. The trial court ordered the jury to return on July 29, 1997, for a capital sentencing proceeding. On July 29,

1997, immediately after the State's first witness was sworn, Kleypas objected to the proceeding and requested that the jury be discharged. He based his objection upon the State's failure to move under K.S.A. 21-4624(b) for a separate sentencing proceeding to determine whether he should be sentenced to death. The State argued that the required notice had been given at arraignment pursuant to K.S.A. 21-4624(a). In the alternative, the State orally moved pursuant to K.S.A. 21-4624(b) for a separate sentencing proceeding. The trial court overruled the objection, finding that notice had been given by the State.

In relevant part, K.S.A. 21-4624(b) provides that *"upon conviction* of a defendant of capital murder, the court *upon motion* of the county or district attorney, shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death." (Emphasis added.) It is important not to confuse this motion requirement with the notice requirements of K.S.A. 21-4624(a). A failure to comply with the following notice requirements of K.S.A. 21-4624(a) precludes the imposition of the death penalty:

"If a defendant is charged with capital murder, the county or district attorney shall file written notice if such attorney intends, upon conviction of the defendant, to request a separate sentencing proceeding to determine whether the defendant should be sentenced to death. Such notice shall be filed with the court and served on the defendant or the defendant's attorney, not later than five days after the time of arraignment. *If such notice is not filed and served as required by this subsection, the county or district attorney may not request such a sentencing proceeding and the defendant, if convicted of capital murder, shall be sentenced as otherwise provided by law, and no sentence of death shall be imposed hereunder."* (Emphasis added).

The State filed its notice under the provisions of K.S.A. 21-4624(a). However, Kleypas correctly points out that the State failed to move for a separate sentencing proceeding after his conviction of capital murder under K.S.A. 21-4624(b) before the separate sentencing proceeding commenced. Does this failure invalidate the separate sentencing proceeding?

Kleypas argues that the State's failure precludes the imposition of a death sentence and that he now must be sentenced by the court for a term of years. The State acknowledges its failure to

comply with the motion provisions of K.S.A. 21-4624(b) but argues that this provision, unlike the mandatory notice provisions of K.S.A. 21-4624(a), is directory only. The question is one of law and our review is unlimited. *State v. Lewis*, 263 Kan. 843, 847, 953 P. 2d 1016 (1998). The resolution of the issue involves a determination of whether the procedural language of K.S.A. 21-4624(b) is mandatory or directory.

The criteria for determining whether a statute should be deemed mandatory or directory is established in *State v. Deavers*, 252 Kan. 149, 167, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993):

"Whether language in a statute is mandatory or directory is to be determined on a case-by-case basis and the criterion as to whether a requirement is mandatory or directory is whether compliance with such requirement is essential to preserve the rights of the parties. *Griffin v. Rogers*, 232 Kan. 168, 174, 653 P.2d 463 (1982). In determining whether a legislative provision is mandatory or directory, it is a general rule that where strict compliance with the provision is essential to the preservation of the rights of parties affected and to the validity of the proceeding, the provision is mandatory, but where the provision fixes a mode of proceeding and a time within which an official act is to be done, and is intended to secure order, system, and dispatch of the public business, the provision is directory. Factors which would indicate that the provisions of a statute or ordinance are mandatory are: (1) the presence of negative words requiring that an act shall be done in no other manner or at no other time than that designated, or (2) a provision for a penalty or other consequence of noncompliance." *Paul v. City of Manhattan*, 212 Kan. 381, Syl. ¶¶ 1, 2, 511 P.2d 244 (1973).

We conclude that the motion requirement of K.S.A. 21-4624(b) is directory, not mandatory. The statute does not establish a specific time within which the prosecution's motion for a separate sentencing proceeding must be made; rather, the motion requirement is intended to secure the orderly and systematic dispatch of the public business. Unlike the notice provisions found in K.S.A. 21-4624(a), there are no provisions in K.S.A. 21-4624(b) for a penalty or other consequences with noncompliance. By its express language, K.S.A. 21-4624(b) fixes a mode of proceeding directing the State to move for a separate sentencing proceeding. The State's delay in so moving in this case caused no prejudice to the defendant. The trial court's denial of Kleypas' motion to set aside the sentencing proceeding was not error.

## Issue 36. Verdict Forms and Instructions Regarding the Verdict

Kleypas argues that the verdict forms and the trial court's instructions concerning the verdict were improper in that they instructed the jury that a unanimous decision was required in order to impose a life sentence. He argues that this is contrary to Kansas law. We have reviewed the trial court's instructions concerning the verdict and the verdict forms provided to the jury and conclude that they are seriously deficient.

We begin with a recitation of the statute regarding the verdict, K.S.A. 21-4624(e), which provides:

"If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced to death; otherwise, the defendant shall be sentenced as provided by law. The jury, if its verdict is a unanimous recommendation of a sentence of death, shall designate in writing, signed by the foreman of the jury, the statutory aggravating circumstances which it found beyond a reasonable doubt. If, after a reasonable time for deliberation, the jury is unable to reach a verdict, the judge shall dismiss the jury and impose a sentence of imprisonment as provided by law and shall commit the defendant to the custody of the secretary of corrections. In nonjury cases, the court shall follow the requirements of this subsection in determining the sentence to be imposed."

We note that pursuant to our decision regarding the weighing equation, the jury must find the aggravating circumstances outweigh the mitigating circumstances rather than that the aggravating circumstances are not outweighed by the mitigating circumstances. However, this does not affect the substance of our analysis of this issue. The major problem with the verdict form given lies not with its recitation of the weighing equation, although this statement is certainly incorrect given our construction of the weighing equation above. Rather, the major problem with the verdict form given is the manner in which it requires the jury to reach and report its decision.

The sentencing proceeding under our capital murder scheme has but one purpose: To determine whether the defendant should be sentenced to death. See K.S.A. 21-4624(b). Under K.S.A. 21-4624, only two options are contemplated: Either the jury will unan-

imously agree beyond a reasonable doubt that one or more aggravating circumstances exist and further that such aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances found to exist and it sentences the defendant to death; or the jury fails to so unanimously find and the defendant is not sentenced to death.

The nature of this verdict is illustrated by our decision in *State v. Stafford*, 255 Kan. 807, 825, 878 P.2d 820 (1994), a hard 40 case under the pre-death penalty version of K.S.A. 21-4624. In *Stafford*, we examined a situation where the trial court excused a juror during sentencing deliberations on the grounds that the juror could not reach a decision. In finding this action to be reversible error, we noted:

"This case differs somewhat from prior cases in which a juror has been replaced. For a jury determining guilt, a hung jury results in the defendant being neither convicted nor acquitted; a hung jury leaves the case undecided and subject to retrial. In the hard 40 context, a hung jury is not an undecided jury. By statute, (K.S.A. 1993 Supp. 21-4624[5]), a hung jury results in a sentence of imprisonment for life with eligibility for parole. Thus, to replace a juror who may cause a jury to be unable to reach a unanimous vote to recommend the hard 40 sentence is to deprive the defendant of a verdict."

Instruction No. 15, given by the trial court in this case, explained the two options to the jury, stating:

"At the conclusion of your deliberations, you shall sign the verdict form upon which you agree.

"The verdict forms provide the following alternative verdicts:

"A. Finding unanimously beyond a reasonable doubt that there are one or more aggravating circumstance(s) and that they [outweigh] any mitigating circumstance(s), and sentencing the defendant to death;

"or

"B. Reasonable doubt that aggravating circumstance(s) [outweigh] any mitigating circumstance(s) and that the defendant should be sentenced as provided by law by the Court."

Instruction No. 15 informed the jury that it would be confronted with two verdict forms reflecting the two choices mandated by K.S.A. 21-4624(e): It would either unanimously find beyond a reasonable doubt that there are one or more aggravating circumstance(s) and that they [outweigh] any mitigating circumstance(s),

in which case it would sign the verdict form sentencing the defendant to death and designate on the verdict form the aggravating circumstances found; or it would fail to make such a finding, in which case it would sign the verdict form indicating the defendant should not be sentenced to death.

However, the verdict forms in this case did not give the jury those two options. The first verdict form stated:

"We, the jury, impaneled and sworn, do upon our oath, or affirmation, unanimously find beyond a reasonable doubt that the following aggravating circumstance(s) have been established by the evidence and [outweigh] any mitigating circumstance(s) found to exist. (The presiding juror shall place an X in the square in front of such aggravating circumstance(s) found to exist.)

"[ ] That the defendant was previously convicted of a felony in which the defendant inflicted great bodily harm, disfigurement, dismemberment or death on another.

"[ ] That the defendant committed the crime in order to avoid or prevent a lawful arrest or prosecution.

"[ ] That the defendant committed the crime in an especially heinous atrocious, or cruel manner as these terms are defined in Instruction No. 11.

"[A]nd so, therefore, unanimously sentence the defendant to death."

Thus, the first verdict form accurately stated the first of the two choices. The problem, however, was with the second verdict form given to the jury which should have provided that it was to be signed if the jury did not unanimously find the existence of aggravating circumstances which outweighed any mitigating circumstances. Instead, the verdict form stated: "We, the jury, impaneled and sworn, do upon our oath or affirmation, unanimously determine that a sentence as provided by law be imposed by the Court."

Thus, the second verdict form erroneously informed the jury that it had to unanimously agree that a sentence other than death should be imposed. This is contrary to Kansas law and further directly contradicts Instruction No. 15. As noted above, K.S.A. 21-4624 does not require the jury to unanimously conclude that a death sentence is unwarranted in order to sentence the defendant to a punishment other than death; rather, the jury must only fail to unanimously conclude beyond a reasonable doubt that a death sentence is warranted.

The verdict forms used in this case were taken directly from the Pattern Instructions for Kansas (PIK). See PIK Crim. 3d 68.14-B-1; PIK Crim. 3d 68.17. We have advised trial courts to follow PIK and for good reason. " 'The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions.' " *State v. Dias*, 263 Kan. 331, 335, 949 P.2d 1093 (1997). However, the second verdict form used in this case, as provided for in the PIK, was inaccurate in that it failed to reflect the law in Kansas. The verdict form was also unclear in that it failed to inform the jury what it should do if it did not reach a unanimous verdict for death or a unanimous verdict for life. The verdict form was confusing in that it directly contradicted jury Instruction No. 15, which informed the jury what the verdict form should contain. The verdict form was inconsistent with Kansas law and was misleading and confusing.

Kleypas brought this problem with the verdict form to the trial court's attention at the sentencing hearing. The trial court recognized that a problem existed and attempted to cure the problem by issuing an additional instruction which informed the jury that if it failed to reach a verdict, Kleypas would be sentenced as provided by law. This is similar to the instruction used by the court in Washington in *In re Personal Restraint of Benn*, 134 Wash. 2d 868, 952 P.2d 116 (1998). In *Benn*, the jury was given a verdict form which asked the question: "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?" The jury was then provided with three options: "YES," "NO," and "THE JURY IS UNABLE TO UNANIMOUSLY AGREE." 134 Wash. 2d at 929. The Washington Supreme Court found that because the verdict form gave the jury the option of a nonunanimous verdict, the challenged instruction was constitutional. 134 Wash. 2d at 932.

In contrast to *Benn*, the corrective jury instruction in the case at hand was just an instruction. The verdict form itself still did not give the jury a method by which it could register a nonunanimous verdict. It is clear that under Kansas law, one juror has the ability to negate the imposition of the death penalty by having a reason-

able doubt about its propriety. See K.S.A. 21-4624(e) (unanimity required to impose the death penalty). However, under the verdict form used in this case, a juror was unable to register his or her reasonable doubt. Even though the trial court informed the jury that its failure to reach a unanimous verdict would result in the imposition of a sentence other than death, the verdict form provided no way for the jury to return other than a unanimous verdict.

The sole purpose of the penalty phase is to determine whether the defendant should be sentenced to death. The erroneous verdict form affected the very heart of this decision because it incorrectly stated the standard that the jury was to apply in considering its decision. Under such circumstances, the verdict form materially prejudiced Kleypas' right to a fair trial. Had we not already determined that a new sentencing hearing was required, the use of this jury instruction would also require vacating of Kleypas' death sentence and remanding for a new penalty phase hearing. See *Kubat v. Thieret*, 867 F.2d 351, 372-74 (7th Cir. 1989); *State v. Brooks*, 75 Ohio St. 3d 148, 162, 661 N.E.2d 1030 (1996).

In accordance with our decision, we further hold that the following second verdict form should be used in addition to the first verdict form in all death penalty cases in Kansas, replacing PIK Crim. 3d 68.17:

"CAPITAL MURDER—SENTENCE OF DEATH—VERDICT FORM FOR SENTENCE AS PROVIDED BY LAW

"SENTENCING VERDICT

"We, the jury, impaneled and sworn, do upon our oath or affirmation state that we are unable to reach a unanimous verdict sentencing the defendant to death."

Such an instruction accurately reflects the law in Kansas and the responsibility of the jury. The instruction does not confuse the jury concerning any need for a decision regarding life to be unanimous. Implicit within the verdict form is the concept that a single juror may block a death verdict and the verdict form allows a juror to give effect to his or her determination that death is not an appropriate sentence.

Issue 37. Admission of Circumstances Regarding Prior Conviction

Kleypas argues that the trial court erred in allowing evidence of the circumstances underlying his 1977 conviction for the murder

of Bessie Lawrence. He contends that such evidence violated the provisions of K.S.A. 21-4625(1), as well as his Eighth and Fourteenth Amendment rights under the United States Constitution and his rights under §§ 9 and 18 of the Kansas Constitution Bill of Rights.

Kleypas filed a motion to limit the production of evidence of the "prior conviction" aggravating circumstance to the admission of the journal entry of the conviction. After a comprehensive consideration of case law, the court ruled that although it would not allow the prior second-degree murder conviction to be relitigated, some of the underlying circumstances of the prior conviction would be admitted into evidence subject to the court's discretion on a witness by witness basis.

Kleypas offered to stipulate that he was previously convicted of second-degree murder and that this conviction was a felony in which he inflicted death on another. However, the trial court refused to force the State to accept the stipulation.

K.S.A. 21-4625 identifies and limits what the State may prove as aggravating circumstances during the penalty phase of a capital murder case. The aggravating circumstance we now consider allows the State to establish that "[t]he defendant was previously convicted of a felony in which the defendant inflicted great bodily harm, disfigurement, dismemberment or death on another." K.S.A. 21-4625(1).

Kleypas argues that the facts and circumstances underlying his 1977 murder conviction are irrelevant and inflammatory. He interprets K.S.A. 21-4625(1) to allow only the fact of the prior conviction to prove the aggravating circumstance, and that once he offered to stipulate to this circumstance, any other information concerning the murder was not relevant. According to Kleypas, the State should have been forced to accept his stipulation, citing *Old Chief v. United States*, 519 U.S. 172, 136 L. Ed. 2d 574, 117 S. Ct. 644 (1997).

In *Old Chief*, the defendant was convicted of assault with a dangerous weapon, use of a firearm, and possession of a firearm by anyone with a prior felony conviction. Before trial, he moved for an order requiring the government to limit its evidence to a state-

ment that Old Chief had been convicted of a felony. He offered to stipulate that he had been convicted of a prior felony. The government refused to accept the stipulation, insisting on its right to prove the case its own way. The district court agreed with the government and the Ninth Circuit Court of Appeals affirmed. The United States Supreme Court, however, reversed:

"[T]he scope of a trial judge's discretion under Rule 403, . . . authorizes exclusion of relevant evidence when its 'probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' Fed. Rule Evid. 403." 519 U.S. at 180.

The Court pointed to the real risk of unfair prejudice, noting that such a risk

"will be substantial whenever the official record offered by the Government would be arresting enough to lure a juror into a sequence of bad character reasoning. Where a prior conviction was for a gun crime or one similar to other charges in a pending case the risk of unfair prejudice would be especially obvious . . . ." 519 U.S. at 185.

In order to mitigate against this risk, the Court concluded:

"Given these peculiarities of the element of felony-convict status and of admissions and the like when used to prove it, there is no cognizable difference between the evidentiary significance of an admission and of the legitimately probative component of the official record the prosecution would prefer to place in evidence. For purposes of the Rule 403 weighing of the probative against the prejudicial, the functions of the competing evidence are distinguishable only by the risk inherent in the one and wholly absent from the other. In this case, as in any other in which the prior conviction is for an offense likely to support conviction on some improper ground, the only reasonable conclusion was that the risk of unfair prejudice did substantially outweigh the discounted probative value of the record of conviction, and it was an abuse of discretion to admit the record when an admission was available." 519 U.S. at 191.

Before addressing the merits of Kleypas' claimed error, some background of how aggravating circumstances fit within Kansas' scheme of capital punishment is necessary. Kansas' statutory death penalty is similar to that of Florida; those states having a similar statutory scheme are sometimes referred to as the "Florida type" in that they limit the aggravating circumstances that a sentencing jury or a judge may consider to a statutory list. See National Judicial

College and Conference of State Trial Judges, Capital Cases Benchbook, 6-2 (1994); K.S.A. 21-4625. Because the Florida scheme limits the aggravating circumstances to be considered, evidence of prior criminal history is relevant under that scheme only insofar as it goes to either establishing a statutory aggravating circumstance or rebutting a mitigating one.

Among those states which follow the Florida sentencing scheme, there is a difference of opinion as to whether testimony regarding the underlying circumstances of a defendant's prior conviction may be admitted to prove an aggravating circumstance where the defendant offers to stipulate to the aggravating circumstance. See *Rhodes v. State*, 547 So. 2d 1201 (Fla. 1989); *State v. Gillies*, 135 Ariz. 500, 662 P.2d 1007 (1983); *People v. Davis*, 794 P.2d 159 (Colo. 1990); *State v. Rose*, 339 N.C. 172, 451 S.E.2d 211 (1994); *Brewer v. State*, 650 P.2d 54 (Okla. Crim. App. 1982); *Com. v. Rompilla*, 554 Pa. 378, 721 A.2d 786 (1998); *State v. Gaskins*, 284 S.C. 105, 326 S.E.2d 132 (1985); *State v. Bigbee*, 885 S.W.2d 797 (Tenn. 1994).

In *Gillies*, the Arizona Supreme Court held that testimony was not admissible to establish the then-aggravating circumstance that the defendant had been previously convicted of a felony involving the use or threat of violence on another person (since changed to "a serous offense"). 135 Ariz. at 511. The court instead found that the evidence should be limited to evidence of the conviction itself:

"This reading of the statute guarantees due process to a criminal defendant. Evidence of a prior conviction is reliable, the defendant having had his trial and exercised his full panoply of rights which accompany his conviction. However, to drag in a victim of appellant's prior crime to establish the necessary element of violence outside the presence of a jury, long after a crime has been committed, violates the basic tenants of due process.

". . . We cannot allow what is, in effect, a second trial on defendant's prior conviction to establish the existence of an A.R.S. § 13-703(F)(2) aggravating circumstance." 135 Ariz. at 511.

Oklahoma has judicially established a procedure for the admission of evidence to prove its aggravating circumstance that the defendant was previously convicted of a felony involving the use or

threat of violence. See *Brewer*, 650 P.2d at 63. In *Brewer*, the Oklahoma Supreme Court stated:

"We therefore hold that the following must be the procedure concerning the State's allegation of 21 O.S. 1981, § 701.12(1) in this and all future capital cases: First, as mandated by § 701.10 the defendant must be given due notice of all evidence in aggravation the State intends to present; second, the judge must review the evidence proffered by the State in support of its allegation in camera to ensure that the felonies did indeed involve the use or threat of violence to a person; third, upon a finding by the court that the prior felony convictions did involve the use or threat of violence to the person, the defendant must be given the opportunity to personally stipulate that the prior felony conviction(s) alleged by the state did involve the use or threat of violence to a person. Counsel for the defendant must not be allowed to stipulate for him. The judge must satisfy himself that the defendant understands and appreciates the nature of the proposed stipulation and the consequences potentially arising from either an agreement or a refusal to stipulate before he may accept the defendant's decision.

"If the defendant stipulates, the State's proof of the aggravating circumstances must be limited to introduction of the judgment and sentence in the prior felonies along with the defendant's written stipulation that the felonies involved the use or threat of violence to the person. If the defendant refuses to so stipulate, the State shall be permitted to produce evidence sufficient to prove that the prior felonies did involve the use or threat of violence to the person. We emphasize that prosecutors and trial courts should exercise informed discretion in permitting only the minimal amount of evidence to support the aggravating circumstances. We do not today authorize the State to re-try defendants for past crimes during the sentencing stage of capital cases." 650 P.2d at 63.

Similarly, the Tennessee Supreme Court held:

"Evidence of facts regarding a previous conviction to show that it in fact involved violence or the threat of violence to the person is admissible at a sentencing hearing in order to establish the aggravating circumstance. [Citations omitted.] However, it is not appropriate to admit evidence regarding specific facts of the crime resulting in the previous conviction, when the conviction on its face shows that it involved violence or threat of violence to the person. [Citations omitted.]" *Bigbee*, 885 S.W.2d at 811.

The Tennessee Supreme Court in *Bigbee* noted that while evidence regarding the victim of the crime for which the defendant is being sentenced is relevant, evidence regarding the victim of a prior crime is not. 885 S.W.2d at 811-12.

Florida, as well as several other jurisdictions, has concluded otherwise. In *Rhodes*, the Florida Supreme Court set forth the follow-

ing principles governing the admission of evidence to show a statutory aggravating circumstance that a defendant had been previously convicted of a violent felony:

"[I]t is appropriate in the penalty phase of a capital trial to introduce testimony concerning the details of any prior felony conviction involving the use or threat of violence to the person rather than the bare admission of conviction. [Citations omitted.] Testimony concerning the events which resulted in the conviction assist the jury in evaluating the character of the defendant and the circumstances of the crime so that the jury can make an informed recommendation as to the appropriate sentence.

. . . .

"[T]he line must be drawn when that testimony is not relevant, gives rise to a violation of a defendant's confrontational rights, or the prejudicial value outweighs the probative value." 547 So. 2d at 1204-05.

Colorado, Pennsylvania, and South Carolina also allow evidence of some of the underlying circumstances of the prior crime where such crime is a statutory aggravating circumstance. Colorado has held that such evidence is "part of the relevant evidence concerning the nature of the crime, [and] the character, background, and history of the defendant" which it is statutorily allowed to receive under Colo. Rev. Stat. Ann. § 16-11-103(1)(b). *Davis*, 794 P.2d at 202.

Pennsylvania has held that the underlying facts of the prior conviction are relevant to allow the jury to "assess the weight to be given to the aggravating factor." *Rompilla*, 554 Pa. at 394. South Carolina allows such evidence because the " 'consideration of the character and record of the individual offender and the circumstances of the particular offense [are] a constitutional indispensable part of the process of inflicting the penalty of death.' " *Gaskins*, 284 S.C. at 124 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978 [1976]).

K.S.A. 21-4624(c) provides: "In the sentencing proceeding, evidence may be presented concerning any matter that the court deems relevant to the question of sentence and shall include matters relating to any of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto and any mitigating circumstances." This language is very similar to the statute in Colorado which the Colorado Supreme Court interpreted to allow the

admission of the underlying circumstances of prior violent felonies in *Davis*. See 794 P.2d at 202. The above language is not included in the capital sentencing statutes of Arizona and Oklahoma. See Ariz. Rev. Stat. § 13-703; Okla. Stat., tit. 21, § 701.10 (1991), which might contribute to their Supreme Courts excluding such evidence. However, Tennessee's statute contains the same language and its Supreme Court excludes such evidence. See Tenn. Code. Ann. § 39-13-204.

While there is merit in the position of the jurisdictions excluding such evidence where the defendant offers to stipulate, we are called upon to interpret the specific language of our legislature. We conclude that the Kansas Legislature intended by its use of the broad language in K.S.A. 21-4625 to allow some evidence of the underlying circumstances of prior convictions where the convictions constitute aggravating circumstances. This conclusion is consistent with the Kansas statutory scheme which requires that the sentencing jury in a capital proceeding actually weigh the aggravating circumstances against the mitigating circumstances in determining whether a defendant should be sentenced to death.

The weighing process in Kansas is more than a simple comparison of the number of aggravating circumstances to the number of mitigating circumstances. The quality as well as the quantity of the aggravating and mitigating circumstances is relevant to allow the jury to "assess the weight to be given to the aggravating factor." See *Rompilla*, 554 Pa. at 394. A defendant with a prior history which includes a heinous crime is perhaps more worthy of death than a defendant who committed a crime which was not heinous. As stated by the Florida Supreme Court, in concluding that evidence concerning the underlying circumstances of the prior conviction was admissible:

"This is so because we believe the purpose for considering aggravating and mitigating circumstances is to engage in a character analysis of the defendant to ascertain whether the ultimate penalty is called for in his or her particular case. Propensity to commit violent crimes surely must be a valid consideration for the jury and the judge. It is a matter that can contribute to decisions as to sentence which will lead to uniform treatment and help eliminate 'total arbitrariness and capriciousness in the imposition of the death penalty.'" *Elledge v. State*, 346 So.

2d 998, 1001 (Fla. 1997) (quoting *Proffitt v. Florida*, 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960 [1976]).

See also *State v. Taylor*, 304 N.C. 249, 280, 283 S.E.2d 761 (1981) (quoting passage from *Elledge* to support its decision reaching same result).

We agree and hold that the State is permitted to introduce evidence regarding the underlying circumstances of the prior crime to satisfy the aggravating circumstance contained in K.S.A. 21-4625(1), notwithstanding a defendant's offer to stipulate to the existence of the aggravating circumstance. However, trial courts must be cautious in the admission of such evidence and exclude evidence that is not relevant, that violates a defendant's confrontational rights, or that has a prejudicial effect outweighing its probative value. We conclude that the evidence admitted in this case did not constitute prejudicial error.

Issue 38. Failure to Allow Evidence of Prison Conditions

Kleypas contends that the trial court erred by refusing to allow evidence of the conditions of future incarceration and the testimony of the Secretary of Corrections as to what life would be like for Kleypas in prison. Kleypas argues that this refusal violated his Eighth Amendment rights as the evidence would have constituted mitigating evidence by showing that prison would be a highly structured environment.

Approximately 7 months before trial commenced, Kleypas moved for the admission of evidence regarding the conditions and effects of a life sentence in the Kansas correctional system. Kleypas also attempted to subpoena the Secretary of Corrections in an effort to obtain and provide information about what life would be like for Kleypas in prison. Approximately 3 months before trial commenced, the trial court denied the motion and also quashed the subpoena for the Secretary of Corrections to appear and testify regarding prison life.

The trial court excluded the evidence based upon its conclusion that the evidence was not proper mitigating evidence because it did not bear on the individual characteristics of the defendant. Two other states have recently reached a similar conclusion. See *People*

*v. Ervin*, 22 Cal. 4th 48, 97, 91 Cal. Rptr. 2d 623, 990 P.2d 506 (2000); *Cherrix v. Commonwealth*, 257 Va. 292, 309-310, 513 S.E.2d 642 (1999).

In *Cherrix*, the defendant sought to introduce mitigating evidence through the testimony of an expert penologist, several Virginia corrections officials, a criminologist, a sociologist, and an individual serving a life sentence in the custody of the Virginia Department of Corrections regarding prison life and its effect on his "future dangerousness." Finding that the trial court did not err in excluding the evidence, the Virginia Supreme Court stated:

"Although the United States Constitution guarantees the defendant in a capital case a right to present mitigating evidence to the sentencing authority, it does not limit 'the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.' *Lockett v. Ohio*, 438 U.S. 586, 605 n.12 (1978). Code § 19.2-264.4(B) vests the trial court with the discretion to determine, subject to the rules of evidence governing admissibility, the evidence which may be adduced in mitigation of the offense. [Citation omitted.]

"The record shows that the evidence Cherrix sought to introduce involved the general nature of prison life. The inmate's proffered testimony sought to establish, based on the inmate's personal prison experience, what prison life would be like for Cherrix if he received a life sentence. The officials from the Department of Corrections would have testified regarding the ability of the penal system to contain Cherrix and the cost to the taxpayers of an inmate's life sentence. Cherrix's counsel stated that the testimony of the expert penologist, the sociologist, and the criminologist would be similar to that of the inmate and corrections officials. As the trial court observed, none of this evidence concerns the history or experience of the defendant. We agree with the conclusion of the trial court that 'what a person may expect in the penal system' is not relevant mitigation evidence. Accordingly, we will affirm the judgment of the trial court excluding this evidence." 257 Va. at 309-10.

The *Cherrix* court did note, however: "Contrary to Cherrix's assertion, none of the evidence proffered at trial addressed Cherrix's ability to conform or his experience in conforming to prison life, as the defendant's evidence did in *Skipper* [*v. South Carolina*], 476 U.S. at 4." 257 Va. at 310 n.4.

Kleypas argues that evidence of prison life was essential as part of his presentation of mitigating evidence that he would adapt well to life in prison. According to Kleypas, his presentation of this mit-

igating circumstance was "doomed to failure" without this evidence because although he could present evidence that he would function well in a highly structured prison environment, this would not overcome the generally held perspective that prison was not a highly structured environment but, rather, a "country club." The essence of Kleypas' argument is not that evidence of prison conditions was a mitigating circumstance but, rather, that it was necessary to allow him to establish the mitigating circumstance that he would do well in prison.

Evidence that a defendant is well behaved in prison and will in the future be well behaved is a mitigating circumstance. *Skipper v. South Carolina*, 476 U.S. 1, 4-5, 90 L. Ed. 2d 1, 106 S. Ct. 1669 (1986) (stating that "evidence that a defendant would not pose a danger if spared [but incarcerated] must be considered potentially mitigating."). However, the evidence that Kleypas sought to present, the general conditions of prison life, is too far removed to be relevant as a mitigating circumstance. Such evidence might be admissible in rebuttal to counter actual evidence produced by the State showing that life in prison is in fact easy. See Solomon, *A Quarter-Century of Death: A Symposium on Capital Punishment in Virginia Since Furman v. Georgia*, 12 Cap. Def. J. 555 (1999) (noting that the rejection of the Eighth Amendment mitigation argument in no way effects the Fourteenth Amendment argument that the evidence may be used to rebut prosecutorial assertions).

We note that counsel for the defendant did not seek to introduce such evidence in rebuttal but sought its admission on the grounds that it was proper mitigating evidence. The trial court did not err in excluding this evidence.

## Issue 39. Instruction on the Definition of Mitigation

Kleypas contends that jury Instruction No. 13, defining mitigating circumstances, impermissibly allowed the jury to reject alleged mitigating circumstances without first considering the evidence in favor of the circumstances and that this is contrary to the Eighth Amendment, as well as the Fifth and Fourteenth Amendments to the United States Constitution.

As we have noted previously when reviewing challenges to jury instructions, this court is required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case and a jury could not reasonably be misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. *State v. Mims*, 264 Kan. 506, 514, 956 P.2d 1337 (1998).

Instruction No. 13 defined mitigating circumstances:

"Mitigating circumstances are those which in fairness may be considered as extenuating or reducing the degree of moral culpability or blame or which justified a sentence of less than death, although it does not justify or excuse the offense. The determination of what are mitigating circumstances is for you as jurors to resolve under the facts and circumstance of this case."

Kleypas argues that the above language, particularly the last sentence, unconstitutionally allows the jury to determine what qualifies as a mitigating circumstance. Kleypas argues that under the Eighth Amendment, the jury must consider each claimed mitigating circumstance and the evidence to support it. According to Kleypas, the jury is free to find that no evidence supports such a circumstance or to give little, if any, weight to a circumstance, but the jury is not free to find that the circumstance is not a mitigating circumstance. In support of this contention, Kleypas cites *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978), and its progeny, including *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982), and *Penry v. Lynaugh*, 492 U.S. 302, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (1989).

Kleypas misinterprets the above cases. In *Johnson v. Texas*, 509 U.S. 350, 361, 125 L. Ed. 2d 290, 113 S. Ct. 2658 (1993), the Court made clear:

" '*Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be a part of the sentencing decision at all.' [Citations omitted.]"

Nothing in *Lockett* or any of its progeny require that a jury consider all possible mitigating circumstances; rather, they simply preclude

the State from foreclosing such consideration. The sentencer may not refuse to consider, as a matter of law, relevant mitigating evidence. *Eddings*, 455 U.S. at 114. However, the sentencer is free to conclude that some circumstances claimed to be mitigating are not mitigating circumstances. *Eddings* only precludes the sentencer from determining that it may not legally consider certain mitigating circumstances evidence. See 455 U.S. at 113-15. In *Eddings*, the sentencing judge determined that he was prevented by law from considering the petitioner's violent upbringing as a mitigating circumstance. The Court found that this restriction violated *Lockett*, as evidence of the petitioner's upbringing was relevant as a mitigating circumstance. 455 U.S. at 112-15.

In *Buchanan v. Angelone*, 522 U.S. 269, 275-76, 139 L. Ed. 2d 702, 118 S. Ct. 757 (1998), the Court held that the Eighth Amendment does not require that the jury be instructed that certain facts are mitigating. Complete jury discretion with regards to mitigating circumstances evidence is constitutionally permissible. Thus, a jury is free to determine for itself what circumstances it chooses to be mitigating and whether the evidence of those circumstances is sufficient.

Instruction No. 13 did not restrict the jury's discretion to find the existence of mitigating circumstances or foreclose the jury's consideration of mitigating evidence. It expressly listed the 31 circumstances claimed as mitigating circumstances by Kleypas and further instructed that the jury "may further consider as a mitigating circumstance(s) any other aspect of the defendant's character, background, or record, and any other aspect of the offense which was presented in either the guilt or penalty phase and that you find to be relevant." The trial court's instruction properly and fairly stated the law and provides no basis for a claimed constitutional deprivation.

## Issue 40. Whether the Penalty Phase Instructions Prevented the Jury from Considering Mitigating Circumstances.

Kleypas argues that the instructions given prevented the jury from considering any mitigating circumstance that the jury did not unanimously find existed. He contends that under the instructions

as given, the sentencing jury could reasonably have determined that it must unanimously agree on the existence of mitigating circumstances.

In *Mills v. Maryland*, 486 U.S. 367, 100 L. Ed. 2d 384, 108 S. Ct. 1860 (1988), the United States Supreme Court vacated the petitioner's death sentence because it found that the verdict form had potentially prevented the jury from considering relevant mitigating evidence that the jury did not unanimously find to exist. The Court found that the verdict form suggested to the jury that it had to unanimously find each mitigating circumstance. The Court stated that, hypothetically, under the verdict form:

" 'If eleven jurors agree that there are six mitigating circumstances, the result is that no mitigating circumstance is found. Consequently, there is nothing to weigh against any aggravating circumstance found and the judgment is death even though eleven jurors think the death penalty wholly inappropriate.' " 486 U.S. at 373-74.

The Court further found that, hypothetically, all 12 jurors might agree that some mitigating circumstances were present and even that those mitigating circumstances were sufficient to outweigh any aggravating circumstances found to exist, but unless all 12 could agree that the same mitigating circumstance was present, the jury would never be permitted to engage in the weighing process. 486 U.S. at 374.

The Court thus concluded that a death sentence should be vacated if there was a substantial probability that reasonable jurors, upon receiving the judge's instructions and attempting to complete the verdict form based on those instructions, may have thought that they could only consider those mitigating circumstances which they unanimously found to exist. 486 U.S. at 376-77. If the jurors were led to believe that they could not each individually consider certain mitigating circumstances because there was not unanimous agreement as to the existence of those circumstances, then "some jurors were prevented from considering 'factors which may call for a less severe penalty,' *Lockett v. Ohio*, 438 U.S., at 605, and petitioner's sentence cannot stand." 486 U.S. at 376. See also *Frey v. Fulcomer*, 132 F.3d 916, 920 (3rd Cir. 1997), *cert. denied* 524 U.S. 911 (1998).

The decision in *Mills* was reaffirmed in *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (1990). In *McKoy*, the Court held that it is unconstitutional to require a mitigating circumstance to be found unanimously. 494 U.S. at 443-44.

In the case we now consider, the parties and the court during an instruction conference discussed *Mills* in the attempt to satisfy its requirement. The parties agreed to the following instruction, which became Instruction No. 12:

"It is not necessary that all jurors agree upon particular facts and circumstances in mitigation of punishment.

"If you as a juror determine that there are facts or circumstances in mitigation of punishment sufficient to outweigh the evidence of aggravating circumstances, then you must not return a verdict of death."

Kleypas advances the following synopsis in his brief before this court:

"In order to clarify this cryptic instruction [Instruction No. 12], defense counsel proposed that the jury be charged:

'Each individual juror shall weigh the aggravating circumstance found unanimously to exist against any mitigating circumstances found by the that individual juror to exist.'

The trial court denied this instruction."

This synopsis is misleading. Kleypas proffered his instruction not to "clarify the [previous] cryptic instruction" but, rather, prior to the adoption of Instruction No. 12. After the parties agreed on Instruction No. 12, the court denied Kleypas' requested instruction because it was already covered under Instruction No. 12. Kleypas made no objection to this denial. Thus, instead of objecting to Instruction No. 12 as claimed in his brief, Kleypas agreed and helped fashion the language of Instruction No. 12 to replace his proposed instruction.

Because of the discussion and holding set forth in issue 23 that it is constitutionally impermissible to mandate the death penalty where the jury finds that the aggravating and mitigating circumstances are in equipoise, it is likewise necessary to disapprove and hold improper the language of the second sentence of instruction No. 12 that states: "If you as a juror determine that there are facts

or circumstances in mitigation of punishment sufficient to out-weigh the evidence of aggravating circumstances, then you must not return a verdict of death."

This language erroneously instructs the jury that before it could not return a verdict of death it would have to find the mitigating facts or circumstances outweigh the aggravating facts and circumstances.

The first sentence of instruction No. 12, "It is not necessary that all jurors agree upon particular facts and circumstances in mitigation of punishment," is a correct statement of law and satisfies the *Mills* and *McKoy* requirements. Whether this sentence goes far enough by itself can only be determined by examining the other instructions relating to consideration by the jury of the aggravating and mitigating facts and circumstances. But, any instruction dealing with the consideration of mitigating circumstances should state (1) they need to be proved only to the satisfaction of the individual juror in the juror's sentencing decision and not beyond a reasonable doubt and (2) mitigating circumstances do not need to be found by all members of the jury in order to be considered in an individual juror's sentencing decision.

The three cases cited by Kleypas and *amicus curiae* the National Association of Criminal Defense Lawyers, *Frey v. Fulcomer*, 132 F.3d 916, 922-23 (3d Cir. 1997), *cert. denied* 524 U.S. 911 (1998); *Kordenbrock v. Scroggy*, 919 F.2d 1091 (6th Cir. 1990) (en banc); and *Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989), are claimed to show that Instruction No. 8 (unanimous beyond a reasonable doubt burden on the State as to aggravating circumstances), Instruction No. 12, and Instruction No. 15 (verdict form provision discussed in issue No. 36) emphasize the requirement of unanimity regarding the aggravating circumstances while failing to clarify the distinction between the standard for mitigating and aggravating circumstances results in a jury likely to believe it must be unanimous in its finding of mitigating circumstances. This was clearly not the import of the first sentence of Instruction No. 12, but we briefly discuss the holdings of the three cases cited to us.

In *Frey*, the court instructed that jury: "The Crimes Code provides that the verdict must be a sentence of death if the jury unan-

imously finds at least one aggravating circumstance and no mitigating circumstance, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances." 13 F.3d at 922. The Third Circuit Court of Appeals found that it was reasonably likely that the jury would conclude from this instruction that it had to unanimously find mitigating circumstances, especially where other instructions expressly referenced unanimous requirement for aggravating circumstances but made no mention that the requirement for mitigating circumstances was different. 132 F.3d at 922-24.

In *Kordenbrock*, the trial court expressly instructed the jury that aggravating circumstances had to be found beyond a reasonable doubt but made no mention of the standard for mitigating circumstances. The Sixth Circuit Court of Appeals, en banc, found that this violated *Mills* because it created a likelihood that the jurors would interpret the instructions to require them to also find mitigating circumstances beyond a reasonable doubt. 919 F.2d at 1109-10. Similarly, in *Kubat*, the court's instructions emphasized unanimity and did not inform the jurors that mitigating circumstances did not have to be found beyond a reasonable doubt, thus violating *Mills*. 867 F.2d at 372-73.

In contrast to these three cases, the jury in this case was specifically instructed by the first sentence of instruction No. 12 that unanimity was not required with regard to mitigating circumstances. *Frey, Kordenbrock,* and *Kubat* do not support Kleypas' argument.

While we disapprove of the second sentence of Instruction No. 12, the first sentence of the agreed-upon instruction was sufficient to address the concern that the jury might believe that unanimity was required as to mitigating circumstances. It explicitly instructed the jury that it need not be unanimous as to mitigating facts and circumstances.

As a result, we hold there was no error in failing to give Kleypas' requested instruction, the first sentence of Instruction No. 12 is approved, and the second sentence of Instruction No. 12 is disapproved.

## Issue 41. Failure to Inform Jury of Sentences that Might be Imposed for Other Convictions

Kleypas argues that the trial court erred in failing to instruct the jury as to the length of the sentence that would be imposed for the murder absent a death sentence, and also erred in failing to instruct the jury that he would be sentenced for two additional felonies which could be run consecutively to the murder conviction. Kleypas also argues that the trial court should have informed the jury as to the exact total term of imprisonment to which he would have been sentenced absent a death sentence.

In *Simmons v. South Carolina*, 512 U.S. 154, 168-71, 129 L. Ed. 2d 133, 114 S. Ct. 2187 (1994), the United States Supreme Court held that it was unconstitutional to deny the defendant's request to instruct the jury that he would not be eligible for parole where the State had attempted to argue that the defendant should be put to death because of his future dangerousness. The Court found that the denial of such an instruction effectively prevented the defendant from rebutting the State's argument. 512 U.S. at 161-62.

The problem with Kleypas' argument, at least with regard to the length of the sentence that would be imposed for the murder absent a death sentence, is that Kleypas' counsel objected to just such an instruction at trial. The trial court offered to give an instruction that Kleypas would be sentenced to life in prison with parole eligibility in 25 years or, at the discretion of the judge, might be sentenced to the hard 40. The defense felt that there was really no possibility of life with parole eligibility in 25 years and refused to have the jury instructed on the subject. Thus, any error of the court on this subject was invited by Kleypas and cannot now be complained of on appeal. See *State v. Borman*, 264 Kan. 476, 480, 956 P.2d 1325 (1998).

Kleypas also argues that the jury should have been instructed on the sentences he would receive for his other felony convictions. In support of this contention, he cites cases from other jurisdictions which he claims have done so: *State v. Loftin*, 146 N.J. 295, 680 A.2d 677 (1996); *Clark v. Tansy*, 118 N.M. 486, 882 P.2d 527 (1994); and *Berry v. State*, 575 So. 2d 1 (Miss. 1990). However,

*Clark* and *Berry* do not substantively support Kleypas' argument. *Clark* stands only for the proposition that the jury be informed as to the length of incarceration facing the defendant either by way of a defendant's rebuttal arguments or by instruction from the court if the defendant so requests. 118 N.M. at 492-93. See *Simmons*, 512 U.S. at 168-69. *Berry* holds that where the defendant's prior crimes will designate him a habitual criminal and thus make him ineligible for parole, the habitual criminal hearing should be held and the jury advised of this fact before deliberations on the death sentence begin. 575 So. 2d at 13-14.

*Loftin*, along with *State v. Martini*, 131 N.J. 176, 619 A.2d 1208 (1993), *cert. denied* 519 U.S. 1063 (1997), set up a system in New Jersey in which the court is required to instruct on the potential sentences a defendant will receive for convictions arising from the same trial as the capital-murder conviction. *Martini*, 131 N.J. at 313. Courts in New Jersey are also required to instruct the jury if there is a reasonable likelihood that consecutive sentences will be imposed on the non-capital counts. *Loftin*, 146 N.J. at 372.

Instructions such as those required in New Jersey are not mandated by *Simmons*. See 512 U.S. at 168-71. Further, the length of incarceration to be served by the defendant before parole eligibility is not a mitigating circumstance under the Eighth Amendment because it not a fact about the defendant's character or background or about the circumstances of the offense. Kansas law does not provide for a system such as that in New Jersey, and we decline to impose such a system *sua sponte*. We conclude that the trial court did not err in failing to instruct the jury on the sentences which Kleypas would receive for his additional felony convictions.

In the absence of a request, the trial court has no duty to inform the jury in a capital-murder case of the term of imprisonment to which a defendant would be sentenced if death were not imposed. Where such an instruction is requested, the trial court must provide the jury with the alternative number of years that a defendant would be required to serve in prison if not sentenced to death. Additionally, where a defendant has been found guilty of charges in addition to capital murder, the trial court upon request must provide the jury with the possible terms of imprisonment for each

additional charge and advise the jury that the determination of whether such other sentences shall be served consecutively or concurrently to each other and the sentence for the murder conviction is a matter committed to the sound discretion of the trial court.

### Issue 42. Failure to Give Limiting Instruction Regarding Inconsistency Between Heinous, Atrocious, or Cruel Manner Aggravating Circumstance and Avoiding Arrest Aggravating Circumstance

Kleypas argues that two of the aggravating circumstances advanced by the State in his separate sentencing proceeding are potentially inconsistent and, therefore, required the trial court to instruct the jury on the inconsistency. He argues that the following two circumstances are inconsistent in that they both address the motive for the killing: "The defendant committed the crime for the defendant's self or another for the purpose of receiving money or any other thing of monetary value," K.S.A. 21-4625(3), and "The defendant committed the crime in an especially heinous, atrocious or cruel manner," K.S.A. 21-4625(6).

Kleypas cites two cases to support his argument for the necessity of the limiting instruction: *State v. Cooper*, 151 N.J. 326, 700 A.2d 306 (1997), and *State v. Barreras*, 181 Ariz. 516, 892 P.2d 852 (1995).

In *Cooper*, the aggravating factors in the penalty phase were that (1) the crime was depraved and senseless and (2) the crime was committed to avoid arrest. The court found that these two factors were inconsistent, as one assumed no motive existed, while the other set forth a motive. 151 N.J. at 382. Under the circumstances, *Cooper* concluded that the trial court should not have submitted both factors but also concluded a limiting instruction that the jury could not find both factors was sufficient to cure the error. 151 N.J. at 382-84. In *Barreras*, the trial court found that the murder had been committed in an especially heinous and depraved manner because, in part, the murder was senseless and the murder was made to eliminate the victim as a witness. The Arizona Supreme Court concluded that the witness elimination aggravating factor was not supported by the evidence but also expressed its doubt that the two factors could exist at the same time. 181 Ariz. at 523.

*Cooper* and *Barreras* involve aggravating factors relating to the motive of the killing, *viz.*, that the killing was senseless and that the killing was made to avoid arrest or eliminate the victim. In both cases, the aggravating factors were clearly inconsistent. However, neither case supports Kleypas' argument.

In Kansas, the heinous, atrocious, or cruel manner aggravating circumstance is not targeted toward the motive for the killing, *i.e.*, that the killing was senseless but, rather, its focus is on the manner in which the killing was committed. We conclude that the alleged inconsistency does not exist under the facts of this case. No limiting instruction was necessary. The State was not relying on Kleypas' motive for the killing to establish the heinous, atrocious, or cruel manner aggravating circumstance. Instead, the State relied on the physical and mental anguish suffered by the victim to establish that aggravating circumstance. Kleypas' argument fails.

## Issue 43. Prosecutorial Misconduct in the Penalty Phase

Kleypas alleges that certain conduct by the State during the penalty phase, as well as numerous statements and arguments during its closing argument, constituted prosecutorial misconduct. According to Kleypas, the prosecutorial misconduct denied him a fair sentencing proceeding and requires that his sentence be overturned. Although we have already determined that Kleypas' sentences must be vacated and the matter remanded for a new sentencing hearing, we choose to address the claimed errors with regard to prosecutorial misconduct in detail. Because this is the first death penalty case in Kansas under the new statute, it is important to highlight the standard of review for claimed misconduct during the penalty phase and to educate both prosecutors and defense attorneys as to the standard to which they will be held in both their conduct and comments during the penalty phase.

### Standard of Review

The purpose of a separate sentencing proceeding in Kansas is "to determine whether the defendant should be sentenced to death." K.S.A. 21-4624(a). We cannot overemphasize the critical importance of such a determination to the victims, the defendant,

and to all Kansas citizens. Because of the life and death nature of the proceedings, prosecutors have a heightened duty to refrain from conduct designed to inflame the passions or prejudices of the jury. The process and proceedings by which the State imposes a death sentence must be fair and free of prejudicial error consistent with the United States Constitution as interpreted by the United States Supreme Court.

The standard of review upon a claim of prosecutorial misconduct during the penalty phase of a capital murder trial is similar to the standard applied in the guilt phase. Yet, there are subtle differences which need to be identified before we consider the specific allegations of the defendant.

In all cases, the standard of review in determining whether alleged improper statements made by the prosecutor during closing argument is a two-step process: First, we must determine whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. Second, we must determine whether the remarks constituted plain error, that is, whether the comments were so gross and flagrant as to prejudice the jury against the accused and deny him a fair trial. *State v. McCorkendale*, 267 Kan. at 263, 278-79, 979 P.2d 1239 (1999).

In our determination of whether the prosecutor's remarks were so gross and flagrant as to prejudice the jury and deny the defendant his constitutional right to a fair trial, we apply the harmless error analysis for federal constitutional errors, as stated by the United States Supreme Court in *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967). A constitutional error may be declared harmless where the State proves beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. 386 U.S. at 24. Although the language used in Kansas "Whether the reviewing court is able to find beyond a reasonable doubt that the error, when viewed in light of the record as a whole, had little, if any, likelihood of changing the result of the trial" is somewhat different than the language used in *Chapman*, we have held that our standard is essentially the same as expressed in *Chapman*. See *State v. Fleury*, 203 Kan. 888, 893, 457 P.2d 44 (1969) (adopted *Chapman* test for

constitutional harmless error and stated that it occurs "where the error or defect had little, if any, likelihood of having changed the result of the trial"). See, *e.g.*, *McCorkendale*, 267 Kan. at 279; *State v. Lumley*, 266 Kan. 939, 959, 976 P.2d 486 (1999); *State v. Zamora*, 247 Kan. 684, 690, 803 P.2d 568 (1990); *State v. Johnson*, 231 Kan. 151, 159, 643 P.2d 146 (1982).

The United States Supreme Court has approved the use of the *Chapman* harmless error analysis to analyze trial errors occurring during the penalty phase of capital murder trials. See *Satterwhite v. Texas*, 486 U.S. 249, 100 L. Ed. 2d 284, 108 S. Ct. 1792 (1988); *Clemons v. Mississippi*, 494 U.S. 738, 108 L. Ed. 2d 725, 110 S. Ct. 1441 (1990). However, the Court has also noted that application of the analysis is somewhat more complicated than in non-death cases or in the guilt phase of a capital trial. In *Satterwhite*, the Court stated:

"It is important to avoid error in capital sentencing proceedings. Moreover, the evaluation of the consequences of an error in the sentencing phase of a capital case may be more difficult because of the discretion that is given to the sentencer. Nevertheless, we believe that a reviewing court can make an intelligent judgment about whether the erroneous admission of psychiatric testimony might have affected a capital sentencing jury." 486 U.S. at 258.

Similarly, in *Clemons*, the Court stated:

"Nothing in this opinion is intended to convey the impression that state appellate courts are required to or necessarily should engage in reweighing or harmless-error analysis when errors have occurred in a capital sentencing proceeding. Our holding is only that such procedures are constitutionally permissible. In some situations, a state appellate court may conclude that peculiarities in a case make appellate reweighing or harmless-error analysis extremely speculative or impossible. We have previously noted that appellate courts may face certain difficulties in determining sentencing questions in the first instance. [Citation omitted]. Nevertheless, that decision is for state appellate courts, including the Mississippi Supreme Court in this case, to make." 494 U.S. at 754.

Several legal commentators have also noted that the application of the harmless error analysis is more difficult and limited in the penalty phases of a capital murder trial. See McCord, *Is Death "Different" for Purposes of Harmless Error Analysis? Should It Be?: An Assessment of United States and Louisiana Supreme Court Case Law*, 59 La. Law Rev. 1105 (1999); Mitchell, *The Wizardry*

*of Harmless Error: Brain, Heart, Courage Required When Review-
ing Capital Sentences*, 4 Kan. J.L. & Pub. Pol'y 51 (1994); Carter,
*Harmless Error in the Penalty Phase of a Capital Case: A Doctrine
Misunderstood and Misapplied*, 28 Ga. L. Rev. 125 (1993). Pro-
fessor Carter noted that the difficulty arises because of the differ-
ence in judgment that a jury must exercise during the penalty phase
as opposed to the guilt phase, and the corresponding greater dis-
cretion:

"In contrast [to the guilt phase, in which the factfinder must reach a decision
as to whether certain facts exist], the sentencer in a capital case must first find
whether certain facts exist and then apply a value judgment to those facts. The
judge or jury in the penalty phase must decide whether the evidence is convincing
that an aggravating circumstance exists and whether any mitigating circumstances
exist. These assessments by the judge or jury are essentially comparable to the
factfinder's task in the guilt phase in deciding if the elements of the crime exist.
The sentencer, however, is asked to do more. The sentencer is asked to take the
facts found—the aggravating and mitigating circumstances—and balance them
against each other. The balancing is virtually unguided. The sentencer must make
a value judgment whether one group of facts (aggravating circumstances) is
greater, the same as, or less than another group of facts (the mitigating circum-
stances)." 28 Ga. L. Rev. at 148-49.

Further, the applicability of what is commonly referred to as the
"overwhelming evidence test," as stated by the United States Su-
preme Court in *Harrington v. California*, 395 U.S. 250, 23 L. Ed.
2d 284, 89 S. Ct. 1726 (1969), is more difficult and complex in
addressing assigned errors occurring during the penalty phase. In
*Harrington*, the Court found that the consideration of the over-
whelming nature of the defendant's guilt was a valid consideration
under *Chapman* and that harmless error may be found where the
evidence against the defendant was "overwhelming," although
courts should be cautioned from giving too much emphasis to this
consideration. 395 U.S. at 254. The overwhelming nature of the
evidence is also a consideration in the Kansas version of the *Chap-
man* harmless error analysis. See *State v. Follin*, 263 Kan. 28, 45,
947 P.2d 8 (1997) (stating that one factor to be considered in de-
termining whether a new trial should be granted because of pros-
ecutorial misconduct is whether the evidence against the defendant

was so overwhelming that there was little or no likelihood the prosecutor's prejudicial remarks changed the result of the trial).

In determining whether the claimed prosecutorial misconduct in the penalty phase of the trial had little or no likelihood of changing the jury's verdict, the court is obliged to consider the evidence in light of the record as a whole. See *McCorkendale*, 267 Kan. at 279. In so considering, the court must necessarily determine whether the evidence in favor of the jury's verdict is so overwhelming that the error had little or no likelihood of changing the jury's verdict. See Carter, *Harmless Error in the Penalty Phase of a Capital Case: A Doctrine Misunderstood and Misapplied*, 28 Ga. L. Rev. at 134-38. Thus, one way in which the misconduct may be found to be harmless is where an appellate court finds that the evidence in favor of the existence of the aggravating circumstances, and the evidence that these aggravating circumstances outweigh the mitigating circumstances, is so overwhelming that the misconduct had little or no likelihood of changing the jury's verdict.

It must be noted that in Kansas, the jury is not required to reveal what mitigating circumstances it found to exist. See K.S.A. 21-4624(e) (requiring the jury to designate in writing the aggravating circumstances it found to exist, but not requiring the same for the mitigating circumstances). Thus, application of the "overwhelming evidence test" as a component of the *Chapman* harmless error analysis assumes that all of the mitigating circumstances claimed by the defendant exist. The appellate court's decision with regard to the overwhelming nature of. the evidence will depend upon whether the court may say that the evidence that the aggravating circumstances outweigh the mitigating circumstances is so overwhelming that the misconduct had little or no likelihood of changing the jury's verdict.

Thus, the standard of review and the ultimate question that must be answered with regard to whether prosecutorial misconduct in the penalty phase of a capital trial was harmless is whether the court is able to find beyond a reasonable doubt that the prosecutorial misconduct, viewed in the light of the record as a whole, had little, if any, likelihood of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circum-

stances. In this determination, the overwhelming nature of the evidence is a factor to be considered, although its impact is limited. Also, in making the determination as to whether an error was harmless, it is important to recognize that the question for the reviewing court is not what effect the constitutional error might generally be expected to have upon a reasonable jury but, rather, what effect it had upon the actual verdict in the case at hand. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 124 L. Ed. 2d 182, 113 S. Ct. 2078 (1993). "The inquiry, in other words, is not whether, in a trial that occurred without the error, a [verdict for death] would surely have been rendered, but whether the [death verdict] actually rendered in this trial was surely unattributable to the error." 508 U.S. at 279.

Further, even if instances of prosecutorial misconduct are harmless error in and of themselves, their cumulative effect must be analyzed. See *State v. Valdez*, 266 Kan. 774, 802, 977 P.2d 242 (1999) (noting that cumulative errors may be so great as to require reversal). For a cumulative error analysis, the focus is on the net prejudicial effect the total prosecutorial misconduct had on the jury's ultimate verdict. The question is whether the total effect of the cumulative misconduct found to exist, viewed in light of the record as a whole, had little, if any, likelihood of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances.

With these standards in mind, we now turn to the specific arguments raised by the defendant:

## Prosecutorial Misconduct During Examination of Witnesses

As part of his mitigating evidence, Kleypas brought forth expert witness testimony designed to show as a mitigating circumstance that he would do well in a structured prison setting. Kleypas' arguments concern certain questions asked by the prosecutor in cross-examining these witnesses.

## A. Cross-Examination of Dr. Othmer

Dr. Othmer, a psychologist, testified that he had diagnosed Kleypas as suffering from several paraphilias or sexual fantasies involving either innate objects or nonconsenting partners. Dr. Othmer

testified that Kleypas could not control his paraphilias and that alcohol would lead to an increase in "acting out" these paraphilias. According to Dr. Othmer, there was no indication in Kleypas' history that he acted on his paraphilias while in prison. Dr. Othmer opined that this was because the triggers for the paraphilias, which were females, alcohol, and drugs, were missing. Dr. Othmer testified that with those triggers removed, the likelihood of Kleypas causing problems in prison was extremely low.

During cross-examination, the prosecutor asked whether a weaker male could be a triggering device for someone with Kleypas' problem if the person had sexual identification problems. Dr. Othmer answered that he saw no indication of that in Kleypas. The prosecutor then said: "I understand but the question is someone with this type of paraphilia who has a sexual identification problem, could a weaker male be a triggering device?" Dr. Othmer answered: "Theoretically". Defense counsel objected but was overruled. The prosecutor then attempted to rephrase the question, an objection from defense counsel was sustained, and the matter was dropped.

Kleypas contends that the prosecutor was improperly asking the question regarding whether a weaker male could be a trigger for a paraphilia in an attempt to insinuate that Kleypas would sexually assault weaker males in prison. He argues that the prosecutor lacked a good faith basis for this question. There is really no question that the prosecutor was indeed attempting to rebut Kleypas' evidence of probable good behavior in prison by trying to establish that Kleypas would be a danger to weaker males due to his paraphilia. The only question is whether the prosecutor had a good faith basis for asking such a question.

In *State v. Cravatt*, 267 Kan. 314, 330, 979 P.2d 679 (1999), we noted that as a general rule, counsel may not make assertions of fact in the form of questions to a witness absent a good faith basis for believing the asserted matters to be true. See *State v. Wilkins*, 269 Kan. 39, 45, 5 P.3d 520 (2000); *State v. Marble*, 21 Kan. App. 2d 509, 512, 901 P.2d 521, *rev. denied* 258 Kan. 861 (1995); KRPC 3.4(e) (2001 Kan. Ct. R. Annot. 406); Graham, Evidence: Text, Rules, Illustrations and Problems, p. 436 (2d ed. 1989). In order

for the prosecutor to have a good faith basis for asking the question that he asked on cross-examination, the prosecutor was required to have a good faith basis for believing that (1) Kleypas had a sexual identification problem and (2) a weaker male would indeed be a triggering device for a person with Kleypas' paraphilias and a sexual identification problem.

However, Kleypas did not object to the prosecutor's question on the basis of lack of a good faith belief. We underscored the necessity for such an objection in *Cravatt*: "An overruled objection at trial would have provided a basis for review. It would also have required the State to proffer its basis for the above questions." 267 Kan. at 330. While it is true that the State must be ready to establish the good faith basis for its questions, its responsibility to do so is triggered by an objection which asks it to do so, and where there is no such objection, the duty does not exist. See *Wilkins*, 269 Kan. at 45; *Cravatt*, 267 Kan. at 330.

If the prosecutor had a good faith basis for believing that Kleypas had a sexual identification problem and that a weaker male might serve as a triggering device for someone with Kleypas' paraphilias and a sexual identification problem, the questions would have been highly relevant to the credibility of Dr. Othmer's opinion that Kleypas would do well in prison. The failure of the defendant to object and to trigger the prosecutor's proffer of a good faith basis precludes a finding of error on this issue.

Of more concern to this court is another question asked by the prosecutor during its cross-examination of Dr. Othmer. The prosecutor noted that Dr. Othmer had said that alcohol was a triggering device. The prosecutor then asked if it was true that the prison records indicated that Kleypas had tested positive for alcohol. Dr. Othmer indicated that he had not been aware of such a specific incident but Larned records had indicated that Kleypas had previously "had a drinking problem in a controlled environment." At this point, the prosecutor asked: "So why did you tell us then that he did not have any indications of being around these triggering devices?" Defense counsel objected but was overruled. The prosecutor then resubmitted the question at which point defense counsel again objected, arguing that there was no good faith basis for

the question. Defense counsel noted that the particular incident to which the prosecutor referred to did not happen in prison but instead occurred while Kleypas was on work release in Missouri and was working at a bar. The prosecutor then explained: "Your Honor, the point is the defendant was in prison and in prison he got on work release and he goes out and he has access to alcohol. This is—he says the doctor made the statement that he has no access while he's in prison and he clearly does." The trial court sustained defense counsel's objection.

With his questioning, the prosecutor was clearly trying to discredit Dr. Othmer's opinion that the triggers for Kleypas' paraphilias would be removed in the prison setting by inferring that Kleypas had access to alcohol in prison and bringing up the point that Kleypas had tested positive for alcohol was in prison. The problem is, as the prosecutor clearly knew, that Kleypas did not test positive for alcohol in prison but rather tested positive while he was on work release. This attempted cross-examination was made without a good faith basis and was improper.

### B. Cross-Examination of Dr. Gentry

The next point about which Kleypas complains took place during the cross-examination of Dr. Gerald Gentry, one of Kleypas' psychiatric experts. On redirect examination, Dr. Gentry testified that Kleypas had suffered some mental damage from the "anticipation or fear of pain" which accompanied him watching the beatings of his brothers by his father. On recross, prosecutor Barry Disney stated: "So you would agree that the anticipation of fear or the anticipation of harm can cause severe mental distress?" When Gentry replied that it would, Disney then stated: "So would you care to venture an opinion as to the amount of severe mental distress that [C.W.] was feeling when the defendant was in her apartment for one and a half to three hours?" Defense counsel objected and the trial court stated: "I think it is beyond the scope of redirect, sustained."

It is impossible to tell exactly what the prosecutor's motive in asking this question was. It was either, as Kleypas suggests, an attempt to remind the jury of C.W.'s pain and suffering in order

to inflame the jury or it was an attempt by the prosecutor to garner additional testimony from a defense witness to support the State's alleged aggravating circumstance that the murder was committed in an especially heinous, atrocious, or cruel manner. In either event, the question itself was improper. We caution that a prosecutor who outside the scope of the examination seeks to gain an advantage with a question that arguably is intended to inflame and impassion the jury is perilously close to committing reversible error.

### C. The Prison Checklist

Dr. James Park testified as an expert witness regarding Kleypas' adjustment in prison. He testified that he had reviewed the Missouri Department of Corrections files and records on Kleypas and found no evidence of sexual assaults and violence. In his opinion, if sentenced to prison, Kleypas would once again be a good prisoner. On cross-examination, the prosecutor asked Dr. Park about a correctional adjustment checklist that was in Kleypas' Missouri prison records. The checklist contained a list of behaviors and was completed by a prison official circling the numbers which corresponded to the behaviors exhibited by the inmate. Kleypas' checklist had circled the attributes "victimizes weaker inmates," "an agitator about race," "continually tries to con staff, "plays staff against one another," and "tries to form a [clique]." The prosecutor asked Dr. Park to verify that those attributes were circled and then referred to them in closing argument. Defense counsel objected to the use of the checklist but was overruled.

Kleypas contends that the prosecutor should not have been allowed to use the checklist in cross-examination to establish his bad conduct in prison because the allegations were unreliable and uncorroborated and, further, that a limiting instruction should have been given informing the jury that the evidence in the checklist could only be used for the purpose of impeaching the credibility of the witness, not as evidence of Kleypas' bad conduct in prison. In support of these contentions, Kleypas relies on our decision in *State v. Hinton*, 206 Kan. 500, 479 P.2d 910 (1971), as well as a New Jersey case, *State v. Rose*, 112 N.J. 454, 548 A.2d 1058 (1988).

*Hinton* stands for the proposition that it is improper to admit evidence of bad character as fact during the cross-examination of a defendant's character witness. Instead, such evidence should only be admitted to affect the credibility of the character witness by asking whether the character witness is familiar with such evidence. 206 Kan. at 506. This cross-examination is sanctioned as a test of the witness' credibility under the theory that if the witness has a familiarity with the evidence, the witness' opinion as to the defendant's good character may not be sound or in good faith, and if the witness has no familiarity with the evidence then the witness may not actually be familiar with the defendant. See 206 Kan. at 506.

We stated in *Hinton*:

"The trial judge in determining whether to allow the prosecuting attorney to cross-examine the defendant's character witness, when challenged by the defendant, should conduct a preliminary inquiry out of the presence of the jury, and he should satisfy himself:

"(1) That there is no question as to the fact of the subject matter of the rumor, that is, of the previous arrest, conviction or other pertinent misconduct of the defendant;

"(2) That a reasonable likelihood exists that the previous arrest, conviction or other pertinent misconduct would have been bruited about the neighborhood or community prior to the alleged commission of the offense on trial;

"(3) That neither the event nor conduct, nor the rumor concerning it, occurred at a time too remote from the present offense;

"(4) That the earlier event or misconduct and the rumor concerned the specific trait involved in the offense for which the accused is on trial; and

"(5) That the examination will be conducted in the proper form, that is, 'Have you heard,' etc., not 'Do you know.' [Citations omitted.]

"If the conclusion is reached to allow the interrogation, the jury should be informed of its exact purpose, either at the conclusion of the cross-examination of the character witness, or in the charge made to the jury at the close of the case." 206 Kan. at 508-509.

Unlike the situation in our case, *Hinton* dealt with the guilt or innocence of the defendant rather than the penalty to be imposed. In the penalty phase of a capital proceeding where a defendant presents evidence of a mitigating circumstance, the prosecution is

permitted to cross-examine defense witnesses as to relevant facts and to introduce relevant evidence in order to rebut the existence of the mitigating circumstance. See *Rose*, 112 N.J. at 502-03; *Com. v. Ford*, 539 Pa. 85, 105, 650 A.2d 433 (1994); *State v. Lord*, 117 Wash. 2d 829, 890-95, 822 P.2d 177 (1991). It is clear by the manner in which the testimony was elicited and the manner in which it was referred to in closing arguments that the prosecutor was using the information to rebut Kleypas' proposed mitigating factor that he would function well in prison rather than attempting to use the information as evidence that the defendant was a bad person and should be sentenced to death.

The checklist used to impeach Dr. Park was included in the documents which Dr. Park relied on in forming his opinion as to Kleypas' amenability to prison. As a result, it was proper for the prosecutor to cross-examine Dr. Park as to evidence without further establishing its accuracy. See *Rose*, 112 N.J. at 500-01 (incidents relied on by expert in expressing opinion a proper subject for cross-examination, subject to limiting instruction). Thus, Kleypas' argument regarding the need for corroboration of the truth of the checklist fails.

However, there is a question as to whether the trial court was obligated to give a jury instruction stating that the information in the checklist could be considered only for the purpose of rebutting the mitigating circumstance that Kleypas could function well in prison. The court in *Rose* found a need for such an instruction, noting:

"In the penalty phase of a capital case, the function of the jury has been sharply defined by the Legislature. The jury must determine if the State has proved beyond a reasonable doubt the existence of any aggravating factors, and if the defendant has proved the existence of any mitigating factors. The jury must then weigh only the aggravating factors against only the mitigating factors. N.J.S.A. 2C:11-3c(3). The jury is not permitted, in its weighing process, to add other evidence of defendant's past conduct to the weight it assigns to the aggravating factors, nor to consider other evidence of defendant's past conduct, except to the extent offered to rebut mitigating factors, as detracting from the weight it assigns to the mitigating factors." 112 N.J. at 507-08.

The *Rose* court stated that under New Jersey law, where relevant evidence is admissible for one purpose and is inadmissible for an-

other purpose, the judge is required to restrict the evidence to its proper scope and instruct the jury accordingly. The court found that it was incumbent upon the judge to instruct the jury that the information could be used only to rebut the proffered mitigating circumstance, not as additional aggravating evidence. 112 N.J. at 506-08. Further, the court found that it did not matter whether the defendant requested such an instruction, as the information, which included the defendant's past misconduct in high school, the army, and jail, in addition to his physical acts of violence against former girlfriends and his racial reason for buying a shotgun, was so inflammatory as to require such an instruction *sua sponte*. 112 N.J. at 505-07.

The United States Constitution does not prohibit the sentencer's consideration during the penalty phase of a capital murder trial of information not directly related to aggravating or mitigating factors as long as that information is relevant to the character of the defendant or the circumstances of the crime. *Barclay v. Florida*, 463 U.S. 939, 967, 77 L. Ed. 2d 1134, 103 S. Ct. 3418 (1983) (Stevens, J., concurring). Therefore, the question is whether under Kansas law such a limiting instruction is required.

As in New Jersey, Kansas law limits the consideration of aggravating circumstances to those listed by the State, and the jury is not permitted to use evidence of other bad acts by the defendant as "nonstatutory aggravating circumstances." The pattern jury instructions for Kansas make this clear by instructing the jury: "In the determination of sentence, you may consider only those aggravating circumstances set forth in this instruction." PIK Crim. 3d 56.00-C. Such an instruction was given to the jury in this case. This instruction adequately informs the jury that it may not use evidence which rebuts a mitigating circumstance as an aggravating circumstance.

Of further significance is the difference between New Jersey and Kansas with regard to the duty of the judge to instruct on evidence which is admissible for one purpose but not for another. The New Jersey Supreme Court in *Rose* found that a limiting instruction was necessary in light of its Evidence Rule 6, which provides: "When relevant evidence is admissible as to one party or for one purpose

and is inadmissible as to other parties or for another purpose, the judge shall restrict the evidence to its proper scope and instruct the jury accordingly." 112 N.J. at 507.

In comparison, Kansas law states: "When relevant evidence is admissible as to one party or for one purpose and is inadmissible as to other parties or for another purpose, the judge *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Emphasis added.) K.S.A. 60-406.

We have held that although a trial judge is required to give such an instruction where applicable on request of one of the parties, the failure to do so when not requested is not error unless such failure is clearly erroneous. *State v. Lolar*, 259 Kan. 682, 687-88, 914 P.2d 950 (1996); *State v. Knowles*, 209 Kan. 676, 679-80, 498 P.2d 40 (1972).

We conclude that the court was not required to instruct the jury regarding the applicability of the evidence where Kleypas failed to request such an instruction. Under the pattern instructions in Kansas, the jury is explicitly instructed that it is to consider only the aggravating circumstances listed. The only statutory aggravating circumstance which even remotely concerns a defendant's history is that the defendant was previously convicted of a felony in which the defendant inflicted great bodily harm, disfigurement, dismemberment, or death on another. See K.S.A. 21-4625(1). The remaining statutory aggravating circumstances concern characteristics of the crime and we conclude that it is very unlikely that a jury would assign greater weight to those aggravating circumstances because of a defendant's past history. It is also unlikely that the jury would use this information to discount the defendant's proffered mitigating circumstances other than the mitigating circumstance which the information specifically rebuts. The jury is presumed to follow the instructions of the court. *State v. Tyler*, 251 Kan. 616, Syl. ¶ 13, 840 P.2d 413 (1992).

Another problem identified by Kleypas regarding the use of the checklist is that according to Kleypas, he had shown that the information was incorrect. Kleypas argues that the trial court erred in denying his motion for new trial given this showing. In his motion for a new trial, Kleypas submitted an affidavit from a Missouri

prison officer. Mary Countryman was the officer who originally completed the checklist in 1988. In her affidavit, Countryman stated the following:

"2. I was familiar with Gary W. Kleypas when he was an inmate and I was a correctional officer at Fordland Correctional Center.

"3. I saw no indication that Mr. Kleypas was dangerous to other inmates. Specifically I saw no indication of assaultive or homicidal behavior on his part.

"4. Mr. Kleypas seemed to get along with everyone he had contact with.

"5. I saw no indication that Mr. Kleypas was racist or engaged in racist activities.

"6. I do not know why the attached form was filled out the way it was.

"7. Nobody from the prosecution in the State of Kansas v. Gary W. Kleypas contacted me at any time to discuss the attached form."

Contrary to Kleypas' assertion, the affidavit does not prove that the information contained in the checklist was false. While the affidavit does contradict the checklist as to the various issues, it provides no explanation as to why the checklist was filled out in the manner in which it was. Therefore, while the affidavit affects the credibility of the checklist, it does not negate the checklist. Rather, it establishes Countryman's view of the events 9 years after the checklist was filled out.

A conviction based on perjured or false evidence is a violation of due process even in cases where the perjury or false evidence was not induced by the prosecution. See *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959). Such a rule should be especially applicable to death penalty proceedings. However, the affidavit does not establish that the evidence was in fact false and, therefore, the trial court did not err in denying Kleypas' motion for new trial on this basis.

## D. Prison Conditions

Kleypas argues that the prosecutor committed misconduct through cross-examination of a defense witness by violating the terms of the trial court's order in limine regarding prison conditions. Prior to trial, the trial court ruled upon the motion of defense counsel that neither side could bring up issues relating to prison conditions, although Kleypas would be allowed to present evidence

regarding his amenability to prison and the State would be allowed to rebut that evidence.

Joe Haggard, a fire safety specialist with the Missouri Department of Corrections, testified that he had supervised Kleypas at the Ozark Correctional Institute. Haggard testified that Kleypas had been a member of the prison fire department responsible for helping fire departments in the surrounding area. Haggard testified that Kleypas was a good worker and followed orders. He also testified that Kleypas had assisted him with administrative and teaching activities and was instrumental in raising money for training materials and fire fighting equipment. He identified Kleypas in a picture from a yearly banquet that the fire fighting crew was allowed to have for an award ceremony.

On cross-examination, prosecutor Disney engaged in the following colloquy:

"[Prosecutor]: And they were allowed according to these pictures to have banquets?
"[Haggard]: Yeah. They were allowed to have one a year. If they had an organization—like the Jaycees they had an organization there.
"[Prosecutor]: They could have cakes in prison and just typical every day life; correct?
"[Haggard]: Well, sort of.
"[Prosecutor]: They were also allowed to have bridge clubs in prison; is that correct?
"[Haggard]: I have no idea.
"[Prosecutor]: Softball tournaments?
"[Haggard]: I've seen them playing softball.
"[Prosecutor]: Were you aware that the defendant was associated with a bridge club?"

Defense counsel objected, and the trial court sustained the objection. Defense counsel then asked for a curative instruction which would inform the jury that the prosecutor had improperly attempted to imply that prison was an easy life and further inform the jury that life in prison was difficult. The trial court explicitly found that the prosecutor had violated the earlier order prohibiting evidence of prison conditions. The trial court stated that "it was obvious" that the prosecutor was trying to imply to the jury that prison life was easy. The prosecutor agreed that he had attempted

to suggest that prison was an easy environment. The trial court gave a curative instruction informing the jury that the prosecutor had improperly attempted to suggest that prison was an easy environment and instructed the jury to disregard such an implication.

The prosecutor's cross-examination of Haggard was a violation of the trial court's order and constituted prosecutorial misconduct. The cross-examination was an attempt to prejudice the jury by improperly suggesting to them that prison was an easy environment, and the prosecutor admitted as much. Such evidence was clearly irrelevant, inadmissible, and prejudicial to the defendant. We are greatly disturbed by the prosecutor's conduct, especially considering the nature of this case.

### Prosecutorial Misconduct During Closing Arguments

#### A. Comments Regarding the Defendant's Right to Remain Silent

The prosecutor in closing argument made the following statement regarding mitigating evidence:

"[Prosecutor]: The defendant also makes the claim that he's remorseful, that he's sorry. Let's talk about remorse. He sat here for a whole month and you've had an opportunity to observe the defendant."

At that point, the defendant objected on the grounds that the prosecutor was preparing to say that the jury had not observed remorse on the part of the defendant and that this was an implication of the defendant's Fifth Amendment right to remain silent. The court sustained the objection and instructed the jury to disregard the remark.

The Fifth Amendment to the United States Constitution, as well as § 10 of the Kansas Constitution Bill of Rights, protects the right of the defendant to exercise his privilege not to testify and forbids comment by the prosecution on the defendant's silence. *Griffin v. California*, 380 U.S. 609, 615, 14 L. Ed. 2d 106, 85 S. Ct. 1229, *reh. denied* 381 U.S. 957 (1965); *State v. Ninci*, 262 Kan. 21, 47, 936 P.2d 1364 (1997). A prosecutor commits error when the language used was manifestly intended or was of such a character that

the jury would necessarily take it to be a comment on the failure of the accused to testify. 262 Kan. at 48.

In the case at hand, the prosecutor's statement was not directly related to the defendant's failure to testify. However, it was indirectly related in that it appears the prosecutor was preparing to argue that the jury had the opportunity to view the defendant during the trial and the defendant did not appear to be remorseful. Such comment is equally a violation of a defendant's Fifth Amendment right in that the prosecutor was attempting to use evidence of the defendant's courtroom behavior where the defendant has exercised his right not to testify. See *United States v. Carroll*, 678 F.2d 1208, 1209-10 (4th Cir. 1982); *U.S. v. Schuler*, 813 F.2d 978, 979-82 (9th Cir. 1987); *United States v. Wright*, 489 F.2d 1181, 1186 (D.C. Cir. 1973). However, the line of questioning was cut off by a prompt objection from defense counsel and by the ruling of the trial court.

The defendant also complains of another comment made by the prosecutor while discussing circumstances of mitigation. In discussing the defendant, the prosecutor stated: "Essentially the defendant says my daddy beat my brothers so I killed two women. Nowhere in this long record has the defendant said himself that this was—that his father—"

Defense counsel again objected and a conference was held at the bench. Defense counsel argued that the comment was directed toward the defendant's decision not to testify. When asked if he had any comment, the prosecutor stated: "Yes, Your Honor, that is not a comment on the defendant not testifying. That is a comment on the fact that he has been through nine evaluations and another trial and has never said a word about not causing that." The trial court ultimately stated: "I'm going to overrule the objection but don't reference that."

It is not entirely clear what the prosecutor's comment actually concerned. Apparently, the prosecutor was getting ready to state that the defendant had not testified anywhere that his father beat either him or his brothers. Depending on the context, this could have been an improper comment on the defendant's right to re-

main silent. Once again, prompt action by the trial court prevented any prosecutorial misconduct from occurring.

## B. Comments Regarding Mitigating Circumstances

Kleypas contends that the prosecutor repeatedly instructed the jury to ignore mitigating evidence and also instructed the jury that mitigating evidence must excuse or justify the crime. Kleypas argues that these comments violated the Eighth and Fourteenth Amendments to the United States Constitution, as well as §§ 1, 2, 9, and 18 of the Kansas Constitution Bill of Rights.

The resolution of this issue requires a detailed analysis of the requirements of the Eighth and Fourteenth Amendments regarding mitigating circumstances. In *Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978), the United States Supreme Court held:

"[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

The Court, therefore, struck down an Ohio statute that limited the mitigating circumstances a judge could consider. 438 U.S. at 608-09.

*Lockett* was followed by *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982). In *Eddings*, the Court overturned a death sentence where the sentencing court declined to consider certain evidence in mitigation because it did not excuse the crime. The Court reasoned:

"Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." 455 U.S. at 113-15.

Thus, in *Eddings*, the Court held that a sentencer must consider all relevant mitigating evidence, whether or not the evidence "suggest[s] an absence for the responsibility of the crime of murder." 455 U.S. at 116.

The *Eddings* rationale was employed by the Court in *Skipper v. South Carolina*, 476 U.S. 1, 90 L. Ed. 2d 1, 106 S. Ct. 1669 (1986), wherein the Court overturned a death sentence because the trial court refused to allow the defendant to present testimony to the jury regarding his character and probable future conduct if sentenced to life in prison. The Court stated: "Although it is true that any such inferences would not relate specifically to petitioner's culpability for the crime he committed, [citation omitted] there is no question but that such inferences would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.' [Citation omitted.]" 476 U.S. at 4-5.

*Lockett, Eddings,* and *Skipper* make it clear that the sentencer must be allowed to consider all relevant mitigating evidence and that such evidence need not excuse or justify the crime or in fact relate to the defendant's culpability as long as it serves as a basis for a sentence less than death. The defendant's argument is that the prosecutor improperly argued to the jury that it should not consider certain mitigating circumstances because they did not excuse or justify the crime or were not mitigating circumstances at all.

Kleypas contends that it was improper for the prosecutor to argue that certain claimed mitigating circumstances were in fact not mitigating. According to Kleypas, this prevented the jury from considering or giving effect to the evidence in support of the circumstances. Clearly, the prosecutor made several statements in which he urged the jury to find that several of Kleypas' claimed mitigating circumstances were not in fact mitigating. However, while Kleypas seems to believe that these comments in some way prevented the jury from considering these circumstances as mitigating, the prosecutor's argument in this regard was not improper. The jury is charged with determining what constitutes mitigating circumstances. See K.S.A. 21-4624(e); PIK Crim. 3d 56.00-D. Therefore,

it is proper for a prosecutor to argue that certain circumstances not be considered as mitigating circumstances.

However, it is improper for a prosecutor to argue that certain circumstances should not be considered as mitigating circumstances because they do not excuse or justify the crime. "Mitigating circumstances are those which in fairness may be considered as extenuating or reducing the degree of moral culpability or blame or which justify a sentence of less than death, even though they do not justify or excuse the offense." PIK Crim. 3d 56.00-D. See *Skipper*, 476 U.S. at 4-5. A prosecutor who argues that mitigating circumstances must excuse or justify the crime improperly states the law.

During closing argument, the prosecutor made several references to the fact that Kleypas' claimed mitigating circumstances did not excuse or justify the crime. The prosecutor first stated that although the defendant claimed brain damage as a mitigator, the defendant's expert "couldn't say" that the brain damage caused either C.W.'s murder or the previous murder of Bessie Lawrence. Defense counsel objected but was overruled. Next, the prosecutor noted Kleypas' claim of alcohol use as a mitigator and stated: "A pint bottle of Canadian Mist did not cause this murder." Defense counsel did not object to this statement. Regarding the claimed mitigator that Kleypas did well in prison, the prosecutor stated: "Does the fact that he did well in prison make the murder of [C.W.] less severe?" No objection was lodged to this statement. The prosecutor then referenced Kleypas' claim that his paraphilia was a mitigator, stating: "The defendant's paraphilia did not kill [C.W.]." There was no objection to this comment. The prosecutor went on to ask the jury that even if Kleypas had schizophrenia which he claimed to be a mitigating circumstance, "Does that lessen what he did?" Defense counsel did not object to this statement.

These statements by the prosecutor were clearly improper and reflect a complete lack of understanding of the concept of mitigating circumstances. By these statements, the prosecutor argued to the jury that mitigating evidence should not be considered unless it excused or justified the crime; this was an erroneous standard of law. The State offers little justification for these comments, choos-

ing to argue instead that this court should not address many of them because no objection was lodged, citing *State v. Baker*, 249 Kan. 431, 446, 819 P.2d 1173 (1991), for the well known standard that reversible error cannot be predicated upon a claim where no contemporaneous objection was lodged. This argument ignores our holding in *State v. McCorkendale*, 267 Kan. 263, 278, 979 P.2d 1239 (1999), that if the prosecutor's statements rise to the level of violating a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection. The State generally argues that the prosecutor's statements were taken "out of context," a claim that does very little to explain the remarks.

A related issue is Kleypas' contention that the prosecutor also made comments telling the jury to disregard mitigating evidence because it was not causally related to the crime. Regarding Kleypas' claimed mitigating circumstance of damaged brain due to cocaine use, the prosecutor stated to the jury that because Kleypas did not use cocaine on the night of the murder, "Cocaine just didn't enter into the picture. The cocaine use was all a smoke screen, all a distraction to divert your attention away." Defense counsel immediately objected, but the trial court overruled the objection, whereupon the prosecutor stated: "That is a distraction to divert your attention away from the defendant's intentional and premeditated actions." Similarly, regarding Kleypas' schizophrenia, the prosecutor stated: "Ladies and gentlemen, the crux of this issue about schizophrenia is it simply doesn't matter and why, it is because the murder of [C.W.] was intentional and was planned and it was organized. Schizophrenia and severe emotional distress just don't enter into the picture of this murder." There was no objection to this statement.

Once again, the prosecutor's comments reflect a complete misunderstanding about the nature of mitigating circumstances. While neither Kleypas' brain damage nor schizophrenia may have caused the murder, both conditions are relevant in the determination of whether either should reduce the moral culpability or blame assigned to Kleypas. In a general sense, they are mitigating because " 'they might serve 'as a basis for a sentence less than death.' " See

*Skipper*, 476 U.S. at 4-5. By his comments, the prosecutor told the jury not to consider them as mitigators in direct contravention of *Skipper* and *Eddings*, see 455 U.S. at 113-14. This constituted prosecutorial misconduct.

## C. Comments Regarding Expert Witnesses

Kleypas argues that the prosecutor committed additional misconduct in closing argument by mischaracterizing the evidence in an attempt to impeach Kleypas' experts and by improperly expressing his personal opinion with regard to the credibility of those experts.

The first instance complained of occurred during the prosecutor's discussion of the testimony of Dr. Othmer and Dr. Park, two of Kleypas' expert witnesses. The prosecutor stated:

"You know, sometimes we can tell something about a person's bias by a comment they let slip and remember Dr. Othmer on the stand and how did he describe the brutal murder of [C.W.]. I made a note of it because I found it so shocking. He said he intruded and the death occurred. He intruded and the death occurred. Well, I guess it did and Mr. Park he said on the outside the defendant did some bad things to some people. The murder of Bessie [Lawrence] and the murder of [C.W.] are passed off as the defendant doing some bad things to some people. I would submit that people who can describe what happened to [C.W.] in those terms simply aren't worthy of your belief."

Defense counsel immediately objected but was overruled based on the prosecutor's assertion that the comment was "on what the evidence shows about the defendant."

The prosecutor's comment told the jury that in the prosecutor's opinion, it should not believe the defense experts because those experts described the murders in sanitized terms. A prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. See Kansas Rules of Professional Conduct (KRPC) 3.4(e) (2001 Kan. Ct. R. Annot. 406), and 1 American Bar Association (ABA) Standards for Criminal Justice, Prosecution Function and Defense Function, Standard 3-5.8 (3d ed. 1993). "The point of not allowing a prosecutor to comment on the credibility of a witness is that expressions of personal opinion by the prose-

cutor are a form of unsworn, unchecked testimony, not commentary on the evidence of the case." *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000). The prosecutor's remark injected his personal opinion as to the credibility of the witnesses and was clearly improper.

The prosecutor also made other comments relating to Kleypas' experts. Regarding Dr. Preston, the prosecutor stated: "Dr. Preston admits to you that he cannot tell one thing about the behavior of the defendant on the night of the murder by looking at his brain." Regarding Dr. Lipman, the prosecutor stated:

"He was the one that was told by the defense not to bring his notes to the stand and what did those notes have in them?

. . . .

"They had a notation about a conversation that the Doctor had with the defendant what did the defendant tell the Doctor, that he had not been using cocaine on the night he murdered [C.W.]."

Defense counsel objected to this comment as a mischaracterization but was overruled. The prosecutor then referenced Dr. Park, noting:

"Mr. Park went through—he's the expert from California and he went through the prison record for the defense. He said the defendant has an excellent record but wasn't going to tell you about the part of the file that says the defendant victimizes weaker inmates and he wasn't going to tell you about the part of the file that says the defendant . . . 'was an agitator in prison about the races.'

. . . .

". . . I was the one that had to bring that out in the questioning of the defendant's own expert."

Again, defense counsel's numerous objections were overruled. Finally, with regard to Dr. Gentry, the prosecutor stated:

"It is curious that one psychologist, Dr. Gentry, could have given a test that had a validity scale built into it. It is the MMPI test and the validity scales remember indicate—are an indication of whether the person who takes the test is lying or not. And isn't it interesting that this is the one test that Dr. Gentry didn't give and what was Dr. Gentry's excuse for not giving this test? He said that a schizophrenic would . . . never sit through the test. Remember he said—he said well, he wouldn't sit through it, he would be climbing the walls but, ladies and gentlemen, you have seen the defendant sitting here for a month and you haven't seen him climbing the walls and, in fact, his behavior has been so good here that the defense now claims it is a mitigator. And look at his school records. He's a nursing

student, he's on the honor roll. He took tests in nursing school and he didn't climb the walls. Are they really trying to tell us that he couldn;t take the MMPI because of a schizophrenia or was it because they were afraid of the validity scales."

Once again, defense counsel's objections were overruled.

Kleypas contends that the above statements were improper because they mischaracterized the evidence in an attempt to insinuate that the defense experts were trying to hide information from the jury. He argues that this attempted impeachment of his experts constituted misconduct.

A prosecutor is given wide latitude in language and in manner or presentation of closing argument as long as it is consistent with the evidence adduced. Reasonable inferences may be drawn from the evidence and the prosecutor is given wide latitude in discussing the case. *State v. Spresser*, 257 Kan. 664, 669, 896 P.2d 1005 (1995). However, it is improper to state facts in closing argument that are not in evidence or contrary to the evidence. See *State v. Heath*, 264 Kan. 557, 583, 957 P.2d 449 (1998); *State v. White*, 263 Kan. 283, 302, 950 P.2d 1316 (1997). See also *People v. Hill*, 17 Cal. 4th 800, 823, 72 Cal. Rptr. 2d 656, 952 P.2d 673 (1998) (stating that although prosecutors have wide latitude to draw inferences from the evidence presented at trial, mischaracterizing the evidence is misconduct).

With regard to Dr. Preston's testimony, the prosecutor's statement: "Dr. Preston admits to you that he cannot tell one thing about the behavior of the defendant on the night of the murder by looking at his brain," while not entirely accurate, was a reasonable inference from the testimony. Dr. Preston testified that he was unable to say that because of abnormalities in the flow of Kleypas' brain, Kleypas would act in a certain way. Dr. Preston also testified that there was no way to tell from the scan of the brain what behavioral affect Kleypas' brain injury would cause. Dr. Preston did testify the damage to Kleypas was of the type that might manifest itself in a syndrome related to sexual violence. On the whole, however, the prosecutor's statement was factually correct and did not mischaracterize the testimony.

With regard to the testimony of Dr. Lipman, the prosecutor's comments clearly insinuated that the defense was trying to keep

information from the jury, first by noting that Dr. Lipman was asked not to bring his notes to court, and then by stating that the notes had a notation in them to the effect that Kleypas did not use cocaine on the date in question. The first insinuation is one which the prosecutor should be allowed to draw, as Dr. Lipman confirmed that he was specifically asked not to bring the notes with him to the trial.

The second insinuation is more troubling. On cross-examination, Dr. Lipman was asked whether Kleypas told him he was using cocaine on the night of the murder. Dr. Lipman stated that Kleypas had denied using cocaine that night. Contrary to the prosecutor's closing statement, it is not known whether that information was in Dr. Lipman's notes. There was absolutely no evidence that the defense attempted to hide the notes in order to prevent this fact from reaching the jury. In fact, the prosecutor's questioning indicated that the State was aware of the fact that Kleypas had told Dr. Lipman that he was not using cocaine the night of the murder. To suggest that Dr. Lipman was attempting to hide the information was unwarranted by the evidence and outside the permissible bounds of inference.

Dr. Park testified regarding Kleypas' prison record that Kleypas made an excellent adjustment to life in prison with few problems. On cross-examination, the prosecutor highlighted a correctional adjustment checklist in which the phrases "victimizes weaker inmates" and "agitator about race" were contained. The prosecutor argued during closing that Dr. Park was not going to tell the jury about the checklist implying that Dr. Park was hiding information. While such an inference is questionable, it is within the wide latitude given to a prosecutor in that it is at least factually accurate and consistent with the evidence.

The prosecutor's comments with regard to Dr. Gentry's reason for not giving Kleypas an MMPI test are more troubling. During defense counsel's redirect, Dr. Gentry was asked why an MMPI test was not normally given to a person suspected of being a paranoid schizophrenic. He answered:

"There is an old graduate school joke that goes something like what is the profile of a paranoid schizophrenic on the MMPI and the answer is got you, because a

paranoid schizophrenic wouldn't sit through an MMPI and if he or she did, it would be so distorted that it would be impossible to interpret."

Dr. Gentry then stated that at the time he made the decision on whether to administer the MMPI, he had enough diagnostic evidence from other testing that he had already made his diagnosis.

From those brief comments, the prosecutor stated: "He said a schizophrenic would never sit through the test. Remember he said—he said well, he wouldn't sit through it, he would be climbing the walls . . . ." The prosecutor then told the jury that it had the opportunity to observe Kleypas in the courtroom and to look at Kleypas' record and that Kleypas never showed signs of "climbing the walls." He then stated: "Are they really trying to tell us that he couldn't take the MMPI because of a schizophrenia or was it because they were afraid of the validity scales?"

Certainly, it is within the bounds of the prosecutor's latitude to question why certain tests were or were not given and even to ask the jury to draw an inference from that test provided that the inference is a reasonable one. It would have been within the bounds to the prosecutor's latitude to suggest to the jury that Kleypas was not given the MMPI test because Dr. Gentry was afraid of the results due to the MMPI's built-in validity scale. However, the prosecutor was not free to mischaracterize and exaggerate Dr. Gentry's testimony to lend credence to that inference. Dr. Gentry testified that he does not normally give the MMPI test to persons suspected of being paranoid schizophrenics because they generally will not sit through the test and the test would give distorted results and that in Kleypas' case the test was unnecessary because he already had enough information to form a diagnosis. Dr. Gentry did not say that Kleypas would be "climbing the walls" if he administered the MMPI test. The prosecutor's closing argument put those words in Dr. Gentry's mouth and then used that standard as a comparison for Kleypas' conduct to support his argument to the jury that Kleypas did not have schizophrenia. This argument mischaracterized the evidence and was improper.

D. Comments Regarding Denigration of Mercy and Referencing Victim's Thoughts

Kleypas contends that certain statements made by the prosecutor during closing argument concerning the crime itself consti-

tuted prosecutorial misconduct. He claims the prosecutor's comments denigrated the concept of mercy by urging the jury to show the same mercy to Kleypas that he showed to the victim. Kleypas further claims that the prosecutor prejudiced his rights by referring to an "imaginary script" of the crime which contained facts not in evidence. Finally, Kleypas contends that the prosecutor committed misconduct in urging the jury to focus on issues irrelevant to the question of whether the death penalty should be imposed.

In his argument concerning statements which denigrated the concept of mercy, Kleypas complains of certain statements made by the prosecutor regarding Kleypas' lack of mercy to the victim. In describing the victim's injuries, the prosecutor stated: "Look at these pictures. Do you see any leniency in these pictures. Do you see any mercy at all in these pictures?" Kleypas contends that this statement improperly suggested to the jurors that they should not give Kleypas mercy because he had not shown mercy to the victim.

There is some dispute over whether it is improper for a prosecutor to argue to a sentencing jury that they should show a defendant the same mercy that the defendant gave to the victim. Some courts have held that this type of argument is an improper appeal to the sympathy of the jury calculated to influence the sentence. See *Lawson v. Dixon*, 3 F.3d 743, 755 (4th Cir. 1993); *Richardson v. State*, 604 So. 2d 1107, 1109 (Fla. 1992); *Crowe v. State*, 265 Ga. 582, 592-93, 458 S.E.2d 799 (1995); *Le v. State*, 947 P.2d 535, 554-55 (Okla. Crim. App. 1997); *State v. Bigbee*, 885 S.W.2d 797, 809-12 (Tenn. 1994). Other courts, however, have found such argument proper under the latitude granted to the prosecutor to argue about the effects of the crime as long as the prosecutor does not suggest to the jury that it is prohibited from showing mercy to the defendant because he or she gave none to the victims. See *People v. Ochoa*, 19 Cal. 4th 353, 464-66, 79 Cal. Rptr. 2d 408, 966 P.2d 442 (1998); *State v. Summit*, 454 So. 2d 1100, 1108-09 (La. 1984); *Com. v. Hackett*, 558 Pa. 78, 93-94, 735 A.2d 688 (1999).

In a capital case, it is important for the jury to be able to evaluate whether a defendant is deserving of mercy. As part of the same concept, however, it is clearly proper for a prosecutor to argue

against the granting of mercy. We hold that it is proper for the prosecutor to argue that the defendant is not deserving of the jury's mercy because of the defendant's actions, as long as the prosecutor does not improperly state the law by arguing to the jury that it is prohibited from granting mercy to the defendant because the defendant showed none to the victim.

The statement in this case, while not expressly imploring the jury to show the same mercy to Kleypas that he showed to the victim, implicitly suggested this concept. However, it did not suggest to the jury that the jury could not find mercy. Therefore, in line with *Ochoa, Summitt*, and *Hackett*, we conclude that the comments were not improper and were within the latitude afforded the prosecution.

Kleypas raises a similar issue pointing out that the prosecutor further suggested that the same mercy as given to the victim be given to Kleypas. In arguing to the jury, the prosecutor stated: "The defense attorney will plead with you to let the defendant be sentenced to prison for life but think about this. When the defendant was over at [C.W.'s] house on March 30 of 1996 and he was over there—" At this point, Kleypas objected, on the grounds that the prosecutor was about to ask the jury to show the same kind of mercy that Kleypas had shown C.W. The court then ordered the prosecutor not to make that argument.

As discussed above, it is questionable whether such an argument, even if made by the prosecutor, would have been improper. The prompt action of defense counsel in objecting and the trial court in prohibiting the argument kept any error from occurring. The prosecutor's statement, up to the objection, did not constitute error.

The next area argued by Kleypas regarding his contention that the prosecutor denigrated the concept of mercy has to do with the prosecutor creating an "imaginary script" of what happened during the incident and what the victim's thoughts might have been. Kleypas argues that in creating this script the prosecutor introduced facts not in evidence and attempted to unduly create, arouse, and inflame the sympathy of the jury.

The four statements of which Kleypas complains were made at different points during the prosecutor's argument. Referring to a picture of the victim, the prosecutor stated: "When someone's eyes are closed as [C.W.]'s are in this picture, they look almost peaceful. But you can bet that when he was beating her, her eyes weren't closed and it was anything but peaceful." There was no objection to this statement and the statement does not constitute misconduct. A prosecutor is allowed to argue reasonable inferences from the evidence and it is reasonable to infer from the injuries described that the beating suffered by the victim was severe and not "peaceful," which was the import of the prosecutor's statement.

There is a problem, however, with the next group of statements complained of by Kleypas. In describing the victim's injuries, the prosecutor stated that when the victim was tied to a chair, she struggled to get away and bruised her own leg in the process. An objection that there was no evidence regarding how the bruise occurred was overruled. In reference to a photograph of the victim, the prosecutor stated: "What we don't see in this picture are any tears. I'm sure there must have been tears, tears of fear, tears of pain, and tears for her dreams that would go unfulfilled." Defense counsel objected and the trial court overruled after being assured by the prosecutor that he would not go further into the matter. Later, the prosecutor stated:

"Also talk about the mental anguish that [C.W.] must have suffered, the uncertainty as to her fate. He burst in knocking her back against the couch, forced her at knife point down that long hall, more than 40 feet down that long hall. Think of what she must have thought when he burst through that door. Then think of the anguish she must have felt when she saw that knife. There is a song that came out several years ago about men aboard a sinking ship, a storm had struck and the ship was going down and the men knew they were going to die and the song writer said the waves turned the minutes to hours. Well, think of how long that time must have seemed to [C.W.]. He was there for one and a half to several hours. And that must have seemed a lifetime to [C.W.] and indeed it was her lifetime. It was the rest of her life. What did she think when he burst in the door? Sure at some point she thought this can't be happening to me, this isn't real, it can't be happening. And later as he was attempting to rape her she must have thought this is the worst I can survive. I just have to get through this. While he was making her orally stimulate him, she must have thought just endure this,

jest [sic] get through it but at some point she realized I'm going to die. This guy is going to kill me.

"Did she have even one moment to think about her parents. Did she have a moment to think of her brother and sister—"

Defense counsel objected at this point but the objection was overruled.

Prosecutorial comments referring to what the victim was thinking are improper because they ask the jury to speculate on facts not in evidence. See *State v. Combs*, 62 Ohio St. 3d 278, 282-83, 581 N.E.2d 1071 (1991). It is improper for the prosecutor to create an "imaginary script" in order to create and arouse the prejudice and passion of the sentencing jury. See *Urbin v. State*, 714 So. 2d 411, 421 (Fla. 1998) (error for prosecutor to put imaginary words in victim's mouth); *McCarty v. State*, 765 P.2d 1215, 1220 (Okla. Crim. App. 1988) (error for prosecutor to suggest that the defendant was grinning and laughing when he murdered the victim).

The State argues that allowing such comments during the penalty phase of a trial is not improper, citing *People v. Haskett*, 30 Cal. 3d 841, 180 Cal. Rptr. 640, 640 P.2d 776 (1982). In *Haskett*, the California Supreme Court ruled that it was not necessarily improper for the prosecution to put itself in the shoes of the victim and imagine suffering the acts inflicted on her. 30 Cal. 3d at 863-64. In so reaching this conclusion, the court stated:

"Although appeals to the sympathy or passions of the jury are inappropriate at the guilt phase [citation omitted], at the penalty phase the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death. It is not only appropriate, but necessary, that the jury weigh the sympathetic elements of the defendant's background against those that may offend the conscience. [Citations omitted.] In this process, one of the most significant considerations is the nature of the underlying crime. Hence assessment of the offense from the victim's viewpoint would appear germane to the task of sentencing." 30 Cal. 3d at 863-64.

Accordingly, the California Supreme Court directed the trial courts to strike a careful balance between the probative and prejudicial and allow evidence and argument on emotional though relevant subjects but deny evidence or argument that would divert the jury from its proper role of soberly and rationally determining whether

the defendant should be put to death. 30 Cal. 3d at 864. The court concluded that the prosecutor's comment was relevant and "insufficiently inflammatory" to justify reversal. 30 Cal. 3d at 864.

Prosecutors are allowed to introduce relevant evidence to show the victim's mental anguish and further to make arguments and inferences from the evidence that the victim suffered such mental anguish, where relevant. However, prosecutors cross the line when they make up an imaginary script that purports to tell the jury what the victim was feeling, where there is no evidence to support such a script. At that point, the imaginary script becomes evidence that was not admitted during trial.

The prosecutor was correctly allowed to describe the violence of the murder and everything that took place in conjunction with it, as well as argue to the jury that the victim could have suffered great mental anguish. However, when the prosecutor began speculating as to the victim's thoughts and essentially making up an eternal dialogue for the victim, he crossed the line into a blatant appeal to the emotions of the jury. This constituted misconduct, as did his speculation to the jury that the victim bruised her legs while trying to escape where no evidence actually existed as to the cause of the bruise.

The final argument made by Kleypas with regard to the prosecution's denigration of mercy is that the prosecutor repeatedly showed the picture of the victim to the jury while asking if it saw tears in her eyes. Kleypas argues that this request was obviously not based on the evidence as no dead victim can cry and, instead, was a naked appeal to the sympathy and prejudice of the jury.

Kleypas' argument misstates what occurred. The prosecutor did not ask the jury whether it saw tears in the picture, rather he asked the jury if it saw leniency or mercy in the injuries depicted by the picture. Later, the prosecutor told the jury that although there were obviously no tears in the picture there must have been tears at the time. As noted above, this speculation regarding the tears was improper not because the prosecutor necessarily speculated that there were tears but because the prosecutor then purported to know the victim's thoughts. However, there was no misconduct in the prosecutor's use of the picture. During closing argument,

we have allowed prosecutors to refer to and use photographs of victims as long as the purpose is not to unduly inflame the passions of the jury and prejudice it towards the defendant. See *State v. Walker*, 252 Kan. 279, 287-88, 845 P.2d 1 (1993). The prosecutor's use of the photograph in this case to show the nature of the injuries inflicted was relevant to support the aggravating circumstance that the murder was committed in an especially heinous, atrocious and cruel manner.

## E. The Characterization of Kleypas as a Race Agitator

Kleypas argues that the prosecutor, in closing argument, improperly told the jury that Kleypas was a "race agitator" who preyed on weaker inmates. Kleypas argues that this characterization was not based on the evidence and was unfair.

This argument is without merit. The prosecutor was referring to his cross-examination of defense expert Dr. Park regarding Kleypas' prison record. During the cross-examination, the prosecutor had highlighted a correctional adjustment checklist that contained the phrases "victimizes weaker inmates" and "agitator about race." The prosecutor then mentioned this checklist in closing argument to rebut Kleypas' alleged mitigating circumstance that he adjusted well to prison life.

Kleypas attempts to characterize the argument as an appeal to racism; more specifically, as an appeal raising the specter that Kleypas would start "violent race wars" if sentenced to prison. It was not. Rather, it was a proper use of the evidence of Kleypas' conduct to rebut Kleypas' assertion that he did well in prison society.

## F. Alleged Suggestions that Kleypas Could be Released to Kill Again

Kleypas argues that the prosecutor improperly warned the jury that Kleypas could be released to kill again, thus attempting to frighten and intimidate the jury into imposing a death sentence as well as attempting to introduce a nonstatutory aggravating circumstance of future dangerousness. Kleypas also contends that by using the phrase "God help us," the prosecutor suggested to the jury that God would punish it for not imposing the death penalty.

It is clearly improper to make references to a defendant's potential for future dangerousness. See *State v. Gibbons*, 256 Kan. 951, 963, 889 P.2d 772 (1995). It is also clearly improper to attempt to introduce a nonstatutory aggravating circumstance. See K.S.A. 21-4625 (limiting aggravating circumstances to those listed). It is further improper to suggest to the jury that God would punish it for its actions in not sentencing the defendant to death. However, the referenced argument by the prosecutor did none of those things. Instead, the prosecutor argued:

"Ladies and gentlemen, the death of Bessie Lawrence in 1977 was a senseless, brutal and tragic murder and the defendant was convicted of second degree murder in 1977 for the death of Bessie Lawrence and he served about fifteen years in prison and he got out and within four years he did it again. God help us, within four years he murdered again."

These statements by the prosecutor were made during the discussion of the aggravating circumstance that Kleypas had previously murdered another and relate to that circumstance rather than to the future dangerousness of Kleypas. Kleypas' argument mischaracterizes the context of the remarks and is without merit.

## G. Alleged Comments Minimizing the Jury's Responsibility

Kleypas contends that the prosecutor committed misconduct by arguing that Kleypas himself by his actions had already made the choice for the jury regarding whether to impose the death penalty. Kleypas argues that these comments improperly minimized the jury's sense of responsibility for the decision.

Kleypas complains of the following comments made at the outset of the prosecution's closing argument:

"Choice, this part of the trial is about choices. Choices that the defendant has made and choices that the defendant has not. And now a choice that you must make. Now, we look at the crime the defendant committed and not necessarily the method he used but the manner in which he committed that crime. And we look at the reason that he committed that crime, to avoid arrest or prosecution. And we look at the facts surrounding the crime and we look at the fact surrounding the defendant and what he has done in his past. *And what we find, ladies and gentlemen, what we discover is that the defendant has made the choice for us.*" (Emphasis added.)

In summing up his closing argument, the prosecutor stated that Kleypas had already been faced with the prospect of spending his life in prison because the victim, C.W., could identify him but he made the decision to kill the victim to try to make good his escape. Therefore, the prosecutor stated: "[H]e had that opportunity to spend the rest of his life in prison. But he chose to murder instead. He has made this choice about life in prison." Finally, the prosecutor stated:

"You may be told that imposing the death penalty is one of the hardest things you will ever do, that may be true. But that is the duty that you are sworn to undertake to make that decision. The defendant has made choices and were it not for the choices he has made, today he could be a college graduate working in the field of nursing but he did make choices and now he must answer for those choices."

There were no objections to the above statements.

In *Caldwell v. Mississippi*, 472 U.S. 320, 328-29, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985), the United States Supreme Court held that under the Eighth Amendment, "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." The prosecutor in *Caldwell* had, in closing argument, informed the jury that its decision was not final and that the defendant would receive an appeal. The Court noted that such an argument presents an intolerable danger of bias towards the death penalty and encourages the jury to vote for death on the assumption that any error in its decision would be corrected on appeal. 472 U.S. at 330-31. Further, the Court found that the prosecutor's comments specifically violated the Eighth Amendment and, thus, were not subject to the general harmless error rule but rather the rule for constitutional error. 472 U.S. at 339-41.

*Caldwell* was later narrowly construed by the United States Supreme Court. See *Romano v. Oklahoma*, 512 U.S. 1, 9, 129 L. Ed. 2d 1, 114 S. Ct. 2004 (1994). In reaffirming the basic rule in *Caldwell*, the Court in *Romano* stated that " '[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local

law.' " 512 U.S. at 9 (quoting *Dugger v. Adams*, 489 U.S. 401, 407, 103 L. Ed. 2d 435, 109 S. Ct. 1211 [1989]).

The prosecutor in the case at hand did not attempt to improperly describe the role assigned to the jury. He did not argue that some other party such as the trial judge or an appellate court bore the ultimate responsibility for Kleypas' fate. Rather, he argued that Kleypas himself bore responsibility for his fate. Such an argument is appropriate. See *Coe v. Bell*, 161 F.3d 320, 350 (6th Cir. 1998); *People v. Jackson*, 13 Cal. 4th 1164, 1238, 56 Cal. Rptr. 2d 49, 920 P.2d 1254 (1996); *People v. Burgess*, 176 Ill. 2d 289, 318-19, 680 N.E.2d 357 (1997); *State v. Scales*, 655 So. 2d 1326, 1334-35 (La. 1995); *State v. Harris*, 870 S.W.2d 798, 807-08 (Mo. 1994); *State v. McLaughlin*, 341 N.C. 426, 443, 462 S.E.2d 1 (1995); *State v. Brimmer*, 876 S.W.2d 75, 85-86 (Tenn. 1994).

The one case relied upon by Kleypas, *Buttrum v. Black*, 721 F. Supp. 1268 (N.D. Ga. 1989), *aff'd* 908 F.2d 695 (11th Cir. 1990), is distinguishable. In *Buttrum*, the court found improper comments by the prosecutor that the defendant had "signed her own death warrant" and alone was responsible for her death. The prosecutor characterized the jury as "merely one cog in the criminal process." 721 F. Supp. at 1316. Thus, in *Buttrum*, the prosecutor did improperly minimize the role of the jury in the process, referring to the jury as only one cog in the process. That is different than the argument in the case at hand which suggested to the jury that Kleypas should be held responsible for his own actions. The prosecutor's comments were not improper.

## H. Comments Urging the Jury to Impose the Death Sentence for the Murder of Bessie Lawrence

Kleypas contends that the prosecutor committed misconduct through his comments regarding the prior murder of Bessie Lawrence. He argues that the prosecutor's comments improperly urged the jury to impose the death penalty for the murder of Lawrence as well as the murder of C.W.

Regarding Kleypas' alleged mitigating circumstances, the prosecutor stated: "And what are circumstances that the defendant claims mitigate against the death of [C.W.] and the death of Bessie

Lawrence?" The prosecutor asked the jury regarding Kleypas' mental illness: "Could that possibly outweigh what he did to [C.W.], the manner in which he did it and could it possibly outweigh the death earlier of Bessie Lawrence." Defense counsel's objection to this latter comment was overruled.

Kleypas cites *State v. Bigbee*, 885 S.W.2d 797 (Tenn. 1994), for his proposition that the prosecutor committed misconduct. In *Bigbee*, the defendant had previously been convicted of felony murder in Montgomery County and was facing the death sentence for murder in Sumner County. During closing argument in the penalty phase, the prosecutor argued that the death penalty would be an appropriate way in which to punish the defendant not only for the Sumner County killing but also for the Montgomery County killing. In finding this to be improper, the *Bigbee* court stated:

"Obviously, the State may argue the existence of the prior conviction as an aggravating circumstance supports imposition of the death penalty; however, in this case, the State's argument went beyond that limit and strongly implied, without flatly stating, that the defendant should be sentenced to death as additional punishment for the previous conviction. The defendant had already been tried, convicted and separately sentenced for that crime. Argument encouraging this jury to impose an additional punishment was improper." 885 S.W.2d at 812.

The *Bigbee* court noted that this error, standing alone, might have been harmless but combined with other errors it mandated reversal of the defendant's sentence. 885 S.W.2d at 812.

The situation in *Bigbee* was somewhat different from our case. Tennessee has determined that it is not appropriate to admit evidence regarding specific facts of a prior crime where the conviction on its face satisfies the aggravating circumstance that the prior crime is relevant to prove. See *State v. Bates*, 804 S.W.2d 868, 879-80 (Tenn. 1991). Thus, any reference to the prior crime other than to state that it occurred was simply not relevant. In contrast, as previously noted, Kansas allows some evidence of the prior crime to be introduced.

More importantly, the prosecutor's statement in the case at hand, unlike that in *Bigbee*, does not argue that Kleypas should be punished for his prior crime but instead argues that the mitigating circumstances put forth by Kleypas should not outweigh the death

of Bessie Lawrence. The fact that Kleypas was previously convicted of a felony in which Kleypas inflicted death on another is an aggravating circumstance. K.S.A. 21-4625(1). Thus, the death of Lawrence is an aggravating circumstance, and it was entirely proper for the prosecutor to argue the relative weight of that aggravating circumstance as compared to Kleypas' mitigating circumstances. The prosecutor did not commit misconduct in this instance.

### I. Alleged Misstatement of the Law Regarding the Aggravating Circumstance of Whether Kleypas Committed the Crime to Avoid or Prevent a Lawful Arrest or Prosecution

Kleypas contends that the prosecutor committed misconduct by misstating the law regarding the aggravating circumstance of whether Kleypas committed the crime to avoid or prevent a lawful arrest or prosecution. Kleypas argues that the prosecutor improperly argued to the jury that certain evidence which occurred after the murder could be used to show that Kleypas committed the murder in order to avoid arrest and prosecution.

In arguing that the evidence showed Kleypas committed the murder in order to avoid arrest and prosecution, the prosecutor highlighted evidence that Kleypas knew he would be prosecuted for the rape and that the victim could identify him. The prosecutor also noted that Kleypas started to tie the victim up but then thought better of it and killed the victim instead. Finally, the prosecutor stated:

"And the evidence of this is clear not only by the defendant's own actions and words and not only by what he did to [C.W.] that night but what he did afterwards. He loaded up his truck, taking evidence of the murder with him and fled town. He took off, he ran and he killed [C.W.] so that he could avoid arrest. There is no other conclusion that can be reached from this evidence."

Evidence that Kleypas loaded up his truck and left town after killing the victim, while definite proof that Kleypas was trying to avoid arrest, does not by itself prove that he in fact killed the victim in order to avoid or prevent arrest for the prior crime of rape. This case is similar to a hard 40 case decided by this court in *State v. Reed*, 256 Kan. 547, 886 P.2d 854 (1994). Reed attempted to rape

a woman and when the attempt failed, killed her and hid the body. The prosecutor in *Reed* argued that this established the aggravating circumstance of killing to avoid arrest. Reed claimed that this argument constituted prosecutorial misconduct. However, this court disagreed and noted:

"[T]he prosecutor in the above remarks did not identify the crime the defendant committed. While evidence may relate to the defendant's efforts to conceal his murder of the victim, the same circumstantial evidence also relates to his concealment of kidnapping or attempted rape of the victim and directly bears upon the aggravating circumstance of avoiding or preventing a lawful arrest or prosecution." 256 Kan. at 566.

The same is true of the case at hand. While evidence that Kleypas left town after the murder does not, standing alone, show that he committed the murder to avoid arrest for rape, it is relevant to this fact. It shows that Kleypas attempted to avoid arrest for not only the murder but the rape and, thus raises the inference that Kleypas committed the murder as part of a plan, along with flight, to avoid arrest for the rape.

Kleypas argues that our analysis in *Reed* should not apply in this case. First, he contends that the activity in *Reed* happened before the murder. This is patently incorrect. Reed's actions in hiding the body occurred postmurder, as did Kleypas' flight in this case. Second, Kleypas argues that our analysis in *Reed* should not apply because capital cases require a higher standard. Under any standard, however, the evidence is relevant and, thus, fair game for comment by the prosecution. Given these circumstances, the prosecutor's comment did not constitute misconduct.

### J. Alleged Misstatements of the Law Regarding Evidence to Support the Heinous, Atrocious, or Cruel Manner Aggravating Circumstance

Kleypas argues that the prosecutor also committed misconduct in his argument to the jury by misstating the law regarding what evidence could be used to support the heinous, atrocious, or cruel manner aggravating circumstance. Kleypas contends that the prosecutor improperly told the jury that it could consider the circumstances of the rape in determining whether the murder was com-

mitted in a heinous, atrocious, and cruel manner in order to satisfy the aggravating circumstance. According to Kleypas, this was a misstatement of the law and constituted misconduct.

The jury was instructed: "Aggravating circumstances are those which increase the guilt or enormity of the offense or add to its injurious consequences which is above and beyond the elements of the crime itself." Kleypas' argument is that the attempted rape is not above and beyond the elements of the crime itself, as attempted rape is an element of the crime of capital murder. See K.S.A. 21-3439(a)(4). Therefore, according to Kleypas, it was improper for the prosecutor to argue that the rape could satisfy the aggravating circumstance.

Kleypas' argument is devoid of merit. A review of the prosecutor's statements regarding the rape reveals that the prosecutor was not arguing that the fact of the rape itself fulfilled the aggravating circumstance but, rather, was arguing that the violent and brutal manner in which the rape was committed helped to make the killing heinous, atrocious, and cruel by causing serious physical abuse and mental anguish. Thus, the argument was not improper.

## K. Cumulative Prosecutorial Misconduct

Kleypas' final arguments regarding prosecutorial misconduct are that the cumulative misconduct on the part of the prosecutor warrants reversal of the death sentence and that the misconduct was so grievous that he should not again be subject to the death penalty. We consider his first argument, but reject his second argument. Nothing in the record suggests misconduct so grievous as to support a conclusion that Kleypas should not again be subject to the death penalty.

Because we are reversing the defendant's sentence due to other errors and remanding for a new sentencing hearing, we need not determine whether the cumulative prosecutorial misconduct would be so great as to also require reversal. However, we note that the instances of prosecutorial misconduct were numerous: The prosecutor made an improper and false insinuation that Kleypas would have access to alcohol in prison and, thus, have a trigger for his paraphilia. The prosecutor improperly cross-examined a de-

fense expert in an attempt to inflame the passions of the jury. The prosecutor violated a motion in limine and improperly tried to insinuate to the jury that prison would be an easy life for the defendant. The prosecutor improperly misstated the law to the jury by implying that mitigating circumstances must excuse or justify the crime to be valid. The prosecutor also improperly urged the jury to disregard mitigating circumstances because they were not causally related to the crime, contrary to Kansas law. The prosecutor then improperly expressed his belief that Kleypas' experts were not believable and mischaracterized their testimony in a manner which made it seem that the experts were attempting to hide evidence from the jury. Finally, the prosecutor made up an imaginary script which purported to tell the jury what the victim was feeling as the crime occurred even though there was no evidence as to the victim's thoughts. Instead, the script was mere speculation on the part of the prosecutor, calculated to inflame the sympathy and passions of the jury.

Many of the instances of prosecutorial misconduct appear to stem from a misunderstanding of the law regarding the imposition of the death penalty and cannot be characterized as intentional. Others, however, would be improper in any proceeding and can only be explained by the pressure put on the prosecutor to secure the death penalty in a high profile case.

As pointed out in our discussion of our standard of review, it is difficult to judge the impact and consequences of the prosecutor's improper arguments in this case. It must be noted that the comments were just that, comments, rather than jury instructions or rulings made by the court. The jury was instructed that such arguments were not evidence. This does not mean, however, that they did not have any effect. While none of the instances of prosecutorial misconduct, taken in isolation, may have been so prejudicial to Kleypas so as to require us to reverse his sentence, the net cumulative effect of the prosecutorial misconduct might very well have provided an additional basis for reversal.

Conclusion

Kleypas' convictions for capital murder, attempted rape, and aggravated burglary are affirmed. His sentences for aggravated bur-

glary and attempted rape are vacated and remanded for resentencing. His sentence of death for capital murder is vacated, and the matter is remanded with instructions to hold a new capital sentencing hearing.

DAVIS, J., dissenting: I join the majority opinion in all respects except on the issue of equipoise. I respectfully dissent from the majority's conclusion that the weighing equation within the Kansas death penalty statute, K.S.A. 21-4624(e), violates the Eighth Amendment to the United States Constitution because it mandates death where mitigating circumstances and aggravating circumstances are found to be equal (equipoise). The express provisions of K.S.A. 21-4624(e) mandate the imposition of a death sentence where "the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist." Yet, the majority changes the express language of the legislature to say that death may be mandated only where *aggravating circumstances outweigh any mitigating circumstances found to exist.*

The majority reverses the weighing equation adopted by the legislature in K.S.A. 21-4624(e) with the idea that the intent of the legislature is to be carried out in a constitutional manner. There is no question, based on the express language of the legislature, that it intended to mandate the imposition of a death sentence where the existence of such aggravating circumstances is not outweighed by any mitigating circumstances found to exist. The precise question was brought to the attention of the legislature in testimony by the attorney general, who recommended that the statute provide for the aggravating circumstances to outweigh the mitigating circumstances before a death sentence may be imposed. The legislature rejected that suggestion of the attorney general and adopted our present statute.

The majority, however, replaces the express language with its own language based upon its conclusion that this new language carries out the intent of the legislature in a constitutional manner. Because the new language mandated by the majority is contrary to the expressed intent and language adopted by the legislature in K.S.A. 21-4624(e), I believe the majority *invades the province of*

*the legislature.* In the face of a clearly expressed legislative intent, the majority not only strikes this clear language as unconstitutional but adopts language exactly the opposite of what the legislature stated. If the language of the statute offends the Constitution, the appropriate judicial solution, in my opinion, is to so hold and let the legislature resolve the matter consistent with the court's opinion.

More importantly, however, I respectfully dissent from the majority's conclusion that the weighing equation contained in K.S.A. 21-4624(e) is unconstitutional. Thus, I would conclude that there is no need to change the weighing equation in that it is constitutional under the Eighth Amendment as expressed by the Kansas Legislature in accordance with *Walton v. Arizona*, 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990).

The majority holds that the weighing equation contained in K.S.A. 21-4624(e) violates the United States and Kansas Constitutions because it mandates a sentence of death when the aggravating and mitigating circumstances are found to be in equipoise. K.S.A. 21-4624(e) states:

"If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced to death; otherwise, the defendant shall be sentenced as provided by law."

The statute provides that the defendant "shall" be sentenced to death where the jury finds that the mitigating circumstances do not outweigh the aggravating circumstances. Theoretically, if the jury were to somehow determine that the aggravating and mitigating circumstances were equally balanced, the defendant would be sentenced to death, as the mitigators would not outweigh the aggravators. The question is whether a weighing equation which has the potential to produce this result is unconstitutional. It is a question of law over which appellate review is unlimited.

As noted in the majority decision, this court has previously rejected the argument that this same weighing equation was unconstitutional in the context of a hard 40 sentencing decision in *State*

*v. Spain*, 269 Kan. 54, 4 P.3d 621 (2000). However, the majority correctly points out that our decision in *Spain* was premised in part on the concept that noncapital cases are of limited precedential value in analyzing capital cases due to the greater scrutiny to which capital cases must be held. See *Spain*, 269 Kan. at 59-60. Thus, the result in *Spain* is not controlling, and the question must instead be analyzed through the specialized lens of the strictures of the United States Constitution with regard to a sentence of death.

The United States Supreme Court has imposed a number of requirements on the capital sentencing process. States must limit and channel the discretion of judges and juries in order to minimize the risk of wholly arbitrary and capricious action. *Gregg v. Georgia*, 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, *reh. denied* 429 U.S. 875 (1976). At the same time, the sentencer must be allowed to retain sufficient discretion to consider the particular circumstances of the crime and the characteristics of the defendant. See *Gregg*, 428 U.S. at 196-98; *Woodson v. North Carolina*, 428 U.S. 280, 304, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976). One way in which this may be accomplished is through a process which requires the sentencer to weigh certain aggravating and mitigating circumstances in order to determine whether a defendant should be sentenced to death. *Proffitt v. Florida*, 428 U.S. 242, 259-60, 49 L. Ed. 2d 913, 96 S. Ct. 2960 (1976) (holding that a scheme which required the sentencer to determine whether mitigating circumstances were sufficient to outweigh aggravating circumstances adequately guided and channeled the sentencer's discretion).

While the Court has imposed numerous requirements on the guiding and channeling of the sentencer's discretion, the actual weighing of aggravating and mitigating circumstances has been left up to the states. In *Zant v. Stephens*, 462 U.S. 862, 890, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983), the Court stated that "the Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances." Similarly, in *Franklin v. Lynaugh*, 487 U.S. 164, 179, 101 L. Ed. 2d 155, 108 S. Ct. 2320 (1988), the Court stated: "[W]e have never held that a specific method for balancing miti-

gating and aggravating factors in a capital sentencing proceeding is constitutionally required."

The Court continued this theme in *Blystone v. Pennsylvania*, 494 U.S. 299, 108 L. Ed. 2d 255, 110 S. Ct. 1078 (1990), and *Boyde v. California*, 494 U.S. 370, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990). In *Blystone*, the question was whether a weighing equation which made the death penalty mandatory where aggravating circumstances outweighed mitigating circumstances was constitutional. The Court ruled that it was, stating: "The requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence." 494 U.S. at 307. The Court noted: "Within the constitutional limits defined by our cases, the States enjoy their traditional latitude to prescribe the method by which those who commit murder shall be punished." 494 U.S. at 309.

In *Boyde*, the question was the same as that in *Blystone*: whether that State's death penalty scheme, which required death when aggravating circumstances outweighed mitigating circumstances and required life when mitigating circumstances outweighed aggravating circumstances, was constitutional. The defendant argued that the jury must have freedom to reject the death penalty even if it found that aggravating circumstances outweighed mitigating circumstances. The Court, however, stated: "[T]here is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.' " 494 U.S. at 377.

In both *Blystone* and *Boyde*, the Court faced a statute which mandated death when the aggravators outweighed the mitigators. This changed, however, with a third death penalty case decided in 1990, *Walton v. Arizona*, 497 U.S. 639. *Walton* involved the constitutionality of the Arizona death penalty scheme. I believe *Walton* is ultimately determinative of the question in this case. In order to place the Court's decision in *Walton* in context, it is necessary to detail the events which led up to the decision.

The Arizona statute at issue in *Walton* provided that the sentencing judge "shall" impose the death penalty if one or more ag-

gravating circumstances is found and the "mitigating circumstances are held insufficient to call for leniency." The majority places great emphasis upon the difference between the language of the Arizona statute and the Kansas statute. K.S.A. 21-4624(e) provides that death is mandated where aggravating circumstances are not outweighed by mitigating circumstances. What the majority fails to note is that the Arizona Supreme Court interpreted (and still interprets) the weighing equation to mean the same as that stated by the Kansas statue: The death penalty shall be imposed where the aggravating circumstances are not outweighed by the mitigating circumstances. See *State v. Ysea*, 191 Ariz. 372, 375, 956 P.2d 499 (1998) ("If the judge finds one or more of the aggravating factors listed in § 13-703[F], the defendant is death eligible, and if the aggravating factors are not outweighed by mitigating factors listed in § 13-703[G], the resulting sentence is death."); *State v. Gretzler*, 135 Ariz. 42, 53-55, 659 P.2d 1 (1983); see also *Walton*, 497 U.S. at 687 (Blackmun, J., dissenting) ("The Arizona Supreme Court repeatedly has indicated that a defendant's mitigating evidence will be deemed 'sufficiently substantial to call for leniency' only if the mitigating factors 'outweigh' those in aggravation.").

The issues in *Walton* developed as the result of a controversy over whether this formulation of the weighing equation violated the United States Constitution. In *State v. Walton*, 159 Ariz. 571, 584, 769 P.2d 1017 (1989), the defendant challenged the Arizona statutory scheme as unconstitutional, arguing, *inter alia*, that "it impermissibly places the burden of proof of mitigation on the defendant" and "it does not require proof beyond a reasonable doubt that the aggravating factors outweigh the mitigating ones." The Arizona Supreme Court summarily rejected these arguments. 159 Ariz. at 584-85. However, less than 2 months earlier, the Ninth Circuit Court of Appeals had been more receptive to an attack on the Arizona statutory scheme. See *Adamson v. Ricketts*, 865 F.2d 1011, 1043 (1988). In *Adamson*, the court held the Arizona death penalty scheme unconstitutional:

"While the statute does require balancing, it nonetheless deprives the sentencer of the discretion mandated by the Constitution's individualized sentencing requirement. This is because in situations where the mitigating and aggravating

circumstances are in balance, or, where the mitigating circumstances give the court reservation but still fall below the weight of the aggravating circumstances, the statute bars the court from imposing a sentence less than death. Thus, the presumption can preclude individualized sentencing as it can operate to mandate a death sentence, and we note that '[p]resumptions in the context of criminal proceedings have traditionally been viewed as constitutionally suspect.' [Citation omitted]." 865 F.2d at 1043-44.

The above holding is strikingly similar to the majority opinion in this case. *Adamson* and *Walton* created a split, with the Ninth Circuit holding the Arizona death penalty scheme unconstitutional while the Arizona Supreme Court found it to be constitutional. The United States Supreme Court granted *certiorari* in *Walton* in order to resolve the conflict between *Walton* and *Adamson*. See *Walton*, 497 U.S. at 647.

There are two parts of the *Walton* decision which are important to the resolution of this issue in this case: Parts III and IV. In Part III, the Court addressed Walton's contention that the Arizona statute violated the Eighth Amendment because it imposed a burden on defendants to establish mitigating circumstances sufficiently substantial to call for leniency. The Court quickly dispensed with this argument, stating:

"So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." 497 U.S. at 650.

While instructive, Part III, standing alone, is not determinative of our issue, as it is more concerned with the burden of proving mitigating circumstances rather than the weighing of mitigating and aggravating circumstances.

However, in Part IV, the *Walton* Court addressed the equipoise question raised by *Adamson*. The Court framed the issue as follows: "Walton insists that because [Arizona's statute] provides that the court 'shall' impose the death penalty if one or more aggravating circumstances are found and mitigating circumstances are held insufficient to call for leniency, the statute creates an unconstitutional presumption that death is the proper sentence." 497 U.S. at

651. This is the equipoise argument, *viz.*, that a statute requiring the imposition of a death sentence is unconstitutional where the mitigating circumstances do not outweigh or are equal to the aggravating circumstances. The Court rejected this argument, stating: "Our recent decisions in [*Blystone*] and [*Boyde*] foreclose this submission" and noting again that "States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" 497 U.S. at 651-52.

Thus, the Court in *Walton* found that it was not unconstitutional for a statute to mandate death where aggravating circumstances are found and mitigating circumstances are insufficient to call for leniency, that is, under Arizona's interpretation, where the aggravating circumstances are not outweighed by the mitigating circumstances. That this was the holding of the majority in *Walton* is clearly demonstrated by the dissent in *Walton*. Justice Blackmun, joined by Justices Brennan, Marshall, and Stevens, dissented, arguing:

"If the mitigating and aggravating circumstances are in equipoise, the [Arizona] statute requires that the trial judge impose capital punishment. The assertion that a sentence of death may be imposed in such a case runs directly counter to the Eighth Amendment requirement that a capital sentence must rest upon a 'determination that death is the appropriate punishment in a specific case.' [Citation omitted.]" 497 U.S. at 687.

In my opinion, the Court's decision in *Walton* settles the question of equipoise of aggravating and mitigating circumstances under the United States Constitution. Contrary to the majority, *Walton* makes it clear that as long as the statute does not preclude the sentencer from considering relevant mitigating evidence, the specific method of balancing the aggravating and mitigating circumstances is left up to the States. See 497 U.S. at 650-52.

The Ninth Circuit Court of Appeals has recognized that *Walton* overruled its *Adamson* decision regarding the constitutionality of the Arizona statute. See *Adamson v. Lewis*, 955 F.2d 614, 619 (9th Cir. 1992). The Supreme Court of Illinois, in a case handed down immediately prior to *Walton*, presaged the *Walton* reasoning in rejecting the *Adamson* holding and the argument that its statute

was unconstitutional because it mandated death unless the mitigating circumstances outweighed the aggravating circumstances. *People v. Thomas*, 137 Ill.2d 500, 561 N.E.2d 57 (1990). The Illinois court found: "The United States Supreme Court has apparently put this argument to rest in [*Blystone*, 494 U.S. 299]." 137 Ill. 2d at 542. Later, the Idaho Supreme Court, citing *Walton*, found that its statute which required a defendant to provide mitigating circumstances which outweighed aggravating circumstances in order to avoid death, was constitutional. *State v. Hoffman*, 123 Idaho 638, 646-47, 851 P.2d 934 (1993).

The majority opinion on this issue echos the arguments made by Kleypas and his reliance upon the cases of *State v. Biegenwald*, 106 N.J. 13, 524 A.2d 130 (1987); *People v. Young*, 814 P.2d 834 (Colo. 1991); and *Hulsey v. Sargent*, 868 F. Supp. 1090 (E.D. Ark. 1993). None of these cases, in my opinion, are particularly persuasive.

*Biegenwald* was decided in 1987, and is thus pre-*Walton*. The language of the New Jersey statute examined in *Biegenwald* required the jury to sentence the defendant to death if it found an aggravating factor that was not outweighed by any one or more mitigating factors. The court found that "fundamental fairness" required that the defendant get the benefit of the doubt where "the explanations for his misconduct (the mitigating factors) were equally as significant as the culpable aspects of that misconduct (the aggravating factors)." 106 N.J. at 62. However, the *Biegenwald* court did not key this "fundamental fairness" to the United States Constitution but rather to "New Jersey's traditional concern for the rights of defendants charged with capital offenses" and its conviction that the legislature actually meant to enact legislation that requires the aggravating factors to outweigh the mitigating factors. See 106 N.J. at 58-67. The *Biegenwald* Court then proceeded to rewrite the New Jersey statute to say exactly the opposite of what the language said. However, unlike the majority opinion in this case, the New Jersey Supreme Court based its decision on significant legislative history which indicated that the legislature might have been confused at to what weighing equation it actually intended to use. *Biegenwald*, based on New Jersey's notion of fun-

damental fairness and a tortured statutory interpretation, provides little, if any, authority for a conclusion that a weighing equation which requires mitigators to outweigh aggravators violates the United States Constitution.

The only two post-*Walton* cases providing some support for the majority are *Hulsey* and *Young*. Both cases address the precise question raised and conclude that the weighing equation mandating death where mitigating circumstances do not outweigh aggravating circumstances is unconstitutional.

*Hulsey* was a federal district court case decided by the Eastern District of Arkansas. In *Hulsey*, the petitioner sought habeas corpus relief from the former Arkansas death penalty statute which had been amended at the time of trial. The court found that the Arkansas death penalty statute was unconstitutional because it mandated death if mitigating circumstances did not outweigh aggravating circumstances. 868 F. Supp. at 1103. The court was concerned the following situation would violate due process:

"If a jury found the mitigating and aggravating circumstances in equipoise, neither one more probative than the other, or, could not fairly come to a conclusion about what balance existed between them, they would be obliged to impose the death sentence since the mitigating circumstances would not be found to outweigh the aggravating." 868 F. Supp. at 1101.

Remarkably, the court in *Hulsey* did not attempt to distinguish or even mention *Walton*, which, as noted above, addressed this precise issue in Part IV of the opinion. Instead, *Hulsey* relied on the reasoning in *Adamson*, the case *Walton* abrogated in reaching its decision. The *Hulsey* court stated:

"Following the logic of the Ninth Circuit, the death presumption and burden shifting claims may be collapsed into one inquiry: whether the weighing equation as drawn 'offends federal due process by effectively mandating death.' The Court concludes that under the Arkansas statute under which petitioner was sentenced, it does." 868 F. Supp. at 1103.

It is highly questionable, in my opinion, whether *Hulsey*, with its reliance on *Adamson*, would have survived appellate review. However, the State's appeal in *Hulsey* was dismissed by the Eighth Circuit Court of Appeals because the State had failed to timely file

its notice of appeal. See *Hulsey v. Sargent*, 15 F.3d 115, 118-19 (8th Cir. 1994).

In *Young*, the Colorado Supreme Court interpreted the Colorado death penalty statute enacted in 1988. Under pre-1988 law, the Colorado statute required that the jury find that the aggravating factors were not outweighed by the mitigating factors and then further decide that death was the appropriate penalty in order to impose a death sentence. The 1988 law eliminated this last step and mandated a death sentence where the aggravating factors were not outweighed by the mitigating factors. The *Young* court, in declaring the death penalty statute unconstitutional, was very concerned with the elimination of the final step, stating:

> "The result of a decision that the relevant considerations for and against imposition of the death penalty in a particular case are in equipoise is that the jury cannot determine with reliability and certainty that the death sentence is appropriate under the standards applied by the legislature. A statute that requires a death penalty to be imposed in such circumstances without the necessity for further deliberations, as does section 16-11-103(2)(b)(III), is fundamentally at odds with the requirement that the procedure produce a certain and reliable conclusion that the death penalty should be imposed. . . . A death sentence imposed in such circumstances violates requirements of certainty and reliability and is arbitrary and capricious in contravention of basic constitutional principles. [Citations omitted.]" 814 P.2d at 845.

The *Young* court distinguished *Walton*, contending that *Walton* did not consider the question of whether a death sentence could be imposed when aggravators and mitigators are in equipoise. 814 P.2d at 845 n.9. The court stated: "We do not believe that the United States Supreme Court cases can fairly be read to contain any suggestion that the death penalty can be imposed when the sentencer finds aggravating and mitigating considerations to be equally balanced." 814 P.2d at 846. However, as noted above, *Walton* approved the Arizona statute which mandated the death penalty where the mitigating circumstances did not outweigh the aggravating circumstances. See 497 U.S. at 650-52.

The *Young* court misinterpreted Arizona's sentencing scheme. In reviewing United States Supreme Court decisions, the *Young* court stated: "The sentencer must also determine whether those mitigating factors are outweighed by the aggravating factors,

*Boyde*, 110 S. Ct. at 1196; *Blystone*, 110 S. Ct. at 1083, or, stated alternatively, are sufficient to call for leniency, *Walton*, 110 S. Ct. at 3056." 814 P.2d at 846. Thus, the *Young* court lumped the Arizona statute at issue in *Walton* with the statutes in *Boyde* and *Blystone* as requiring the aggravating circumstances to outweigh the mitigating circumstances to impose death. A correct interpretation of the Arizona statute in *Walton* demonstrates that Arizona law required the mitigating circumstances to outweigh the aggravating circumstances in order to reject a death sentence. Had the *Young* court correctly interpreted the *Arizona* statute, *viz*, the way it was interpreted in *Walton*, it would have had a difficult time distinguishing *Walton* from the Colorado statute.

In any event, the *Young* court did not ultimately decide to base its decision on the United States Constitution. Rather, the court decided that if it was wrong in its understanding of federal precedent, it would hold that the Colorado sentencing scheme violated the Colorado Constitution and it, therefore, invalidated the scheme on state constitutional grounds. 814 P.2d at 845-46.

It should be noted that the Colorado Legislature in reaction to the *Young* decision, passed a new death penalty statute which still authorizes the death penalty where aggravating circumstances are not outweighed by mitigating circumstances, although it does not mandate it. Under the Colorado scheme, after a finding that the aggravating circumstances are not outweighed by mitigating circumstances, a panel of judges then determines whether the death penalty is the appropriate punishment for that particular case. Colo. Rev. Stat. § 16-11-103. The Colorado Supreme Court has determined that this procedure satisfies the problem it identified in *Young*. See *State v. Dunlap*, 975 P.2d 723, 736 (1999). Thus, it appears that the Colorado Supreme Court's objection to the statute at issue in *Young* was not that it authorized death where the aggravating circumstances are not outweighed by the mitigating circumstances but, instead, that it mandated death in that situation.

Since *Walton*, there has been only one case, *Hulsey*, which held that a statutory scheme providing for a sentence of death where mitigating circumstances do not outweigh aggravating circumstances was barred by the United States Constitution and its value

is highly questionable. The language in the *Young* decision provides some support for the majority decision in this case, but the ultimate decision was based not on the United States Constitution but, rather, on the Colorado Constitution. Meanwhile, Arizona, Idaho, and Illinois have reached the opposite conclusion.

Since *Walton*, the United States Supreme Court has reaffirmed its earlier statements regarding the abilities of the states to enact their own weighing schemes. In *Harris v. Alabama*, 513 U.S. 504, 130 L. Ed. 2d 1004, 115 S. Ct. 1031 (1995), the Court faced the question of whether Alabama's death penalty statute was unconstitutional because it failed to give the trial judge any standards for accepting or rejecting the jury's advisory verdict of life or death. The Court found no violation, reemphasizing: "We have rejected the notion that 'a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.'" 513 U.S. at 512. The Court also stated:

"What purpose is served by capital punishment and how a State should implement its capital punishment scheme—to the extent that those questions involve only policy issues—are matters over which we, as judges, have no jurisdiction. Our power of judicial review legitimately extends only to determine whether the policy choices of the community, expressed through its legislative enactments, comport with the Constitution." 513 U.S. at 510.

Similarly, in *Buchanan v. Angelone*, 522 U.S. 269, 276, 139 L. Ed 2d 702, 118 S. Ct. 757 (1998), the Court found that the Eighth Amendment did not require the sentencing jury to be instructed on particular mitigators or how to apply them, stating:

"In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. [Citations omitted.] *However, the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence.* [Citations omitted.] *Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence.*

*"But we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence."* (Emphasis added.)

The United States Supreme Court opinions on the subject make it clear that as long as a State's scheme allows the sentencer to give effect to mitigating evidence, the Eighth Amendment is satisfied. In *Walton*, the Court upheld a statute substantially similar to K.S.A. 21-4624 as constitutional, despite the fact that it mandated death where the mitigating circumstances did not outweigh the aggravating circumstances. Arizona has followed *Walton* and continues to apply its statute. Illinois and Idaho have relied on *Walton* and *Boyde* to hold their statutes constitutional, notwithstanding that they also contain a Kansas-type of weighing equation which requires that aggravators are not outweighed by mitigators. The only post-*Walton* case which has affirmatively held that a statute violates the United States Constitution in mandating death where the mitigating circumstances do not outweigh the aggravating circumstances, *Hulsey*, is unpersuasive in that it does not mention *Walton* and instead relies on *Adamson*, which *Walton* abrogated. In *Young*, the Colorado Supreme Court decided the matter based on the Colorado Constitution rather than the federal one and misinterpreted the Arizona sentencing scheme in reaching that result.

For all the above reasons, I would hold that *Walton* is dispositive of the issues raised here and that the weighing equation contained in K.S.A. 21-4624(e) does not violate the United States Constitution.

Kleypas also contends that the weighing equation should be held unconstitutional under the Kansas Constitution. Based upon the majority decision, there was no need to address this argument. Based upon my dissent, there would be a need to address Kleypas' claim. However, in doing so, I note that "[t]his court has never extended greater protection to our citizens beyond the federal guarantees." *State v. Spain*, 269 Kan. 54, 59, 4 P.3d 621 (2000). As a result, I conclude that the weighing equation contained in K.S.A. 21-4624(e) does not violate the Kansas Constitution.

MCFARLAND, C.J., joins in the foregoing dissent.

ABBOTT, J., dissenting: I concur with Justice Davis' dissent. I have no quarrel with anything in Justice Davis' dissent, which I

consider to be excellent. I would merely add the following thoughts.

The American Law Institute Model Penal Code § 210.6(2) (1985) (adopting 1962 official draft) requires mitigating circumstances to outweigh aggravating circumstances. The Model Penal Code provides for a hearing either before a jury or before a judge, and the language indicates that if the sentencer finds one of the aggravating circumstances it still may not impose the death penalty unless it "further finds there are no mitigating circumstances sufficiently substantial to call for leniency." To me, this obviously requires the defendant to come forth with evidence of mitigating circumstances sufficiently substantial to call for leniency. It simply requires mitigating circumstances to outweigh the aggravating circumstances to prevent the death penalty from being imposed.

Justice Davis has thoroughly discussed the cases set forth below. I would rely on them.

In *Walton v. Arizona*, 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990), the Court stated:

"So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." 497 U.S. at 650.

Kleypas attempts to distinguish *Walton* on the basis that the Arizona statute does not mandate a death sentence if the sentencing court finds the aggravators and mitigators in equal balance. The Ninth Circuit Court of Appeals disagreed in *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir. 1988) (en banc) noting that "under the Arizona statute, the death sentence will be imposed unless mitigating circumstances *outweigh* the aggravating circumstances," and "in situations where the mitigating and aggravating circumstances are in balance . . . the statute bars the court from imposing a sentence less than death." 865 F.2d at 1042 n.50, 1043.

In *People v. Bean*, 137 Ill. 2d 65, 560 N.E.2d 258 (1990), *cert. denied* 499 U.S. 932 (1991), the court concluded:

"The defendant does not alone have a burden of persuasion at this balancing stage, for the State is the movant, the party seeking the death penalty, and so bears the

primary burden of persuading the jury that, as the statute states, there are no mitigating factors sufficient to preclude the sentencer from imposing the sentence of death for which the defendant is eligible. [Citation omitted.]" 137 Ill. 2d at 139.

Further,

"because this is a process of balancing intangibles, not of proving facts, it is improper to speak of defendants as having a 'burden.' After the State as movant has attempted to persuade the jury the death sentence should be imposed, a defendant may attempt to dissuade the jury from doing so. Whether defendant attempts to dissuade the jury, whether he decides to take up this burden, is up to him; the law does not require him to take it up." 137 Ill. 2d at 140.

In *State v. Spain*, 263 Kan. 708, 725, 953 P.2d 1004 (1998), Spain was convicted and received a hard 40 sentence. His sentence was vacated and remanded. On remand, the trial court found one aggravating and one mitigating circumstance, and found them to be of equal weight. The trial court interpreted K.S.A. 1999 Supp. 21-4635(c) to require a hard 40 sentence when aggravators and mitigators were in equipoise. Spain was sentenced to a term of 40 years without parole. See *State v. Spain*, 269 Kan. 54, 58, 4 P.3d 621 (2000).

On appeal, Spain argued that 21-4635(c) violated state and federal constitutional prohibitions against cruel and unusual punishment. He relied on death penalty cases, including *Hulsey v. Sargent*, 868 F. Supp. 1090 (E.D. Ark. 1993); *People v. Young*, 814 P.2d 834 (Colo. 1991); and *State v. Biegenwald*, 106 N.J. 13, 524 A.2d 130 (1987), to support his argument. The State, as it did here, relied on *Walton*.

This court pointed out that the court in *Young* interpreted the Colorado Constitution to provide broader protection under its cruel and unusual punishment clause than that offered by the Eighth Amendment to the United States Constitution. For that reason, this court noted, *Young* distinguished *Walton*. 269 Kan. at 59. In discussing *Walton*, this court stated:

"In *Walton*, five justices agreed the Arizona death penalty statute did not create an unconstitutional presumption in favor of the death penalty. The statute at issue in *Walton* required imposition of the sentence of death if any aggravating circumstances were established and there were " 'no mitigating circumstances sufficiently substantial' " to warrant leniency. [Citations omitted.] Although the language cho-

sen by the Arizona Legislature does not include the terms 'weigh' or 'outweigh,' what the statute prescribes is a weighing process that results in imposition of the death penalty if the mitigating circumstances are not of sufficient weight to tip the balance toward leniency.

"As previously noted, the Colorado Supreme Court interpreted its own constitutional provisions to grant greater protection than the comparable United States constitutional provision. Thus, *Walton* was not controlling. *In contrast, this court has never extended greater protection to our citizens beyond the federal guarantees.* [Citation omitted.]" (Emphasis added.) 269 Kan. at 59.

This court reaffirmed that death penalty cases are not controlling in hard 40 cases. 269 Kan. at 59. That said, this court quoted the following key passage from *Walton*:

" 'So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.' " 269 Kan. at 60 (citing *Walton*, 497 U.S. at 650).

As the Fourth Circuit Court of Appeals stated, in summarizing the relevant Supreme Court philosophy:

"The procedure involved in imposing the death penalty need not be structured to favor a defendant but need only avoid creating a fundamentally unfair trial. See *Barclay v. Florida*, 463 U.S. 939, 103 S. Ct. 3418, 77 L. Ed. 2d 1134 (1983). The best of all procedural worlds is not guaranteed by the United States Constitution. *McGautha v. California*, 402 U.S. 183, 91 S. Ct. 1454, 28 L. Ed. 2d 711 (1971). In *Zant v. Stephens*, 462 U.S. 862, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983), the Supreme Court emphasized that in designing a constitutional capital punishment system, all that the state is required to provide is a meaningful basis for distinguishing between those trials resulting in a penalty of death and those in which a penalty of life imprisonment is imposed. Under *Zant*, this is accomplished by simply identifying aggravating circumstances and requiring that one or more of them be found." *Rook v. Rice*, 783 F.2d 401, 406 (4th Cir. 1986).

*Walton* echoes this basic philosophy and is the seminal case in this area. While the wording of the Arizona statute in *Walton* is not identical to that of the Kansas statute, the operation is the same. The United States Supreme Court's analysis bears repeating:

"So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional

rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Walton*, 497 U.S. at 650.

With this simple framing of the issue, it is clear that Kansas' statute passes constitutional muster. K.S.A. 21-4624(e) requires the State to prove one or more of the aggravating circumstances beyond a reasonable doubt. There is no burden on the defendant to prove mitigating circumstances; the jury may consider anything it considers a mitigating circumstance regardless of whether it has been "proven" or not. K.S.A. 21-4624(f) requires the court to review a death sentence imposed by a jury to ensure it is supported by the evidence. The fact that a death sentence results where aggravators and mitigators are found to be in equipoise does not lessen the State's burden to prove the existence of aggravating circumstances.

Kleypas fails to explain how the Kansas scheme precludes the sentencer from considering any mitigating evidence, much less how the Kansas scheme forces the jury to disregard such evidence. Clearly the Kansas scheme allows, under K.S.A. 21-4624(e), consideration of *any* mitigating circumstances found to exist.

Justice Scalia's pointed concurring opinion in *Walton* concluded that guided discretion and individualized sentencing as set forth in the cases cannot be reconciled. The majority's treatment of the Arizona weighing equation, however, suggests that in an attempt to harmonize the two objectives, the Court has fashioned a safety valve of sorts. In effect, while holding in *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978), that the *substance* of mitigating evidence cannot be restricted beyond a determination of its relevance, the Court in subsequent cases stops short of an "anything goes" approach to the defendant's presentation of mitigating evidence by allowing the states to fashion the *procedure* or *method* by which mitigating evidence is considered. This is evident in *Zant v. Stephens*, 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983), and *Franklin v. Lynaugh*, 487 U.S. 164, 101 L. Ed. 2d 155, 108 S. Ct. 2320 (1988), where the Court refused to require a weighing equation, and in *Blystone v. Pennsylvania*, 494 U.S. 299, 108 L. Ed. 2d 255, 110 S. Ct. 1078 (1990), and *Boyde v. California*,

494 U.S. 370, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990), where the Court in summary fashion approved two states' formulations of a weighing equation. *Walton* is an extension of *Blystone* and *Boyde* in that the Court once again faced the task of evaluating a particular type of weighing equation, and it refused to delve into the mechanics of the equation, focusing instead on the more basic requirements of whether the sentencer was allowed to consider all relevant mitigating evidence.

The Court's development of Eighth Amendment jurisprudence on this issue suggests that the precise nature of any state's weighing equation is not at issue. The weighing equation is part of the procedural makeup of the death penalty decision, and as long as it operates within a scheme which allows full consideration of relevant mitigating evidence, it is left to the broad discretion of the individual states.

In *Walton*, the Supreme Court did more than simply approve the particular wording of the Arizona weighing equation. It confirmed what its earlier decisions suggested—that the Eighth Amendment would be applied to the substance of the death penalty decision to ensure guided discretion and individualized consideration, but that procedural aspects, the weighing equation among them, would be left to the will of state legislatures. See *Tuilaepa v. California*, 512 U.S. 967, 980, 129 L. Ed. 2d 750, 114 S. Ct. 2630 (1994) (reiterating that the States are not constrained to "adopt a kind of mandatory sentencing scheme requiring a jury to sentence a defendant to death if it found, for example, a certain kind or number of facts, or found more statutory aggravating factors than statutory mitigating factors"); *Buchanan v. Angelone*, 522 U.S. 269, 276, 139 L. Ed. 2d 702, 118 S. Ct. 757 (1998) ("Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to any relevant mitigating evidence. . . . But we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence."); *Campbell v. Blodgett*, 978 F.2d 1502, 1512-13 (9th Cir. 1992).

The substance-procedure dichotomy thus renders unimportant the distinction, as raised by Kleypas, between the approved Arizona weighing equation and the Kansas weighing equation.

The balance of Kleypas' arguments can be characterized as general complaints about the inherent unfairness of allowing a "tie," or aggravators and mitigators found to be in equal balance, to result in a sentence of death. Kleypas couches this "tie goes to the State" argument in terms of a presumption of death and a burden on him to prove that his life should be spared. The visceral appeal of this argument is simply not supported by the Eighth Amendment.

Much of this appeal likely stems from thinking of the sentencing decision in terms of the State's burden during the guilt phase of a trial. It is clear, however, that the guilt phase and sentencing phase are distinct and subject to different rules. In *California v. Ramos*, 463 U.S. 992, 77 L. Ed. 2d 1171, 103 S. Ct. 3446 (1983), the United States Supreme Court rejected an analogy between the two phases, noting

"the fundamental difference between the nature of the guilt/innocence determination . . . and the nature of the life/death choice at the penalty phase. . . . In returning a conviction, the jury must satisfy itself that the necessary elements of the particular crime have been proved beyond a reasonable doubt. In fixing a penalty, however, there is no similar 'central issue' from which the jury's attention may be diverted. Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, as did respondent's jury in determining the truth of the alleged special circumstance, the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." 463 U.S. at 1007-08.

If the Kansas death penalty scheme meets the Eighth Amendment requirements of guided discretion and individualized sentencing, the details of the weighing equation should not operate to defeat the balance of the death penalty law under the federal Constitution. That the Kansas weighing equation may or may not differ from that of Arizona is of little consequence; it is a matter of procedure left to the discretion of the States.